# EXHIBIT A

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

MALIBU MEDIA, LLC,      *

      Plaintiff,      *      **CASE NO.**

v.      *

JOHN DOE subscriber assigned IP address    *
173.64.119.92,

      *

      Defendant.      *

      *

## DECLARATION OF TOBIAS FIESER IN SUPPORT OF PLAINTIFF'S MOTION FOR LEAVE TO TAKE DISCOVERY PRIOR TO A RULE 26(f) CONFERENCE

### I, TOBIAS FIESER, HEREBY DECLARE:

1. My name is Tobias Fieser.

2. I am over the age of 18 and am otherwise competent to make this declaration.

3. This declaration is based on my personal knowledge and, if called upon to do so, I will testify that the facts stated herein are true and accurate.

4. I am employed by IPP International UG ("IPP"), a company organized and existing under the laws of Germany, in its litigation support department.

5. Among other things, IPP is in the business of providing forensic investigation services to copyright owners.

6. As part of my duties for IPP, I routinely monitor the BitTorrent file distribution network for the presence of copyrighted works, and I identify the Internet Protocol ("IP") addresses that are being used by infringers to distribute these copyrighted works.

7.     Plaintiff retained IPP to monitor the BitTorrent file distribution network in order to identify IP addresses that are being used by to distribute Plaintiff's copyrighted works without authorization.

8.     IPP tasked me with effectuating, analyzing, reviewing and attesting to the results of this investigation.

9.     During the performance of my duties, I used forensic software named INTERNATIONAL IPTRACKER v 1.5 and related technology enabling the scanning of the BitTorrent file distribution network for the presence of infringing transactions involving Plaintiff's movies.

10.     INTERNATIONAL IPTRACKER v 1.5 was correctly installed and initiated on a server.

11.     I personally extracted the resulting data emanating from the investigation.

12.     After reviewing the evidence logs, I isolated the transactions and the IP addresses being used on the BitTorrent file distribution network to distribute Plaintiff's copyrighted works.

13.     Computer(s) using the IP address identified on Exhibit A to the Complaint[1] ("Exhibit A") connected to IPP's investigative server in order to transmit a full copy, or a portion thereof, of each digital media file as identified by the hash values as set forth on Exhibit A to the Complaint.   At no point did IPP distribute any of Plaintiff's copyrighted works. INTERNATIONAL IPTRACKER v 1.5 is designed in such a way so that it is incapable of distributing any content.

14.     The IP address, hash values and hit dates contained on Exhibit A correctly reflect what is contained in the evidence logs.

---

[1] For the avoidance of doubt, each Exhibit referenced herein refers to the corresponding Complaint Exhibit.

MD166

2
EXHIBIT D

15. Our software analyzed each bit downloaded from the IP address identified on Exhibit A. Our software further verified that each of these bits was a portion of the file hash as listed on Exhibit A. Each file hash listed on Exhibit A was verified to be a digital media file containing a motion picture as enumerated in Exhibit A. Our software downloaded one or more bits of each file hash listed on Exhibit A from the IP address referenced on Exhibit A.

16. IPP was provided with a control copy of each copyrighted work identified on Exhibit A (the "Movie"). IPP reviews each Movie side-by-side with the corresponding digital media files identified by their file hash values as set forth on Exhibit A. IPP verifies that each digital media file contained a motion picture that was identical, strikingly similar or substantially similar to the Movie associated with it, as identified by its file hash, on Exhibit A.

17. IPP's software also logged Defendant's IP address being used to distribute third party files through BitTorrent. This evidence is referred to as the Additional Evidence in the Complaint. The Additional Evidence indicates that a person using Defendant's IP address engaged in BitTorrent transactions associated with 381 files between 07/02/2013 and 01/07/2014.

**FURTHER DECLARANT SAYETH NAUGHT.**

**DECLARATION**

**PURSUANT TO 28 U.S.C. § 1746,** I hereby declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on this _13th_ day of _January_____, 201_4_.

**TOBIAS FIESER**

By: _____

3
EXHIBIT D

# EXHIBIT B

<span style="color:red">**Exhibit E**</span>

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS

MALIBU MEDIA, LLC,           )
                                    )
        Plaintiff,           )     Civil Action Case No. 1:13-cv-06312
                                      )
v.                                 )
                                    )
JOHN DOE subscriber assigned IP address  )
24.14.81.195,                          )
                                    )
        Defendant.        )
_____ )

## PLAINTIFF'S RESPONSES TO DEFENDANT'S
## FIRST SET OF INTERROGATORIES

Plaintiff, MALIBU MEDIA, LLC, responds to Defendant's First Set of Interrogatories served November 27, 2013, as follows:

## STATEMENT OF WILLINGNESS TO COOPERATE

Counsel for Plaintiff is prepared to discuss with counsel for Defendant the objections set forth below for the purpose of resolving any disputes that may arise over the responses to the interrogatories without the need for intervention by the Court.

## PLAINTIFF'S RESPONSES TO DEFENDANT'S
## FIRST SET OF INTERROGATORIES

1.     Please identify all persons or business entities that have an interest, financially, or otherwise, in this litigation, including, but not limited to, owners or members of Malibu, Counsel for Malibu, forensic consultants, and/or witnesses, or to whom payment for any settlements are sent to, and specifically and in detail describe the nature of the interest.

**Response to Interrogatory No. 1:** Attorney Mary Schulz has a standard tiered contingency fee agreement. IPP International UG, is a fact witness who will testify that its technology detected that a person using Defendant's IP address was downloading and



distributing Plaintiff's copyrighted works.  ==Pursuant to an oral contingency fee agreement, IPP International UG is entitled to a small portion of the proceeds from the resolution of this case in consideration for the services it provided.==  Plaintiff objects to disclosing the exact percentage on the basis that it is confidential information.  Notwithstanding the foregoing, Plaintiff will provide the exact percentage if the parties enter into a stipulated protective order.  Malibu Media, LLC owns the copyrights, which have not been assigned to anyone.  Malibu Media, LLC is responsible for paying all of the costs and fees associated with the litigation.  Malibu Media, LLC is the only other entity that has a financial interest in the outcome of this litigation.  The parties have not entered into a settlement agreement.  Therefore, it has not been determined where any settlement monies will be sent.  No other entity is entitled to any share of the monies which may be paid from Plaintiff to Defendant.

2.      In the event that any trusts hold an interest as outlined in Interrogatory One, please provide the name of the trustee of said trusts, the jurisdiction of said trusts, and the beneficiaries of such trusts.

**Response to Interrogatory No. 2:** No trust holds any interest in the litigation.

3.      Please list each and every past and pending action brought by Malibu involving the twenty-four hashes as listed in Exhibit A.

**Response to Interrogatory No. 3:** Plaintiff objects on the basis that this interrogatory seeks information that is neither relevant nor likely to lead to the discovery of admissible evidence.  Plaintiff further objects on the basis that this request is unduly burdensome and overly broad.  To explain, Plaintiff does not organize its lawsuits by hash values.  Further, few if any

infringer steal the same set of Plaintiff's copyrighted works. In that sense, ever suit is truly different. Doe defendants infringe Plaintiff's work at such a high volume, that it would be extremely labor intensive and burdensome to review the exhibits to ever Complaint that Palintiff has ever filed to ascertain whether any of the twenty-four hashes at issue in this case were also at issue in that case. Further, Defendant can access all of Plaintiff's past and present cases nationwide on RFC Express [http://www.rfcexpress.com/search.asp] by clicking on the 'Basic Search' tab under 'Search' and typing in 'Malibu Media' on the Party Name field. Pursuant to Fed. R. Civ. P. 33(d), Plaintiff avers that the burden of Defendant to identify the set of cases Defendant seeks to have Plaintiff identify is the same as it would be for Plaintiff to identify the set of cases. Therefore is Plaintiff desires this information, he can use RFC Express to create it.

4.     Please provide the total number of settling alleged infringers and the amount of money settled for in each of the cases of Interrogatory 3 that has been obtained by settlement. Note: Doe understands the confidential nature of settlements entered into, and does not request the identity of those persons who have settled in this action, or any other action involving the so-called "swarms" complained of.

**Response to Interrogatory No. 4:** Plaintiff objects to this interrogatory on the basis that it seeks information that is neither relevant nor likely to lead to the discovery of admissible information. Plaintiff is only suing Defendant for statutory damages. The amount of money that Plaintiff has obtained from third party Defendants via settlements or judgments is not a factor used to set the quantum of statutory damages which should be assessed against Defendant. To explain in greater detail, Malibu Media has elected only to receive statutory damages so any calculation towards actual damages is irrelevant. 17 U.S.C. § 504(c) states that there are

maximum statutory damages per work, per case: "the copyright owner may elect, at any time before final judgment is rendered, to recover, instead of actual damages and profits, an <u>award</u> of statutory damages for all infringements involved <u>in the action</u>, <u>with respect to any one work</u>, for which any one infringer is liable individually, or for which any two or more infringers are liable jointly and severally . . . as the court considers just." *Id.* This "action" has not gone to trial and Plaintiff has not been "award[ed]" any statutory damages. Plaintiff's settlement amount is not relevant because a confidential settlement is not an "award of damages." An "award of damages" is an amount entered in a final judgment after a verdict for the infringement of the work.

Black's Law Dictionary specifically defines award as: "**award**, n. (14c) A final judgment or decision, esp. one by an arbitrator or by a jury assessing damages. — Also termed arbitrament." AWARD, Black's Law Dictionary (9th ed. 2009), award. The District Court of Colorado examined this issue and stated: "[Defendant's] argument that Plaintiff's alleged settlements with other defendants precludes recovery of statutory damages severely misreads the statute. Because Plaintiff has not received any award for actual damages in this action, 17 U.S.C. § 504(c)(1) does not bar Plaintiff from pursuing its claim for statutory damages. Thus, Mr. Batz's First Defense cannot succeed under any circumstance." *Malibu Media, LLC v. Batz*, 12-cv-01953, CM/ECF 120 *5 (D. Colo April 5, 13) (refuting the argument that receiving settlements precludes a recovery of statutory damages). Plaintiff's position is that any settlement proceeds it has received from other actions would not be factored into any consideration for awarding statutory damages in this action and is therefore not relevant.

Plaintiff further objects on the basis that this request is unduly burdensome. Here, Plaintiff has alleged Defendant infringed twenty-nine separate works. In order to determine the



Exhibit B - 4

amount of settlement for each work, in each swarm, throughout the country would be unduly burdensome, particularly when Plaintiff's records do not reflect settlements by swarm. And, each Defendant's universe of infringed works is different.

5.      Please provide the total number of judgments, default, agreed, or otherwise, in each of the cases of Interrogatory 3.

**Response to Interrogatory No. 5:** See Response to Interrogatory No. 4.

6.      Please provide the first date of detected infringement – as detected by Malibu, IPP, Ltd., or any other agent of Malibu's – of any film through utilization of the Hash Values appearing in Exhibit A to the Complaint.

**Response to Interrogatory No. 6:** Plaintiff objects on the basis that this interrogatory seeks information that is neither relevant nor likely to lead to the discovery of admissible evidence. Notwithstanding the foregoing objection and without waiving same, Plaintiff is not in possession, custody, or control of the information deemed responsive to this request. This information is in IPP International UG's possession. In addition, IPP International UG charges a fee for the extractions of information from its servers. Plaintiff is willing to request the information from IPP International UG and produce to Defendant only if Defendant agrees to pay the cost associated with the production. However, Defendant should be aware that Plaintiff registered all of the copyrights to the works at issue in this dispute within 3 months of the first date of publication. Therefore, pursuant to 17 U.S.C. § 504 and 17 U.S.C. § 412, the answer to this interrogatory is irrelevant.

7.  Provide revenue figures for each month of Malibu's existence. Do not include copyright infringement suits in federal courts, trespass to chattels or other suits in state courts, or settlements or verdicts regarding the same, whether had before or after the service of the summons.

**Response to Interrogatory No. 7:** Plaintiff objects on the basis that this interrogatory seeks information that is neither relevant nor likely to lead to the discovery of admissible information. Plaintiff is seeking statutory damages and therefore the amount of revenue for each month of Plaintiff's existence is not relevant to any issue or fact in this case. Plaintiff further objects to this request on the basis that it seeks information that is confidential. Plaintiff additionally objects on the basis that this request is unduly burdensome. Plaintiff objects to this interrogatory on the basis that it is intended to harass Plaintiff. Notwithstanding the foregoing objections, Plaintiff states that it is multimillion dollar business. Further, well over 95% of Plaintiff's revenue is generated from subscription sales.

8.  Provide the total cost of doing business for each month of Malibu's existence. Do not include copyright infringement suits in federal courts, trespass to chattels or other suits in state courts, or settlements or verdicts regarding the same, whether had before or after the service of the summons.

**Response to Interrogatory No. 8:** Plaintiff objects on the basis that this interrogatory seeks information that is neither relevant nor likely to lead to the discovery of admissible information. Indeed, Plaintiff's monthly cost of doing business has nothing to do with copyright enforcement and has no bearing on any relevant fact in this case. Plaintiff further objects to this request on the basis that it seeks information that is confidential business information pursuant to

Fed. R. Civ. P. 26(c). Plaintiff additionally objects on the basis that this request is intended to harass Plaintiff.

9.    Provide a detailed itemization of Malibu's actual damages for Doe's direct infringement (being the only cause of action asserted), regardless of whether or not statutory damages are being sought.

**Response to Interrogatory No. 9:** Plaintiff objects to this interrogatory on the basis that it seeks information that is neither relevant nor likely to lead to the discovery of admissible evidence. Nevertheless, Plaintiff avers it has suffered substantial actual damages from BitTorrent copyright infringement. The basis for determining the quantum of these damages would be a reasonable royalty for the worldwide distribution of Plaintiff's copyrighted works over the internet. Plaintiff would not enter into a license with a third party which authorizes such distribution for less than the statutory maximum award under the Copyright Act. The exact dollar amount that BitTorrent infringement costs Plaintiff in lost sales is uncertain and requires assumptions to be made about the number of infringers who would become subscribers but for the availability of BitTorrent. If Plaintiff had 80,000 new subscribers per month, its revenue would increase by ten figures. Plaintiff has no doubt that BitTorrent infringement costs it several million dollars in lost profits every year.

## DECLARATION

PURSUANT TO 28 U .S.C. § 17 46, I hereby declare under penalty of perjury under the

laws of the United States of America that the foregoing is true and correct.

Executed on this 27th day of December, 2013

**COLETTE PELISSIER FIELD**

By: _Colette Pelissier Field_

# EXHIBIT C

EXHIBIT C

**UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT INDIANA**

| | | |
|---|---|---|
| MALIBU MEDIA, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Case No. 1:12-cv-01117-WTL-DML |
| | ) | |
| v. | ) | |
| | ) | |
| R. STEPHEN HINDS, TROY LAMB, | ) | |
| MICHAEL HARRIS, ROBERT JOHNSON, | ) | |
| MICHAEL HARRISON, JAMES DUNCAN, | ) | |
| HOWARD MCDONALD, and JOHN DOE 10, | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFF'S RESPONSE TO DEFENDANT MICHAEL HARRISON'S
FIRST SET OF INTERROGATORIES**

Plaintiff, MALIBU MEDIA, LLC, responds to Defendant Michael Harrison's First Set of

Interrogatories served October 25, 2013, as follows:

**STATEMENT OF WILLINGNESS TO COOPERATE**

Counsel for Plaintiff is prepared to discuss with counsel for Defendant the objections set

forth below for the purpose of resolving any disputes that may arise over the responses to the

interrogatories without the need for intervention by the Court.

**PLAINTIFF'S RESPONSES TO DEFENDANT'S
FIRST SET OF INTERROGATORIES**

1.      Please identify the individual answering these interrogatories on behalf of Malibu

Media, LLC, an any an all individuals or entities contributing or supplying the answering

individual with information prior to or in order to prepare these answers to interrogatories.

**Response to Interrogatory No. 1:** Colette Field is the only person who answered these

interrogatories.  Ms. Field is a Co-Owner of Plaintiff.

Exhibit C - 1

2.     Please identify any and all parent, sister, subsidiary, affiliated, or otherwise related entities of Malibu Media, LLC, X-Art, X-Art affiliates and X-Art affiliated programs and the identify any person who possesses or has a personal knowledge of the location of any and all copies of articles of incorporation, operating agreements, shareholder agreements, employment contracts, buy-sell agreements, and the like for these entities.

**Response to Interrogatory No. 2:** Plaintiff is owned entirely by Brigham Field and Colette Field, who possess and have personal knowledge of the location of any and all copies of articles of incorporation, operating agreements, shareholder agreements, employment contracts, buy-sell agreements, and the like for this entity.  Plaintiff operates a website, the domain for which is X-Art.com.  Plaintiff is the operating entity for this business, although the domain name is owned by a trademark holding company named Click Here, LLC.  Like Plaintiff, Click Here, LLC is also owned entirely by Brigham Field and Colette Field.

3.     Please state if you, your agent(s), or any individual or entity hired, retained, employed, compensated or otherwise acting for you, or on behalf of any agent of yours or agent of theirs, has ever, prior to or during the course of any civil proceedings to which you have been or are a party, utilized in any capacity and for any purpose whatsoever:

      a. Lexis Nexis, Westlaw, or other similar service offering comprehensive person search and reporting services which compile and/or store information relating to a person or any member of a person's family's: profession; work history; marital status and/or marital history; household and/or family members; criminal history; education; credit rating; past and/or present income level; civil litigation history; history and/or expectancy of windfalls (meaning any type of past occurrence of or anticipated financial gains as a result of gifts, inheritances, civil judgments, sales, transfers, beneficiary status, or events of record); ownership interests (financial, nonfinancial, managerial, stock, voting, or otherwise, and any and all rights attendant thereto) in any sort of business entity; and/or ownership interests in real, personal, or intellectual property;

Exhibit C - 2

    b. Any website which makes the dissemination of information provided by private individuals accessible as determined by the privacy settings of private individuals (including but not limited to social media and/or professional networking websites); and/or,

    c. Any entity, person, place, or thing to gather information or inquire into an individual's social, political, and/or religious beliefs and/or activities (including but not limited to, and for the purpose of example only, an individual's participation, membership, and/or affiliation with a church or other religious organization, participation on a board of directors for a profit, nonprofit, or charitable organization, and/or participation, membership, or position in a local, state, or national political group or party).

For the purpose of making civil litigation decisions, and identify any and all individuals or entities (including you), who possess personal knowledge, documents, or electronically stored information reflecting the use of (a) – (c), above.   And please state whether prior to or in preparing your answer to this interrogatory you specifically asked your employees, agents, consultants, investigators, or attorneys to provide you with the above information.

    **Response to Interrogatory No. 3:**  Plaintiff objects on the basis that this interrogatory seeks information protected by the privilege against discovery of attorney work product.   To explain, this interrogatory seeks information about Plaintiff's attorneys' process for culling and collecting evidence against Defendant.   Further, merely describing the process used by Plaintiff's attorneys would unnecessarily reveal Plaintiff's attorneys' work product because it would enable Defendant to reproduce a set of documents that Plaintiff's counsel has determined may be relevant to this matter.   The thought processes which went into deciding which documents may be relevant are work product and privileged.   Without waiving the foregoing objections, no such documents exist.

Exhibit C - 3

4.    Please give the following details with respect to IPP International Limited ("IPP Int. Ltd."), but not confining or limiting your answer to:

   a. When and how you first became aware of IPP Int. Ltd. And their performance of computer forensic investigation services ("services" or "their services");
   b. The date you initially contacted IPP Int. Ltd. to inquire or arrange to contact for their services; and
   c. Identify any and all individuals from and/or on behalf of IPP int. Ltd, who:
      i. Spoke to, communicated with, or ever provided information to you at any time regarding their services or any information or data gather or collected as a result of their performing computer forensic services for you;
      ii. Presented to you, negotiated with you, or finalized on behalf of IPP Int. Ltd., the terms and conditions of any offer, acceptance, contract, or modification of or amendment thereto, between you and IPP Int. Ltd. For the sale of goods or services and other arrangement for the exchange of information or equipment owned or possessed by IPP Int. Ltd.;
      iii. You knew, know, suspected or suspect to be an owner of or have an ownership interest in IPP Int. Ltd.; and,
      iv. You knew, know, suspected or suspect to be an employee or agent of IPP Int. Ltd.

   **Response to Interrogatory No. 4:** Plaintiff first became aware of IPP International UG approximately 2.5 years ago through its attorneys, specifically, through communication with M. Keith Lipscomb. Plaintiff's attorneys negotiated the terms of Plaintiff's agreement with IPP International UG. Plaintiff does not know who owns IPP International UG.

5.    Please state the terms and conditions of any and all offers and agreements (whether in the nature or form of a contract, bill of sale, purchase order, and the life, etc.) between you and (1) IPP Int. Ltd. and (2) IPP International U.G., and for each agreement please include the following details and information in addition, and specifically pertaining to said terms and conditions:

   a. The date of the agreement;

   b. Whether the agreement was oral or written;

Exhibit C - 4

    c.  Whether the agreement was ever modified or amended;

    d.  Whether the modification or amendment was oral or written;

    e.  The date the agreement was modified or amended; and

    f.  The terms and conditions of any and all modification of, or amendments to, agreements.

**Response to Interrogatory No. 5:**   Plaintiff and IPP International have an oral agreement that was formed approximately 2.5 years ago.  This agreement has not ever been modified or amended.  The terms of this agreement are confidential and constitute a trade secret.

6.    Please identify the individual you contacted, or who informed you that the correct name of the company you have always known as "IPP, Limited" was/is actually IPP International Limited, and give the details with respect to the communication by which you obtained the aforesaid information, including but not limiting your answer to the following;

    a.  The date you first learned IPP Int. Ltd. was no longer performing computer forensic investigation services as a company in the United Kingdom;

    b.  The date IPP Int. Ltd. began conducting its affairs and business activities in Germany as IPP International U.G. (IPP Int. UG) and that IPP Int. UG had registered with the German commercial register.

**Response to Interrogatory No. 6:**  Plaintiff objects on the basis that this interrogatory seeks information that is neither relevant nor likely to lead to the discovery of admissible information.  Indeed, none of the information requested in this interrogatory is related or relevant to any issue in this case.  Further, Plaintiff objects on the basis that this interrogatory is intended to harass Plaintiff.

Exhibit C - 5

7.    Please give a detailed description and explanation of X-art and its relationship to you legally and financially, insuring that your response includes but is not limited to the following information:

    a.  Identification of any and all individuals or entities having an ownership interest or other rights in:

        i.  Z-Art, X-Art affiliates and X-Art affiliate programs (e.g. X-Cash);

        ii.  The X-Art.com domain name and website and X-Art.com affiliate and affiliate program domain names and websites;

        iii.  Common law trademark rights or states and federal trademark registrations for or related to X-Art the X-art domain name, and X-Art affiliates or X-Art affiliate programs and the domain names of X-Art affiliates or X-Art affiliate programs;

        iv.  Any copyrighted works, content or material or copyright registrations for any work, content or material contributed or otherwise made available on any X-Art, X-Art affiliate or X-Art affiliated program website; and

    b.  Identification of any and all individuals or entities who have ever been employed, hired, retained, or compensated to create, develop, or maintain the security of any X-Art, X-Art affiliate or X-Art affiliated program website, or any website which you own, or that hosts or distributes you copyrighted works and which requires the website's users to pay for you

Exhibit C - 6

copyrighted works or pay for a subscription to view you copyrighted works.

**Response to Interrogatory No. 7:** Plaintiff is owned entirely by Brigham Field and Colette Field. Plaintiff operates a website, the domain for which is X-Art.com. The copyrighted works at issue in this case are published on X-Art.com along with other copyrighted works owned by Plaintiff. Plaintiff is the operating entity for this business, although the domain name is owned by a trademark holding company named Click Here, LLC. Like Plaintiff, Click Here, LLC is also owned entirely by Brigham Field and Colette Field. Plaintiff will provide the name of its security professionals pursuant to a stipulated protective order.

8.    Please identify each and every individual or entity to whom you have granted licenses, permissions, or otherwise allowed to use any content and/or material owned by you, or that has ever existed under the brand of or as an X-Art titles, X-Art affiliate, or X-Art affiliate program title (i.e., as an X-Art, X-Art affiliate, or X-Art affiliate program movie).

**Response to Interrogatory No. 8:** Plaintiff objects on the basis that this interrogatory seeks information that is neither relevant nor likely to lead to the discovery of admissible evidence. When X-Art first began, the company uploaded a small number of its full length movies onto a few tubesites. X-Art placed visual watermarks on these videos that linked users directly to X-Art.com. The purpose of doing so was to get X-Art rapid attention and to increase traffic to its subscription website. Shortly thereafter, Plaintiff noticed that unauthorized third parties were also posting X-Art's full length videos onto the tubesites. At that time, Plaintiff began having its agents send DMCA notices to remove all unauthorized content from the tubesites and subsequently stopped uploading full length movies on such sites. Since then,

Exhibit C - 7

16.    Please give the details of your knowledge and understanding of media access control ("MAC") address, and whether and how it was used by IPP Int. Ltd. or IPP Int. UG's computer forensic software or related technology to identify Harrison's IP address as the infringer in each instance of infringement of your copyrighted works.  And please state whether prior to or in preparing your answer to this interrogatory you specifically asked you officers, employees, agents, consultants, investigators, or attorneys to provide you with the above information.

**Response to Interrogatory No. 16:** Plaintiff does not have sufficient information in its possession, custody or control to answer this interrogatory.  IPP International UG tracked the infringement.


17.    Please give the details of any and all webmaster affiliated programs of X-Art or X-Cash, how the affiliated programs work (i.e. give the specific details of how such programs function or operate), and how many persons have subscribed or otherwise signed up for any and all webmaster affiliate programs.

**Response to Interrogatory No. 17:**  Plaintiff objects on the basis that interrogatory seeks information that is neither relevant nor likely to lead to the discovery of admissible evidence. Indeed, such information has nothing to do with this case or copyright enforcement.


## DECLARATION

PURSUANT TO 28 U.S.C. § 17 46, I hereby declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on this 3rd day of December, 2013

Exhibit C - 8

**COLETTE PELISSIER FIELD**

By: _____

Exhibit C - 9

# EXHIBIT D

 | YOUR TRANSLATION PARTNER    5200 S. Highland Dr., Suite 201, Salt Lake City, UT 84117
Telephone: (801) 273-5700 Fax: (801) 880-8883

**Statement of Verification**

July 28, 2011

This document certifies that the following document(s): **Notice of Appeal, Transcript of Oral Hearing, Verdict,** and **Exhibit 17** has been translated for:

Jason Booth
BOOTH SWEET
32R Essex Street, Suite 1A
Cambridge, MA 02139

Furthermore, the said document(s) have been translated from **German** to **English** and have been translated correctly and accurately to the best of our (Verbatim Solutions, LLC) knowledge by a certified, native speaking **German** translator.

*J. Walsh*

Jeff Walsh
Account Manager

---

Forms of Acknowledgment (3)
**Person Acknowledging Instrument Unknown to**
**Notary But Proved to be Signer by Satisfactory Evidence**

State of Utah              )
                                        §
County of _Salt Lake_      )

On this _28 th_ day of _July_, 20 _11_, personally appeared before me, _Jeff Walsh_, proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is (are) subscribed to this instrument, and acknowledged that he (she) (they) executed the same.

S
E
A
L

THOMAS F. SEAL
Notary Public, State of Utah
Commission # 600770
My Commission Expires
September 08, 2014

_Thomas F. Seal_
Notary Public

My Commission Expires _Sept. 8, 2014_

# EXHIBIT E

**Susanne Preuss**                                                    Anlage AG 12

| | |
|---|---|
| **Von:** | Philipp Brandt [brandt@bb-legal.de] |
| **Gesendet:** | Donnerstag, 14. April 2011 11:33 |
| **An:** | Susanne Preuß |
| **Betreff:** | Fwd: Copyright infringements - cooperation with your law office(s) in Asia |

Anfang der weitergeleiteten E-Mail:

**Von:** "Achache,Patrick" <patrick.achache@guardaley.com>
**Datum:** 10. Dezember 2008 12:59:04 MEZ
**An:** brandt@bb-legal.de
**Betreff: Copyright infringements - cooperation with your law office(s) in Asia**
**Antwort an:** patrick.achache@guardaley.com

Dear Mr.Brandt,

as spoken on the phone, I send you my questions regarding fighting copyright infringements on the basis of internet technologies.
We are a company based in the UK and Germany specialised in producing forensic technical evidence for criminal and civil rights proceedings.

We are searching for a strong partner allowing us to claim damages from several hundred infringers to stop them to spread our client's product in Asia especially India, Thailand and China.

In regard to that we kindly ask you to have a look on the following questions:

What circumstances allow us to request contact details for infringers under the specific laws?
Are these for example depending on the number of files shared or the period the user stayed online and provided the data?
Are there infringements which weighten heavyer than others e.g. adult content or sofware which is not even released?
Does one have to initiate a criminal law case first?
Are there already similar cases in India? Judgements?
Do the Internet service providers demand money for the addresses of infringers?
Do we need a special indian expert opinion for our monitoring software to obtain the data?

We feature a software for managing that amount of adress requests and claims, if you need support to handle the huge amount of data.
It would be free for the law offices and is developed to guarantee a perfect workflow between GuardaLey as the data provider and the law offices as acting partner.

I am looking forward to your answers, many thanks in advance

Regards
Patrick Achache

PS: Would you mind to confirm the receipt of this email?

--

1

Patrick Achache
IP Department
Guardaley Ltd.
Telefon (direkt) +49 (0)176/24791824
mailto:patrick.achache@guardaley.com

GuardaLey Ltd: Geschäftsführer: Ben Perino; Reading(UK) and Karlsruhe(D); Company No. 06576149;

Exhibit E - 2

# EXHIBIT F

BaumgartenBrandt Attorneys at Law
Friedrichstr. 95-10117 Berlin

State  Court  Berlin                               Attorneys at Law
Littenstraße  12-17
10179 Berlin                                       Dr. Ralf Baumgarten
                                                   Philipp Brandt
                                                   AndréNourbakhsch

Sekretary    Ms. Haase                             Intern. Handelszentruin
Direct dial  +49 30 20 60 97 90-75                  Friedrichstraße 95
E-Mail       haase@bb-legal.de                      10117 Berlin
Our code     13/11/nli

                                           T+49   3 2 6 9    9
                                                  0 0 0 7 (1-0
                                           F+49   3 2 6 9  90-
                                                  0 0 0 7   20

April 15,  2011


### URGENT! Please submit immediately!


__-16055/11__

**In the matter of the preliminary injunction**

**Guardaley Ltd. inter al. v.  BaumgartenBrandt GbR**


We substantiate our objection of  3/15/2011 as follows:


### I. Facts

1.     **About the Parties**

       Petitioner No. 1 for the injunction\* is a capital company with limited liability
       (Limited)  under English law, formed on 4/24/2008.

                     **Initial Proof:**   Extract from the Companies' House Register as

                                                         **- Exhibit AG 1 –**

       It has maintained a branch in Germany in Karlsruhe since 1/29/2009.

**Initial Proof:**   Commercial Register extract for Petitioner No. 1 as

**- Exhibit AG 2 -**

Petitioner No. 2 for the injunction\*acts in commerce for Petitioner No. 1 as Director of Data Services.

**Initial Proof:**   Affidavit of Petitioner No. 2 of 12/31/2009 before the United States District Court for the District of Columbia (File no.: CA. 1:10-cv-00453-RMC) in English as

**- Exhibit AG 3 –**

Respondent against the injunction\* is a law office located in Berlin.

Attorney André Nourbakhsch (formerly Respondent No. 2 against the motion\*) is an employee of the Respondent. In such capacity, he works at the address of the Respondent solely for the Respondent and does not pursue his <u>own</u> business activities there. Without limiting the generality of the foregoing, he is not a partner or managing director of the Respondent against   the injunction.

2.        **Contractual Relationship between  Petitioner No. 1 and the Respondent**

There was a contractual relationship between Petitioner No. 1 and the Respondent, on the basis of which Petitioner No. 1 developed, and made administrative software available to Respondent for the duration of the contract.

In addition, Petitioner No. 1 entered into contracts with holders of copyrights for films. The subject of such contracts was the collection and documentation, for secure evidentiary purposes, of IP connection data of internet connection owners offering for download, in infringement of copyright, copyrighted works of clients of Petitioner No. 1 to other users, in a so-called peer-to-peer procedure (also called file-sharing). In this connection, it is denied, on the basis of lack of knowledge, that the Petitioner [sic]  was also commissioned by its clients to investigate the IP data of owners of connections who merely attempted to download copyrighted works, without it being documented that the download was actually completed, much less that such works were offered via such connections for download, i.e., were publicly made available.

The Respondent also entered into contracts, for the provision of legal services, with copyright holders that had previously also entered into contracts with Petitioner No. 1 for the investigation of IP addresses. Respondent, in the context of its legal services, moves for orders to secure and reveal IP addresses of the connection owners behind the Internet service providers and asserts against such persons cease-and-desist and damages claims. Respondent is commissioned by its clients solely to proceed against such connection owners who make films publicly available, within the meaning of § 19 a of the Copyright Law, on the Internet, in infringement of copyright. It was not, and is not, commissioned to proceed against connection owners who merely attempt to download films, without offering the same to the public. For the motion to obtain the orders to secure and reveal pursuant to § 109 (9) of the Copyright Law, necessary to conduct the cease-and-desist proceedings, the Respondent presents to the respective court the Affidavit of Petitioner No. 2, in which Petitioner No. 2 declares that that only such IP addresses are identified as offering filmed works for download. He did not declare therein that Petitioner No. 1 investigates the IP addresses of persons who merely download filmed works or who have only attempted to do so.

**Initial Proof:** Affidavit of Petitioner No. 2 as

**- Exhibit AG 4 -**

Clients of Petitioner No. 1 were, and some still are, still clients of Respondent. Mr. Mark Damon, who is mentioned in the Affidavit of Ms. Barbara Mudge, represents, for example, the company Foresight Unlimited, located in the USA, and which at the time of the statements at issue in this

dispute was both a client of Petitioner No. 1 and a client of the Respondent. In order to comply with its obligations as attorneys pursuant to the service agreements with its clients pursuant to the Federal Attorneys' Regulation and the Regulation of Professional Responsibility, Respondent naturally continues to maintain contact with its clients, and thus with Mr. Mark Damon of Foresight Unlimited, irrespective of the existence of contractual relationships of clients of Petitioner No. 1.

### 3. Termination of the Contractual Relationship between Petitioner No. 1 and the Respondent

Respondent terminated, as of 1/21/2011, the contract between Petitioner No. 1 and the Respondent, without notice. The termination was sent to the Petitioner No. 1 and was received by the latter prior thereto by fax on 1/21/2011.

**Initial Proof:** Termination letter by the Respondent dated 1/21/2011 with transmission report of the fax transmission on 1/21/2011, 20:07 as

**- Exhibit AG 5 -**

In addition, as of 1/25/2011, Petitioner No. 1 declared to the Respondent, over the signature of Petitioner No. 2, the termination, without notice, of the of the existing contract. The termination was received by the Respondent by fax on 1/25/2011, at14:37 and on 1/26/2011 by mail.

**Initial Proof:** Telefax of the Termination Letter of Petitioner No. 1 for the injunction dated 1/25/2011, 14:37

**- Exhibit AG 6 -**

Thus, the Petitioners knew, at least at the time of sending the motion for preliminary injunction to the State Court of Berlin, of the termination of the contract by the Respondent. While the motion for the issuance of the preliminary injunction is dated 1/21/2011, it was not received by the Court until 1/26/2011. The sending of the motion thus cannot have occurred prior to Tuesday, 1/25/2011. In fact, we allege that the Petitioners sent the motion for issuance of the preliminary injunction after 1/25/2011, 14:37, i.e., after receipt by Respondent of the termination by Petitioner No. 1. If the Petitioners are of a different view, then let them state and prove such.

To the extent the Petitioners in their motion for issuance of the preliminary injunction state that they were in a contractual relationship with the Respondent commencing in 2009, then the result is that they intentionally failed to state the fact that such contract had ended as of 1/21/2011. We expressly refer to the criminal law relevance of such false testimony.

### 4. Telephone Conversation between Mr. Nourbakhsch and Ms. Barbara Mudge

### a. Professional Position of Ms Barbara Mudge and Reason for Calling Her

Ms. Barbara Mudge is a member of the Board of Directors of the Independent Film and Television Alliance (IFTA) in Los Angeles, USA. She is responsible for companies from the film industry that are IFTA members. Included among such companies is, as can be seen from the text of the Affidavit of Ms. Barbara Mudge (Exhibit AS 3), Foresight Unlimited, represented by Mr. Mark Damon.

Ms. Mudge has also been active for some time as an employee of Petitioner No. 1.

**Initial Proof:** Email of Ms. Barbara Mudge of 2/25/2011 as

**- Exhibit AG 7 -**

Thus, Ms. Mudge was, and is, at no time a client of Petitioner No. 1, but rather its employee.

In addition, neither the Petitioners nor Ms. Barbara Mudge state, in the grounds of the motion or in the preliminary injunction, the background of the telephone conversation between Ms. Mudge and Mr. Nourbakhsch.   Ms. Barbara Mudge did not, as the grounds of the motion and the Affidavit might suggest, call   Mr. Nourbakhsch for no reason. Rather, the telephone call took place after the Respondent had called its client, Foresight Unlimited. Apparently, thereafter Mr. Mark Damon of Foresight Unlimited called Ms. Mudge. It is impossible for us to know whether Ms. Mudge was then speaking to Mr. Nourbakhsch as a representative of Foresight Unlimited or in her capacity as an employee of Petitioner No. 1. In any case, the conversation took place at the desire, and on the initiative, of Ms. Mudge and with the knowledge of the client of the Respondent,  Foresight Unlimited.

The information transmitted to Ms. Mudge in the conversation with Mr. Nourbakhsch related solely to the client relationship between the Respondent and the client, Foresight Unlimited, and the telephone conversation previously conducted with Mr. Mark Damon. Ms. Mudge wanted to hear again for herself the questions raised therein. In this connection, reference was expressly and repeatedly made during the conversation to the conversation with Mr. Damon and Ms. Mudge repeatedly stated that Mr. Damon was her client and that she was, in her telephone call, complying with his request that she hear for herself was had been stated to him.

|  |  |
|---|---|
| **Initial Proof:** | Testimony of Mr. Nourbakhsch, to be subpoenaed via the Respondent |

The grounds for the motion and the Affidavit of Ms. Barbara Mudge also give the impression that Ms. Mudge was called on 1/5/2011 at the initiative of Mr. Nourbakhsch. In fact it was Ms. Barbara Mudge herself who initially tried to call Mr. Nourbakhsch on 1/5/2011, at ca. 16:30.

|  |  |
|---|---|
| **Initial Proof:** | Testimony of the employee of the Respondent, Ms. Nadine Haase, to be subpoenaed via the Respondent |

Since Mr. Nourbakhsch was not available at the time of Ms. Mudge's call, Mr. Nourbakhsch as well as Mr. Philipp Brandt, Partner of the Respondent, called Ms. Mudge back on the same day.

|  |  |
|---|---|
| **Initial Proof:** | Testimony of Mr Nourbakhsch, to be subpoenaed via the Respondent |

Ms. Mudge has incompletely and incorrectly represented the contents of the telephone conversation. At the time of making the Affidavit of 1/16/2011, and thus 11 days after the telephone conversation, Ms. Mudge was apparently unable to remember precisely the contents of the conversation. This is seen in the fact that she writes: "In gist, a telephone conversation with the following contents took place". Thereupon she provides „the gist" of a summary of the contents of the conversation, abridged to the motion for the injunction and incorrectly and incompletely states what was said.  In addition, the conversation was in English, and thus a foreign language for Mr. Nourbakhsch. Moreover, the contents of the conversation were of a legal nature, as a result of which, Ms. Mudge, who unlike Attorney Nourbakhsch, is not an attorney, could have misunderstood what Mr. Nourbakhsch said.

That Ms. Mudge misunderstood the contents of the conversation, is seen with respect to the statement (which is no longer part of the dispute) in Point 1) of the Affidavit (Exhibit AS 3). Already in this Point Ms. Mudge incorrectly stated what was said: Mr. Nourbakhsch informed Ms. Mudge that Petitioner No. 1 had, over a period of five months, transmitted to another law firm IP connection data that Petitioner No. 1 had collected for a copyright holder which was being legally represented by the Respondent. Such law firm had then, at the instigation of Petitioner No. 1, conducted, in the name of the copyright holder, copyright proceedings pursuant to § 101 ( 9) of the Copyright Law at various State Courts and had obtained appropriated orders for the disclosure of the data on the owners of the Internet connections. Mr. Nourbakhsch informed Ms. Mudge that there was an exclusive client relationship between the copyright holder and the Respondent and the Petitioners did not inform the copyright holder of the transmission of the data to the third law firm. In contrast therewith, Ms. Mudge alleges in the Affidavit that Mr. Nourbakhsch stated that legal titles had been obtained which had been assigned to the Respondent. The Respondent does not have rights assigned to it. It is also incomprehensible for Ms. Mudge to claim that Mr Nourbakhsch

claimed that the third law firm had instituted legal complaint.

**b. As to the statements in the conversation that relate to the dispute**

**aa. As to Heading Point 1. a) — Theft of Software**

In the telephone conversation at issue with Ms. Mudge, Mr. Nourbakhsch did not say that Petitioner No. 2 had stolen the investigation software used by Petitioner No. 1 from a Swiss company. Rather, Mr. Nourbakhsch merely informed Ms. Mudge about the circumstances of the previous employment of Petitioner No. 2 with Logistep AG. Specifically, he informed her that the Petitioner No. 2 had been employed until October 31, 2008, as Manager of the Technical Department of Logistep AG and that the latter had developed software for the investigation of copyright infringements. In an affidavit for a complaint in the USA against Petitioner No. 1 that has been published in the Internet Petitioner No. 2, however, claimed that he had been working for the Petitioner No. 1 since the beginning of 2007.

> **Initial Proof:**   Testimony of Mr.Nourbakhsch, to be subpoenaed via
> the Respondent

In addition, Mr. Nourbakhsch reported to Ms. Mudge that employees of Logistep AG had seen in the company car of Petitioner No. 2, during the latter's employment for Logistep AG, brochures and business cards of Guardaley Ltd.

> **Initial Proof:**   Testimony of Mr. Nourbakhsch, to be subpoenaed
> via the Respondent

Mr. Nourbakhsch expressly informed Ms. Mudge, that on the basis of the overall appearance of the circumstances, he could no longer, despite the long and good cooperation with the Petitioners, assume with certainty that Petitioner No. 2 had not, in the development of the software of Petitioner No. 1, had illegal recourse to the copyrighted know-how of Logistep AG. Mr. Nourbakhsch repeatedly emphasized that so far it was all only justified uncertainty, that the Respondent had, however, tried and was continuing to attempt to clarify the issue with Petitioner No. 1, in order to remove the doubts.

> **Initial Proof:**   Testimony of Mr. Nourbakhsch, to be subpoenaed via
> the Respondent

In addition, Mr. Nourbakhsch told Ms. Mudge, that Petitioner No. 2 was not willing, despite written demand by the Respondents, to dispel such uncertainties by making an affidavit.

> **Initial Proof:**   Testimony of Mr. Nourbakhsch, to be subpoenaed via
> the Respondent

Ms. Mudge failed to state all of these details in the Affidavit. She only reports what "stuck in her mind" after the telephone conversation of 11 days previously. And that is solely her own conclusion from the details of what was said, to wit, that the software had been "stolen".

**bb. As to Heading Point 1.b) aa) — Undependable Research Service**

Mr. Nourbakhsch indicated to Ms. Mudge that the Respondent had learned that the IP connection data determined by the Petitioner No. on the commission of the copyright holders was not 100% accurate. That the Petitioner No. 1 had included not only so-called uploaders, i.e., those offering works, but also persons who had made download inquiries to Petitioner No. 1. In addition, Mr. Nourbakhsch said that Petitioner No. 1 did not distinguish between up- and download determinations or did not mark them appropriately. The download inquiries were [verb missing…probably "designated"] as "Determinations", of which it was unable to be determined how many there were, without exception for civil law copyright claims without meaning. This meant that an unknown number of cease and

desist letters about copyright infringements might have been undertaken without a legal basis and that the Respondent did not have any way, either at that time, or today, of identifying such. Finally, Mr. Nourbakhsch indicated to Ms. Mudge that unjustified cease and desist letters could, in certain circumstances, result in damages claims of the persons receiving such letters against the copyright holders.

**Initial Proof:**     Testimony of Mr. Nourbakhsch, to be subpoenaed via the Respondent

### cc. As to Heading Point 1.b) bb) — Class Action in the USA Pending

Mr. Nourbakhsch indicated to Ms. Mudge that a class action complaint was to be found on the Internet, from which it could be seen that a plaintiff had instituted suit for himself as well as for 4,500 other affected persons against various parties, inter alia, Petitioner No. 1. He also informed her that the complaint was, on the basis of the grounds, based upon the accusation of "fraud and extortion".

**Initial Proof:**     Testimony of Mr. Nourbakhsch, to be subpoenaed via the Respondent

### d. As to Heading Point 1. b) cc) — Offering Services by Others

In addition, the Affidavit of Ms. Mudge is incorrect to the extent that it claims that Mr Nourbakhsch offered to have investigations performed for "her clients" by another, specified company. The only correct aspect of this statement is that Ms. Mudge asked Mr. Nourbakhsch if there were other service providers as an alternative to Petitioner No. 1. Mr. Nourbakhsch answered this question by saying that there were numerous firms on the market. In response to the additional question by Ms. Mudge, as to whether and to what extent a change of service provider was possible, Mr. Nourbakhsch, in the context of his technical understanding, answered that the assumption of investigative activities by another firm was at least technically possible without problem.

### 5. In the Alternative: No Allegation of Untrue Facts

There would also be true facts in the statements forming the subject of the dispute. With respect thereto, individually:

### a. As to Heading Point 1. a) — Theft of Software

It is claimed that, in the development of the software used for research by Petitioner No. 1, that the software was thus "stolen". That the investigative software of Petitioner No. 1 is based on the knowledge of third parties can be concluded from the circumstances, particularly the circumstances relating to the employment of Petitioner No. 2.

In the judicial proceeding before the United States District Court for the District of Columbia, Petitioner No. 2 claimed, in an affidavit of 12/31/.2009 (File No..: CA. 1:10-cv-00453-RMC) to have been employed since January 2007 for the Petitioner No. 1.

**Initial Proof:**     Affidavit of Petitioner No. 2 before the United States District Court for the District of Columbia dated12/31/2009(File No.: CA. 1:10-cv-00453-RMC) in the English language, previously submitted as

**- Exhibit AG 3 -**

He was, however, employed at Logistep AG, with its offices in Steinhausen, Switzerland, in a managerial position as Chief Technical Officer, i.e., Manager of Technology. Thereafter, until 2/21/2009, he was an independent contractor for Logistep AG.

**Initial Proof:**   1. Affidavit of Mr. Richard Schneider, Member of the Administrative Board of  Logistep AG, Sennweidstr. 45, 6312 Steinhausen, Switzerland as

**- Exhibit AG 8 -**

2. Testimony  of Mr.  Richard Schneider, Logistep AG, Sennweidstr. 45, 6312 Steinhausen, Switzerland

Logistep AG provides, as does Petitioner No. 1, services in the Internet and in the area of Internet security.

**Initial Proof:**   **1.** Commercial Register extract of Logistep AG as

**- Exhibit AG 9 -**

2. Affidavit of Mr.  Richard Schneider,  Member of the Administrative Board of Logistep AG, Sennweidstr. 45, 6312 Steinhausen, Switzerland, previously submitted as

**- Exhibit AG 8 -**

3.Testimony  of Mr.  Richard Schneider, Logistep AG, Sennweidstr. 45, 6312 Steinhausen, Switzerland

Logistep AG was one of the first companies to develop and use software for the collection, for secure evidentiary purposes, of IP addresses. Such software was develop by several Logistep AG employees over a period from February 2004 to May 2005 and has continuously been developed since then.

**Initial Proof:**   **1.**  Affidavit of Mr.  Richard Schneider, Member  of the  Administrative Board of Logistep AG, previously submitted as

**- Exhibit AG 8 -**

2. Testimony  of Mr.  Richard Schneider, Logistep AG, Sennweidstr. 45, 6312 Steinhausen, Switzerland

Petitioner No. 2 never disclosed to Respondent that he had worked for Logistep AG in the past, nor did he disclose that he had been employed by Logistep AG until October 31, 2008, and had worked with it until 2/21/2009 as an independent contractor.

According thereto, Petitioner No. 2, by his own statement, worked in a parallel fashion for Petitioner No. 1 in the same position, without disclosing this to Logistep AG.

Petitioner No. 2 also had, prior to his departure from Logistep AG his calls secretly forwarded from his office telephone number at Logistep AG to his cell phone number, 0176-24791824. He had the call forwarding installed, not on his telephone, but rather at the Logistep AG telephone services provider, so that the call forwarding would not be seen on the displays of the Logistep

Exhibit F - 7

AG telephones. The call forwarding was discovered by chance only on 4/29/2010 by Mr. Richard Schneider and Mr. Michael Wicher of Logistep AG.

**Initial Proof:** 1. Affidavit of Mr. Richard Schneider, Member of the Administrative Board of Logistep AG, previously submitted as

**- Exhibit AG 8 -**

2. Testimony of Mr. Richard Schneider, Logistep AG, Sennweidstr. 45, 6312 Steinhausen, Switzerland

3. Affidavit of Mr. Michael Wicher, Mitarbeiter der Logistep AG as

**- Exhibit AG 10 -**

In addition, Petitioner No. 2, while he was working for Logistep AG, had all emails directed to his email address achache@logistepag.com at Logistep AG forwarded to his private email address.

**Initial Proof:** Affidavit of Mr. Leszek Oginski, Direktor der Logistep AG as

**- Exhibit AG 11-**

Finally, Mr. Oginski of Logistep AG saw brochures and business cards of Guardaley Ltd. In the company car of Petitioner No. 2, while he was still working for Logistep AG.

**Initial Proof:** Affidavit of theHerm Leszek Oginski, Director der Logistep AG, previously submitted as

**- Exhibit AG 11 -**

Petitioner No. 2, however, offered, in the name of Petitioner No. 1, to the Respondent already on 12/10/2008, i.e., while he was still working for Logistep AG as an independent contractor, to collect data on internet connection owners who offer copyrighted works for downloading on the Internet.

**Initial Proof:** Email dated 12/10/2008 of Petitioner No. 2 as

**Exhibit AG 12 -**

In light of the fact that Logistep AG employed three employees for some 16 months in the development of its investigative software it is remarkable that Petitioner No. 1 was able, prior to the departure of Petitioner No. 2 from Logistep AG, to offer the same services as Logistep AG.

The doubts of Respondent as to the copyright status and above all as to the reliability of the „Observer" software were intensified by reason of the fact that Petitioner No. 2 contacted Mr. Nourbakhsch on 11/30/2011 by email and requested that the Respondent only use the expert opinion on the functionality and reliability of the "Observer" software only in critically necessary cases, without being able to state a credible reason therefor.

**Initial Proof:** Email of 11/30/2010 of Petitioner No. 2 as

**- Exhibit AG 13 -**

Exhibit F - 8

As a result of the aggregate impression of such facts, the Respondent began to have doubts about the copyright status of the "Observer" data collection software of the Respondents [sic {has to be "Petitioners"}]. The Respondent feared that Petitioner No. 2 could have had recourse to the know-how of his previous employer, Logistep AG, in the development of the investigative software used by Petitioner No. 1.

As a result, Mr. Nourbakhsch asked both Petitioners for a binding counterstatement in the form of an affidavit for the purpose of removing such misgivings.

> **Initial Proof:** Email of Mr. Nourbakhsch of 1/12/2011, with attachments, as
>
> **- Exhibit AG 14 -**

Both Petitioners refused, until making the motion for preliminary injunction, to make such an affidavit and thus to remove such doubts. All they did was inform the Respondent that they had transmitted the affidavits to a Mr. Guido Hettinger and that that the affidavits would be able to be executed „only after the completion of an outside examination".

> **Initial Proof:** Email of Petitioner No. 2 dated 1/14/2011
>
> **- Exhibit AG 15 -**

Only in the context of the motion for preliminary injunction did the Petitioners make such a statement.

### b. As to Heading Point 1. b) aa) — Unreliable Investigative Services

Petitioner No. 1 is, as noted above, obligated and authorized to collect for the Respondent only the IP data of so-called uploaders, but not, that of persons who only engage in a so-called download or only inquire as to a download of copyrighted films. Commensurately, the Respondent only issues cease and desist letters against the upload, as making publicly accessible pursuant to § 19 a of the Copyright Law.

In January 2011, Respondent learned from ipoque GmbH that the investigative services being performed by Petitioner No. 1 were, in part, not what had been agreed upon with the copyright holders and did not correspond with the cease and desist letters and were thus unreliable.

ipoque GmbH is an IT firm that offers various services in the area of bandwidth and Internet management. The company is active internationally, inter alia, for various German universities.

> **Initial Proof:** 1. Presentation of representative clients of ipoque GmbH under their Internet presence at http://www.ipoque.comicompany/customerreferences as
>
> **- Exhibit AG 16 –**
>
> 2. Testimony of Dr. Frank Stummer, to be subpoenaed via ipoque GmbH, Mozartstral3e 3, 04107 Leipzig

One area, for which, inter alii, Dr. Frank Stummer is responsible, is the forensic data investigation of IP addresses where copyright infringements are occurring.

On the basis of the following incident, ipoque GmbH determined that Petitioner No. 1 collects IP data on owners of connections which are not making any films publicly available, which are thus not engaging in any "upload."

On 11/18/2009 at 01:03:25 CET, ipoque GmbH conducted a so-called test screening of the film „Antichrist" on the Internet. This film was being investigated at such time by Petitioner No. 1, on

Internet exchanges, especially Peer2Peer networks such „Bittorrent", in the name of the copyright holder. The IP addresses collected by Petitioner No. 1 were identified by the Respondent in a proceeding pursuant to § 101 (9) of the Patent Law and a cease and desist letter sent to the owners of the connection pursuant to §§ 97, 19a of the Patent law, for the impermissible making publicly available of the aforementioned film.

In the course of such test screening, ipoque GmbH's software searched for the sources of illegal copies of the aforementioned film in the „Bittorrent" network, i.e., searched for download possibilities from servers offering such files (uploaders). On the ipoque GmbH servers there was at this time, as at no other time, a complete or partial copy of the work "Antichrist". For this reason, no part of the film "Antichrist" was offered in the „Bittorent" network by ipoque GmbH, nor was this impression given on the Internet.

| | |
|---|---|
| **Initial Proof:** | 1. Testimony of the expert witness, Dr. Frank Stummer, to be subpoenaed via ipoque GmbH, Mozartstrafle 3, 04107 Leipzig |
| | 2. Powerpoint presentation by ipoque GmbH "Facts about the Cease and Desist Letter for "Antichrist," BaumgartenBrandt to ipoque, 11/18/2009" dated 1/13/2011 as |

**- Exhibit AG 17 -**

Following the test screening, ipoque GmbH received a cease and desist letter, including an assessment of costs, from the Respondent, in which it was demanded that ipoque GmbH make a cease and desist undertaking by 5/18/2010. The accusation was of an upload constituting a copyright infringement, i.e., the making publicly available of the film „Antichrist" at the aforementioned time of the test screening.

| | |
|---|---|
| **Initial Proof:** | 1. Testimony of Dr. Frank Stummer, to be subpoenaed via ipoque GmbH, Mozartstral3e 3, 04107 Leipzig |
| | 2. Cease and desist letter of 4/27/2010 to ipoque GmbH as |

**- Exhibit AG 18-**

It is documented, as reliable evidence, that it is technically impossible for ipoque GmbH to have offered such a file in whole or in part, for a so-called "upload" to have occurred.   It is also technically impossible for a download of the file to have occurred, which was not an accusation made in the cease and desist letter. At the time in question, there was contact with only one single third-party server on the part of ipoque GmbH, which this can only be attributed to Petitioner No. 1. But Petitioner No. 1, for its part, did not offer parts of the film. Rather, the Bittorrent monitoring program [of] Petitioner No 1 was set in such a way that it represented to other users, i.e., to their programs, by means of a falsified bit field, that it was always in possession of 50% of the file being sought, i.e., as to which inquiry was being made.

| | |
|---|---|
| **Initial Proof:** | 1. Testimony of the expert witness, Dr. Frank Stummer, to be subpoenaed via ipoque GmbH, Mozartstrafle 3, 04107 Leipzig |
| | 2. Powerpoint presentation by ipoque GmbH "Facts about the Cease and Desist Letter for "Antichrist", BaumgartenBrandt to ipoque, 11/18/2009" dated 1/13/2011 as |

**- Exhibit AG 17 -**

For purposes of technical understanding, it should be explained that, as soon as a Bittorrent client

program of a user receives such a notice from another client program, it sends to the client of the other user a download inquiry for such file parts. Such an inquiry was sent at the time from the program (client) of ipoque GmbH to the server of Petitioner No. 1 and thereupon the IP address of the user, i.e., specifically the former IP address of ipoque GmbH's server, was recorded by Petitioner No. 1. That occurred even though ipoque GmbH neither offered an upload in infringement of copyright nor effected a download in infringement of copyright, because the server of ipoque GmbH could not receive any parts of the copyrighted file from the server of Petitioner No. 1, because they were not there.

**Initial Proof:** 1. Testimony of the expert witness, Dr. Frank Stummer, to be subpoenaed via ipoque GmbH, Mozartstrafle 3, 04107 Leipzig

2. Powerpoint presentation by ipoque GmbH "Facts about the Cease and Desist Letter for "Antichrist,"BaumgartenBrandt to ipoque, 11/18/2009" dated 1/13/2011 as

**- Exhibit AG 17 -**

The consequence of this was that ipoque GmbH wrongfully received a cease and desist letter, on the basis of incorrect data collection.

After such cease and desist order became known, Petitioners had a meeting with ipoque GmbH's attorneys, as well as with Mr. Stummer. In the context of such meeting the aforementioned power point presentation **(Exhibit AG 17)** was shown to the Petitioners.

**Initial Proof:** Testimony of Mr. Dr. Frank Stummer, to be subpoenaed via ipoque GmbH, Mozartstral3e 3, 04107 Leipzig

Subsequently, Petitioners intentionally failed to disclose the entire contents thereof to the Respondent and to the clients of Petitioner No. 1. Only when the Respondent happened to have contact with ipoque GmbH in January 2011, did it learn that Petitioner No. 1 had made incorrect data determinations. After ipoque GmbH informed the Respondent by telephone that the monitoring services of Petitioner No. 1 were defective, employees of the Respondent, including Mr. Andre Nourbakhsch and Mr. Christian Roloff traveled on 1/13/2011 to ipoque GmbH at its offices in Leipzig and had the course of the test screening explained to them, using the PowerPoint presentation that ipoque GmbH had already shown to Petitioner No. 1.

**Initial Proof:** 1. Testimony of Mr. André Nourbakhsch, to be subpoenaed via the Respondent

2. Testimony of Mr. Christian Roloff, to be subpoenaed via the Respondent

c.     **As to Heading Point 1. b) bb) — Class Action pending in the USA**

Contrary to the allegation of Petitioners, a class action is pending in the USA against Petitioner No. 1. Mr. Dimitriy Shirokov, in his own name and in the name of 4,756 persons, instituted suit against Dunlap, Grubb & Weaver PLLC, US Copyright Group, Thomas Dunlop,

Nicholas Kurtz, Petitioner No. 1 and Achte/Neunte Boll Kino Beteiligungs Gmbh & Co KG. The plaintiffs there are being represented by the law firm of BOOTH SWEET LLP in Cambridge, Massachusetts, USA..

**Initial Proof:**   Class action by 4,756 plaintiffs against, inter alia, Petitioner No. 1, made available online under http://boothsweet.com/wpcontent/uploads/2010/08/ Master-Complaintl.pdf by the law firm of BOOTH SWEET LLP, 32R Essex Street Studio 1A, Cambridge, MA 02139, USA, as

**- Exhibit AG 19 -**

The complaint was filed no later than 11/26/2010 at the United States District Court, District of Massachusetts. It has the file number  1:10-CV-12043-GAOt. On 11/26/2010, the court sent a notice to the defendants as to the fact that complaint had filed. The notice said: „A lawsuit has been filed against you".

**Initial Proof:**   Notice of 11/26/2010 of the United States District Court, District of Massachusetts to the defendants as to the filing of a complaint

**- Exhibit AG 20 -**

The notice of the court also contained the demand to the defendants to answer the complaint within 21 days. In the system of prosecution of civil matters by the parties, the notice of the court of 11/26/2010 is sent to the defendants there by the attorneys of the plaintiffs. The  Respondent has no knowledge of the extent to which the complaint has been  received by Petitioner No. 1.

We assume that the Director of  Petitioner No. 1, when he writes in his Affidavit (Exhibit AS 1) that a complaint of one individual person existed that the Petitioner No. 1 did not receive within 21 days, is referring to the complaint in   **Exhibit AG 19**. In the complaint in **Exhibit AG 19** reference is made only to the „Plaintiff" in the singular; as one, however, can easily see when one reads the designation of the parties and Point 1 of the Introduction, Mr.  Dimitriy Shirokov sued for injunctive relieve „on behalf of himself and all others similarly situated"  and  „on behalf of himself and 4,576 other similarly-situated victims" against, inter al., Petitioner No. 1. In addition, the complaint was filed and accepted as a „Complaint Class Action", i.e.., a class action. Unlike in the Federal Republic of Germany,  this is possible in the United States. Other complaints in the USA against Petitioner No. 1  were not able to be located on the Internet, where complaints have to be made available, by the Respondent. Die Petitioner No. 1 is politely requested, if it intends to maintain its allegation that a complaint by one single person existed, to submit the complaint of such single person.

At bottom, it is clear that a class action complaint by 4,576 persons is pending and that Mr. Nourbakhsch, in his statement that 4,300 persons had filed a class action complaint against Petitioner

No. 1, had actually understated the situation. The statement by the Director of Petitioner No. 1, Mr. Ben Perino, in the affidavit (Exhibit AS 1), that there had been at no time a class action complaint against Petitioner No. 1, thus is, in consequence, contrary to the facts.

**6.     Defective or Incomplete Service of the Order of 2/10/2011**

The order of the State Court of Berlin of 2/10/2011 was neither delivered directly to Mr. Nourbakhsch nor was the order given to a person living or employed at the home address of  Mr.

Nourbakhsch or deposited into the mail box at the home address of Mr. Nourbakhsch. Only the Respondent received a certified copy of the order, addressed to Mr. Nourbakhsch. This was deposited on 2/11/2011 in the mail box of the Respondent. The undersigned, however, have not appeared, either vis-á-vis the Court, nor vis-á-vis the Petitioners, as the procedural or trial representatives of Mr. Nourbakhsch.

The order of 2/10/2011 was deposited in the mail box of the Respondent, to wit on Friday, 2/11/2011 at its offices, but without the motion and the exhibits thereto.

## II. Legal Considerations

1. **No Execution of the Preliminary Injunction**

a. **No Service of the Order upon Mr. Andre Nourbakhsch**

As a result of the failure to serve the order of 2/10/2011 upon Mr. Nourbakhsch, the order has not been executed vis-á-vis the latter, §§ 936, 929 (2) Code of Civil Procedure. The order was neither served upon him directly pursuant to § 191 Code of Civil Procedure, taken together with § 177 Code of Civil Procedure, nor as a substitute service pursuant to § 178 (1) No. 1 Code of Civil Procedure at the home of Mr. Nourbakhsch.

Depositing the order in the mail box of the Respondent does not constitute effective service upon Mr. Nourbakhsch. Service at the address of his professional activity, by placing in the mail box of the Respondent, was not possible as substitute service pursuant to § 178 (1) No. 2 Code of Civil Procedure, § 180 sent.. 1 Code of Civil Procedure. The address of the Respondent is not the office of Mr. Nourbakhsch within the meaning of § 178 (1) No. 2 Code of Civil Procedure. An office within the meaning of § 178 (1) No. 2 Code of Civil Procedure is an area devoted to the business activity of the recipient of service (Baumbach/Lauterbach/Albers/Hartmann, [Commentary on the] Code of Civil Procedure, 69th ed.,, 2011, § 178 note 16; Federal Supreme Court {for non-constitutional matters}] N[eue]J[uristische]W[ochenschrift]-R[echtsprechungs-]R[eport=New Legal Weekly –Case Report]** 2010, 489 (490) note 15). The recipient of service himself has to maintain a business office under the address (Federal Supreme Court, NJW 1998, 1958 (1959)). Since Mr. Nourbakhsch, as an employee, does not pursue his own business activities in the offices of the Respondent, as noted above, substitute service at the address of the Respondent is, for such reason, excluded.

Since there was not, prior to the substitute service, any attempt to effect service upon the recipient of the service personally, substitute service pursuant to § 178 (1) No. 2 Code of Civil Procedure, § 180 sent. 1Code of Civil Procedure is also excluded.

Service pursuant to § 172 (1) Code of Civil Procedure was also not effectively made upon Respondent as the procedural representative of Mr. Nourbakhsch, since the Respondent was not, or [sic] is not, the procedural representative of Mr. Nourbakhsch While the Respondent appeared as the representative of Mr. Nourbakhsch in the pre-trial cease and desist [matter], such appearance does not extend, however, to the judicial injunctive proceeding. The judicial proceeding commencing with the service of the preliminary injunction is, with respect to the pre-trial attorney correspondence about a cease and desist letter, a new phase and is to be distinguished therefrom (Superior State Court of Hamburg NJW-RR 1993, 958; Musielak, [Commentary on the] Code of Civil Procedure , 7th ed. 2009, § 172, note 2).

Since, however, the order was not executed vis-á-vis Mr. Nourbakhsch, he is no longer a party to the proceeding and can thus be heard as a witness. As the [Berlin] Superior Court has held, a party to a dispute who, while he was a party to the proceeding in the first instance, but, by reason of failure to appeal, is not a party to the appellate proceeding being pursued by the other parties to the dispute, may be heard as a witness (Superior Court [for Berlin], M[onatsschrift für]D [eutsches]R[echt=Monthly Journal on German Law] 1981, 765). The Superior State Court of Koblenz held the same (Superior Court of Koblenz, NJW-RR 2003, 283). The same

Exhibit F - 13

conclusion has to apply to the opponents of a motion for a preliminary injunction who are, as a result of failure to execute the injunction, no longer parties to the proceeding.

**b.**     **Service of the Order upon the Respondent without the Motion**

The Petitioners have also not executed the injunction vis-á-vis the Respondent. To effect execution, there had to have been, in addition to the service of the order, a service of the motion as well, since the order of the LG Berlin of 10.02.2011 is, read alone, without the motion, not able to be understood.

Reference to the motion is made several times in the order. Thus, already in the decision as to costs, the calculation is made on the basis of the motion. The Respondent thus does not know to which points in the heading the partial amounts in controversy relate. In addition, in the grounds of the decision, on p. 5, 3rd paragraph, a position is taken on the partial prayer in 2.d) of the motion, without it being clear to the Respondent what prayer is meant, and what statement is supposed to be unfair pursuant to § 4 No. 10 Unfair Competition Law.

In cases where an order of injunction refers to the motion in the heading or even only in the grounds, the motion is to accompany the injunction (State Court of Wuppertal, Judgment of 3/18/2009, File No.: 3 **0** 480/08). This is all the more true, where the injunction refers to the motion and the injunction is not understandable when read alone (Superior State Court of Celle, Judgment of 2/3/1999, File No..: 2 U 279/98, juris [an online legal databank, similar to Lexis]).

**2.**     **No Claim for Injunctive Relief**

**a.**     **No Competitive Relationship between the Parties**

There is no competitive relationship between Petitioners and the Respondent. The characteristic of being a competitor pursuant to § 8 (3) Nos. 2 and 3   Unfair Competition Law is excluded at the outset in the case of the Respondent. The Respondent is, however, also not a competitor of the Petitioner pursuant to § 8 (3) No. 1  Unfair Competition Law. The fact that both Respondent and the Petitioner are active in the area of the pursuit of copyright infringements does not, by itself, permit the conclusion that they are competitors within the meaning of § 8 (3) No. 1    Unfair Competition Law. Competitors in the foregoing sense are solely businesses that attempt to market the same or similar goods or services within the same group of customers ( Federal Supreme Court GRUR 2007, 884 note 35 — Cambridge Institute;  Federal Supreme Court GRUR 2007, 1079 note 18 — Federal Printer;    Federal Supreme Court G[ewerblicher]R[echtsschutz und]U[rheber]R [echt=Commercial Legal Protection and Copyright Law] 2009, 845 note 40 — Internet Video Recorder;  Federal Supreme Court GRUR 2009, 980 note 9 — Email advertising II). It cannot be contended that the Respondent and die Petitioners offer the same or similar services. The Petitioners offer investigative services in the Internet. The Respondent offers, however, exclusively legal advice and representation. The fact that the services of both parties relate to copyright infringement does not change the distinction between such services.

**b.**     **Statement to  Ms. Mudge neither an Allegation nor an Interference with Competitors**

In the statements made to Ms. Mudge, there were neither facts within the meaning of  § 4 No. 8 Unfair Competition Law alleged nor was a competitor interfered with pursuant to § 4 No. 10 Unfair Competition Law. Since Ms. Mudge is an employee of Petitioner No. 1, the statements made to her are to be attributed to the Petitioner [sic] pursuant to § 166 Civil Code]  analogously.

Allegations pursuant to § 4 No. 8 Unfair Competition Law must be made, however, to third parties. The competitor affected by such allegation is not included in third parties in such sense. Allegations made to it are not capable of fostering or interfering with the sales or supplies of the business in question. This would only be true in the case allegations to persons who are not "in the camp" of the  Petitioners.

The same applies to unfairness pursuant to § 4 No. 10 Unfair Competition Law. An interference is

excluded if it occurs [sic: I think what is meant is that the "allegations" are made, and thus occur, but not, obviously, the interference, which is being denied] as a result of allegations made to a business affected by the allegation. In such case, the allegation is not capable of resulting in an interference with the competitor.

**c.No claim for Injunctive Relief for the Statements that are the Subject of the  Dispute**

**aa.    Evidentiary Value of the Affidavit of  Ms. Barbara Mudge**

In light of the abridged, "summarized in gist" and incorrect representation of the contents of the telephone conversation between Ms. Mudge and Mr. Nourbakhsch, the Affidavit of Ms. Mudge has no evidentiary value.

**bb.    As to the Allegation in Heading Point 1. a) — Theft of the Software**

With respect to the statement under Point 1.a) of the heading, neither of the Petitioners have a claim for injunctive relief. The conditions of § 4 No. 8  Unfair Competition Law and § 823 (2) BGB, read together with § 186, 187 Criminal Code are not satisfied. Since Mr. Nourbakhsch never claimed that Petitioner No. 2 stole the software used by Petitioner No. 1, he did not publicize any untrue fact.

In all other respects, the statements of Mr.Nourbakhsch to Ms. Mudge as the representative, or at least the agent of, Foresight Unlimited,  the client of the  Respondent, were confidential statements, as to which the client of the der Respondent had a justified interest, § 4 No. 8, 2nd clause,  Unfair Competition Law. Communication between attorney and client are subject, pursuant to § 43 a (2) Federal Attorney Regulation , to attorney confidentiality. At the European level, attorney confidentiality is protected pursuant to Art. 8 (1) European Human Rights Convention (protection of correspondence)    read together with Art. 6 (1) and (3) letter c European Human Rights Convention (right to fair proceeding) as well as Art. 7 of the Charter of Basic Rights of the European Union (respect for communications) read together with Art. 47 (1), (2) sent. 2 and Art. 48 (2)  of the Charter of Basic Rights of the European Union  (right to advice, defense and representation, respect for rights of defense). The European Court of Justice has expressly confirmed the protection of attorney confidentiality (European Court of Justice in: NJW 1983, 503). Communications underlying attorney confidentiality is to be categorized as confidential and privileged. In addition, the confidentiality of the statement is a consequence of the fact that Mr. Nourbakhsch's statements were made to only one recipient and not to a large number of recipients. Such communications are, in the view of the    Federal Supreme Court, to be classified as confidential ( Federal Supreme Court GRUR 1960, 135 (136) — Printing Orders).

Mr.  Andre Nourbakhsch, as well as the client of the Respondent, Foresight Unlimited, also otherwise had a justified interest in the communication. To be considered, in a balancing of the interests, is, whether the person making the statement is legally or contractually required  or obligated to communicate the facts (Kithler/Bornkamm, [Commentary on the] Unfair Competition Law, 29th ed., 2011, § 4, note 8.23). Mr. Nourbakhsch, as an attorney, commissioned and obligated to protect the interests of his client, Foresight Unlimited. This is a direct consequence of the statutory and contractual obligation of the attorney to notify and warn (Kleine-Cosack, [Commentary on the] Federal Attorney Regulation, 6th ed., Attachment I 1, § 11 Professional Regulation of Attorneys). Neglect of such obligations would have subjected the Respondent to a potential liability claim by its client. It is not only the right, but also the obligation, of the attorney to prevent such from the outset.

The interest of the client of the Respondent in the information constituting the subject of the dispute is, as a result of the large number of cases processed by using the „Observer" investigative software of Petitioner No. 1, is to be classified as very important.

**cc.    As to the Statement in Heading Point 1. b) aa) Unreliable Investigative Services**

Nor, with respect to the statement under Point 1.b) aa) of the Heading, does either Petitioner have a claim for injunctive relief. Here as well, the conditions of § 4 No. 8  Unfair Competition Law

Exhibit F - 15

and § 823 (2) BGB read together with § 186, 187 StGB are not satisfied. Petitioner No. 1 provided unreliable investigative services, with the result that the statements forming the subject of the dispute are true facts.

In all other respects, here as well, Mr. Nourbakhsch's statements to Ms. Mudge, as representative of the client of the Respondent, Foresight Unlimited, constitute confidential communications, to which both the client of the Respondent and the Respondent have, for the same reasons, a justified interest, § 4 No. 8, 2nd clause  Unfair Competition Law.

**dd.    As to the Statement in Heading Point 1. b) bb) — Pending Class Action Suit in the USA**

Nor, with respect to the statement under Point 1.b) bb) of the Heading, does either Petitioner have a claim for injunctive relief. The conditions of § 4 No. 8  Unfair Competition Law and § 823 (2) BGB read together with § 186, 187Criminal Code are not satisfied. Mr. Nourbakhsch did not publicize any untrue facts.

As set forth above, a class action complaint in the name of 4,576 persons is pending in the USA against Petitioner No. 1. "Pending" means that the complaint has been filed with the court. "Legally pending" means that it has been served upon the defendant. Mr. Nourbakhsch did not say anything about legally pending, but rather only that a complaint was pending against Petitioner No. 1. The question of whether the complaint has been served upon the Petitioner No. 1 is thus not relevant for the decision.

In all other respects, here again, Mr.  Nourbakhsch's statements to  Ms. Mudge, as representative of the client of the Respondent, Foresight Unlimited, constitute confidential communications, to which  the client of the Respondent has a justified interest, § 4 No. 8, 2nd clause Unfair Competition Law. We refer to the foregoing explanations.

**ee.    As to Heading Point 1. b) cc)**

Point 1.b) cc) of the order of injunction is to be abrogated, due to lack of definitiveness, pursuant to § 253 (2) No. 2 Code of Civil Procedure . It is not clear, from the Heading, which contractual relationship is at issue. It is possible that the contractual relationship between Petitioner No. 1 and the Respondent is meant. But the Heading can also be interpreted to mean that the term "contractual relationship" means the contractual relationships between Petitioner No. 1 and its clients.

In addition, as a result of the reference in the Heading to the Affidavit of Ms. Barbara Mudge, it is not clear in what cases the Respondent is enjoined from contacting clients of Petitioner No. 1. Is contact for the purpose of offering  cooperation without the assistance of  Petitioner No. 1 only enjoined when one of the statements in Points 1. a), 1. b) aa) to cc) is made thereby, or only when all of such statements are made? Where, in the first case, is the substantive difference of the Heading in Point 1 b) cc) and the other Points of the Heading? Point 1. b) cc) of the Heading cannot be executed, due to lack of definitiveness.

If the term „contractual relationship" in Point 1. b) cc) of the Heading refers to the contract between Petitioner No. 1  and  Respondent, then the claim for injunctive relief of Petitioner No. 1 under § 8 (1) read together with §§ 3, 4 No. 10  Unfair Competition Law fails, as a substantive legal matter, due to the fact that the contractual relationship between the parties was terminated as of 1/21/2011. The fact that the Respondent, following  the termination of its contract with Petitioner No. 1, makes contact with the latter's clients, does not, by itself, result in unfairness pursuant to § 4 No. 10  Unfair Competition Law. Because luring away clients is in the nature  of free competition, even when it is accomplished intentionally and systematically (on the basis of a plan) and the clients are still contractually bound to the competitor. As a result, objection can basically not be made when a business works to effect the dissolution of a contract in compliance with statutory or contractual provisions (termination, rescission or revocation periods) and takes advantage of the same for its own competitive purposes. Intruding into third-

party contractual relationships only becomes unfair when special circumstances are present (Köhler/Bornkamm, [Commentary on the] Unfair Competition Law, 29th ed., 2011, § 4, note 10.33, referring to Federal Supreme Court GRUR 1997, 920 (921) — Vending Machine Installers; Federal Supreme Court GRUR 2002, 548 (549) — Reimbursement of Car Rental Expenses; Federal Supreme Court GRUR 2004, 704 (705) — Departure Letter). Thus, if a sales representative who has left the company uses customer addresses that he has in his memory, this does not constitute anti-competitive behavior (Federal Supreme Court GRUR 1999, 934 (935) — Wine Consultant).

Even if there were a contractual relationship between Petitioner No. 1 and the Respondent, however, there would still be no claim for injunctive relief.

The fact that Respondent contacts possible clients of Petitioner No. 1 for the purpose of offering continued cooperation without the assistance of Petitioner No. 1, does not by itself result in unfairness. As set forth above, Ms. Barbara Mudge called Mr. Nourbakhsch at the order, or at least with the authorization, of a client of the Respondent, Foresight Unlimited, represented by Mr. Mark Damon. The knowledge of the contact data pertaining to Mr. Mark Damon was thus not based on the contractual relationship between the Respondent and Petitioner No. 1, but rather on the client relationship between Respondent and Foresight Unlimited. It is thus not true that the Respondent used customer addresses that had been entrusted to it or which it had obtained illegally, and thus resources to which it had no right. The instant case is not comparable with cases where employees approach customers of the employer, during the existence of the employment relationship, in order to obtain them as future customers for their own, or a third-party, business.

Irrespective thereof, the sole deciding factor is that the Respondent contacted only its own clients. That they are, or were, simultaneously customers of Petitioner No. 1, is irrelevant.

In addition, as previously set forth, Mr. Nourbakhsch in no way, either directly or indirectly, introduced or offered to the customers of Petitioner No. 1 services or business such as those of Petitioner No. 1.

On the basis of all of the foregoing, the preliminary injunction is to be abrogated.

In the event that the Court is of the view that the pleading of the Respondent is inadequate or needs to be supplemented, we request an appropriate notice from the Court. In such event, the Respondent will gladly supplement its pleadings extensively.

In the event that the Court requires a certified translation of **Exhibits AG 3, 19 and 20**, we also request a notice from the Court.

Service on the Petitioners shall be accomplished from attorney to attorney pursuant to § 174 Code of Civil Procedure .

Susanne Preuß
Attorney at Law

Exhibit F - 17

**Exhibits**

AG 1    Extract from the Register of the Companies' House

AG 2    Commercial Register extract for Petitioner No. 1

AG 3    Affidavit of Petitioner No. 2  before the United States District Court for the District of Columbia of  12/31/2009 (File no.: CA. 1:10-cv-00453-RMC) in English

AG 4    Affidavit of Petitioner No.2

AG 5    Termination Letter of  Respondent of 1/21/2011 with transmission report of the fax transmission on 1/21/2011, 20:07

AG 6    Telefax of  the termination letter of  Petitioner No. 1 of 1/25/2011, 14:37

AG 7    Email of Ms. Barbara Mudge of  2/25/2011

AG 8    Affidavit of Mr.  Richard Schneider,  Member  of the Administrative Board of Logistep   AG

AG 9    Commercial Register extract of Logistep AG

AG 10   Affidavit of  Mr.  Michael Wicher, employee of  Logistep AG

AG 11   Affidavit of  Mr.  Leszek Oginski, Director of  Logistep AG

AG 12   Email of Petitioner No. 2  of 12/10/2008

AG 13   Email of Petitioner No. 2 of 11/30/2010

AG 14   Email of  Mr.  Nourbakhsch of 1/12/2011 with attachments

AG 15   Email of  Petitioner No. 2 of 1/14/2011

AG 16   Presentation of reference customers of ipoque GmbH under their Internet presence at        http://www.ipoque.com/companv/customer-references

AG 17   Powerpoint Presentation of  ipoque GmbH „Facts on the Cease and Desist Letter about "Antichrist," BaumgartenBrandt to ipoque, 11/18/2009" of 1/13/2011

AG 18   Cease and Desist Letter to ipoque GmbH of 4/27/2010

AG 19   Class Action Complaint of  4,576 plaintiffs against, inter al., Petitioner No. 1, available on line at http://boothsweet.com/wp-content/uploads/2010/08/Master-Complaintl.pdf, by the law firm of BOOTH SWEET LLP

AG 20   Notice of the United States District Court, District of Massachusetts to the defendants as to the filing of a complaint, of 11/26/2010

Exhibit F - 18

# EXHIBIT G

# ⒽⒷ BAUMGARTENBRANDT

BaumgartenBrandt  Rechtsanwälte
Friedrichstraße 95   10117 Berlin

| | |
|---|---|
| **Landgericht Berlin**<br>**Littenstraße 12-17**<br>**10179 Berlin** | Rechtsanwälte<br><br>Dr. Ralf Baumgarten·<br>Philipp Brandt<br>André Nourbakhsch |

| | | |
|---|---|---|
| Sekretariat | Frau Haase | Intern. Handelszentrum |
| Durchwahl | +49 30 20 60 97 90-25 | Friedrichstraße 95 |
| E-Mail | haase@bb-legal.de | 10117 Berlin |
| Unser Zeichen | 13/11/nh | |
| | | T  +49 30 20 60 97 90-0 |
| | | F  +49 30 20 60 97 90-20 |

15. April 2011

### EILT! Bitte sofort vorlegen!

### - 16 O 55/11 -

### In der einstweiligen Verfügungssache

### Guardaley Ltd. u.a. ./. BaumgartenBrandt GbR

begründen wir unseren Widerspruch vom 15.03.2011 wie folgt:

## I. Sachverhalt

**1.**    **Zu den Parteien**

Die Verfügungsklägerin zu 1) ist eine nach englischem Recht am 24.04.2008 gegründete Kapitalgesellschaft mit beschränkter Haftung (Limited).

**Glaubhaftmachung:**  Auszug aus dem Register des Companies' House als

**- Anlage AG 1 -**

In Deutschland unterhält sie seit dem 29.01.2009 in Karlsruhe eine Zweigniederlassung.

Bangalore  Bangkok  Beijing  Berlin  Calcutta  Chennai  Hong Kong  Hyderabad  Mumbai  New Delhi  Shanghai
Associated Büros

USt.-Id-Nr. DE246485186
gem. § 2% BRAO von der Kanzleipflicht befreit Zustellungsbevollmächtigter  Philipp Brandt

⊕ BAUMGARTENBRANDT

**Glaubhaftmachung:** Handelsregisterauszug zu der Verfügungsklägerin
zu 1) als

**- Anlage AG 2 -**

Der Verfügungskläger zu 2) tritt im Geschäftsverkehr für die Verfügungsklägerin zu 1)
als Director of Data Services auf.

**Glaubhaftmachung:** Eidesstattliche Erklärung des Verfügungsklägers zu
2) vor dem United States District Court for the
District of Columbia vom 31.12.2009 (Az: CA.
1:10-cv-00453-RMC) in englischer Sprache als

**- Anlage AG 3 -**

Die Verfügungsbeklagte ist eine Rechtsanwaltskanzlei mit Sitz in Berlin.

Herr Rechtsanwalt André Nourbakhsch (ehemals Antragsgegner zu 2) ist Mitarbeiter
der Verfügungsbeklagten. Er wird damit unter der Adresse der Verfügungsbeklagten le-
diglich für die Verfügungsbeklagte tätig und geht dort nicht einer <u>eigenen</u> Geschäftstä-
tigkeit nach. Er ist insbesondere nicht Gesellschafter oder Geschäftsführer der Verfü-
gungsbeklagten.

2. **Vertragsverhältnisse der Verfügungsklägerin zu 1) und der Verfügungsbeklagten**

Zwischen der Verfügungsklägerin zu 1) und der Verfügungsbeklagten bestand ein Ver-
tragsverhältnis, aufgrund dessen die Verfügungsklägerin zu 1) eine Verwaltungs-
Software entwickelt und diese der Verfügungsbeklagten für die Dauer des Vertrages zur
Nutzung zur Verfügung gestellt hat.

Daneben hat die Verfügungsklägerin zu 1) mit Inhabern von Urhebernutzungsrechten an
Filmen Verträge abgeschlossen. Gegenstand dieser Verträge ist die beweissichere Erfas-
sung und Dokumentation von IP-Verbindungsdaten von Inhabern von Internetanschlüs-
sen, die im so genannten Peer-to-Peer-Verfahren (oder auch File-Sharing genannt) ur-
heberrechtlich geschützte Werke der Kunden der Verfügungsklägerin zu 1) anderen
Nutzern urheberrechtswidrig zum Download anbieten. Es wird in diesem Zusammen-
hang mit Nichtwissen bestritten, dass die Verfügungsklägerin durch ihre Kunden eben-
falls beauftragt wurde, auch die IP-Daten von Anschlussinhabern zu ermitteln, die le-
diglich versuchten, urheberrechtlich geschützte Werke herunterzuladen, ohne dass do-
kumentiert wird, dass es tatsächlich zu einem Download gekommen ist, geschweige
denn, dass die entsprechenden Werke über diese Anschlüsse selbst zum Download an-
geboten, also öffentlich zugänglichgemacht worden sind.

Die Verfügungsbeklagte hat wiederum mit Inhabern von Urhebernutzungsrechten, die
in der Vergangenheit auch mit der Verfügungsklägerin zu 1) Verträge über die Ermitt-
lung von IP-Adressen abgeschlossen haben, Verträge über die Erbringung anwaltlicher
Dienstleistungen abgeschlossen. Die Verfügungsbeklagte beantragt im Rahmen ihrer
anwaltlichen Dienstleistungen Beschlüsse zur Sicherung und Herausgabe von IP-
Adressen, ermittelt von den Internet Service Providern die hinter den IP-Adressen ste-
henden Anschlussinhaber und macht gegen diese Unterlassungs- und Schadensersatzan-

sprüche geltend. Von ihren Mandanten wird die Verfügungsbeklagte dabei dazu beauftragt, ausschließlich gegen solche Anschlussinhaber vorzugehen, die urheberrechtswidrig Filme im Internet gem. § 19 a UrhG öffentlich zugänglichmachen. Sie wurde und wird nicht dazu beauftragt, gegen Anschlussinhaber vorzugehen, die lediglich versucht haben, Filme herunterladen, ohne selbst solche der Öffentlichkeit anzubieten. Zur Beantragung der zur Durchführung der Abmahnungen erforderlichen Sicherungs- und Herausgabebeschlüsse nach § 109 Abs. 9 UrhG hat die Verfügungsbeklagte dem jeweiligen Gericht jeweils eine Eidesstattliche Erklärung des Verfügungsklägers zu 2) vorgelegt, in der der Verfügungskläger zu 2) erklärt, nur IP-Adressen von Internetnutzern zu identifizieren, die Filmwerke zum Download anbieten. Er hat darin nicht erklärt, dass die Verfügungsklägerin zu 1) auch IP-Adressen von Personen ermittelt, die lediglich Filmwerke herunterladen oder dies sogar nur versucht haben.

**Glaubhaftmachung:** Eidesstattliche Erklärung des Verfügungsklägers zu 2) als

**- Anlage AG 4 -**

Mandanten der Verfügungsklägerin zu 1) waren und sind zum Teil heute noch Mandanten der Verfügungsbeklagten. Herr Mark Damon, der in der eidesstattlichen Erklärung der Frau Barbara Mudge erwähnt wird, vertritt beispielsweise das Unternehmen Foresight Unlimited mit Sitz in den USA, das zum Zeitpunkt der streitgegenständlichen Äußerungen sowohl Kunde der Verfügungsklägerin zu 1) als auch Mandantin der Verfügungsbeklagten war. Zu ihren Mandanten, und damit auch zu Herrn Mark Damon von dem Unternehmen Foresight Unlimited hält die Verfügungsbeklagte selbstverständlich unabhängig vom Bestehen vertraglicher Beziehungen der Mandanten zu der Verfügungsklägerin zu 1) weiterhin eigenen Kontakt, um ihren anwaltlichen Pflichten aus den mit den Mandanten abgeschlossenen Geschäftsbesorgungsverträgen unter Beachtung der BRAO und der BORA nachzukommen.

**3. Kündigung des zwischen der Verfügungsklägerin zu 1) und der Verfügungsbeklagten bestehenden Vertragsverhältnisses**

Den zwischen der Verfügungsklägerin zu 1) und der Verfügungsbeklagten bestehenden Vertrag hat die Verfügungsbeklagte bereits mit Datum vom 21.01.2011 fristlos gekündigt. Die Kündigung wurde per Post an die Verfügungsklägerin zu 1) versendet und ging dieser zudem am 21.01.2011 vorab per Fax zu.

**Glaubhaftmachung:** Kündigungsschreiben der Verfügungsbeklagten vom 21.01.2011 mit Sendebericht der Faxversendung vom 21.01.2011, 20:07 Uhr als

**- Anlage AG 5 -**

Mit Datum vom 25.01.2011 hat darüber hinaus auch die Verfügungsklägerin zu 1) mit Unterschrift des Verfügungsklägers zu 2) der Verfügungsbeklagten die fristlose Kündigung des bestehenden Vertrages erklärt. Die Kündigung ging der Verfügungsbeklagten am 25.01.2011, 14:37 Uhr per Fax und am 26.01.2011 per Post zu.

BAUMGARTENBRANDT

| | |
|---|---|
| **Glaubhaftmachung:** | Telefax des Kündigungsschreibens der Verfügungs-klägerin zu 1) vom 25.01.2011, 14:37 Uhr |

**- Anlage AG 6 -**

Damit wussten die Verfügungskläger bei Versand des Antrages auf einstweilige Verfügung an das LG Berlin jedenfalls von der Kündigung des Vertrages durch die Verfügungsbeklagte. Der Antrag auf Erlass der einstweiligen Verfügung datiert zwar auf den 21.01.2011, ist aber bei Gericht erst am 26.01.2011 eingegangen. Der Versand des Antrags kann daher nicht vor Dienstag, den 25.01.2011 erfolgt sein. Wir behaupten sogar, dass die Verfügungskläger den Antrag auf Erlass der einstweiligen Verfügung nach dem 25.01.2011, 14:37 Uhr, also nach Zugang der Kündigung der Verfügungsklägerin zu 1) bei der Verfügungsbeklagten versendet haben. Sollten die Verfügungskläger anderer Auffassung sein, mögen sie dies entsprechend darlegen und beweisen.

Soweit die Verfügungskläger in ihrem Antrag auf Erlass der einstweiligen Verfügung angeben, seit 2009 mit der Verfügungsbeklagten in einem vertraglichen Verhältnis zu stehen, haben sie im Ergebnis entgegen ihrem eigenen Wissen die Tatsache unterschlagen, dass dieser Vertrag seit dem 21.01.2011 beendet ist. Wir weisen ausdrücklich auf die strafrechtliche Relevanz dieser Falschaussage hin.

**4.   Telefonat des Herrn Nourbakhsch mit Frau Barbara Mudge**

**a.   Berufliche Stellung der Frau Barbara Mudge und Anlass des Anrufs bei dieser**

Frau Barbara Mudge ist Mitglied des Board of Directors der Independent Film and Television Alliance (IFTA) in Los Angeles, USA. Sie betreut Unternehmen aus der Filmbranche, die Mitglied der IFTA sind. Zu diesen Unternehmen gehört, wie sich auch dem Wortlaut der eidesstattlichen Erklärung der Frau Barbara Mudge (Anlage AS 3) entnehmen lässt, das von Herrn Mark Damon vertretene Unternehmen Foresight Unlimited.

Frau Mudge wird darüber hinaus seit längerem für die Verfügungsklägerin zu 1) als deren Mitarbeiterin tätig.

| | |
|---|---|
| **Glaubhaftmachung:** | E-Mail von Frau Barbara Mudge vom 25.02.2011 als |

**- Anlage AG 7 -**

Frau Mudge war und ist daher zu keinem Zeitpunkt Kundin der Verfügungsklägerin zu 1) gewesen, sondern deren Mitarbeiterin.

Zudem stellen weder die Verfügungskläger noch Frau Barbara Mudge in der Antragsbegründung bzw. der eidesstattlichen Erklärung die Hintergründe des Telefonats von Frau Mudge mit Herrn Nourbakhsch dar. Frau Barbara Mudge hat nicht ohne Grund mit Herrn Nourbakhsch telefoniert, wie die Antragsbegründung und die eidesstattliche Erklärung suggerieren mögen. Das Telefonat geschah vielmehr, nachdem die Verfügungsbeklagte mit ihrem Mandanten Foresight Unlimited telefoniert hatte. Offenbar hatte anschließend Herr Mark Damon vom Unternehmen Foresight Unlimited mit Frau Mudge telefoniert. Es kann diesseits nicht nachvollzogen werden, ob Frau Mudge anschließend

BAUMGARTENBRANDT

in Vertretung der Foresight Unlimited oder aber aufgrund ihrer Tätigkeit für die Verfü-
gungsklägerin zu 1) mit Herrn Nourbakhsch gesprochen hat. In jedem Fall erfolgte das
Gespräch aber auf Wunsch und Initiative von Frau Mudge und mit Wissen der Mandan-
tin der Verfügungsbeklagten Foresight Unlimited.

Die an Frau Mudge in dem Telefonat mit Herrn Nourbakhsch weitergegebenen Infor-
mationen bezogen sich ausschließlich auf das Mandatsverhältnis der Verfügungsbeklag-
ten zur Mandantin Foresight Unlimited und das zuvor mit Herr Mark Damon geführte
Telefonat. Frau Mudge wollte die darin aufgeworfenen Fragen selbst noch einmal dar-
gelegt haben. Es wurde in diesem Zusammenhang während des Gesprächs ausdrücklich
immer wieder auf das Gespräch mit Herrn Damon Bezug genommen und Frau Mudge
hat wiederholt dargelegt, dass Herr Damon ihr Kunde (client) sei und sie daher mit ih-
rem Anruf einer Bitte von ihm nachkomme, sich das ihm mitgeteilte nochmals selbst
darlegen zu lassen.

> **Glaubhaftmachung:** Zeugnis des Herrn Nourbakhsch, zu laden über die
> Verfügungsbeklagte

Die Antragsbegründung und die eidesstattliche Erklärung von Frau Barbara Mudge er-
wecken ferner den Eindruck, dass Frau Mudge am 05.01.2011 auf Initiative von Herrn
Nourbakhsch angerufen wurde. Tatsächlich war es aber Frau Barbara Mudge selbst, die
zunächst versucht hatte, Herrn Nourbakhsch am 05.01.2011, ca. 16:30 Uhr anzurufen.

> **Glaubhaftmachung:** Zeugnis der Mitarbeiterin der Verfügungsbeklagten,
> Frau Nadine Haase, zu laden über die Verfügungs-
> beklagte

Da Herr Nourbakhsch zum Zeitpunkt des Anrufs der Frau Mudge nicht zu sprechen
war, haben Herr Nourbakhsch sowie Herr Philipp Brandt, Gesellschafter der Verfü-
gungsbeklagten, Frau Mudge noch am selben Tag zurückgerufen.

> **Glaubhaftmachung:** Zeugnis des Herrn Nourbakhsch, zu laden über die
> Verfügungsbeklagte

Den Inhalt des Telefonats hat Frau Mudge unvollständig und falsch wiedergegeben. Bei
Abgabe der eidesstattlichen Erklärung vom 16.01.2011 und damit 11 Tage nach dem
Telefonat konnte sich Frau Mudge offenbar schon nicht mehr präzise an den Inhalt des
Gesprächs erinnern. Dies zeigt sich an der Tatsache, dass sie schreibt: „Sinngemäß
ergab sich folgender Gesprächsinhalt:" Anschließend gibt sie lediglich „sinngemäß" ei-
ne Zusammenfassung des Gesprächsinhalts wieder, der auf die Anträge der Verfügung
verkürzt wurde und das Gesagte unvollständig und falsch wiedergibt. Hinzu kommt,
dass das Gespräch auf Englisch und damit einer Fremdsprache für Herrn Nourbakhsch
geführt wurde. Der Inhalt des Gesprächs war zudem juristischer Art, weshalb Frau
Mudge, die im Unterschied zu Herrn Rechtsanwalt Nourbakhsch keine Juristin ist, das
von Herrn Nourbakhsch Gesagte falsch verstanden haben könnte.

Dass Frau Mudge den Inhalt des Gesprächs offenbar falsch verstanden hat, zeigt sich
bereits hinsichtlich der nicht mehr streitgegenständlichen Aussage in Punkt 1) der Ei-
desstattlichen Erklärung (Anlage AS 3). Schon in diesem Punkt hat Frau Mudge das
Gesagte falsch wiedergegeben: Herr Nourbakhsch hat Frau Mudge mitgeteilt, dass die
Verfügungsklägerin zu 1) IP-Verbindungsdaten, die die Verfügungsklägerin zu 1) für
einen Inhaber von Urheberrechten ermittelt hat, der von der Verfügungsbeklagten recht-

BAUMGARTENBRANDT

lich vertreten wurde, über einen Zeitraum von fünf Monaten einer anderen Rechtsan-
waltskanzlei übermittelt hat. Diese Kanzlei hat sodann auf Betreiben der Verfügungs-
klägerin zu 1) im Namen des Inhabers der Urheberrechte Verfahren gem. § 101 Abs. 9
UrhG vor verschiedenen Landgerichten geführt und die entsprechenden Beschlüsse auf
Herausgabe der Daten der Inhaber der Internetanschlüsse erwirkt. Herr Nourbakhsch
teilte Frau Mudge mit, dass ein exklusives Mandatsverhältnis zwischen dem betreffen-
den Inhaber der Urheberrechte und der Verfügungsbeklagten bestand und die Verfü-
gungskläger den Inhaber der Urheberrechte von der Weitergabe der Daten an die dritte
Kanzlei nicht in Kenntnis gesetzt haben. Im Gegensatz hierzu gibt Frau Mudge in der
eidesstattlichen Erklärung an, Herr Nourbakhsch hätte erklärt, es seien Rechtstitel ein-
gefordert worden, die an die Verfügungsbeklagte abgetreten worden seien. Die Verfü-
gungsbeklagte lässt sich keine Rechte abtreten. Ebenso ist nicht nachvollziehbar, dass
Frau Mudge behauptet, Herr Nourbakhsch hätte behauptet, die dritte Rechtsanwalts-
kanzlei hätte Klage eingereicht.

**b.**    **Zu den streitgegenständlichen Aussagen im Telefonat**

**aa.**   **Zum Tenor Punkt 1. a) – Diebstahl der Software**

Herr Nourbakhsch hat in dem fraglichen Telefonat mit Frau Mudge nicht ausgesagt,
dass der Verfügungskläger zu 2) die von der Verfügungsklägerin zu 1) genutzte Ermitt-
lungssoftware von einem Schweizer Unternehmen gestohlen hat. Herr Nourbakhsch hat
Frau Mudge vielmehr lediglich über die Umstände der früheren Mitarbeit des Verfü-
gungsklägers zu 2) bei der Logistep AG informiert. Er hat sie namentlich darüber in-
formiert, dass der Verfügungskläger zu 2) bis zum 31. Oktober 2008 als Leiter der tech-
nischen Abteilung bei der Logistep AG beschäftigt war und diese eine Software zur
Ermittlung von Urheberrechtsverletzungen entwickelt hatte. In einer eidesstattlichen
Versicherung, die zu einer Klage in den USA gegen die Verfügungsklägerin zu 1) im
Internet veröffentlicht worden ist, hat der Verfügungskläger zu 2) hingegen behauptet,
bereits seit Anfang 2007 bei der Verfügungsklägerin zu 1) tätig zu sein.

   **Glaubhaftmachung:** Zeugnis des Herrn Nourbakhsch, zu laden über die
                          Verfügungsbeklagten

Weiterhin hat Herrn Nourbakhsch Frau Mudge berichtet, dass Mitarbeiter der Logistep
AG im Dienstwagen des Verfügungsklägers zu 2) noch während dessen Tätigkeit für
die Logistep AG Broschüren und Visitenkarten der GuardaLey Ltd. gesehen haben.

   **Glaubhaftmachung:** Zeugnis des Herrn Nourbakhsch, zu laden über die
                          Verfügungsbeklagten

Herr Nourbakhsch hat Frau Mudge ausdrücklich mitgeteilt, dass er aufgrund der Ge-
samtschau dieser Umstände trotz der langen und guten Zusammenarbeit mit den Verfü-
gungsklägern nunmehr nicht mehr mit Sicherheit davon ausgehen könne, dass der Ver-
fügungskläger zu 2) zur Entwicklung der Software der Verfügungsklägerin zu 1) nicht
in rechtswidriger Weise auf urheberrechtlich geschütztes Know-How der Logistep AG
zurückgegriffen habe. Herr Nourbakhsch hat dabei wiederholt betont, dass es sich bislang
nur um begründete Zweifel handelt, die Verfügungsbeklagte aber versucht hat und wei-
ter versucht, diese Frage mit der Verfügungsklägerin zu 1) zu klären um die Zweifel
auszuräumen.

**Glaubhaftmachung:** Zeugnis des Herrn Nourbakhsch, zu laden über die Verfügungsbeklagten

Herr Nourbakhsch hat Frau Mudge außerdem davon erzählt, dass der Verfügungskläger zu 2) trotz schriftlicher Aufforderung der Verfügungsbeklagten nicht bereit war, diese Zweifel durch Abgabe einer eidesstattlichen Versicherung auszuräumen.

**Glaubhaftmachung:** Zeugnis des Herrn Nourbakhsch, zu laden über die Verfügungsbeklagten

All diese Details hat Frau Mudge in der eidesstattlichen Erklärung außen vor gelassen. Sie gibt quasi lediglich das wieder, was bei ihr 11 Tage nach dem Telefonat noch in der Erinnerung „hängen geblieben" ist. Und das ist allein ihre persönliche Schlussfolgerung aus den Details des Gesagten, nämlich dass die Software „gestohlen" worden sei.

**bb. Zum Tenor Punkt 1. b), aa) – Unzuverlässige Rechercheleistungen**

Herr Nourbakhsch hat Frau Mudge darauf hingewiesen, dass der Verfügungsbeklagte erfahren hat, dass die von der Verfügungsklägerin zu 1) im Auftrag der Inhaber der Urheberrechte festgestellten IP-Verbindungsdaten nicht zu 100 % korrekt sind. Die Verfügungsklägerin zu 1) habe mit ihren Ermittlungsleistungen nicht nur so genannte Uploader, also Anbieter von Werken, sondern auch solche Personen erfasst, die lediglich Downloadanfragen an die Verfügungsklägerin zu 1) gestellt habe. Weiter hat Herr Nourbakhsch ausgeführt, dass die Verfügungsklägerin zu 1) die von ihr gelieferten Daten auch nicht nach Up- und Downloaderfassungen unterscheide bzw. entsprechend kenntlich mache. Die Download-Anfragen seien als „Erfassungen", von denen nicht bekannt sei, um wie viele es sich handelt, ohne Ausnahme für zivilrechtliche unberechtliche Ansprüche ohne Bedeutung. Dies bedeute, dass eine unbekannte Anzahl von Abmahnungen wegen der Verletzung von Urheberrechten rechtsgrundlos ergangen sein könnten und die Verfügungsbeklagte weder zum damaligen Zeitpunkt noch heute die Möglichkeit habe, diese zu identifizieren. Abschließend hat Herr Nourbakhsch Frau Mudge darauf hingewiesen, dass unberechtigte Abmahnungen unter Umständen zu Regressforderungen der abgemahnten Personen gegen die Inhaber der Urheberrechte führen können.

**Glaubhaftmachung:** Zeugnis des Herrn Nourbakhsch, zu laden über die Verfügungsbeklagte

**cc. Zum Tenor Punkt 1. b) bb) – Sammelklage in den USA anhängig**

Herr Nourbakhsch hat Frau Mudge darauf hingewiesen, dass im Internet eine Sammelklageschrift zu finden ist, aus der sich ergibt, dass ein Kläger Klage für sich sowie für über 4.500 andere Betroffene gegen verschiedene Parteien, unter anderem auch gegen die Verfügungsklägerin zu 1) erhoben hat. Er hat ihr darüber hinaus mitgeteilt, dass die Klage ausweislich der Begründung auf dem Vorwurf von „fraud and extortion" [Betrug und Erpressung] beruht.

**Glaubhaftmachung:** Zeugnis des Herrn Nourbakhsch, zu laden über die Verfügungsbeklagte

BAUMGARTENBRANDT

**dd.  Zum Tenor Punkt 1. b) cc) – Anbieten anderweitiger Zusammenarbeit**

Weiterhin ist die eidesstaatliche Versicherung der Frau Mudge insoweit unzutreffend, als dass sie behauptet, Herr Nourbakhsch habe ihr angeboten „ihren Mandanten" Untersuchungen von Urheberrechtsverletzungen von einem anderen, bestimmten Unternehmen durchführen zu lassen. Zutreffend ist an dieser Aussage lediglich, dass Frau Mudge Herrn Nourbakhsch gefragt hat, ob es Alternativen zu dem Verfügungskläger zu 1) als Dienstleister gibt. Diese Frage hat Herr Nourbakhsch dahingehend beantwortet, dass es zahlreiche Anbieter am Markt gebe. Auf die weitere Frage von Frau Mudge, ob und inwieweit ein Wechsel des Dienstleisters möglich sei, hat Herr Nourbakhsch im Rahmen seines technischen Verständnisses geantwortet, dass die Übernahme der Überwachungstätigkeiten durch einen anderen Anbieter zumindest technisch ohne weiteres möglich sein sollte.

**5.  Hilfsweise: Keine Behauptung unwahrer Tatsachen**

Bei den streitgegenständlichen Aussagen würde es sich zudem um wahre Tatsachen handeln. Dazu im Einzelnen:

**a.  Zum Tenor Punkt 1. a) – Diebstahl der Software**

Es wird behauptet, dass für die Entwicklung der von der Verfügungsklägerin zu 1) zur Recherche genutzten Software auf Wissen fremder Personen zurückgegriffen wurde, die Software also „gestohlen" wurde. Dass die Ermittlungssoftware der Verfügungsklägerin zu 1) auf Wissen fremder Personen beruht, ergibt sich aus den Umständen, insbesondere den Umständen der Tätigkeit des Verfügungsklägers zu 2).

In dem Gerichtsverfahren vor dem United States District Court for the District of Columbia hat der Verfügungskläger zu 2) in einer eidesstattlichen Erklärung vom 31.12.2009 (Az.: CA. 1:10-cv-00453-RMC) behauptet, bereits seit Januar 2007 bei der Verfügungsklägerin zu 1) tätig zu sein.

|  |  |
|---|---|
| **Glaubhaftmachung:** | Eidesstattliche Erklärung des Verfügungsklägers zu 2) vor dem United States District Court for the District of Columbia vom 31.12.2009 (Az.: CA. 1:10-cv-00453-RMC) in englischer Sprache bereits vorgelegt als |

- Anlage AG 3 -

Bis zum 31. Oktober 2008 war er allerdings bei der Logistep AG mit Sitz in Steinhausen, Schweiz in führender Position als Chief Technical Officer, das heißt Leiter der Technik angestellt. Im Anschluss daran war er bis zum 21.02.2009 bei der Logistep AG als freier Mitarbeiter tätig.

|  |  |  |
|---|---|---|
| **Glaubhaftmachung:** | 1. | Eidesstattliche Erklärung des Herrn Richard Schneider, Mitglied des Verwaltungsrates der Logistep AG, Sennweidstr. 45, 6312 Steinhausen, Schweiz als |

- Anlage AG 8 -

⊕ BAUMGARTENBRANDT

2. Zeugnis des Herrn Richard Schneider, Logistep AG, Sennweidstr. 45, 6312 Steinhausen, Schweiz

Die Logistep AG erbringt wie die Verfügungsklägerin zu 1) Dienstleistungen im Internet und im Bereich Internet-Sicherheit.

**Glaubhaftmachung:** 1. Handelsregisterauszug der Logistep AG als

- Anlage AG 9 -

2. Eidesstattliche Erklärung des Herrn Richard Schneider, Mitglied des Verwaltungsrates der Logistep AG, Sennweidstr. 45, 6312 Steinhausen, Schweiz bereits vorgelegt als

- Anlage AG 8 -

3. Zeugnis des Herrn Richard Schneider, Logistep AG, Sennweidstr. 45, 6312 Steinhausen, Schweiz

Die Logistep AG hat als eines der ersten Unternehmen eine Software für die beweissichere Erfassung von IP-Adressen entwickelt und zum Einsatz gebracht. Diese Software wurde von mehreren Mitarbeitern der Logistep AG im Zeitraum von Februar 2004 bis Mai 2005 entwickelt und wird seitdem beständig fortentwickelt.

**Glaubhaftmachung:** 1. Eidesstattliche Erklärung des Herrn Richard Schneider, Mitglied des Verwaltungsrates der Logistep AG bereits vorgelegt als

- Anlage AG 8 -

2. Zeugnis des Herrn Richard Schneider, Logistep AG, Sennweidstr. 45, 6312 Steinhausen, Schweiz

Der Verfügungskläger zu 2) hat der Verfügungsbeklagten gegenüber nie offengelegt, dass er in der Vergangenheit überhaupt für die Logistep AG tätig war, noch hat er offengelegt, dass er bis zum 31. Oktober 2008 bei der Logistep AG angestellt und bis 21.02.2009 als freier Mitarbeiter bei dieser beschäftigt war.

Demnach hat der Verfügungskläger zu 2) nach eigenem Vortrag etwa zwei Jahre parallel für die Verfügungsklägerin zu 1) in gleicher Position gearbeitet, ohne dies der Logistep AG gegenüber offengelegt zu haben.

Der Verfügungskläger zu 2) hatte darüber hinaus vor seinem Ausscheiden aus der Logistep AG eine geheime Rufumleitung von seinem Dienstanschluss bei der Logistep AG auf seine Mobiltelefonnummer 0176-24791824 geschaltet. Die Rufumleitung hatte er dabei nicht am Telefon eingestellt, sondern schon bei dem Telefonanbieter der Logistep AG geschaltet, sodass die Rufumleitung auf den Displays der Telefone der

ⓑ BAUMGARTENBRANDT

Logistep AG nicht sichtbar war. Die Rufumleitung haben Herr Richard Schneider und Herr Michael Wicher von der Logistep AG erst am 29.04.2010 zufällig entdeckt.

| | | |
|---|---|---|
| **Glaubhaftmachung:** | 1. | Eidesstattliche Erklärung des Herrn Richard Schneider, Mitglied des Verwaltungsrates der Logistep AG bereits vorgelegt als |

**- Anlage AG 8 -**

| | | |
|---|---|---|
| | 2. | Zeugnis des Herrn Richard Schneider, Logistep AG, Sennweidstr. 45, 6312 Steinhausen, Schweiz |
| | 3. | Eidesstattliche Erklärung des Herrn Michael Wicher, Mitarbeiter der Logistep AG als |

**- Anlage AG 10 -**

Zudem hat der Verfügungskläger zu 2) während seiner Tätigkeit bei er Logistep AG sämtliche an seine E-Mail-Adresse achache@logistepag.com bei der Logistep AG gerichteten E-Mails an seine private E-Mail-Adresse weitergeleitet.

| | |
|---|---|
| **Glaubhaftmachung:** | Eidesstattliche Versicherung des Herrn Leszek Oginski, Direktor der Logistep AG als |

**- Anlage AG 11 –**

Herr Oginski von der Logistep AG sah schließlich im Dienstwagen des Verfügungsklägers zu 2) noch während seiner Tätigkeit bei der Logistep AG Broschüren und Visitenkarten der GuardaLey Ltd..

| | |
|---|---|
| **Glaubhaftmachung:** | Eidesstattliche Versicherung des Herrn Leszek Oginski, Direktor der Logistep AG, bereits vorgelegt als |

**- Anlage AG 11 -**

Der Verfügungskläger zu 2) hat der Verfügungsbeklagten jedoch bereits am 10.12.2008, also noch während dessen freiberuflicher Tätigkeit bei der Logistep AG namens der Verfügungsklägerin zu 1) die Ermittlung von Daten von Inhabern von Internetanschlüssen angeboten, die im Internet urheberrechtlich geschützte Werke zum Herunterladen anbieten.

| | |
|---|---|
| **Glaubhaftmachung:** | E-Mail des Verfügungsklägers zu 2) vom 10.12.2008 als |

**- Anlage AG 12 -**

Angesichts der Tatsache, dass die Logistep AG für die Entwicklung ihrer Ermittlungssoftware unter Einsatz von mindestens drei Mitarbeitern etwa 16 Monate benötigt hat, ist es auffällend, dass die Verfügungsklägerin zu 1) noch vor dem Ausscheiden des Ver-

BAUMGARTENBRANDT

fügungsklägers zu 2) aus der Logistep AG in der Lage war, die gleichen Dienstleistungen wie die Logistep AG anzubieten.

Die Zweifel der Verfügungsbeklagten an der Urheberschaft und vor allem an der Zuverlässigkeit der Software „Observer" wurden dadurch verstärkt, dass der Verfügungskläger zu 2) Herrn Nourbakhsch am 30.11.2010 per E-Mail kontaktierte und die Verfügungsbeklagte darum bat, das Gutachten über die Funktionsweise und Zuverlässigkeit der Software „Observer" nur in zwingend notwendigen Fällen zu verwenden, ohne dafür einen glaubwürdigen Grund vorbringen zu können.

**Glaubhaftmachung:** E-Mail des Verfügungsklägers zu 2) vom 30.11.2010 als

**- Anlage AG 13 -**

Aufgrund der Gesamtschau dieser Tatsachen sind bei der Verfügungsbeklagten Zweifel an der Urheberschaft der Datenermittlungssoftware „Observer" der Verfügungsbeklagten aufgekommen. Die Verfügungsbeklagte befürchtete, dass der Verfügungskläger zu 2) für die Entwicklung der von der Verfügungsklägerin zu 1) eingesetzten Ermittlungssoftware auf Know-How seines früheren Arbeitgebers, der Logistep AG, zurückgegriffen haben könnte.

Daraufhin hat Herr Nourbakhsch beide Verfügungskläger zur Ausräumung dieser Bedenken um eine verbindliche Gegendarstellung in Form einer eidesstattlichen Versicherung gebeten.

**Glaubhaftmachung:** E-Mail des Herrn Nourbakhsch vom 12.01.2011 mit Anhängen als

**- Anlage AG 14 -**

Beide Verfügungskläger haben bis zur Beantragung der einstweiligen Verfügung die Abgabe einer solchen Erklärung und damit die Ausräumung dieser Zweifel verweigert. Alles, was sie getan haben, ist, der Verfügungsbeklagten mitzuteilen, dass sie die Eidesstattlichen Erklärungen an einen Herrn Guido Hettinger weitergeleitet haben und „erst nach erfolgter Prüfung durch externe" die eidesstattlichen Erklärungen unterschrieben werden können.

**Glaubhaftmachung:** E-Mail des Verfügungsklägers zu 2) vom 14.01.2011

**- Anlage AG 15 -**

Erst im Rahmen der Beantragung der einstweiligen Verfügung haben die Verfügungskläger eine entsprechende Erklärung abgegeben.

**b.** **Zum Tenor Punkt 1. b) aa) – Unzuverlässige Rechercheleistungen**

Die Verfügungsklägerin zu 1) ist, wie oben bereits dargestellt, den Mandanten der Verfügungsbeklagten gegenüber lediglich dazu verpflichtet und berechtigt, die IP-Daten von so genannten Uploadern zu ermitteln, nicht dagegen von Personen, die lediglich einen sogenannten Download oder gar nur eine Downloadanfrage von urheberrechtlich

⑥ BaumgartenBrandt

geschützten Filmwerken vornehmen. Entsprechend mahnt die Verfügungsbeklagte lediglich den Upload als öffentliches Zugänglichmachen nach § 19 a UrhG ab.

Im Januar 2011 hat die Verfügungsbeklagte von der ipoque GmbH erfahren, dass die von der Verfügungsklägerin zu 1) erbrachten Recherchedienstleistungen teilweise nicht dem mit den Inhabern der Urheberrechte Vereinbarten, noch dem, was abgemahnt wurde, entsprachen und daher unzuverlässig sind.

Die ipoque GmbH ist ein IT-Unternehmen, welches verschiedene Dienstleistungen im Bereich Bandbreiten- und Internetmanagement anbietet. Das Unternehmen ist weltweit tätig, unter anderem für zahlreiche deutsche Universitäten.

| Glaubhaftmachung: | 1. | Darstellung der Referenzkunden der ipoque GmbH unter deren Internetpräsenz auf http://www.ipoque.com/company/customer-references als |
|---|---|---|

**- Anlage AG 16 -**

|  | 2. | Zeugnis des Dr. Frank Stummer, zu laden über die ipoque GmbH, Mozartstraße 3, 04107 Leipzig |
|---|---|---|

Ein Teilbereich, für den unter anderem Herr Dr. Frank Stummer zuständig ist, ist die forensische Datenermittlung von IP-Adressen, unter welchen Urheberrechtsverletzungen im Internet begangen werden.

Die ipoque GmbH hat aufgrund folgender Begebenheit festgestellt, dass die Verfügungsklägerin zu 1) IP-Daten von Anschlussinhabern ermittelt, die selbst keine Filmwerke der Öffentlichkeit zugänglich machen, die also keinen „Upload" vornehmen.

Am 18.11.2009 um 01:03:25 Uhr MEZ hat die ipoque GmbH ein sog. Testscreening zu dem Filmwerk „Antichrist" im Internet durchgeführt. Dieses Filmwerk wurde zum damaligen Zeitpunkt durch die Verfügungsklägerin zu 1) in Internet-Tauschbörsen, insbesondere Peer2Peer-Netzwerken wie „Bittorrent" im Namen des Inhabers der Urheberrechte überwacht. Von der Verfügungsklägerin zu 1) erfasste IP-Adressen wurden durch die Verfügungsbeklagte in Verfahren nach § 101 Abs. 9 UrhG identifiziert und deren Anschlussinhaber gem. §§ 97, 19a UrhG wegen des unerlaubten öffentlichen Zugänglichmachens des vorgenannten Filmwerkes abgemahnt.

Im Zuge dieses Testscreenings hat die Software der ipoque GmbH in dem Netzwerk „Bittorrent" nach Quellen von illegalen Kopien des vorgenannten Filmwerkes gesucht, das heißt Download-Möglichkeiten von Servern gesucht, die diese Dateien anbieten (Uploader). Auf den Servern der ipoque GmbH hat sich zu diesem, wie auch zu keinem anderen Zeitpunkt eine vollständige oder teilweise Kopie des Werkes „Antichrist" befunden. Aus diesem Grund wurde von der ipoque GmbH in dem Netzwerk „Bittorrent" weder ein Bestandteil des Films „Antichrist" angeboten, noch wurde dieser Eindruck im Internet erweckt.

| Glaubhaftmachung: | 1. | Zeugnis des sachverständigen Zeugen Dr. Frank Stummer, zu laden über die ipoque GmbH, Mozartstraße 3, 04107 Leipzig |
|---|---|---|

BAUMGARTENBRANDT

2. Powerpoint-Präsentation der ipoque GmbH „Fakten zur Abmahnung „Antichrist", BaumgartenBrandt an ipoque, 18.11.2009" vom 13.01.2011 als

**- Anlage AG 17 -**

Nach dem Testscreening erhielt die ipoque GmbH eine kostenpflichtige Abmahnung der Verfügungsbeklagten, in der die ipoque GmbH zur Abgabe einer Unterlassungserklärung bis zum 18.05.2010 aufgefordert wurde. Tatvorwurf war ein urheberrechtswidriger Upload, das heißt das öffentliche Zugänglichmachen des Filmwerkes „Antichrist" zum vorgenannten Zeitpunkt des Testscreenings.

**Glaubhaftmachung:** 1. Zeugnis des Dr. Frank Stummer, zu laden über die ipoque GmbH, Mozartstraße 3, 04107 Leipzig

2. Abmahnung an die ipoque GmbH vom 27.04.2010 als

**- Anlage AG 18 -**

Es ist beweissicher dokumentiert, dass es technisch ausgeschlossen ist, dass die ipoque GmbH eine solche Datei ganz oder teilweise angeboten hat, also ein so genannter „Upload" stattgefunden hat. Es ist technisch darüber hinaus sogar ausgeschlossen, dass, was nicht Vorwurf der Abmahnung war, ein Download der Datei stattgefunden hat. Zum Tatzeitpunkt bestand seitens der ipoque GmbH nur zu einem einzigen fremden Server Kontakt, der somit nur der Verfügungsklägerin zu 1) zugeordnet werden kann. Die Verfügungsklägerin zu 1) hat ihrerseits aber keine Bestandteile des Filmes angeboten. Stattdessen war das Bittorrent-Überwachungsprogramm Verfügungsklägerin zu 1) „Observer" so eingestellt, dass es anderen Benutzern, das heißt deren Programmen durch ein gefälschtes Bitfeld vorgetäuscht hat, immer im Besitz von 50 % der gesuchten, das heißt angefragten, Datei zu sein.

**Glaubhaftmachung:** 1. Zeugnis des sachverständigen Zeugen Dr. Frank Stummer, zu laden über die ipoque GmbH, Mozartstraße 3, 04107 Leipzig

2. Powerpoint-Präsentation der ipoque GmbH „Fakten zur Abmahnung „Antichrist", BaumgartenBrandt an ipoque, 18.11.2009" vom 13.01.2011, bereits vorgelegt als

**- Anlage AG 17 -**

Für das technische Verständnis sei erläutert, dass, sobald ein Bittorrent-Clientprogramm eines Benutzers eine solche Meldung von einem anderen Clientprogramm erhält, es dem Client des anderen Benutzers eine Downloadanfrage für diese Dateibestandteile sendet. Eine solche Anfrage wurde seinerzeit vom Programm (Client) der ipoque GmbH an den Server der Verfügungsklägerin zu 1) geschickt, und dabei wurde von der Verfügungsklägerin zu 1) die IP-Adresse des Benutzers, das heißt konkret die damalige IP-Adresse des Servers der ipoque GmbH erfasst. Dies geschah, obgleich der Server der ipoque

ⓑ BaumgartenBrandt

GmbH weder einen urheberrechtswidrigen Upload angeboten, noch einen urheber-
rechtswidrigen Download durchgeführt hat, denn von dem Sever der Verfügungskläge-
rin zu 1) konnte der Server der ipoque GmbH mangels Vorhandensein keine Bestandtei-
le der urheberrechtlich geschützten Datei erhalten.

| | | |
|---|---|---|
| **Glaubhaftmachung:** | 1. | Zeugnis des sachverständigen Zeugen Dr. Frank Stummer, zu laden über die ipoque GmbH, Mozartstraße 3, 04107 Leipzig |
| | 2. | Powerpoint-Präsentation der ipoque GmbH „Fakten zur Abmahnung „Antichrist", Baum gartenBrandt an ipoque, 18.11.2009" vom 13.01.2011, bereits vorgelegt als |

**- Anlage AG 17 -**

Dies führte im Ergebnis dazu, dass die ipoque GmbH aufgrund falscher Datenermittlung
zu Unrecht eine Abmahnung erhalten hat.

Die Verfügungskläger trafen sich nach Bekanntwerden der damaligen Abmahnung mit
den Anwälten der ipoque GmbH sowie Herrn Dr. Stummer. Im Rahmen dieses Treffens
wurde den Verfügungsklägern die vorgenannte Powerpoint-Präsentation (**Anlage AG
17**) gezeigt.

| | |
|---|---|
| **Glaubhaftmachung:** | Zeugnis des Herrn Dr. Frank Stummer, zu laden über die ipoque GmbH, Mozartstraße 3, 04107 Leipzig |

Deren gesamten Inhalt haben die Verfügungskläger der Verfügungsbeklagten und den
Kunden der Verfügungsklägerin zu 1) in der Folge vorsätzlich verschwiegen. Erst als
die Verfügungsbeklagte im Januar 2011 zufällig in Kontakt zu der ipoque GmbH getre-
ten ist, hat sie davon erfahren, dass die Verfügungsklägerin zu 1) falsche Daten ermit-
telt. Nachdem die ipoque GmbH der Verfügungsbeklagten telefonisch mitgeteilt hat,
dass die Rechercheleistungen der Verfügungsklägerin zu 1) fehlerhaft seien, sind Mitar-
beiter der Verfügungsbeklagten, unter ihnen auch Herr André Nourbakhsch und Herr
Christian Roloff am 13.01.2011 zu der ipoque GmbH an deren Sitz nach Leipzig gefah-
ren und haben sich dort mittels der Powerpoint-Präsentation, die die ipoque GmbH be-
reits der Verfügungsklägerin zu 1) gezeigt hatte, den Ablauf des Test-Screenings erläu-
tern lassen.

| | | |
|---|---|---|
| **Glaubhaftmachung:** | 1. | Zeugnis des Herrn André Nourbakhsch, zu laden über Verfügungsbeklagte |
| | 2. | Zeugnis des HerrnChristian Roloff, zu laden über Verfügungsbeklagte |

**c.   Zum Tenor Punkt 1. b) bb) – Sammelklage in den USA anhängig**

Entgegen der Behauptung der Verfügungskläger ist in den USA eine Sammelklage ge-
gen die Verfügungsklägerin zu 1) anhängig. Herr Dimitriy Shirokov hat in eigenem
Namen und im Namen von 4.576 Personen gegen Dunlap, Grubb & Weaver PLLC, US
Copyright Group, Thomas Dunlop, Nicholas Kurtz, die Verfügungsklägerin zu 1) und

⑱ BAUMGARTENBRANDT

die Achte/Neunte Boll Kino Beteiligungs Gmbh & Co KG Klage erhoben. Die dortigen Kläger werden von den Rechtsanwälten BOOTH SWEET LLP mit Sitz in Cambridge, Massachusetts, USA vertreten.

| | |
|---|---|
| **Glaubhaftmachung:** | Sammelklage von 4.576 Klägern u.a. gegen die Verfügungsklägerin zu 1), online gestellt unter http://boothsweet.com/wp-content/uploads/2010/08/Master-Complaint1.pdf von den Rechtsanwälten BOOTH SWEET LLP, 32R Essex Street Studio 1A, Cambridge, MA 02139, USA, als |

- Anlage AG 19 -

Die Klage ist spätestens am 26.11.2010 bei dem United States District Court, District of Massachsetts eingegangen. Sie wird dort unter dem Aktenzeichen 1:10-CV-12043-GAO geführt. Mit Datum vom 26.11.2010 hat das Gericht eine Mitteilung an die Beklagten über die Klageerhebung erstellt. Dort heißt es: „A lawsuit has been filed against you" („Gegen Sie ist eine Klage eingereicht worden").

| | |
|---|---|
| **Glaubhaftmachung:** | Mitteilung des United States District Court, District of Massachsetts an die Beklagten über den Eingang einer Klage vom 26.11.2010 |

- Anlage AG 20 -

Die Mitteilung des Gerichts enthält zugleich die Aufforderung an die Beklagten, innerhalb von 21 Tagen zu der Klage Stellung zu nehmen. An die dortigen Beklagten versandt oder zugestellt wird die Mitteilung des Gerichts vom 26.11.2010 im Parteibetrieb durch die Anwälte der Kläger. Es entzieht sich der Kenntnis der Verfügungsbeklagten, inwieweit die Klage bei der Verfügungsklägerin zu 1) eingegangen ist.

Wir gehen davon aus, dass der Director der Verfügungsklägerin zu 1), wenn er in der Eidesstattlichen Erklärung (Anlage AS 1) schreibt, dass eine Klageschrift einer einzelnen Person existierte, die der Verfügungsklägerin zu 1) nicht innerhalb von 21 Tagen zugestellt worden sein soll, die Klage in **Anlage AG 19** meint. In der Klageschrift in **Anlage AG 19** ist zwar nur von „Plaintiff" („Kläger") im Singular die Rede, wie man aber bei genauerem Lesen des Rubrums und von Punkt 1 der Einleitung problemlos erkennen kann, hat Herr Dimitriy Shirokov „on behalf of himself and all others similarly situated" („für sich selbst und alle anderen in der gleichen Situation") bzw. „on behalf of himself and 4,576 other similarly-situated victims" („für sich selbst und 4.576 andere Opfer in der gleichen Situation") u.a. gegen die Verfügungsklägerin zu 1) Klage erhoben. Zudem wurde die Klage als „Complaint Class Action", das heißt „Sammelklage" erhoben und zugelassen. In den Vereinigten Staaten ist dies, anders als in der Bundesrepublik Deutschland möglich. Andere gegen die Verfügungsklägerin zu 1) in den USA erhobene Klagen konnte die Verfügungsbeklagte im Internet, wo Klageschriften in den USA veröffentlicht werden müssen, nicht finden. Die Verfügungsklägerin zu 1) möge, wenn sie bei ihrer Behauptung bleiben sollte, dass eine Klage einer einzelnen Person existiert habe, die Klageschrift dieser einzelnen Person vorlegen.

Festzuhalten bleibt, dass gegen die Verfügungsklägerin zu 1) tatsächlich eine Sammelklage von 4.576 Personen anhängig ist und Herr Nourbakhsch mit seiner Aussage, ge-

Exhibit G 15

(BB) BAUMGARTENBRANDT

gen die Verfügungsklägerin zu 1) hätten 4.300 Personen Sammelklage erhoben, sogar untertrieben hat. Die Aussage des Directors der Verfügungsklägerin zu 1) Herrn Ben Perino in der eidesstattlichen Erklärung (Anlage AS 1), gegen die Verfügungsklägerin zu 1) hätte zu keinem Zeitpunkt eine Sammelklage existiert, widerspricht damit im Ergebnis den Tatsachen.

**6.   Mangelnde bzw. unvollständige Zustellung des Beschlusses vom 10.02.2011**

Der Beschluss des LG Berlin vom 10.02.2011 ist Herrn Nourbakhsch weder unmittelbar übergeben worden noch wurde der Beschluss an der Wohnanschrift des Herrn Nourbakhsch einer dort lebenden oder dort beschäftigten Person übergeben oder in den Briefkasten an der Wohnanschrift des Herrn Nourbakhsch eingelegt. Lediglich die Verfügungsbeklagte hat eine beglaubigte Abschrift des Beschlusses, adressiert an Herrn Nourbakhsch erhalten. Diese ist am 11.02.2011 in den Briefkasten der Verfügungsbeklagten eingelegt worden. Die Unterzeichner haben sich aber bisher weder dem Gericht gegenüber noch den Verfügungsklägern gegenüber zu Verfahrens- bzw. Prozessbevollmächtigten des Herrn Nourbakhsch bestellt.

Der Verfügungsbeklagten ist der Beschluss vom 10.02.2011 zwar am Freitag, den 11.02.2011 an dessen Sitz in den Briefkasten eingelegt worden, jedoch ohne die Antragsschrift und deren Anlagen.

**II. Rechtliche Erwägungen**

**1.   Keine Vollziehung der einstweiligen Verfügung**
**a.   Keine Zustellung des Beschlusses an Herrn André Nourbakhsch**

Mangels Zustellung des Beschlusses vom 10.02.2011 an Herrn Nourbakhsch ist der Beschluss ihm gegenüber nicht vollzogen worden, §§ 936, 929 Abs. 2 ZPO. Der Beschluss ist ihm weder gem. § 191 ZPO i.V.m. § 177 ZPO unmittelbar noch gem. § 178 Abs. 1 Nr. 1 ZPO in der Wohnung des Herrn Nourbakhsch im Wege der Ersatzzustellung zugestellt worden.

Das Einlegen des Beschlusses in den Briefkasten der Verfügungsbeklagten stellt keine wirksame Zustellung an Herrn Nourbakhsch dar. Eine Zustellung an die Adresse seiner beruflichen Tätigkeit durch Einlegen in den Briefkasten der Verfügungsbeklagten war als Ersatzzustellung gem. § 178 Abs. 1 Nr. 2 ZPO, § 180 S. 1 ZPO nicht möglich. Bei der Anschrift der Verfügungsbeklagten handelt es sich nicht um Geschäftsräume des Herrn Nourbakhsch i.S.v. § 178 Abs. 1 Nr. 2 ZPO. Geschäftsraum i.S.v. § 178 Abs. 1 Nr. 2 ZPO ist der für die Geschäftstätigkeit gerade des Zustellungsempfängers bestimmte Raum (Baumbach/Lauterbach/Albers/Hartmann, ZPO, 69. Auflage, 2011, § 178 Rdnr. 16; BGH NJW-RR 2010, 489 (490) Rdnr. 15). Der Zustellungsempfänger selbst muss unter der Adresse ein Geschäftslokal unterhalten (BGH NJW 1998, 1958 (1959)). Da Herr Nourbakhsch in den Räumen der Verfügungsbeklagten wie oben dargestellt, als Angestellter keiner eigenen Geschäftstätigkeit nachgeht, scheidet schon aus diesem Grund eine Ersatzzustellung an die Adresse der Verfügungsbeklagten aus.

Exhibit G - 16

**BAUMGARTENBRANDT**

Da vor der Ersatzzustellung auch kein Zustellversuch an den Zustellungsadressaten persönlich unternommen wurde, scheidet eine Ersatzzustellung gem. § 178 Abs. 1 Nr. 2 ZPO, § 180 S. 1 ZPO ebenfalls aus.

Eine Zustellung gem. § 172 Abs. 1 ZPO an die Verfügungsbeklagte als Prozessbevollmächtigte des Herrn Nourbakhsch ist ebenfalls nicht wirksam erfolgt, da die Verfügungsbeklagte nicht Prozessbevollmächtigte des Herrn Nourbakhsch war oder ist. Zwar hat sich die Verfügungsbeklagte in der vorgerichtlichen Abmahnung zur Vertreterin des Herrn Nourbakhsch bestellt, diese Bestellung erstreckt sich jedoch nicht auf das gerichtliche Verfügungsverfahren. Das mit der Zustellung der einstweiligen Verfügung beginnende gerichtliche Verfahren ist gegenüber der vorgerichtlichen anwaltlichen Korrespondenz über eine Abmahnung ein neuer Abschnitt und hiervon zu trennen (OLG Hamburg NJW-RR 1993, 958; Musielak, ZPO, 7. Auflage 2009, § 172, Rdnr. 2).

Da der Beschluss Herrn Nourbakhsch gegenüber nicht vollzogen wurde, ist dieser nicht mehr Partei des Verfahrens und kann damit als Zeuge vernommen werden. Wie das Kammergericht entschieden hat, kann ein Streitgenosse, der zwar erstinstanzlich Partei des Verfahrens war, aber mangels Berufung nicht Partei des von einem anderen Streitgenossen durchgeführten Berufungsverfahrens ist, als Zeuge vernommen werden (KG, MDR 1981, 765). Ebenso hat das OLG Koblenz entschieden (OLG Koblenz, NJW-RR 2003, 283). Die gleiche Folge muss für Antragsgegner einer einstweiligen Verfügung gelten, die mangels Vollziehung der Verfügung nicht mehr Partei des Verfahrens sind.

**b.    Zustellung des Beschlusses an die Verfügungsbeklagte ohne Antragsschrift**

Auch der Verfügungsbeklagten gegenüber haben die Verfügungskläger die Verfügung nicht vollzogen. Zur Vollziehung hätte es neben der Zustellung des Beschlusses auch der Zustellung des Verfügungsantrages bedurft, denn der Beschluss des LG Berlin vom 10.02.2011 ist aus sich heraus, ohne die Antragsschrift, nicht verständlich.

Im Beschluss wird mehrfach auf den Antrag Bezug genommen. So wird bereits in der Kostenentscheidung die Bezifferung laut Antragsschrift vorgenommen. Der Verfügungsbeklagten ist damit nicht bekannt, auf welche Punkte des Tenors im Beschluss sich die Teilstreitwerte beziehen. Darüber hinaus wird in den Entscheidungsgründen auf S. 5, 3. Absatz zum Teilantrag zu 2.d) der Antragsschrift Stellung genommen, ohne dass der Verfügungsbeklagten deutlich wird, um welchen Antrag es sich dabei handelt und welche Äußerung danach unlauter nach § 4 Nr. 10 UWG sein soll.

In Fällen, in denen eine Beschlussverfügung im Tenor oder auch nur in ihren Gründen auf die Antragsschrift Bezug nimmt, ist die Antragsschrift der Verfügung beizufügen (LG Wuppertal, Urteil vom 18.03.2009, Az.: 3 O 480/08). Erst recht gilt dies, wenn die Verfügung auf die Antragsschrift Bezug nimmt und die Verfügung aus sich heraus nicht verständlich ist (OLG Celle, Urteil vom 03.02.1999, Az.: 2 U 279/98, juris).

**2.    Kein Verfügungsanspruch**
**a.    Kein Wettbewerbsverhältnis zwischen den Parteien**

Zwischen den Verfügungsklägern und der Verfügungsbeklagten besteht kein Wettbewerbsverhältnis. Eine Mitbewerbereigenschaft der Verfügungsbeklagten nach § 8 Abs. 3 Nr. 2 und 3 UWG scheidet von vornherein aus. Die Verfügungsbeklagte ist aber auch

BAUMGARTENBRANDT

nicht Mitbewerberin der Verfügungskläger nach § 8 Abs. 3 Nr. 1 UWG. Allein die Tatsache, dass sowohl die Verfügungsbeklagte als auch die Verfügungskläger auf dem Gebiet der Verfolgung von Urheberrechtsverletzungen tätig sind, führt nicht dazu, dass diese Mitbewerber i.S.v. § 8 Abs. 3 Nr. 1 UWG sind. Mitbewerber in diesem Sinne sind lediglich Unternehmen, die gleiche oder gleichartige Waren oder Dienstleistungen innerhalb desselben Abnehmerkreises abzusetzen versuchen (BGH GRUR 2007, 884 Rdnr. 35 – Cambridge Institute; BGH GRUR 2007, 1079 Rdnr. 18 – Bundesdruckerei; BGH GRUR 2009, 845 Rdnr. 40 – Internet-Videorecorder; BGH GRUR 2009, 980 Rdnr. 9 – E-Mail-Werbung II). Davon, dass die Verfügungsbeklagte und die Verfügungskläger gleiche oder auch nur gleichartige Dienstleistungen anbieten, kann nicht die Rede sein. Die Verfügungskläger bieten Ermittlungsdienstleistungen im Internet an. Die Verfügungsbeklagte bietet dagegen ausschließlich Rechtsberatung und –vertretung an. Die Tatsache, dass sich die Dienstleistungen beider Parteien auf Urheberrechtsverletzungen beziehen, ändert an der Verschiedenartigkeit der Dienstleistungen nichts.

**b.   Äußerung gegenüber Frau Mudge weder eine Behauptung noch eine Behinderung von Mitbewerbern**

Durch die gegenüber Frau Mudge getätigten Äußerungen wurden weder Tatsachen i.S.d. § 4 Nr. 8 UWG behauptet, noch Mitbewerber nach § 4 Nr. 10 UWG behindert. Da Frau Mudge Mitarbeiterin der Verfügungsklägerin zu 1) ist, sind die ihr gegenüber getätigten Äußerungen der Verfügungsklägerin nach § 166 BGB analog zuzurechnen.

Behauptungen gem. § 4 Nr. 8 UWG müssen aber gegenüber Dritten aufgestellt werden. Der von der Äußerung betroffene Mitbewerber selbst gehört nicht zu Dritten in diesem Sinne. Äußerungen, die ihm gegenüber aufgestellt werden, sind nicht geeignet, den Absatz oder den Bezug des betreffenden Unternehmens zu fördern oder zu behindern. Dies wäre nur bei Äußerungen gegenüber Personen der Fall, die nicht „im Lager" der Verfügungskläger stehen.

Gleiches gilt hinsichtlich der Unlauterkeit nach § 4 Nr. 10 UWG. Eine Behinderung ist ausgeschlossen, wenn sie durch Äußerungen gegenüber dem von der Äußerung betroffenen Unternehmen erfolgt. In diesem Fall ist die Äußerung nicht geeignet, zu einer Behinderung des Mitbewerbers zu führen.

**c.   Kein Unterlassungsanspruch zu den streitgegenständlichen Aussagen**
**aa.   Beweiswert der eidesstattlichen Erklärung von Frau Barbara Mudge**

Angesichts der verkürzten, „sinngemäßen" und unzutreffenden Darstellung des Inhalts des Telefonats zwischen Frau Mudge und Herrn Nourbakhsch kommt der eidesstattlichen Erklärung von Frau Mudge keinerlei Beweiswert zu.

**bb.   Zur Aussage im Tenor Punkt 1. a) – Diebstahl der Software**

Hinsichtlich der Äußerung unter Punkt 1.a) des Tenors besteht seitens beider Verfügungskläger kein Unterlassungsanspruch. Die Voraussetzungen des § 4 Nr. 8 UWG und des § 823 Abs. 2 BGB i.V.m. § 186, 187 StGB liegen nicht vor. Da Herr Nourbakhsch niemals behauptet hat, dass der Verfügungskläger zu 2) die von der Verfügungsklägerin zu 1) genutzte Software gestohlen habe, hat er schon keine unwahre Tatsache verbreitet.

Im Übrigen handelt es sich bei den Äußerungen des Herrn Nourbakhsch gegenüber Frau Mudge als Vertreterin oder zumindest Bevollmächtigte der Mandantin der Verfügungs-

⟨BB⟩ BAUMGARTENBRANDT

beklagten, Foresight Unlimited um vertrauliche Mitteilungen, an denen die Mandantin der Verfügungsbeklagten ein berechtigtes Interesse hatte, § 4 Nr. 8, 2. HS UWG. Die Kommunikation zwischen Anwalt und Mandant unterliegt gem. § 43 a Abs. 2 BRAO dem Anwaltsgeheimnis. Auf europäischer Ebene ist das Anwaltsgeheimnis gem. Art. 8 Abs. 1 EMRK (Schutz der Korrespondenz) i.V.m. Art. 6 Abs. 1 und 3 Buchst. c EMRK (Recht auf ein faires Verfahren) sowie aus Art. 7 Charta der Grundrechte der Europäischen Union (Achtung der Kommunikation) i.V.m. Art. 47 Abs. 1, Abs. 2 Satz 2 und Art. 48 Abs. 2 Charta der Grundrechte der Europäischen Union (Recht auf Beratung, Verteidigung und Vertretung, Achtung der Verteidigungsrechte) geschützt. Den Schutz des Anwaltsgeheimnisses hat der EuGH ausdrücklich festgestellt (EuGH in: NJW 1983, 503). Die dem Anwaltsgeheimnis unterliegende Kommunikation ist als vertraulich und privilegiert einzuordnen. Zudem folgt die Vertraulichkeit der Mitteilung auch aus der Tatsache, dass die Äußerungen des Herrn Nourbakhsch nur an einen Empfänger und nicht gleichzeitig an eine Vielzahl von Adressaten erfolgt sind. Solche Mitteilungen sind nach Ansicht des BGH als vertraulich einzustufen (BGH GRUR 1960, 135 (136) – Druckaufträge).

Herr André Nourbakhsch wie auch die Mandantin der Verfügungsbeklagten Foresight Unlimited hätten auch ansonsten ein berechtigtes Interesse an der Mitteilung gehabt. Bei der Interessenabwägung ist zu berücksichtigen, ob der Mitteilende gesetzlich oder vertraglich zur Mitteilung der Tatsachen berechtigt oder verpflichtet ist (Köhler/Bornkamm, UWG, 29. Auflage, 2011, § 4, Rdnr. 8.23). Herr Nourbakhsch war als Rechtsanwalt zur Wahrung der Interessen seiner Mandantin Foresight Unlimited berufen und verpflichtet. Dies folgt unmittelbar aus den gesetzlichen und vertraglichen Benachrichtigungs- und Warnpflichten des Rechtsanwaltes (Kleine-Cosack, BRAO, 6. Auflage, Anhang I 1, § 11 BORA). Ein Unterlassen dieser Pflichten hätte die Verfügungsbeklagte einer potentiellen Haftpflicht gegenüber ihren Mandanten ausgesetzt. Dies von vornherein zu unterbinden ist nicht nur Recht, sondern auch Pflicht des Anwalts.

Das Interesse der Mandanten der Verfügungsbeklagten an den streitgegenständlichen Informationen ist wegen der Vielzahl der betroffenen Fälle, die unter Verwendung der Ermittlungs-Software „Observer" der Verfügungsklägerin zu 1) bearbeitet werden, als sehr hoch einzustufen.

**cc.  Zur Aussage im Tenor Punkt 1. b) aa) – Unzuverlässige Rechercheleistungen**

Hinsichtlich der Äußerung unter Punkt 1.b) aa) des Tenors besteht seitens beider Verfügungskläger ebenfalls kein Unterlassungsanspruch. Die Voraussetzungen des § 4 Nr. 8 UWG und des § 823 Abs. 2 BGB i.V.m. § 186, 187 StGB liegen auch hier nicht vor. Die Verfügungsklägerin zu 1) hat unzuverlässige Rechercheleistungen erbracht, sodass es sich bei der streitgegenständlichen Aussage um eine wahre Tatsache handelt.

Im Übrigen handelt es sich auch hier bei den Äußerungen des Herrn Nourbakhsch gegenüber Frau Mudge als Vertreterin der Mandantin der Verfügungsbeklagten Foresight Unlimited um vertrauliche Mitteilungen, an denen sowohl die Mandantin der Verfügungsbeklagten als auch die Verfügungsbeklagte aus den gleichen Gründen ein berechtigtes Interesse haben, § 4 Nr. 8, 2. HS UWG.

® BAUMGARTENBRANDT

**dd. Zur Aussage im Tenor Punkt 1. b) bb) – Sammelklage in den USA anhängig**

Auch hinsichtlich der Äußerung unter Punkt 1.b) bb) des Tenors besteht seitens beider Verfügungskläger kein Unterlassungsanspruch. Die Voraussetzungen des § 4 Nr. 8 UWG und des § 823 Abs. 2 BGB i.V.m. § 186, 187 StGB liegen nicht vor. Herr Nourbakhsch hat keine unwahre Tatsache verbreitet.

Wie oben dargestellt, ist gegen die Verfügungsklägerin zu 1) in den USA eine Sammelklage sogar im Namen von 4.576 Personen anhängig. Anhängigkeit bedeutet, dass die Klage bei Gericht eingegangen ist, Rechtshängigkeit, dass sie den Beklagten zugestellt worden ist. Herr Nourbakhsch hat nicht von Rechtshängigkeit gesprochen, sondern lediglich davon, dass gegen die Verfügungsklägerin zu 1) eine Klage anhängig gemacht wurde. Die Frage, ob die Klage an die Verfügungsklägerin zu 1) zugestellt worden ist, ist daher nicht entscheidungserheblich.

Im Übrigen handelt es sich bei den Äußerungen des Herrn Nourbakhsch gegenüber Frau Mudge als Vertreterin der Mandantin der Verfügungsbeklagten Foresight Unlimited wiederum um vertrauliche Mitteilungen, an denen die Mandantin der Verfügungsbeklagten ein berechtigtes Interesse hat, § 4 Nr. 8, 2. HS UWG. Auf die obigen Ausführungen dürfen wir verweisen.

**ee. Zum Tenor Punkt 1. b) cc)**

Punkt 1.b) cc) der Beschlussverfügung ist schon wegen mangelnder Bestimmtheit gem. § 253 Abs. 2 Nr. 2 ZPO aufzuheben. Aus dem Tenor wird nicht deutlich, von welchem Vertragsverhältnis die Rede ist. Es ist möglich, dass das Vertragsverhältnis der Verfügungsklägerin zu 1) zur Verfügungsbeklagten gemeint ist. Der Tenor lässt sich aber auch so auslegen, dass mit „Vertragsverhältnis" die vertraglichen Beziehungen der Verfügungsklägerin zu 1) zu deren Kunden gemeint sein sollen.

Zudem wird durch den Verweis im Tenor auf die eidesstattliche Erklärung von Frau Barbara Mudge nicht klar, in welchen Fällen der Verfügungsbeklagten die Kontaktaufnahme zu Kunden der Verfügungsklägerin zu 1) untersagt ist. Soll eine Kontaktaufnahme zum Anbieten einer Zusammenarbeit ohne Mitwirkung der Verfügungsklägerin zu 1) nur dann untersagt sein, wenn dabei eine der in den Punkten 1. a), 1. b) aa) bis cc) untersagten Äußerungen getätigt wird, oder nur, wenn alle diese Äußerungen getätigt werden? Worin liegt in ersterem Fall der inhaltliche Unterschied des Tenors in Punkt 1 b) cc) zu den übrigen Punkten des Tenors? Punkt 1. b) cc) des Tenors ist mangels Bestimmtheit nicht vollstreckbar.

Sollte mit „Vertragsverhältnis" in Punkt 1. b) cc) des Tenors der Vertrag zwischen der Verfügungsklägerin zu 1) und der Verfügungsbeklagten gemeint sein, würde der Unterlassungsanspruch der Verfügungsklägerin zu 1) aus § 8 Abs. 1 i.V.m. §§ 3, 4 Nr. 10 UWG materiellrechtlich daran scheitern, dass das Vertragsverhältnis zwischen den Parteien seit dem 21.01.2011 beendet ist. Allein die Tatsache, dass die Verfügungsbeklagte nach Beendigung ihres Vertrages zur Verfügungsklägerin zu 1) Kontakt zu deren Kunden aufnimmt, führt noch nicht zur Unlauterkeit nach § 4 Nr. 10 UWG. Denn das Abwerben von Kunden gehört zum Wesen des freien Wettbewerbs, und zwar auch dann, wenn es zielbewusst und systematisch (planmäßig) geschieht und die Kunden noch vertraglich an den Mitbewerber gebunden sind. Es ist daher grds. nicht zu beanstanden, wenn ein Unternehmer auf eine Vertragsauflösung unter Einhaltung der gesetzlichen oder vertraglichen Bestimmungen (Kündigungs-, Anfechtungs- oder Widerrufsfristen)

Exhibit G - 20

BAUMGARTENBRANDT

hinwirkt und zu eigenen Wettbewerbszwecken ausnutzt. Unlauter wird das Einbrechen in fremde Vertragsbeziehungen erst durch das Hinzutreten besonderer Umstände (Köhler/Bornkamm, UWG, 29. Auflage, 2011, § 4, Rdnr. 10.33 m.V.a. BGH GRUR 1997, 920 (921) – Automatenaufsteller; BGH GRUR 2002, 548 (549) – Mietwagenkostenersatz; BGH GRUR 2004, 704 (705) – Verabschiedungsschreiben). Verwertet daher etwa ein ausgeschiedener Handelsvertreter Kundenadressen, die in seinem Gedächtnis geblieben sind, so liegt kein wettbewerbswidriges Verhalten vor (BGH GRUR 1999, 934 (935) – Weinberater).

Auch in dem Fall, dass zwischen der Verfügungsklägerin zu 1) und der Verfügungsbeklagten noch ein Vertragsverhältnis bestehen würde, bestünde aber kein Unterlassungsanspruch.

Allein die Tatsache, dass die Verfügungsbeklagte zu möglichen Kunden der Verfügungsklägerin zu 1) Kontakt aufnimmt, um diesen eine weitere Zusammenarbeit ohne Mitwirkung der Verfügungsklägerin zu 1) anzubieten, führt noch nicht zur Unlauterkeit. Wie oben dargestellt, hat Frau Barbara Mudge im Auftrag oder zumindest mit Befugnis einer Mandantin der Verfügungsbeklagten, des von Herrn Mark Damon vertretenen Unternehmens Foresight Unlimited, mit Herrn Nourbakhsch telefoniert. Die Kenntnis der Kontaktdaten zu Herrn Mark Damon beruhte dabei nicht auf der Vertragsbeziehung der Verfügungsbeklagten mit der Verfügungsklägerin zu 1), sondern auf der Mandatsbeziehung der Verfügungsbeklagten mit dem Unternehmen Foresight Unlimited. Es ist daher nicht so, dass die Verfügungsbeklagte ihr anvertraute oder von ihr rechtswidrig beschaffte Kundenadressen verwendet und damit ihr nicht zustehende Ressourcen nutzt. Der vorliegende Fall ist nicht mit solchen Fällen vergleichbar, in denen Beschäftigte noch während des Beschäftigungsverhältnisses an Kunden des Arbeitgebers herantreten, um sie als künftige Kunden für das eigene oder ein fremdes Unternehmen zu gewinnen.

Davon unabhängig ist allein entscheidend, dass die Verfügungsbeklagte lediglich ihre Mandanten kontaktiert hat. Dass diese auch gleichzeitig Kunden der Verfügungsklägerin zu 1) sind, bzw. waren, spielt keine Rolle.

Darüber hinaus hat Herr Nourbakhsch wie bereits ausgeführt, den Kunden der Verfügungsklägerin zu 1) in keiner Weise Dienstleistungen oder Unternehmen wie die Verfügungsklägerin zu 1) zugeführt oder angeboten, weder unmittelbar, noch mittelbar.

Nach alledem ist die einstweilige Verfügung aufzuheben.

Sollte das Gericht der Ansicht sein, dass der Vortrag der Verfügungsbeklagten unzureichend oder ergänzungsbedürftig ist, bitten wir um einen entsprechenden Hinweis des Gerichts. In diesem Fall wird die Verfügungsbeklagte gerne ausführlich ergänzend vortragen.

Sollte das Gericht eine beglaubigte Übersetzung der **Anlagen AG 3, 19 und 20** benötigen, wird ebenfalls um einen richterlichen Hinweis gebeten.

Die Zustellung an die Verfügungskläger erfolgt gem. § 174 ZPO von Anwalt zu Anwalt.

Susanne Preuß
Rechtsanwältin

BAUMGARTENBRANDT

## Anlagen

| | |
|---|---|
| AG 1 | Auszug aus dem Register des Companies' House |
| AG 2 | Handelsregisterauszug zu der Verfügungsklägerin zu 1) |
| AG 3 | Eidesstattliche Erklärung des Verfügungsklägers zu 2) vor dem United States District Court for the District of Columbia vom 31.12.2009 (Az: CA. 1:10-cv-00453-RMC) in englischer Sprache |
| AG 4 | Eidesstattliche Erklärung des Verfügungsklägers zu 2) |
| AG 5 | Kündigungsschreiben der Verfügungsbeklagten vom 21.01.2011 mit Sendebericht der Faxversendung vom 21.01.2011, 20:07 Uhr |
| AG 6 | Telefax des Kündigungsschreibens der Verfügungsklägerin zu 1) vom 25.01.2011, 14:37 Uhr |
| AG 7 | E-Mail von Frau Barbara Mudge vom 25.02.2011 |
| AG 8 | Eidesstattliche Erklärung des Herrn Richard Schneider, Mitglied des Verwaltungsrates der Logistep AG |
| AG 9 | Handelsregisterauszug der Logistep AG |
| AG 10 | Eidesstattliche Erklärung des Herrn Michael Wicher, Mitarbeiter der Logistep AG |
| AG 11 | Eidesstattliche Versicherung des Herrn Leszek Oginski, Direktor der Logistep AG |
| AG 12 | E-Mail des Verfügungsklägers zu 2) vom 10.12.2008 |
| AG 13 | E-Mail des Verfügungsklägers zu 2) vom 30.11.2010 |
| AG 14 | E-Mail des Herrn Nourbakhsch vom 12.01.2011 mit Anhängen |
| AG 15 | E-Mail des Verfügungsklägers zu 2) vom 14.01.2011 |
| AG 16 | Darstellung der Referenzkunden der ipoque GmbH unter deren Internetpräsenz auf http://www.ipoque.com/company/customer-references |
| AG 17 | Powerpoint-Präsentation der ipoque GmbH „Fakten zur Abmahnung „Antichrist", BaumgartenBrandt an ipoque, 18.11.2009" vom 13.01.2011 |
| AG 18 | Abmahnung an die ipoque GmbH vom 27.04.2010 |
| AG 19 | Sammelklage von 4.576 Klägern u.a. gegen die Verfügungsklägerin zu 1), online gestellt unter http://boothsweet.com/wp-content/uploads/2010/08/Master-Complaint1.pdf von den Rechtsanwälten BOOTH SWEET LLP |
| AG 20 | Mitteilung des United States District Court, District of Massachsetts an die Beklagten über den Eingang einer Klage vom 26.11.2010 |

# EXHIBIT H



# Facts on the Cease and Desist Letter "Antichrist," BaumgartenBrandt to ipoque, 11/18/2009

CONFIDENTIAL
January, 2011

# ipoque received a cease and desist letter for "Antichrist," which was in test screening

## Facts about the Cease and Desist Letter

**Recipient of Letter: ipoque GmbH, Mozartstr. 3, 04107 Leipzig**

**Issuer: BaumgartenBrandt, Attorneys at Law, Berlin**
Note: "Independent Security Provider" is Guardaley.

**Client: Zentropa Entertainments23 ApS**

**Work: Film "Antichrist"**

**Date, Time: 1/18/2009, 01:03:25 CET**

**IP Address: 79.222.120.152**
Note: At the time in question, a test screening with this film was running at ipoque for a third-party order. It was our IP address. It is a file in the BitTorrent Network (this information is not in the cease and desist letter).

**Accusation: Offer to Download the Film by Release on the Hard Drive**

**Total Amount: 1,200.00 Euros**

**Deadline: 5/18/2010**

# The case is completely recorded and reproducible

### Facts about the Cease and Desist Letter

**The case was able to be completely reproduced.**

This test screening was running on the PFS (Peer-to-Peer Forensic System), that ipoque itself uses for investigations of copyright infringements in Peer-to-Peer networks. As a result, we recorded and saved the entire traffic recordings; the case can thus be completely reproduced and demonstrated at any time.

**We identified the other client (Guardaley)**

The opposing investigators had the IP address 78.43.254.8 at the time in question. According to GoIP information, it is Baden-Würtenberg Cable, Karsruhe. In the period from 21:00 on 11/17/2009 to 02:00 on 11/18/2009, there were five different client hashes behind this IP address—one per file requested. At that time, we inquired about these files for Antichrist. This information is not in the cease and desist letter. We analyzed them from our investigation data bank:

| | |
|---|---|
| ClientHash: | 2D5554313831302D36D33E2627698192889A38D1 |
| human readable: | -UT1810-66%3E%26%27i%81%92%88%9A8SI |
| program and version: | -UT1810- |

# The Guardaley client transmitted a characteristic bit field

## Facts about the Cease and Desist Letter

**We did not offer or upload.**

Our client neither made an offer not did it upload, since, first, our P2P client informs all other clients that it does not have anything, and, second, the client could not upload anything. We demonstrably (in the complete traffic recordings) did not make a single transfer to this client.

**The Guardaley client only inquired, but neither downloaded, nor sent us anything—ipoque also transferred nothing.**

The clients of the opposing IP always transmit a bit field 010101010101010101… (they thus claim to have every other, and thus 50%, of the files).

Screen shot 1 shows this bit field.

*Note: The screen shot was produced using Wireshark, an available program for the manual analysis of network traffic.*

Exhibit H - 4

# Screen shot 1: Bit field on the availability of pieces of the opposing client

# At no time and in no direction did a transfer take place

## Facts about the Cease and Desist Letter

**Screen shot 2 is a seamless presentation of the complete occurrence resulting in the cease and desist letter.**

1. It commences with the Handshake (Initiation of contact by the opponent)
2. TCP exchange (confirmation of the Handshake package, has nothing to do with the BitTorrent proceeding) → no BitTorrent transfer or the like takes place here, there is only an exchange to make and terminate the TCP connection
3. Confirmation of the Handshake by us
4. Opponent transmits (apparently falsified) bit field (see note above, Screen shot 1)
5. Our response that we are interested.
6. TCP (Confirmation of the Interested package from the previous step by the opponent)
7. Opponent requests a specific piece (although it knows that we do not have anything, since we sent no bit field — see note above)
8. TCP exchange (Confirmation of the request package by us)
9. Opponent again requests a piece
10. TCP (Confirmation of the request package by us)
11. TCP (Termination by us)
12. TCP (Confirmation by the opponent of the termination)
13. TCP(Termination by the opponent)
14. TCP (Confirmation by us of the termination)

*Note: The screen shot was produced using Wireshark, an available program for the manual analysis of network traffic.*

# Screen shot 2: The complete proceeding resulting in the cease and desist letter

# EXHIBIT I

EXHIBIT I



# Fakten zur Abmahnung „Antichrist", BaumgartenBrandt an ipoque, 18.11.2009

CONFIDENTIAL
January, 2011



Anlage AG 17

Exhibit I - 1



# ipoque wurde für "Antichrist", das in einem Testscreening lief, abgemahnt

## Fakten der Abmahnung

| | |
|---|---|
| **Abgemahnter:** | **ipoque GmbH, Mozartstr. 3, 04107 Leipzig** |
| **Abmahner:** | **BaumgartenBrandt Rechtsanwälte, Berlin** |
| Bemerkung: | „Unabhängiger Sicherheitsdienstleister" ist Guardaley. |
| **Mandantin:** | **Zentropa Entertainments23 ApS** |
| **Werk:** | **Film „Antichrist"** |
| **Datum, Zeit:** | **18.11.2009, 01:03:25 MEZ** |
| **IP-Adresse:** | **79.222.120.152** |
| Bemerkung: | In dem fraglichen Zeitraum ist ein Testscreening mit diesem Film im externen Auftrag bei ipoque gelaufen. Die IP-Adresse war unsere. Es handelt sich um eine Datei im BitTorrent-Netzwerk (diese Information steht nicht im Abmahnschreiben). |
| **Vorwurf:** | **Angebot des Filmes zum Download durch Freigabe auf der Festplatte** |
| **Gesamtbetrag:** | **1200,- Euro** |
| **Frist:** | **18.05.2010** |

 **Der Fall ist komplett aufgezeichnet und reproduzierbar**

## Fakten der Abmahnung

### Der Fall konnte komplett nachvollzogen werden.

Dieses Testscreening lief auf dem PFS (Peer-to-Peer Forensic System), das ipoque selbst für Ermittlungen von Urheberrechtsverletzungen in Peer-to-Peer-Netzwerken einsetzt. Damit haben wir die kompletten Verkehrsmitschnitte aufgezeichnet und abgespeichert, der Fall kann also jederzeit wieder komplett nachvollzogen und belegt werden.

### Wir haben den anderen Client (Guardaley) identifiziert

Der gegnerische Ermittler hatte zum fraglichen Zeitpunkt die IP-Adresse 78.43.254.8. Laut GoIP-Auskunft ist es Kabel Baden-Würtenberg, Karsruhe. Hinter dieser IP-Adresse standen in diesem Zeitraum von 21 Uhr am 17.11.2009 bis um 2 Uhr am 18.11.2009 insgesamt fünf verschiedene Clienthashes - einer pro angefragtem File. Wir haben damals diese fünf Files für Antichrist angefragt. Diese Informationen stehen nicht im Abmahnschreiben. Wir haben sie aus unserer Ermittlungsdatenbank analysiert:

ClientHash:          2D5554313831302D36D33E2627698192889A38D1
human readable:      -UT1810-6Ó%3E%26%27i%81%92%88%9A8Ñ
program and version: -UT1810-



# Der Guardaley-Client sendete ein charakteristisches Bitfeld

## Fakten der Abmahnung

**Wir haben nicht angeboten oder hochgeladen.**

Unser Client hat weder ein Angebot gemacht, noch hochgeladen, da erstens unser P2P-Client allen anderen Clients mitteilt, das er nichts hat und der Client zweitens auch gar nichts hochladen könnte. Wir haben belegbar (in den kompletten Verkehrsmitschnitten) keinen einzigen Transfer an diesen Client gesendet.

**Der Guardaley-Client hat nur angefragt, jedoch weder heruntergeladen, noch uns etwas gesendet – auch ipoque hat nichts transferiert**

Die Clients der gegnerischen IP senden immer Bitfield 010101010101010101... (sie behaupten also immer jedes zweite und damit 50% des Files zu haben).

Screenshot 1 zeigt dieses Bitfeld.

*Hinweis: Der Screenshot wurde mit Wireshark hergestellt, einem gängigen Programm zur manuellen Analyse von Netzwerkverkehr.*



# Screenshot 1: Bitfeld über die Verfügbarkeit von Pieces des gegnerischen Clients





# Es hat niemals und in keiner Richtung ein Transfer stattgefunden

## Fakten der Abmahnung

**Der Screenshot 2 zeigt lückenlos den kompletten Vorgang zu der Abmahnung.**

1: Es beginnt mit dem Handshake (Kontaktaufnahme durch den Gegner)
2: TCP Austausch (Bestätigung des Handshakepaketes, hat nichts mit dem Bittorrent-Vorgang zu tun) → es findet hier kein BitTorrent-Transfer o.ä. statt, es handelt sich nur um den Austausch zum Herstellen und Auflösen der TCP-Verbindung
3: Bestätigung des Handshakes durch uns
4: Gegner sendet (mutmasslich gefälschtes) Bitfeld (siehe Hinweis oben, Screenshot 1)
5: Unsere Antwort, das wir interessiert sind.
6: TCP (Bestätigung des Interested-Pakets im vorigen Schritt durch den Gegner)
7: Gegner fragt ein bestimmtes piece an (obwohl er weiss, das wir nichts haben, da wir kein Bitfeld gesendet haben – siehe Hinweis oben)
8: TCP Austausch (Bestätigung des Requestpakets durch uns)
9: Gegner fragt nochmals ein piece an
10: TCP (Bestätigung des Requestpakets durch uns)
11: TCP (Abbruch durch uns)
12: TCP (Bestätigung des Abbruchs durch Gegner)
13: TCP (Abbruch durch Gegner)
14: TCP (Bestätigung des Abbruchs durch uns)

*Hinweis: Der Screenshot wurde mit Wireshark hergestellt, einem gängigen Programm zur manuellen Analyse von Netzwerkverkehr.*

Exhibit I - 6



Screenshot 2: Der komplette abgemahnte Vorgang



# EXHIBIT J

# Landgericht Berlin
# Im Namen des Volkes

## Judgment

In the legal dispute

1. of Guardaley Ltd.,
   represented by its Managing Director, Ben Perino,
   Rubensstraße 33, 76149 Karlsruhe,

2. of Mr. Patrick Achache
   employed at Rubenstraße 33, 76149 Karlsruhe

Petitioners,

- Attorneys:
  Schulenberg & Schenk, Attorneys at Law
  Alsterchaussee 25, 20149 Hamburg,

versus

1. Baumgarten Brandt GBR, Intemationales
   Handelszentrum,
   Friedrichstrafle 95, 10117 Berlin,

2. Andre Nourbakhsch, Attorney at Law
   (employed at: Intemationales Handelszentrum),
   Friedrichstralle 95, 10117 Berlin,

Respondents,

- Attorneys:
  BaumgartenBrandt Attorneys at Law,
  Friedrichstrafle 95, 10117 Berlin,

Civil Chamber 16 of the State Court of Berlin, in Berlin Central, Littenstraße 12-17, 10179

Berlin, has, on the basis of the oral hearing on 5/3/2011, by Presiding State Court Judge, Dr.

Scholz,  State Court Judge, Dr. Danckwert, and Judge, Dr. Elfing,

**adjudicated:**

1. The preliminary injunction of February 10, 2011 is confirmed with respect to the heading under 1. a). In all other respects the preliminary injunction is set aside and the motion for the issuance thereof denied.

2. Of the court costs, the Petitioner No.1 shall bear 4/5 and Respondents No.1 and No.2 each 1/10. Of the non-court costs of Petitioner No.1, Respondents No.1 and No.2 shall each bear 1/10. Of the non-court costs of Petitioner No.2, Respondents No.1 and No.2 shall each bear 1/2. Of the non-court costs of Respondents No.1 and No.2, Petitioner shall each bear 3/4. Except for the foregoing, there shall be no reimbursement of costs.

3. The judgment is provisionally enforceable. The Petitioner shall be permitted to prevent execution by means of provision of security in the sum of the executable amount, to the extent that the Respondents do not, prior to execution, provide security in the sum of any amount to be levied upon.

**Facts**

Petitioner No.1 is an IT firm specializing in the investigation of, and protection against, infringements of intellectual property on the Internet and makes available, for such purpose, data identification and prosecution measures. It collects and documents IP connection data on the owners of Internet connections wrongfully offering for download the works of its clients. Petitioner No.2 is an employee of Petitioner No.1.

Respondent No.1 asserts, in the context of its legal services, cease and desist and damages claims against connection owners who make films publicly available in infringement of copyright and submits affidavits of Respondent No.2 in which the latter states which owners of

Internet connections have offered specific films for download on the Internet.

Respondent No.2  works as an attorney for Respondent No.1.

Commencing in 2009, there was a contractual relationship between Petitioner No.1 and Respondent No.1. On 1/21/2011,  Respondent No.1 terminated the contract without a  period of notice. On 1/25/2011 Petitioner No.1 also asserted its termination of the contract, without a period of  notice.

Foresight Unlimited, located in the USA and represented by Mr. Damon, is among the clients both of  Petitioner No.1 and of Respondent No.1.

Following a telephone conversation between Respondent No.2 and Mr. Damon, a telephone conversation took place on 1/15/2011 between Ms. Mudge, an American contract partner of Petitioner No.1 and Respondent No.1. Ms. Mudge is also a member of the Board of Directors of the Independent Film and Television Alliance, an association of independent film companies in the USA, to which, inter al., Foresight Unlimited belongs.

A class action law suit of some 4,300 persons against Petitioner No.1, is pending at the District Court of Massachusetts in the USA under the file number 1:10-cv-12043-GAO and was served upon the latter in April 2011.

The Petitioners claim that the Respondents contacted the contract partners of Petitioner No.1 and attempted to move them, to end their contractual relationship with Petitioner No.1, whereby they relied, it is claimed, on untrue facts and confidential internal contract information.

Respondent No.2, it is claimed, stated in the telephone conversation with Ms. Mudge that Petitioner No.1 uses investigative software that Petitioner No.2 stole from Logistep AG, the

Swiss firm he previously worked for. In fact, it is claimed, Petitioner No.1 uses "Observer", a software program developed by its Managing Director, Mr. Ben Perino.

In addition, it is claimed, Respondent No.2 stated in the telephone conversation that the investigation results achieved by Petitioner No.1 are not reliable. This, it is claimed, is also incorrect.

In addition, it is claimed, Respondent No.2 offered to Ms. Mudge to conduct the services of Petitioner No.1 in the future via another firm for her and also approached the copyright holders, i.e., the clients of Ms. Mudge, directly, with the same statements. Respondent No.1. recently, it is claimed, repeatedly offered to other clients, inter al., Los Banditos Film GmbH, to replace Petitioner No.1 with another firm, to wit, Tree Garden Burning GmnH. The shareholders thereof are the name partners of Respondent No.1.

Petitioners are of the view that Respondent No.2 mentioned the class action complaint in connection with an attempt to lure away customers. This, it is claimed, violates § 4 No. 7 Unfair Competition Law.

Petitioners obtained the preliminary injunction of 2/10/2011, in which the Respondents are enjoined, under penalty of a fine of up to 250,000.00 EUR to be set by the Court for each violation, or, in the alternative, administrative incarceration, or administrative incarceration of up to six months, the foregoing to be enforced, with respect to Respondent No.1, on one of its managing partners, from:

— with respect to Petitioner No.1 and 2, making and/or causing to be made, submitting and/or causing to be submitted, the claim that Mr. Patrick Achache stole from a Swiss firm, where he previously worked, the software used by Guardaley,

5

— with respect to Petitioner No.1, making and/or causing to be made, submitting and/or causing

to be submitted, the claim that Guardaley Ltd. Provides unreliable investigative services and

that a class action complaint by 4,300 persons is pending against it in the United States of

America, as well as, during an existing contractual relationship with Petitioner No.1,

contacting its clients without its knowledge and consent and offering to work with the same

without the assistance of Petitioner No.1,

If such occurs as reported in the Affidavit of Ms. Mudge of 1/16/2011 (p. 42 of the file).

Otherwise, regarding the motion to enjoin the Respondents from communicating to third parties

information that constitutes confidential contract information, the motion for issuance of a

preliminary injunction was denied.

The objection of the Respondent of 3/15/2011 is against this preliminary injunction that,

addressed to each of Respondent No.1 and Respondent No.2, was served by a marshal on

2/11/2011 by deposit in a mail box belonging to the office of Respondent No.1.

The Petitioners move to sustain the preliminary injunction of the State Court of Berlin of

2/10/2011 (File No. 16 O 55/11), denying the objection of the Respondent.

The Respondents move to abrogate the preliminary injunction of the State Court of Berlin of

2/10/2011 (File No. 16 O 55/11), and deny the motion for issuance of a preliminary injunction.

Respondent No.1 is of the view that Respondent No.2 is no longer a party to the proceeding,

since, it is claimed, the preliminary injunction of  2/10/2011 was not executed against him, by

reason of failure of service. Service at the address of his professional activity—Respondent No.2

is, it is claimed, an employee of Respondent No.1 and does not carry out his own business

activities, and he  is, without limiting the generality thereof, not a partner or managing director of

Respondent No.1—is not, it is claimed, substitute service pursuant to § 178 (1) No. 2 Code of Civil Procedure, § 180 sent. 1 Code of Civil Procedure. Respondent No.1 is also not, it is claimed, the procedural representative of Respondent No.2.

The Respondents claim that Ms. Mudge is not a client, but rather an employee of Petitioner No.1. The telephone conversation between Respondent No.2  and Ms. Mudge took place at her wish. The information related in the telephone conversation concerned exclusively the client relationship between Respondent No.1 and Foresight Unlimited. In her Affidavit, Ms. Mudge, it is claimed, reported the contents of the telephone conversation with Respondent No.2 incompletely and incorrectly.

As to the statements forming the subject of the dispute, the Respondents claim as follows:

Respondent No.2, it is claimed, expressly stated to Ms. Mudge that he, as a result of the overall impression resulting from various circumstances, especially the circumstance that Petitioner No. 2 did not communicate that he had been working for Logistep AG until 2/21/2009 and at the same time working for Petitioner No.1 since January 2007, could not safely assume that Petitioner No.2 had  not had access to Logistep AG's copyrighted know-how. In this respect, it is claimed, he repeatedly emphasized that he only had reason for doubts that initially had to be clarified and  dispelled.

In addition, it is claimed, Respondent No.2 indicated to Ms. Mudge that Respondent No 1  had learned that the IP connection data determined by Petitioner No.1 were not 100% correct. IP data, it is claimed, was being collected for connection owners who were not effecting "uploads" themselves. Respondent No.1, it is claimed, had learned this in January 2011 from ipoque GmbH, a firm offering services in the area of bandwidth and Internet management and which

7

had wrongfully received a cease and desist letter from Respondent No.1 on the basis of a notification by Petitioner No.1, which is answered by the Petitioners with the claim of lack of knowledge.

Finally, it is claimed, Respondent No.2 did not offer to Ms. Mudge to have investigations conducted for her clients by another firm. He, it is claimed, merely responded to Ms. Mudge's question as to whether there were other providers than Petitioner No.1, that the assumption of such investigation activities by another provider was at least technically possible without problem.

Respondents are of the view that no competitive relationship exists between them and Petitioners, since Petitioners offer Internet investigative services, while the Respondents, however, exclusively legal advice and representation. In the statements made to Ms. Mudge, it is claimed, neither facts within the meaning of § 4 No. 8 Unfair Competition Law were asserted, nor were competitors interfered with pursuant to § 4 No. 10 Unfair Competition Law. The statements are to be attributed  to [sic] Petitioner No.1, since Ms. Mudge is its employee, and as a result, they were not statements made to third parties. In addition, it is claimed, the statements as to unreliable investigative services and class action complaint were true facts.

With respect to the other assertions by the parties, reference is made to the pleadings exchanged between the parties, including the exhibits thereto.


**<u>Grounds of the Decision</u>**

With respect the heading as to 1. a), the preliminary injunction is to be confirmed, because it was issued in accordance with law (§§ 925, 936 Code Of Civil Procedure). Otherwise, it is to be abrogated and the motion for the issuance thereof is to be denied.

8

Petitioner No.1 has, with respect to the statement set forth in the heading of the preliminary injunction under 1a), a claim for injunctive relief against the Respondents pursuant to §§ 8 (1), 3 (1), 4 No. 8 Unfair Competition Law.

Such claim also extends to Respondent No.2. He is still a party to the proceeding. Contrary to the pleading of the Respondents, depositing the order of the chamber of 2/10/2011 into the mail box of the Respondent No.1 on 2/11/2011 constitutes effective substitute service upon the Respondent No. 2 in his place of business within the meaning of  § 178 (1) No.2 Code of Civil Procedure.

A place of business is any place in which there is public traffic (Zöller, [Commentary to the] Code of Civil Procedure, 27th ed., 2009, § 178 note 15). Effective substitute service requires that that the place of business be that from which the recipient of service pursues his business; for the persons employed there, such a place may be a place of business for purposes of substitute service, if such person is active in a place established for public traffic or at least gives the impression that he maintains such place as a place of business (Zöller, supra., § 178 Code of Civil Procedure notes 16 and 17).

Since Respondent No.2 appears on the letterhead of Respondent No.1 as an attorney working there, he gives the outward impression that he is operating a place of business there. There is thus the expectation that the order addressed to Respondent No.2 as a recipient of service will be reliably transmitted to Respondent No.2.

Petitioners are competitors of Respondents within the meaning of §§ 8 (3) No. 1; 2 (1) No. 3 Unfair Competition Law.

Even though the Respondents state that they only offer legal advice and representation, they provide, however, as do the Petitioners, services in the area of the prosecution of copyright infringements. This satisfies, against the background of the required economic method of analysis, the existence of a concrete competitive relationship Respondent No.2 "alleged," within the meaning of 4 No.8 Unfair Competition Law,  the statement in question, in that he made it to Ms. Mudge. Irrespective of whether Ms. Mudge is, as stated by Respondents, an employee of Petitioner No.1, she is a third party, to whom the impermissible claims of fact must be made pursuant to § 4 No. 8 Unfair Competition Law. Because, in the interests of effective protection, the concept of third party is to be interpreted extensively, with the result that even employees or workers of the affected business can be included therein (Köhler/Bornkamm, [Commentary on the] Unfair Competition Law, 28th ed., 2010, § 4 Unfair Competition Law note 8.18). Since Ms. Mudge, according to the statements of the Respondents, is also a representative of  Foresight Unlimited, she is to be viewed as a "third party".

The statement evident in the partial motion at 1 and from the heading of the preliminary injunction at a) is unfair pursuant to § 4 No. 8 Unfair Competition Law. It is capable of harming the operations of Petitioner No.1 or of endangering its credit.

Petitioners stated and made a credible showing that Respondent No.2 made the statement to Ms. Mudge.  The chamber is convinced, on the basis of Ms. Mudge's Affidavit of 1/16/2011 and the certified translation thereof from the English language, that Respondent No.2 stated to Ms. Mudge that Petitioner No.2 had stolen Logistep AG's software.

The Respondents have not cast doubt upon this credible showing. Without limiting the generality of the foregoing, they did not make credible their assertion that Respondent No.2 only stated that, on the basis of the overall impression of the circumstances, it could not be

Exhibit J - 10

excluded that Petitioner No.2 had, in the development of software, had recourse to the third-party knowledge of Logistep AG. Rather, they only made a credible showing of the statements about the circumstances that supposedly gave rise to the misgivings of Respondent No.2. That, however, is insufficient to refute the assumption that Respondent No.2 used the term "stole."

The statement, which Respondent No.1 must, pursuant to § 831 Civil Code, permit to be attributed to it, also violates, for the foregoing reasons, 823 (2) Civil Code, read together with §§ 186, 187 Criminal Code, since Respondent No.2 publicized an untrue fact capable of causing Petitioner No.2 to be regarded with contempt or to demean him in public opinion.

Urgency is presumed pursuant to § 12(2) Unfair Competition Law.

The danger of repetition, which is a requirement for the claim for injunctive relief, is to be presumed, as a result of the legal violation, and could only have been dispelled by the making a criminally enforceable cease and desist declaration, which was not made.

Petitioners, however, do not have a claim against the Respondents for injunctive relief under  §§ 8(1), 3 (1), 4 No.8 Unfair Competition Law by reason of the statements set forth in the heading of the preliminary injunction under 1.b) aa) and bb).

Respondents have stated and made a credible showing that the statement of Respondent No. 2, claimed and made credible in the Affidavit of Ms. Mudge, that Petitioner No.1 provides unreliable investigative services, is true. Pursuant thereto, Respondent No.1 learned from ipoque GmbH that Petitioner No.1 collected IP data on connection owners who were not themselves making films available to the public, and were thus not effecting "uploads." This can be concluded from the presentation of 1/13/2011 by ipoque that was submitted as Exhibit AG 17. It can be concluded that the film in question, "Antichrist", was running under the ipoque IP

address in the context of a test screening, that ipoque GmbH did not offer the film as an upload. In spite of this, the software of Petitioner No.1, by which only uploads in infringement of copyright were to be collected, collected ipoque GmbH's IP data. As a result, Petitioner No.1 sent—wrongfully—a cease and desist letter, submitted as Exhibit AG 18. These credibly demonstrated facts permit the assumption that the statement in dispute is true.

In addition, the statement of Respondent No.2, alleged and made credible, that a class action complaint of 4,300 persons is pending in the USA, is true. It follows from Exhibits AG 19 and 29 submitted by Respondents that such a complaint is pending before the  United States District Court of Massachusetts.

The statement is not unfair by reason of the fact that, in the view of Petitioners, it was made in connection with an attempt to lure away clients. For the following reasons, an unfair luring away of clients did not take place.

Finally, the Petitioners do not have a claim for injunctive relief with respect to the statement set forth under  1. b) cc) of the preliminary injunction. This is not unfair within the meaning of  § 4 No.10 Unfair Competition Law.

The statement of Respondent No.2 does not constitute an unfair luring away of customers of Petitioner No.1, but rather a permissible solicitation of clients.

Petitioners did not make a credible showing that Respondents obtained information that they would not have obtained absent the business relationship with Petitioner No.1. At least, according to the statements of Petitioners and of Ms. Mudge in the Affidavit, Foresight Unlimited, the subject of the statement, is a client of Respondent No.1, with the result that Respondent No.2 was contacting a client.

12

It is also not evident that Respondents approached Los Banditos Film GmbH in an unfair manner. At least, Petitioners have not presented or made a credible showing of circumstances demonstrating such unfairness.

The decision as to costs results from § 92 (1) sent. 1 Code of Civil Procedure, the decision on preliminary enforceability is on the basis of §§ 708 No. 6, 711 Code of Civil Procedure.

Issued



Dr. Elfring

Dr. Danckwerts

# EXHIBIT K

**Ausfertigung**



# Landgericht Berlin

# Im Namen des Volkes

### Urteil

Geschäftsnummer:  16 O 55/11          verkündet am :     03.05.2011
                                                         Baate,
                                                         Justizobersekretärin

In dem Rechtsstreit

1. der Guardaley Ltd.,
   vertreten d.d. Geschäftsführer Ben Perino,
   Rubensstraße 33, 76149 Karlsruhe,

2. des Herrn Patrick Achache,
   geschäftsansässig Rubensstraße 33, 76149 Karlsruhe,

                                                    Antragsteller,

- Verfahrensbevollmächtigte:
  Rechtsanwälte Schulenberg & Schenk,
  Alsterchaussee 25, 20149 Hamburg,-


g e g e n

1. die Baumgarten Brandt GbR, Internationales Handels-
   zentrum,
   Friedrichstraße 95, 10117 Berlin,

2. den Herrn Rechtsanwalt André Nourbakhsch,
   (geschäftsansässig: Internationales Handelszentrum),
   Friedrichstraße 95, 10117 Berlin,

                                                    Antragsgegner,

- Verfahrensbevollmächtigte:
  Rechtsanwälte BaumgartenBrandt Rechtsanwälte,
  Friedrichstraße 95, 10117 Berlin,-


hat die Zivilkammer 16 des Landgerichts Berlin in Berlin-Mitte, Littenstraße 12-17, 10179 Berlin,

auf die mündliche Verhandlung vom 03.05.2011 durch den Vorsitzenden Richter am Landgericht

Dr. Scholz, den Richter am Landgericht Dr. Danckwerts und den Richter Dr. Elfring

ZP 550

**f ü r   R e c h t   e r k a n n t :**

1. Die einstweilige Verfügung vom 10. Februar 2011 wird hinsichtlich des Tenors zu 1. a) bestätigt. Im Übrigen wird die einstweilige Verfügung aufgehoben und der Antrag auf ihren Erlass zurückgewiesen.

2. Von den Gerichtskosten tragen die Antragstellerin zu 1. 4/5 und die Antragsgegner zu 1. und 2. jeweils 1/10.

   Die außergerichtlichen Kosten der Antragstellerin zu 1. tragen die Antragsgegner zu 1. und 2. zu jeweils 1/10.

   Die außergerichtlichen Kosten des Antragstellers zu 2. tragen die Antragsgegner zu 1. und 2. jeweils zu 1/2.

   Die außergerichtlichen Kosten der Antragsgegner zu 1. und 2. trägt die Antragstellerin zu 3/4. Im Übrigen findet eine Kostenerstattung nicht statt.

3. Das Urteil ist vorläufig vollstreckbar.

   Der Antragstellerin wird nachgelassen, die Zwangsvollstreckung gegen Sicherheitsleistung in Höhe des vollstreckbaren Betrages abzuwenden, sofern die Antragsgegner vor der Vollstreckung nicht Sicherheit in Höhe des jeweils beizutreibenden Betrages leisten.

**Tatbestand**

Die Antragstellerin zu 1) ist ein IT-Unternehmen, das auf die Recherche und Sicherung von Verletzungen des geistigen Eigentums im Internet spezialisiert ist und hierzu Dateiidentifizierungs- und Verfolgungsmaßnahmen zur Verfügung stellt. Sie erfasst und dokumentiert IP-Verbindungsdaten der Inhaber von Internetanschlüssen, die Werke ihrer Kunden urheberrechtswidrig im Internet zum Download anbieten. Der Antragsteller zu 2) ist Angestellter der Antragstellerin zu 1).

Die Antragsgegnerin zu 1) macht im Rahmen anwaltlicher Dienstleistungen Unterlassungs- und Schadensersatzansprüche gegen Anschlussinhaber geltend, die urheberrechtswidrig Filme öffentlich zugänglich machen und legt hierzu eidesstattliche Erklärungen des Antragstellers zu 2) vor, in denen dieser erklärt, welche Inhaber von Internetanschlüssen bestimmte Filme urheberrechtswidrig im Internet zum Download angeboten haben.

Der Antragsgegner zu 2) ist als Rechtsanwalt bei der Antragsgegnerin zu 1) tätig.

Exhibit K - 2

Zwischen der Antragstellerin zu 1) und der Antragsgegnerin zu 1) bestand seit 2009 ein Vertragsverhältnis. Die Antragsgegnerin zu 1) kündigte den Vertrag am 21.01.2011 fristlos. Mit Faxschreiben vom 25.01.2011 erklärte auch die Antragstellerin zu 1) die fristlose Kündigung des Vertrags.

Zu den Mandanten sowohl der Antragstellerin zu 1) als auch der Antragsgegnerin zu 1) gehört u.a. das Unternehmen Foresight Unlimited mit Sitz in den USA, vertreten durch Herrn Damon.

Nachdem zunächst ein Telefonat zwischen dem Antragsgegner zu 2) und Herrn Damon stattgefunden hatte, erfolgte am 05.01.2011 ein Telefonat zwischen Frau Mudge, einer amerikanischen Vertragspartnerin der Antragstellerin zu 1), und dem Antragsgegner zu 2). Frau Mudge ist zugleich Mitglied des Board of Directors der Independent Film and Television Alliance (IFTA), einem Verband unabhängiger Filmgesellschaften in den USA, zu dem u.a. die Foresight Unlimited gehört.

Beim District Court of Massachusetts in den USA ist zu dem Aktenzeichen 1: 10-cv-12043-GAO eine Sammelklage von ca. 4.300 Personen u.a. gegen die Antragstellerin zu 1) anhängig, die ihr im April 2011 zugestellt wurde.

Die Antragsteller behaupten, die Antragsgegner kontaktierten die Vertragspartner der Antragstellerin zu 1) und versuchten, diese dazu zu bewegen, ihr Vertragsverhältnis mit der Antragstellerin zu 1) zu beenden, wobei sie sich auf unwahre Tatsachen und auf geheime vertragsinterne Informationen stützten.

Der Antragsgegner zu 2) habe in dem Telefonat mit Frau Mudge mitgeteilt, die Antragstellerin zu 1) nutze eine Ermittlungssoftware, die der Antragsteller zu 2) bei dem Schweizer Unternehmen Logistep AG, bei dem er zuvor tätig gewesen sei, gestohlen habe. Tatsächlich nutze die Antragstellerin zu 1) eine von ihrem Geschäftsführer Herrn Ben Perino entwickelte Software namens „Observer".

Weiterhin habe der Antragsgegner zu 2) in dem Telefonat ausgeführt, die durch die Antragstellerin zu 1) geleisteten Ermittlungsergebnisse seien nicht zuverlässig. Dies sei indessen unzutreffend.

Zudem habe der Antragsgegner zu 2) der Frau Mudge angeboten, die Leistungen der Antragstellerin zu 1) künftig über ein anderes Unternehmen für sie durchzuführen und sich mit ähnlichen Äußerungen auch direkt an die Rechteinhaber, also die Mandanten von Frau Mudge, gewandt. Die Antragsgegnerin zu 1) habe in der jüngeren Vergangenheit mehrfach auch anderen Mandanten, u.a. der Los Banditos Film GmbH, angeboten, die Antragstellerin zu 1) durch ein anderes Unter-

nehmen, nämlich der Tree Garden Burning GmbH, zu ersetzen. Deren Gesellschafter sind unstreitig die Namensgeber der Antragsgegnerin zu 1).

Die Antragsteller sind der Ansicht, der Antragsgegner zu 2) habe die Sammelklage in Verbindung mit einer Abwerbung von Mandanten erwähnt. Dies verstoße gegen § 4 Nr. 7 UWG.

Die Antragsteller haben die einstweilige Verfügung vom 10.02.2011 erwirkt, mit der den Antragsgegnern bei Vermeidung eines vom Gericht für jeden Fall der Zuwiderhandlung festzusetzenden Ordnungsgeldes bis zu 250.000,00 EUR, ersatzweise Ordnungshaft, oder einer Ordnungshaft bis zu sechs Monaten, diese hinsichtlich der Antragsgegnerin zu 1) zu vollziehen an einem ihrer geschäftsführenden Gesellschafter, untersagt worden ist:

- Hinsichtlich der Antragsteller zu 1) und 2) die Behauptung aufzustellen und/oder aufstellen zu lassen, zu verbreiten und/oder verbreiten zu lassen, Herr Patrick Achache hätte die Software, die von der Firma Guardaley benutzt wird, bei einem Schweizer Unternehmen gestohlen, bei welchem er früher beschäftigt war

- Hinsichtlich der Antragstellerin zu 1) die Behauptung aufzustellen und/oder aufstellen zu lassen, zu verbreiten und/oder verbreiten zu lassen, die Firma Guardaley Ltd. würde unzuverlässige Rechercheleistungen erbringen und gegen sie sei in den Vereinigten Staaten von Amerika eine Sammelklage von 4.300 Personen anhängig sowie während eines bestehenden Vertragsverhältnisses zu der Antragstellerin zu 1) ohne deren Kenntnis und Einwilligung deren Kunden zu kontaktieren und diesen eine Zusammenarbeit ohne Mitwirkung der Antragstellerin zu 1) anzubieten,

wenn dies jeweils geschehe wie in der eidesstattlichen Versicherung von Frau Mudge vom 16.01.2011 (Bl. 42 d.A.) wiedergegeben. Im Übrigen, betreffend den Antrag, den Antragsgegnern zu untersagen, Dritten gegenüber Informationen mitzuteilen, die Gegenstand von Vertragsinterna seien, wurde der Antrag auf Erlass einer einstweiligen Verfügung zurückgewiesen.

Gegen diese einstweilige Verfügung, die jeweils an die Antragsgegnerin zu 1) und den Antragsgegner zu 2) adressiert, am 11.02.2011 durch eine Gerichtsvollzieherin durch Einlegen in einen zum Geschäftsraum der Antragsgegnerin zu 1) gehörenden Briefkasten zugestellt wurde, richtet sich der Widerspruch der Antragsgegnerin vom 15.03.2011.

Die Antragsteller beantragen,

ZP 550

die einstweilige Verfügung des Landgerichts Berlin vom 10.02.2011 (Az.: 16 O 55/11) unter Zurückweisung des Widerspruchs der Antragsgegnerin aufrechtzuerhalten.

Die Antragsgegner beantragen,

die einstweilige Verfügung des Landgerichts Berlin vom 10.02.2011 (Az. 16 O 55/11) aufzuheben und den Antrag auf Erlass einer einstweiligen Verfügung zurückzuweisen.

Die Antragsgegnerin zu 1) ist der Ansicht, der Antragsgegner zu 2) sei nicht mehr Partei des Verfahrens, da die einstweilige Verfügung vom 10.02.2011 ihm gegenüber mangels Zustellung nicht vollzogen worden sei. Eine Zustellung an die Adresse seiner beruflichen Tätigkeit – der Antragsgegner zu 2) sei Mitarbeiter der Antragsgegnerin zu 1) und gehe keiner eigenen Geschäftstätigkeit nach, sei insbesondere nicht Gesellschafter oder Geschäftsführer der Antragsgegnerin zu 1) – sei keine Ersatzzustellung gemäß § 178 Abs. 1 Nr. 2 ZPO, § 180 S. 1 ZPO. Die Antragsgegnerin zu 1) sei auch nicht Prozessbevollmächtigte des Antragsgegners zu 2).

Die Antragsgegner behaupten, Frau Mudge sei nicht Kundin, sondern Mitarbeiterin der Antragstellerin zu 1). Das Telefonat zwischen dem Antragsteller zu 2) und Frau Mudge habe auf ihren Wunsch hin stattgefunden. Die in dem Telefonat weitergegebenen Informationen hätten sich ausschließlich auf das Mandatsverhältnis der Antragsgegnerin zu 1) zu Foresight Unlimited bezogen. In ihrer eidesstattlichen Versicherung habe Frau Mudge den Inhalts des Telefonats mit dem Antragsgegner zu 2) unvollständig und falsch wiedergegeben.

Zu den einzelnen streitgegenständlichen Aussagen behaupten die Antragsgegner Folgendes:

Der Antragsgegner zu 2) habe gegenüber Frau Mudge ausdrücklich mitgeteilt, dass er nur aufgrund einer Gesamtschau verschiedener Umstände, insbesondere des Umstands, dass der Antragsteller zu 2) nicht mitgeteilt habe, dass er bis zum 21.02.2009 für die Logistep AG und zugleich bereits seit Januar 2007 für die Antragstellerin zu 1) tätig gewesen sei, nicht mit Sicherheit davon ausgehen könne, der Antragsteller zu 2) habe nicht auf urheberrechtlich geschütztes Know-How der Logistep AG zurück gegriffen. Dabei habe er wiederholt betont, dass es sich bis dahin nur um begründete Zweifel handele, die zunächst zu klären seien und ausgeräumt werden sollten.

Der Antragsgegner zu 2) habe Frau Mudge zudem darauf hingewiesen, dass die Antragsgegnerin zu 1) erfahren habe, dass die von der Antragstellerin zu 1) festgestellten IP-Verbindungsdaten nicht zu 100 Prozent korrekt seien. Es würden auch IP-Daten von Anschlussinhabern ermittelt, die selbst keine „Uploads" vornähmen. Dies habe die Antragsgegnerin zu 1) im Januar 2011 von der ipoque GmbH, einem Unternehmen, das Dienstleistungen im Bereich Bandbreiten- und Internetmanagement anbiete und das nach einem Hinweis der Antragstellerin zu 1) von der Antragsgegnerin zu 1) zu unrecht abgemahnt worden sei, erfahren, was die Antragsteller mit Nichtwissen bestreiten.

Schließlich habe der Antragsgegner zu 2) Frau Mudge nicht angeboten, ihren Mandanten Untersuchungen von einem anderen Unternehmen durchführen zu lassen. Er habe auf die Frage von Frau Mudge, ob es alternative Dienstleister zu der Antragstellerin zu 1) gebe, lediglich mitgeteilt, dass die Übernahme der Überwachungstätigkeiten durch einen anderen Anbieter zumindest technisch ohne weiteres möglich sei.

Die Antragsgegner sind der Ansicht, zwischen ihnen und den Antragstellern bestehe kein Wettbewerbsverhältnis, da die Antragsteller Ermittlungsdienstleistungen im Internet anböten, die Antragsgegner jedoch ausschließlich Rechtsberatung und -vertretung. Durch die gegenüber Frau Mudge getätigten Äußerungen seien weder Tatsachen i.S.v. § 4 Nr. 8 UWG behauptet, noch Mitbewerber nach § 4 Nr. 10 UWG behindert worden. Die Äußerungen seien der Antragstellerin zu 1) zuzurechnen, da Frau Mudge ihre Mitarbeiterin sei, daher habe es sich nicht um Äußerungen gegenüber Dritten gehandelt. Ferner handele es sich bei den Aussagen zu den unzuverlässigen Rechercheleistungen und der Sammelklage um wahre Tatsachen.

Hinsichtlich des Vorbringens der Parteien im Übrigen wird auf die zwischen ihnen gewechselten Schriftsätze nebst Anlagen verwiesen.

## Entscheidungsgründe

Die einstweilige Verfügung ist hinsichtlich des Tenors zu 1. a) zu bestätigen, weil sie insoweit zu Recht ergangen ist (§§ 925, 936 ZPO). Im Übrigen ist sie aufzuheben und der Antrag auf ihren Erlass zurückzuweisen.

Die Antragstellerin zu 1) hat hinsichtlich der im Tenor der einstweiligen Verfügung unter 1. a) genannten Äußerung einen Unterlassungsanspruch aus §§ 8 Abs. 1, 3 Abs. 1, 4 Nr. 8 UWG gegen die Antragsgegner.

Der Anspruch besteht auch gegen den Antragsgegner zu 2). Dieser ist weiterhin Partei des Ver-
fahrens. Entgegen dem Vortrag der Antragsgegner stellt die Einlegung des an den Antragsgegner
zu 2) adressierten Beschlusses der Kammer vom 10.02.2011 am 11.02.2011 in den Briefkasten
der Antragsgegnerin zu 1) eine wirksame Ersatzzustellung an den Antragsgegner zu 2) in seinem
Geschäftsraum im Sinne von § 178 Abs. 1 Nr. 2 ZPO dar.

Geschäftsraum ist jeder Raum, in dem sich der Publikumsverkehr abspielt (Zöller, ZPO, 27. Aufla-
ge 2009, § 178 Rn. 15). Eine wirksame Ersatzzustellung setzt voraus, dass es sich um den Ge-
schäftsraum des Zustellungsadressaten handelt, von dem aus seiner Erwerbstätigkeit nachgeht;
für die dort erwerbstätigen Personen kann ein solcher Geschäftsraum Ort der Ersatzzustellung
sein, wenn er in einem für den Publikumsverkehr bestimmten Geschäftsraum tätig ist oder zumin-
dest den Rechtsschein hervorruft, er unterhalte als solcher ein besonderes Geschäftslokal (Zöller,
a.a.O., § 178 ZPO Rn. 16 und 17).

Indem der Antragsgegner zu 2) auf dem Briefbogen der Antragsgegnerin zu 1) als dort tätiger
Rechtsanwalt aufgeführt ist, erweckt er nach außen den Anschein, als betreibe er dort ein Ge-
schäftslokal. Es besteht danach die Erwartung, dass die Weitergabe des Beschlusses an den An-
tragsgegner zu 2) als Zustellungsadressaten verlässlich gewährleistet sei.

Die Antragsteller sind Mitbewerber der Antragsgegner im Sinne von §§ 8 Abs. 3 Nr. 1; 2 Abs. 1 Nr.
3 UWG.

Auch wenn die Antragsgegner ausführen, sie böten nur Rechtsberatung und -vertretung an, so
erbringen sie dennoch, wie auch die Antragsteller, Dienstleistungen auf dem Gebiet der Verfol-
gung von Urheberrechtsverletzungen. Dies genügt vor dem Hintergrund der gebotenen wirtschaft-
lichen Betrachtungsweise für das Bestehen eines konkreten Wettbewerbsverhältnisses.

Der Antragsgegner zu 2) hat die betreffende Äußerung „behauptet" im Sinne von § 4 Nr. 8 UWG,
indem er sie gegenüber Frau Mudge tätigte. Unabhängig davon, ob es sich bei Frau Mudge um
eine Mitarbeiterin der Antragstellerin zu 1) handelt, wie die Antragsgegner behaupten, handelt es
sich bei ihr um eine dritte Person, der gegenüber die nach § 4 Nr. 8 UWG unzulässigen Tatsa-
chenbehauptungen geäußert werden müssen. Denn der Begriff des Dritten ist im Interesse eines
effektiven Schutzes weit zu fassen, so dass auch Angestellte oder Mitarbeiter des betroffenen
Unternehmens darunter fallen können (Köhler/Bornkamm, UWG, 28. Auflage 2010, § 4 UWG Rn.
8.18). Da Frau Mudge nach dem Vortrag der Antragsgegner jedoch auch als Vertrete-
rin/Bevollmächtigte der Foresight Unlimited tätig ist, ist sie als „Dritte" anzusehen.

Die aus dem Teilantrag zu 1. bzw. aus dem Tenor der einstweiligen Verfügung zu a) ersichtliche Äußerung ist gemäß § 4 Nr. 8 UWG unlauter. Sie ist geeignet, den Betrieb der Antragstellerin zu 1) zu schädigen oder ihren Kredit zu gefährden.

Die Antragsteller haben dargelegt und glaubhaft gemacht, dass der Antragsgegner zu 2) die Äußerung gegenüber Frau Mudge getätigt hat. Aufgrund der eidesstattlichen Versicherung von Frau Mudge vom 16.01.2011 und ihrer beglaubigten Übersetzung aus der englischen Sprache ist die Kammer überzeugt, dass der Antragsgegner zu 2) gegenüber Frau Mudge äußerte, der Antragsteller zu 2) habe Software der Firma Logistep gestohlen.

Diese Glaubhaftmachung haben die Antragsgegner nicht erschüttert. Insbesondere haben sie ihre Behauptung, der Antragsgegner zu 2) habe lediglich geäußert, es sei aufgrund einer Gesamtschau der Umstände nicht auszuschließen, dass der Antragsteller zu 2) bei der Entwicklung von Software auf fremdes Wissen der Logistep AG zurückgriffen habe, nicht glaubhaft gemacht. Vielmehr haben sie lediglich die Ausführungen zu den Umständen, die die Zweifel des Antragsgegners zu 2) begründen sollen, glaubhaft gemacht. Dies reicht jedoch nicht aus, die Annahme, der Antragsteller zu 2) habe den Begriff „gestohlen" verwendet, zu widerlegen.

Die Äußerung, die sich die Antragsgegnerin zu 1) gemäß § 831 BGB zurechnen lassen muss, verstößt aus den genannten Gründen zudem gegen § 823 Abs. 2 BGB i.V.m. §§ 186, 187 StGB, da der Antragsgegner zu 2) eine unwahre Tatsache verbreitet, die den Antragsteller zu 2) verächtlich zu machen oder in der öffentlichen Meinung herabzuwürdigen geeignet ist.

Die Dringlichkeit wird gemäß § 12 Abs. 2 UWG vermutet.

Die für den Unterlassungsanspruch als Voraussetzung erforderliche Wiederholungsgefahr ist aufgrund der erfolgten Rechtsverletzung zu vermuten und hätte nur durch eine strafbewehrte Unterlassungserklärung ausgeräumt werden können, die nicht abgegeben wurde.

Die Antragsteller haben hingegen hinsichtlich der im Tenor der einstweiligen Verfügung unter 1. b) aa) und bb) genannten Äußerungen keinen Unterlassungsanspruch aus §§ 8 Abs. 1, 3 Abs. 1, 4 Nr. 8 UWG gegen die Antragsgegner.

Die Antragsgegner haben dargelegt und glaubhaft gemacht, dass die behauptete und durch die eidesstattliche Versicherung von Frau Mudge glaubhaft gemachte Äußerung des Antragsgegners zu 2), die Antragstellerin zu 1) erbringe unzuverlässige Recherchedienstleistungen, der Wahrheit entspricht. Die Antragsgegnerin zu 1) hat demnach von der ipoque GmbH erfahren, dass die An-

tragstellerin zu 1) IP-Daten von Anschlussinhabern ermittelt, die selbst keine Filmwerke der Öffentlichkeit zugänglich machen, also keinen „Upload" vornehmen. Dies lässt sich der als Anlage AG 17 vorgelegten Präsentation der ipoque GmbH vom 13.01.2011 entnehmen. Daraus folgt, dass der betreffende Film „Antichrist" unter der IP-Adresse der ipoque GmbH im Rahmen eines Testscreenings gelaufen ist, die ipoque GmbH den Film aber nicht als Upload angeboten hat. Dennoch ermittelte die Software der Antragstellerin zu 1), durch die lediglich urheberrechtswidrige Uploads ermittelt werden sollten, die IP-Daten der ipoque GmbH. Darauf mahnte die Antragsgegnerin zu 1) mit dem als Anlage AG 18 vorgelegten Schreiben – zu unrecht – ab. Dieser glaubhaft gemachte Sachverhalt rechtfertigt die Annahme, dass die streitgegenständliche Äußerung der Wahrheit entspricht.

Weiterhin entspricht auch die behauptete und glaubhaft gemachte Äußerung des Antragsgegners zu 2), in den USA sei eine Sammelklage von 4.300 Personen anhängig, der Wahrheit. Aus den von den Antragsgegnern eingereichten Anlagen AG 19 und 20 folgt, dass bei dem United States District Court of Massachusetts eine entsprechende Klage anhängig ist.

Die Äußerung ist auch nicht deshalb unlauter, weil sie, wie die Antragsteller meinen, von dem Antragsgegner zu 2) im Zusammenhang mit einem Abwerben von Mandanten erfolgt sei. Ein solches unlauteres Abwerben von Mandanten liegt aus den nachfolgenden Gründen nicht vor.

Schließlich haben die Antragsteller keinen Unterlassungsanspruch hinsichtlich der unter 1. b) cc) der einstweiligen Verfügung genannten Äußerung. Diese ist nicht unlauter im Sinne von § 4 Nr. 10 UWG.

Die Äußerung des Antragsgegners zu 2) stellt kein unlauteres Abwerben von Kunden der Antragstellerin zu 1) dar, sondern ein erlaubtes Werben um Mandanten.

Die Antragsteller haben nicht glaubhaft gemacht, dass sich die Antragsgegner Informationen beschafft hätten, an die sie ohne die Geschäftsbeziehung zur Antragstellerin zu 1) nicht gelangt wären. Jedenfalls handelt es sich nach den Ausführungen der Antragsteller und von Frau Mudge in der eidesstattlichen Versicherung bei dem von der Aussage betroffenen Unternehmen Foresight Unlimited um eine Mandantin der Antragsgegnerin zu 1), so dass der Antragsgegner zu 2) eine eigene Mandantin kontaktiert hätte.

Weiterhin ist nicht ersichtlich, dass sich die Antragsgegner in unlauterer Weise an die Los Banditos Film GmbH gewendet haben. Insoweit haben die Antragsteller weder Umstände dargelegt noch glaubhaft gemacht, aus denen sich die Unlauterkeit ergeben soll.

ZP 550

10

Die Kostenentscheidung ergibt sich aus § 92 Abs. 1 Satz 1 ZPO, die Entscheidung über die vorläufige Vollstreckbarkeit beruht auf §§ 708 Nr. 6, 711 ZPO.

Dr. Scholz                    Dr. Danckwerts                    Dr. Elfring

Ausgefertigt

Baate
Justizobersekretärin

ZP 550

# EXHIBIT L

EXHIBIT L

## UNITED STATES DISTRICT COURT FOR THE
## DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| NU IMAGE, INC. | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | **CA. 1:11-cv-00301-RLW** |
| | ) | |
| DOES 1 – 6,500 | ) | |
| | ) | |
| **Defendants.** | ) | |
| _____ | ) | |

### DECLARATION OF DANIEL ARHEIDT IN SUPPORT OF PLAINTIFF'S MOTION FOR LEAVE TO TAKE DISCOVERY PRIOR TO RULE 26(f) CONFERENCE

I, Daniel Arheidt, declare:

1.   I am Director of Data Services for Guardaley, Limited ("Guardaley"), a company incorporated in England and Wales under company number 06576149.  Guardaley is a provider of online anti-piracy services for the motion picture industry.  Before my employment with Guardaley, I held various software developer and consultant positions at companies that developed software technologies.  I have approximately ten (10) years of experience related to the protocols, technical architecture and operation of the Internet.

2.   I submit this declaration in support of Plaintiff's Motion for Leave to Take Discovery Prior to Rule 26(f) Conference.  This declaration is based on my personal knowledge, and if called upon to do so, I would be prepared to testify as to its truth and accuracy.

3.   At Guardaley, I am the head of the department that carries out evidence collection and provides litigation support services.   I work closely with our development team to create credible techniques to scan for, detect, and download copies of copyrighted material on multiple network protocols for use by copyright owners.

1

Exhibit L - 1

4.   Guardaley has developed a technology that provides an effective means to detect the unauthorized distribution of movies and other audiovisual content and files over online media distribution systems, or "peer-to-peer" ("P2P") networks.   Guardaley's technology enables it to detect and monitor the unlawful transfer and distribution of files amongst the P2P network by different protocols   Those protocols make even small computers with low bandwidth capable of participating in large data transfers across a P2P network.  The initial file-provider intentionally elects to share a file with P2P networks.  This is called "seeding."  Other users ("peers") on the network connect to the seed file to download. As yet additional peers request the same file, each additional user becomes a part of the network from where the file can be downloaded.  However, unlike a traditional P2P network, each new file downloader is receiving a different piece of the data from each user who has already downloaded the file that together comprises the whole. This means that every "node" or peer user who has a copy of the infringing copyrighted material on a P2P network investigated by our software must necessarily also be a source of download for that infringing file.

5.   This distributed nature of the P2P networks typically leads to a rapid viral spreading of a file throughout peer users. Because of the nature of a P2P, any seed peer who has downloaded a file prior to the time a subsequent peer downloads the same file is a possible source for the subsequent peer so long as that first seed peer is online at the time the subsequent peer downloads a file.

6.   The Plaintiff in this action is producer and distributor of motion pictures.  The Plaintiff engaged the United States Copyright Gr*oup to, among other* tasks, document evidence of the unauthorized reproduction and distribution of the copyrighted motion picture to which Plaintiff

Exhibit L - 2

holds the exclusive distribution and licensing rights, *"The Expendables"* (the "Motion Picture"),

within the United States of America, including the District of Columbia.

7.   USCG, in turn, retained Guardaley to monitor and identify copyright infringement of

Plaintiff's copyrighted Motion Picture on P2P networks.  On behalf of Plaintiff, we engaged in a

specific process utilizing Guardaley's specially designed software technology to identify direct

infringers of Plaintiff's copyrights using protocols investigated by Guardley's software on P2P

networks.

8.   All of the infringers named as Doe Defendants were identified in the following way: Our

software is connected to a number of files of illegal versions of the Motion Picture. All infringers

connected to those files will be investigated through downloading a part of the file placed on

their computer. This evidence is saved on our service and could be shown to the court as

evidence if necessary.

9.   Once Guardaley's searching software program identifies an infringer in the way

described herein for the Motion Picture for which Plaintiff owns the exclusive licensing and

distribution rights, we obtain the Internet Protocol ("IP") address of a user offering the file for

download.  When available, we also obtain the user's pseudonym or network name and examine

the user's publicly available directory on his or her computer for other files that lexically match

Plaintiff's motion picture.  In addition to the file of the motion picture itself, we download or

otherwise collect publicly available information about the network user that is designed to help

Plaintiff identify the infringer.  Among other things, we download or record for each file

downloaded: (a) the time and date at which the file or a part of the file was distributed by the

user; (b) the IP address assigned to each user at the time of infringement; and, in some cases, (c)

the video file's metadata (digital data about the file), such as title and file size, that is not part of

3

Exhibit L - 3

the actual video content, but that is attached to the digital file and helps identify the content of the file.  We then create evidence logs for each user that store all this information in a database.

10. An IP address is, in combination with the date, a unique numerical identifier that is automatically assigned to a user by its Internet Service Provider ("ISP") each time a user logs on to the network.  Each time a subscriber logs on, he or she may be assigned a different IP address unless the user obtains from his/her ISP a static IP address.  ISPs are assigned certain blocks or ranges of IP addresses.  ISPs keep track of the IP addresses assigned to its subscribers at any given moment and retain such "user logs" for a very limited amount of time.  These user logs provide the most accurate means to connect an infringer's identity to its infringing activity.

11. Although users' IP addresses are not automatically displayed on the P2P networks, any user's IP address is readily identifiable from the packets of publicly available data being exchanged.  The exact manner in which we determine a user's IP address varies by P2P network.

12. An infringer's IP address is significant because it is becomes a unique identifier that, along with the date and time of infringement, specifically identifies a particular computer using the Internet.  However, the IP address does not enable us to ascertain with certainty the exact physical location of the computer or to determine the infringer's identity.  It only enables us to trace the infringer's access to the Internet to a particular ISP.  Subscribing to and setting up an account with an ISP is the most common and legitimate way for someone to gain access to the Internet.  An ISP can be a telecommunications service provider such as Verizon, an Internet service provider such as America Online, a cable Internet service provider such as Comcast, or even an entity such as a university that is large enough to establish its own network and link directly to the Internet.

Exhibit L - 4

13. Here, the IP addresses Guardaley identified for Plaintiff enable us to determine which ISP was used by each infringer to gain access to the Internet.  Publicly available databases located on the Internet list the IP address ranges assigned to various ISPs.  However, some ISPs lease or otherwise allocate certain of their IP addresses to other unrelated, intermediary ISPs.  Since these ISPs consequently have no direct relationship -- customer, contractual, or otherwise -- with the end-user, they are unable to identify the Doe Defendants through reference to their user logs. The intermediary ISPs' own user logs, however, should permit identification of the Doe Defendants.   We determined that the Doe Defendants here were using those ISPs listed in Exhibit C to Plaintiff's Motion for Leave to Take Discovery Prior to Rule 26(f) Conference together with various other ISPs operating both within and outside the District of Columbia, to gain access to the Internet and distribute and make available for distribution and copying Plaintiff's copyrighted motion picture.

14. We downloaded the motion picture file, or a substantial part of it, and other identifying information described above and created evidence logs for each Doe Defendant.  Once we identified the ISP used by the Doe Defendants to gain access to the Internet from the IP address, USCG sent an e-mail to the relevant contact at each ISP informing them of the Doe Defendant's IP address and the date and time of the infringing activity.  That e-mail message requested that each ISP retain the records necessary to identify its subscriber who was assigned that IP address at that date and time.  Once provided with the IP address, plus the date and time of the infringing activity, the Doe Defendant's ISPs quickly and easily can use their respective subscriber logs to identify the name and address of the ISP subscriber who was assigned that IP address at that date and time.

Exhibit L - 5

## Confirmation of Downloaded Material

15. I am also responsible for identifying on-line piracy of motion pictures for Guardaley, including gathering evidence of on-line piracy to support counsel's copyright protection enforcement efforts.

16. As part of my responsibilities at Guardaley, I have been designated to confirm that the digital audiovisual files downloaded by Guardaley are actual copies of Plaintiff's Motion Picture. It is possible for digital files to be mislabeled or corrupted; therefore, Guardaley (and accordingly, Plaintiff) does not rely solely on the labels and metadata attached to the files themselves to determine which motion picture is copied in the downloaded file, but also to confirm through a visual comparison between the downloaded file and the Motion Picture themselves.

17. As to Plaintiff's copyrighted Motion Picture, as identified in the Complaint, I or one of my assistants have watched a DVD copy of the Motion Picture provided by Plaintiff.  After Guardaley identified the Doe Defendants and downloaded the motion pictures they were distributing, we opened the downloaded files, watched them and confirmed that they contain a substantial portion of the motion picture identified in the Complaint.

18. Plaintiff's Motion Picture continues to be made available for unlawful transfer and distribution using P2P protocols, in violation of Plaintiff's exclusive licensing and distribution rights, and rights in the copyright.  USCG and Guardaley continue to monitor such unlawful distribution and transfer of Plaintiff's Motion Picture and to identify infringers.

Exhibit L - 6

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on February 17, 2011.

Daniel Arheidt

Exhibit L - 7

# EXHIBIT M

Fotokopie

No du dossier de la Cour : T-

COUR FÉDÉRALE

ENTRE :

VOLTAGE PICTURES LLC

| | COUR FÉDÉRALE<br>FEDERAL COURT | |
|---|---|---|
| D<br>É<br>P<br>O<br>S<br>É | AOUT 2 4 2011<br>AUG<br>MARIE-EVE LAROCHE | F<br>I<br>L<br>E<br>D |
| | MONTRÉAL, QC | 3 |

Demanderesse

-ET-

M. ou Mme UNTEL

Défendeurs

## AFFIDAVIT OF DANIEL ARHEIDT

I, Daniel Arheidt, a consultant of IPP Limited, of the City of Hamburg, Germany,

AFFIRM THAT:

1.  I am a consultant in the litigation support department of IPP Limited ("IPP"), a German company that provides forensic investigation services to copyright owners.

2.  As part of my duties for IPP, I routinely identify the Internet Protocol ("IP") addresses used by people who download, reproduce and distribute copyrighted works using the BitTorrent Protocol.

3.  IPP has developed a proprietary technology platform that provides an effective means to detect the unauthorized distribution of movies and other audiovisual content over P2P networks by members of those networks who use a BitTorrent protocol.

4.  Voltage Pictures LLC hired IPP to determine whether its film, *Hurt Locker*, was being copied and distributed by Canadian members of peer-to-peer ("P2P") online networks.

### The BitTorrent Protocol

5.  The BitTorrent protocol allows even small computers with low bandwidth to participate in large data transfers across a P2P network.

Exhibit M - 1

6.  The initial file-provider will choose to share a file with a P2P network. This initial file is called a "seed."

7.  Other P2P network users ("peers") connect to the seed file if they wish to copy it.

8.  The BitTorrent protocol breaks a file into packets, which are individually downloaded to a peer. The protocol also directs each new peer to the most readily available packet. In this way, a peer will not copy a file directly and solely from the seed but may download individual packets from any peer who has previously copied the file and who has made it available to the P2P network.

9.  As more and more peers request the same file, each additional peer automatically becomes a source for those packets of a file that he has copied. This speeds up the time it takes to download a file and frees up the capacity of a computer or server that would otherwise have to send a complete, large file to each peer.

10. Every peer who is copying or who has copied a file is simultaneously distributing it to every other peer.

*Hurt Locker*

11. Voltage Pictures LLC retained IPP to identify the IP addresses being used to reproduce and/or distribute Plaintiff's copyrighted works using the BitTorrent Protocol.

12. IPP asked me to implement, monitor, analyze, and attest to the results of, the investigation.

13. I ran forensic software named INTERNATIONAL IPTRACKER v1.2.1 and related technology, which scans P2P networks for the presence of copyrighted material.

14. The software searched P2P networks for files corresponding to *Hurt Locker* and then identified the peers who were offering the file for transfer or distribution. This information is available to anyone that is connected to the P2P network.

15. Once the software identified that *Hurt Locker* was being distributed over a particular P2P network, we obtained the internet protocol ("IP") address of each peer who was reproducing and/or distributing the movie. When available, we also obtained the peer's pseudonym or network name and examined the peer's publicly available directory for other files that lexically match *Hurt Locker*.

16. We then downloaded the copy of *Hurt Locker* that the peer was offering to the P2P network and distributing via the BitTorrent protocol.

17. At the same time, we downloaded other publicly available information to assist in identifying the peer. For instance, for every file we download, we are able to

record: (a) the date and time at which the file was distributed by the peer; (b) the IP address assigned to the peer by his internet service provider at the time of the distribution; (c) the video file's metadata, such as title and file size, that is not part of the video content but that is attached to the digital file.

18. We then created evidence logs for each peer and stored this information in a central database.

19. Schedule A to this affidavit ("Schedule A") lists those IP addresses and related information that was discovered during the *Hurt Locker* investigation.

*IP Addresses*

20. An IP address is a unique numerical identifier that is automatically assigned to an internet user by the user's Internet Service Provider ("ISP").

21. ISP's are assigned blocks or ranges of IP addresses. The range assigned to any ISP can be found in publicly available databases on the internet.

22. ISP's keep track of the IP addresses assigned to its customers at any given moment and retain "user logs" for a limited amount of time. These user logs provide an accurate means to match an IP address with a specific customer.

23. IPP can use IP addresses to track a peer to a particular ISP and, sometimes, to a particular geographic region. We determined that the defendants listed at Schedule A were customers of three Canadian ISP's: Bell Canada, Cogeco Câble inc., and Videotron s.e.n.c.

24. Once provided with the IP address, plus the date and time of the detected and documented activity, ISPs can use their subscriber logs to identify the names and addresses of their clients who acted as peers to copy and distribute unauthorized versions of *Hurt Locker*.

25. Only an ISP can correlate the IP address to the real identity of its subscriber.

*Confirmation of Copied and Distributed Material*

26. I personally extracted the data gathered from this *Hurt Locker* investigation.

27. After reviewing the evidence logs, I isolated the transactions and the IP addresses being used on the BitTorrent P2P network to reproduce and distribute *Hurt Locker*.

28. The IP addresses, hash values and hit dates contained in Exhibit A correctly reflect what is contained in the evidence logs.

29.  In addition to identifying the labels and metadata attached to the P2P files to determine that a peer identified at Schedule A has copied and distributed *Hurt Locker*, IPP analyzed each BitTorrent "piece" distributed by the IP addresses listed at Exhibit A and verified that reassembling the pieces results in a fully playable digital motion picture.

30.  I was provided with a control copy of the *Hurt Locker*, which members of my team viewed side-by-side with the digital media files set forth at Exhibit A and confirmed that they were the same.

Affirmed before me at the City of                    )
Karlsruhe, Germany, on _08-24-2011_                  )
_____.                     )
                                                     )
                                                     )
~~D-J.dllman~~                                        )
    Dr. Joachim Mellmann                             )
         Notar                                        )
_____                      )
Commissioner for Taking Affidavits                   )          _____
                                                                      Daniel Arheidt

This is Exhibit "A" referred to in the Affidavit of Daniel Arheidt,
affirmed before me this 24th day of August, 2011.

Dr. Joachim Mellmann
Notar
_____
A Commissionner for Taking Affidavits

# EXHIBIT N

British pornographer Jasper Feversham was fed up. The Internets were sharing his films, quality work like Catch Her in the Eye, Skin City, and MILF Magic 3. He wanted revenge—or at least a cut. So Feversham signed on to a ...

Business
People and Technologies That Matter
› Intellectual Property
› Internet Culture & Etiquette
Share on Facebook
shares



| Tweet 0 | | g+1 0 | | Share |

# The 'Legal Blackmail' Business: Inside a P2P-Settlement Factory

› By Nate Anderson, Ars Technica
› 10.03.10
› 10:30 AM



British pornographer Jasper Feversham was fed up. The Internets were sharing his films, quality work like *Catch Her in the Eye*, *Skin City*, and *MILF Magic 3*. He wanted revenge—or at least a cut. So Feversham signed on to a relatively new scheme: track down BitTorrent infringers, convert their IP addresses into real names, and blast out warning letters threatening litigation if they didn't cough up a few hundred quid.

"Much looking forward to sending letters to these f—ers," he wrote in an email earlier this year.

The law firm he ended up with was ACS Law, run by middle-aged lawyer Andrew Crossley. ACS Law had, after a process of attrition, become one of the only UK firms to engage in such work. Unfortunately for Crossley, mainstream film studios had decided that suing file-sharers

Exhibit N - 1

brought little apart from negative publicity, and so Crossley was left defending a heap of pornography, some video games, and a few musical tracks.

Crossley parleyed the porn into national celebrity—or perhaps "infamy" would be a better word. Earlier this year, Crossley was excoriated in the House of Lords by Lord Lucas of Crudwell and Dingwall—yes, I know—for what "amounts to blackmail... The cost of defending one of these things is reckoned to be £10,000. You can get away with asking for £500 or £1,000 and be paid on most occasions without any effort having to be made to really establish guilt. It is straightforward legal blackmail."

Lord Lucas went on to offer an amendment to the (now-passed) Digital Economy Bill, titled "Remedy for groundless threats of copyright infringement proceedings."

But the Lords were just getting started. Lord Young of Norwood Green likened firms such as ACS Law to "rogue wheel-clampers, if I can use that analogy," while the Earl of Erroll railed against the way that "ACS Law and others threaten people with huge costs in court unless they roll over and give lots of money up front, so that people end up settling out of court. The problem is the cost of justice, which is a huge block. We have to remember that."

Lord Clement-Jones also called out Crossley's work. "Like many noble Lords, I have had an enormous postbag about the activities of this law firm. It is easy to say 'of certain law firms,' but this is the only one that I have been written to about... ACS seems to specialize in picking up bogus copyright claims and then harassing innocent householders and demanding £500, £650, or whatever—a round sum, in any event—in order to settle."

May go for a Lambo or Ferrari. I am so predictable.

That was only the start of Crossley's problems. In the last 12 months, Crossley has been targeted by the Blackpool municipal government, dogged by journalists, hounded by a major consumer group, and hauled up before the Solicitors Regulation Authority for disciplinary proceedings. Baffled, angry people write his office daily, denying any knowledge of his charges. He has blacklisted his own ex-wife in his e-mail client, demanding that she cut off all contact with him forever. Clients press him to pay up. His own data suppliers are, he fears, out to screw him, and Crossley harbors the suspicion that he could make far more money in America, where fat statutory damage awards mean he could demand even more cash from his targets.

And, just to put a ridiculous cherry atop his plate of problems, the streets department in Westminster, London—where Crossley keeps his office—went after ACS Law because some of their office waste mysteriously "ended up in the public highway."

"We are a tightly resourced small firm," Crossley complained as he wheedled the fine in half. But not *that* tightly resourced. Crossley bragged over e-mail earlier this year that he "spent much of the weekend looking for a new car. Finances are much better so can put £20-30k down. May go for a Lambo or Ferrari. I am so predictable!" He began looking at new homes, including a gated property with "five double bedrooms, three bathrooms, modern kitchen and four reception rooms."

Keeping track of all the details might not be Crossley's strong suit. As he wrote (one assumes in jest) when a dispute about financial issues came up, "I am not an accountant, true. But I am a genius and everything I do is brilliant. You must understand that!"

He's also dogged. With all the hate, a lesser man might have buckled—as did other law firms like Tilly Bailey & Irvine, which dropped its own "settlement letter" business in April 2010 after "adverse publicity." Instead, Crossley plows ahead, defending work like *To the Manner*

Exhibit N - 2

*Porn* and *Weapons of Mass Satisfaction*; indeed, he seems rather philosophical about his lot in life.

"Sorry to bombard you with more things to deal with," he wrote recently to a colleague, "but this business seems to have its share of complications." Indeed it does—and the complications get even more complicated when you anger the anonymous masses at 4chan, who promptly crash your website, expose your private e-mail, and in doing so shed a powerful and unflattering light on the real practice of P2P lawyering. Drawing on thousands of personal e-mails, Ars takes you inside the world of ACS Law, reveal its connections to the US Copyright Group, and discovers just what Andrew Crossley thinks of *Godfather 3*.

Spoiler: "*Godfather 3* is not quite as bad as I remember."

# Operation Payback

"This will be a calm, coordinated display of blood," said the initial call to action. "We will not be merciful. We will not be newfags."

Users of the free-wheeling (to put it mildly) Internet community 4chan last week implemented "Operation Payback," a distributed denial of service attack against various anti-piracy groups the chanologists didn't like. The RIAA was hit. The MPAA was hit. But after some big targets, Operation Payback moved on to smaller firms, including ACS Law.

I have far more concern over the fact of my train turning up 10 minutes late or having to queue for a coffee than them wasting my time with this sort of rubbish.

After the group's data flood knocked the ACS Law website offline for a few hours, UK tech site The Register called up Andrew Crossley to ask him about the attack. The site was "only down for a few hours," Crossley said. "I have far more concern over the fact of my train turning up 10 minutes late or having to queue for a coffee than them wasting my time with this sort of rubbish."

He has something to be concerned about now. After these comments, Operation Payback hit ACS Law a second time, knocking out the site. In the process of bringing it back up, someone exposed the server's directory structure through the Web instead of showing the website itself. Those conducting Operation Payback immediately moved in and grabbed a 350MB archive of ACS Law e-mails, then threw the entire mass up on sites like The Pirate Bay.

This is more than a matter of mere embarrassment. The UK has tougher data protection laws than the US, and the country's Information Commissioner has already made it clear that ACS Law could be on the hook for hundreds of thousands of pounds. That's because, in addition to his iTunes receipts ("Hooray for iPads. I love mine," Crossley says at one point) and Amazon purchase orders, the e-mails include numerous attachments filled with all manner of private information: names, addresses, payment details, passwords, revenue splits, business deals. All of which is horrible, terrible, awful news—unless you want to know how a firm like ACS Law actually works.

*Continue Reading ...*

# Meet the Accused

After reading through many hundreds of e-mails, one thing becomes clear: ACS Law operates a rather boring business. That is, there's no juvenile gloating, no sinister cackling, no profanity-laced tirades (OK, there are a few tirades). The dominant picture is of a sober operation that spends most of its time in mind-numbing scanning and database work. They even reply personally to letters. Sure, all this work is in the service of dreck like *Granny F—*,

but this is just a *business*, and Crossley is just a middle-aged solicitor trying to run an efficient operation.

But the effects of this operation on those accused of infringement are remarkable. The e-mail trove is stuffed with anguished pleas like this:

I was in total shock after receiving the letter I received from you today as explained in the telephone conversation. I will say that I was not the person responsible for this infringement. The only person who it could have been would be my son who is [name redacted]. I would never entertain the idea of downloading such a thing—in fact I do not even know how to download any type of software. I only use the internet for Ebay and emails. I also go on dating sites and facebook. This is where my knowledge of computers stops. I do not understand what P2P is....

At the time of the download, to my knowledge my son was visiting my home. I have no idea what he was looking at on my computer. I must add that I do not tolerate any such pornographic material. This letter has upset me greatly and I have spoken to my ex husband who also called yourself with regard to this matter.

Most of the notices seem to have gone to parents, as one would expect from a program targeting ISP account holders. But many of the parents seem baffled:

I have today received a legal notification from you that a pornographic film was downloaded from my internet connection in October 2009.I immediately phoned your contact number and was told to put my comments in writing. I am obviously shocked both at this alleged illegal activity and the fact that the title appears to be of an offensive nature. I can confirm that i have no knowledge of this download being carried out at my home address. I have checked my computer and my sons computer for any reference to this file (using windows search function) and have found no trace.I have spoken to my two sons about downloads (They are 8 and 12) but obviously not about the nature of this file and to be honest they know even less than me. My oldest child has used i tunes and downloaded games from a site called friv.com but these claim to be free. Is this true? or will it also result in copyright issues ?

Others are offended at the titles they are accused of sharing:

I am no prude and can see what type of material something entitled *Granny F—* is. I am the father of 5 children, 3 of these under the age of 7, and to suggest i would have such material on a computer is what i find offensive. May i also add that i am very anti pornography, having been abused as a child by someone who would use porn films before abusing me .this is why i am totally anti porn.

Then come the "innocent infringers," though some of these explanations can feel a bit... strained.

on the date 16-11-2009 at 16.35 i was browsing the internet namely bt junkie ,without going into a long story i accidentely pressed the download button for the copyright protected file british granny f— 5@6 which then opened my bittorrent client on my pc which the torrent is sent to with the forementioned file is attached. It normally takes a few minutes for the file to start downloading and before it did i realised what i had done and canceled the file preventing any copyright infringement from taking place. just by starting the download process would have been enough to leave my ip address listed. I hereby appologise for any inconvienience i have caused yourself or your client and can swear at no time was any part of the forementioned copyright protected file downloaded onto my pc or shared with anyone else.

(I mean, haven't we all, at one time or another, accidentally been browsing BitTorrent sites

and accidentally clicked on a film called *Granny F—*?)

Others took responsibility for their actions:

I am writing in response to the recent letter my father [name redacted] received on the 13.04.2010 based on the subject of infringement of copyright. I would firstly like to state that I am solely responsible for this and I [name redacted] take full responsibility. I have read through all the information that you have supplied and I understand how serious the matter is—since last year 2009 I have not downloaded any material as I understood how it was a bad thing to do and how it is killing out industry.

I do take responsibility for this issue and I would very much like to ask if the required payment of £495 could somehow possibly be reduced. The reason i am asking this is because I am currently a student and money is a big factor and getting by generally is a hard thing to do.

Indeed, many of the guilty appear to be kids. Some parents figured it out:

"I would also like to also say that it was not my sons intention to fileshare this music and was unaware of how file sharing works as am I—I appreciate that this is no excuse but ask you to bear this in mind. As mentioned in previous correspondence from myself I am writing to again explain that my financial circumstances make it impossible for me to pay £400 in one go or even at £40 per month I am in extreme financial hardship with mounting debts and do not have any spare money – if you were to take this to court I would be unable to even pay the basic utility bills or even the necessary food bills.

If there's one great theme running through these letters, it's the poverty of the respondents. One is a "a single mum living of state benefits who cannot afford to pay any kind of money my daughter is very sorry for any problems caused," while another lives "in the hold of my bank overdraft my money is never my own. We at present find it very hard to make ends meet, at the moment I am trying to amass funds to pay our utility bills for this month and can not see any change in the near future." Students plead hardship due to school fees; many people claim to be unemployed.

But perhaps most creative are the letters that make no attempt at argument. These are sheer vitriol. One stands out among the rest:

Go f— your mum you stupid pakistani black jew. You zimbabwean immigrant.

So listen up fat f—, don't send me another letter. If you do send me another f—ing letter, I will rape your mum against the wall and I will blow up your house and kill you all in a terrorist attack.

In addition, I want a £3500 cheque written to me for the invinvience [sic] you have caused me.

*If you do not reply to this email with a confirmation that you will pay me, I will hunt you down and stab you in the back and blow your d— up.*

Creative, in an unhinged way. If you had thoughts about going into P2P litigation, consider the sheer migraine-inducingness of getting such messages on a daily basis. Indeed, after reading the correspondence, it's not hard to see why one paralegal who worked at ACS Law during the summer of 2010 told a friend there was "no chance in hell" she would go back.

*Continue Reading …*

# In Which Everyone Complains

When you make people this angry, they tend to complain—and that's just what happened to Crossley. Earlier this year, UK Consumer group Which? noted that it had "heard from more than 150 consumers who believed they had been wrongly accused." One letter writer said, "My

Case 1:14-cv-00223-MJG   Document 9-1   Filed 03/28/14   Page 132 of 270

78 year-old father yesterday received a letter from ACS law demanding £500 for a porn file he is alleged to have downloaded. He doesn't even know what file sharing or bittorrent is so has certainly not done this himself or given anyone else permission to use his computer to do such a thing."

Reporters began following up on such stories. One reporter, from the *Daily Echo* in Bournemouth, e-mailed Crossley about a particular local case—an Aberdeen man who spent most of his time near Bournemouth caring for an ill relative.

"He is accused of downloading the track *Evacuate the Dancefloor*' on October 2 last year," write the reporter. "Mr [name redacted] says he was in Dorset at the time, not in Aberdeen where his IP address is registered, and that he has airline tickets and medical appointment records to prove it. He says he leaves his internet connection switched off when he's away and no one else has access to it. He has no interest in pop music."

There were other problems. One of the firms providing Crossley with data on infringers then began to get balky, wanting more money than Crossley wanted to pay before turning over its information. "This guy is stupid," Crossley noted in an email to a colleague. "And he MUST release ALL data to us. It is ours. We have a deal. I will go to court this afternoon if he does not give it to us."

As if this wasn't enough, Crossley was subject to repeated, probing questions from the Solicitors Regulatory Authority, which controls lawyers in England and Wales. The group had received 400+ complaints about his firm's behavior. This was a big deal; the SRA could put Crossley out of business, and he had been in trouble with them before.

Back in 2002 and 2006, Crossley was disciplined by the Solicitors Disciplinary Tribunal, which ordered him to pay around £5,500 in fines and penalties. In both of these cases, Crossley had not submitted an accountant's yearly report on his firm—needed under UK rules to show that a lawyer does not improperly hang on to client funds.

The problem appeared to stem from a lack of cash. At one point, he told the tribunal handling his case that his lack of paperwork was "because he had been unable to raise the money to pay the accountant who retained the papers."

Crossley suffered "an extended period of clinical depression in 1999″ and then a stroke in 2000. "The effect of the stroke, which caused him to lose his sight altogether for a brief period, was that the Respondent could not work full-time for a period and as a consequence he quickly got into financial difficulties."

Any bundle of documents sent by a law 'firm' headed with the words 'Letter of claim; Infringement of Copyright' is likely to cause distress

The new investigation wasn't about accounting, but about claims that Crossley was shaking down his targets. Things were bad enough that one of his ACS Law employees noted, "We are constantly being reminded by infringers that we are under investigation by the SRA."

To defend himself, Crossley secured the services of another lawyer. "I am meeting with my retained lawyer today regarding the sra," he wrote. "He is Andrew Hopper QC and he literally wrote the sra rules!"

But Andrew Hopper, QC couldn't save Crossley from the SRA, even if he did write their rules. On August 20, the SRA referred Crossley—once more—to the disciplinary tribunal.

"Absolutely predictable political decision to 'fast track' and give the problem to someone else; therefore SRA is seen by Which etc to be 'doing the right thing' without them actually having to think at all or justify the decision," sniffed Hopper.

Exhibit N - 6

The Blackpool municipal government also objected to Crossley's tactics. ACS Law was contacted by Blackpool, which complained that local citizens "have been significantly distressed by your letter and feel compelled to pay. You say that your letters are not demands but compromise agreements, but any bundle of documents sent by a law 'firm' headed with the words 'Letter of claim; Infringement of Copyright' is likely to cause distress and mislead the consumer into making a transactional decision they would not otherwise make... None of the complainants have any recollection of having downloaded the tracks in dispute."

The Blackpool official then notes that under UK law, damages are fixed at "economic loss, either realized or potential." When it comes to music tracks, the loss equals "the approximate market value of the track as a single download—79p. Without further transparency as to the legal costs mentioned above, I would imagine that this would be sufficient to bring the matter to a close."

# Meet the U.S. Copyright Group

Indeed, the justice of this remark about damages haunts Crossley. One of his own legal advisers tells him that "establishing damages beyond the value of the gross profit of one copy of the work is problematic." In other words, a few pence for music. The advisor goes on to note that the one court case which would seem to prove the opposite "has, in my opinion, about as much legal force as a *Sun* newspaper headline regarding the licentious behavior of a D list celebrity."

We should get to work on this, I have massive copyright in the US. And in the US there is minimum statutory damages

"Therefore, it is my belief that the rights holder can only rely on the damage resulting from making a single copy of the work in infringement," he concludes, because of the difficulty in proving just how much (if any) "sharing" of the material with others took place. Lawyers are of course free to ask the courts for huge awards, but this carries the risk "that, in a defended case with competent opposing expert witnesses, the court will reject the application."

In other words, actually *going to court* would net very little money. Sending out letters and collecting a few hundred pounds is a much better business, which may explain why Crossley doesn't seem to sue people who refuse to settle. Yes, he promises to do so at some point, and the emails do show that he's considering hiring a litigator, but the campaign has been going over for quite some time now with no court action. (This is a common theme in the complaints against him; Crossley insists he's just trying to help everyone stay out of court.)

If only Crossley lived in America! "What is interesting is that it is the US model I want," he wrote earlier this year after hearing the news that the US Copyright Group was now filing mass Doe lawsuits against alleged movie pirates. "We should get to work on this, I have massive copyright in the US. And in the US there is minimum statutory damages."

Yes, statutory damages—under which copyright holders don't need to prove actual economic harm at all. The idea was that some infringement was simply too hard to quantify, but a system designed for commercial use has now been turned against US college students, leading to $1.92 million judgments in one case and $675,000 in another. (Both were so egregious that the judges involved tossed out the monetary amounts.) This is the system Crossley wants to profit from.

So he contacted Tom Dunlap of the Virginia law firm Dunlap, Grubb, and Weaver (DGW). DGW helped put the "US Copyright Group" together and does all the litigation on its cases, which include films like *The Hurt Locker* and *Far Cry*. Crossley wanted some kind of

partnership.

"I own and operate the most prolific firm in the UK that identifies and pursues copyright infringements committed through peer to peer networks," he bragged to Dunlap. "I have a growing number of clients, existing and potential, including US based copyright owners and are actively looking to expand our work into the US, especially because of the ability to receive statutory damages for infringement and jury-awarded assessments of damages. I note that you act for Guardaley, a client of the person who introduced the file sharing work previously carried out by Davenport Lyons in the UK to my firm. It is a small world!

"I have substantial amounts of data, which I wish to exploit appropriately in the US and would very much like to speak with you with a view to exploring the possibility of an ongoing working relationship, to our mutual benefit. If this is of interest to you, please let me know."

The lawyers did a call. Later, they met up in Cannes, France at a conference. Crossley later booked a table at Le Baoli, which he described in another email to someone else as "the best club I have ever been in in my life! Le Baoli in Cannes! A million models in one place!" But the club was not serving dinner that night, and in the confusion over rescheduling, Crossley missed the DGW lawyers for dinner. But he did email later to say that "we are mailshotting all major uk film and music companies with the ucg [US Copyright Group] so you should get some calls soon." He seems to have believed a partnership was in the offing.

In a blog post soon after, Crossley announced his return from Cannes and said that "a new joint working relationship with US-based attorneys has opened up the North American region to our clients for identification and pursuit of illegal file sharing of their products." He was going to begin "cooperation with a newly-formed organization, the United Copyright Group." That reference was scrubbed from the post two days later; Crossley had apparently been a bit too exuberant. Tom Dunlap told Ars that his firm was not working with ACS Law. He also told CNET this week that "the IT company [which the law firm uses to track file sharers] does not do anything for ACS Law."

But is that true?

*Continue Reading …*

# The Mysterious "Guardaley"

The "IT firm" Dunlap mentions appears to be Guardaley, the BitTorrent detection company cited in US Copyright Group court filings. Guardaley identifies the IP addresses of suspected infringers, logs all necessary data, and turns this information over the lawyers. But the firm is deeply implicated in the US Copyright Group, not just a mere contractor.

Guardaley is based in Germany, where it is run by Bejamin Perino and Patrick Achache, though the firm has registered itself as a UK business, too, with an unlikely address in an Aldermaston office park.

In a document (PDF) filed with the White House's new "IP Czar" earlier this year, Perino is listed as the "managing director" of Guardaley, and Dunlap called on the expertise of his subordinate Achache as an expert witness who swore to the accuracy of the company's data in court filings. But then, in April of this year, another court filing appeared in the *Far Cry* case. Here, Perino declared that he was "one of four Managers of the US Copyright Group (USCG) which is a private company dedicated to anti-piracy efforts in the motion picture industry involving unlawful torrent downloading."

Virginia state records seen by Ars show that DGW set up "US Copyright Group" as a legal entity, though it appears to be some sort of partnership between the law firm and the techies

at Guardaley.

Here's where it gets weird: this summer, after falling out with his detection company, Crossley turned to a young man named Terence, who is referenced above and who helped Crossley get into the settlement letter business. Terence then helped Crossley sign on with… Guardaley. Crossley writes about a "guy I know called Patrick who is good friends with Terence. Patrick is based in Germany with a high quality system. We get no hidden charges and I will drop my charges to fully absorb the extra cost."

He needed to rush the deal through, because the pornographer Jasper Feversham was upset that detection of his works had stopped; Crossley needed a new data supplier as soon as he could get one.

The deal, for 15 percent gross, was done through Terence; no emails emerge from Guardaley at all. Even Crossley found the situation odd. "Also, I note that Guardaley in the UK is registered as a dormant company. That needs to be changed if that is the contracting company. And why is there a company in the UK and why its it registered in Aldermaston? What's all that about? (as Peter Kay would say)."

In response, Terence offers some intriguing details. "GL [Guardaley] has a number of companies for monitoring and different ones are used depending on content and jurisdiction. The data supplier for [ACS Law client] Mediacat will be a Swiss company to manage PR (you know how it is!)."

Despite using the same tech, Guardaley apparently operates under numerous names. This means that each of the entities it creates needs a separate "expert's report" verifying that the system is accurate. The one drafted for Guardaley itself wouldn't work; a new expert must be found.

"An independent expert's report is in place for Guardaley, but your monitoring will be done through a different legal entity," wrote Terence. "This will mean that we will need to get a new one created. There will be no problems, as the technology used will be exactly the same as Guardaley's." And later: "We are in correspondence with an expert and the report can be finalised fairly quickly, well in advance of the first court order."

So, while Tom Dunlap suggests that "Guardaley" doesn't work for ACS Law, some other company with a new name and the same tech is. This gives Guardaley a hand in the two major "settlement letter" factories in the United States and Britain.

# Follow the Money

Why bother with all these hassles, all the vitriol, all the criticism from the House of Lords? Money, for one. Despite Crossley's claim that he runs a "tightly resourced small firm," he appears to be doing alright for himself. After bragging about getting a "Lambo or Ferrari," Crossley instead settled on a Jeep Compass 2.4CVT.

He spent the summer looking for a new high-end home to rent; one property send over for his consideration was "a contemporary mansion with breath taking views in an elevated position on this exclusive gated estate. Arranged over three floors the accommodation comprises entrance hall, cloakroom, kitchen/breakfast room, utility room, large dining room, lounge with doors out onto patio and balcony and double bedroom suite. Stairs down to family room, four double bedrooms, shower room, family bathroom. Stairs down to indoor swimming pool, bar area/gym with doors out onto patio, double bedroom suite and storage room, double garage." Such places go from £6,000 to £8,000 a month; not a modest sum.

And he's looking to buy a bulldog puppy.

But despite the expenditures, there are also some signs that cash does not flow steadily in this business. "You seem to have ignored my previous e-mail, I am not happy and want some revenue in account," demands one client. "Everyone is getting their bit and I am owed £17k ffs."

He also pleads with one of his data suppliers to do some work for him, and quickly. "We need to run that data to maintain cashflow," he wrote. "Meanwhile, we have come under considerable pressure from [UK Internet provider] O2 to pay an outstanding invoice of £13,107.00 in respect of the supply of that data. As we have not been able to send any letters out we have not been able to collect any income from that data to meet ISP costs. This matter is very pressing as O2 have said that unless it is paid straight away they will release all their staff that they have retained to provide the data. This will have the effect of delaying very considerably the time for the provision of the finished data from the ISP. This will impact on al of us, most importantly for cashflow."

In an operation like this, the letters need to keep flowing out for the money to keep flowing in. As Crossley noted after seeing all the confusion among alleged infringers, "I have an idea. We should send a factsheet.... answering all the usual questions and dispelling some common misapprehensions as I think it will better inform people and increase revenue."

But that revenue comes from confused people like the accountant who wrote ACS Law, claiming utter bafflement and innocence. "Due to a lack of detail in your letter, I had to Google search the title to find information on what I'm being accused of downloading. I was astounded to find it to be PORN of pregnant women. Sick!"

"I am an Accountant who works normal office hours. There is NO CHANCE I would be at home downloading porn at 11:43 in the morning. Furthermore, on the date stipulated, I was in Brighton for the day with a client. I am the owner of my home, I live alone and have being doing so at the current address for the past 4 years. No-one has access to my property unless I'm present."

But the attitude at ACS Law is, as one legal advisor put it, "I sometimes think that we try to be too nice. That is not our purpose. If our clients want nice then they are likely to go to a priest or social worker."

So the Lords can say what they like, the consumer groups can rail, and Westminster can levy fines for trash in the streets, but the letters for *Pump Fiction* will continue.

**Pages:** 1 2 3 4 View All



Nate is a senior editor at Ars Technica, where he covers technology law, politics, and culture. He holds an MA in English literature from the University of North Carolina, where he also taught freshmen how to craft sentences, think clearly, and use semicolons. (Surprisingly, the

Exhibit N - 10

semicolons proved most difficult.) In his free time, Nate has written a pair of novels and read plenty more; he one day hopes to meet in the flesh another reader of twelve volumes of Anthony Powell's Dance to the Music of Time.

Read more by Nate Anderson, Ars Technica

## WE RECOMMEND

RECOMMENDED BY



**With $25 Million Bet, Silicon Valley Officially Claims Bitcoin as Its Own**



**2014: The Year That Puts the Nail in Desktop's Coffin**



**DNA Reveals a Surprise in Mario Lopez's Past**

- ANCESTRY.COM

Case 1:14-cv-00223-MJG   Document 9-1   Filed 03/28/14   Page 138 of 270

Tags: P2P
Post Comment | 21 Comments | Permalink
Back to top

Share on Facebook
shares

Tweet 0          g+1  0

Reddit  Digg Stumble Upon Email

Exhibit N - 12
3/4/14 4:59 PM

**Comments for this thread are now closed.**                                    ✕

**21 Comments**     Wired: Business                                   Login ▾

Sort by Best ▾                                                     Share   Favorite ★

 **smithjohn0880** • 3 years ago
In my perception that article has a grade theme which reflect about he wrote in an email earlier this year.

**********

smith
Conveyancing Solicitors
⌃ | ⌄  •  Share ›

 **eMacPaul** • 3 years ago
He's looking to buy a bulldog puppy?! Say it ain't so! Seriously, is that something that only evil, exorbitantly wealthy lawyers can do?
⌃ | ⌄  •  Share ›

 **LandShark** • 3 years ago
What I pity the most is all those grannies performing for naught.
⌃ | ⌄  •  Share ›

 **thefixer** • 3 years ago
Anon=FAll, and 4 the record, they did NOT deface teaparty.org, they just flooded the uploads section with random anonfaggotry
⌃ | ⌄  •  Share ›

 **luckystriker** • 3 years ago
Is page 2 broken for anyone else?
⌃ | ⌄  •  Share ›

 **neverseenthesun** • 3 years ago
The problem that these morons will have is that most intelligent people us a program like hotspot shield to hide their ip... so guess what if 4chan starts using their office ips to download these titles they might start to understand what they are really upagainst.
⌃ | ⌄  •  Share ›

 **nautilus68** • 3 years ago
Sounds like P2P is another cash cow for them. Its appalling what he does is not a crime. basically sending out blackmail, pay me $500 or lose $10,000 in court cost. Its legal fraud. I can see this will be the a new con scheme coming from people from Nigeria. Just send

Exhibit N - 14
3/4/14 4:59 PM

# EXHIBIT O

**UNITED STATES DISTRICT COURT FOR THE**
**DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **ACHTE/NEUNTE BOLL KINO** | ) | |
| **BETEILIGUNGS GMBH & CO KG** | ) | |
| | ) | |
|    **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CA. 1:10-cv-00453-RMC** |
| | ) | |
| **DOES 1 – 2,094** | ) | |
| | ) | <u>**Next Deadline:**</u> **N/A** |
|    **Defendants.** | ) | |
| _____ | ) | |

<u>**DECLARATION OF PATRICK ACHACHE IN SUPPORT OF PLAINTIFF'S MOTION**</u>
<u>**FOR LEAVE TO TAKE DISCOVERY PRIOR TO RULE 26(f) CONFERENCE**</u>

I, Patrick Achache, declare:

   1.  I am Director of Data Services for Guardaley, Limited ("Guardaley"), a company

incorporated in England and Wales under company number 06576149, where I have been

employed since January of 2007.  Guardaley is a leading provider of online anti-piracy services

for the motion picture industry.  Before my employment with Guardaley, I held various software

developer and consultant positions at companies that developed software technologies.  I have

approximately ten (10) years of experience related to the protocols, technical architecture and

operation of the Internet.

   2.  I submit this declaration in support of Plaintiff's Motion for Leave to Take Discovery

Prior to Rule 26(f) Conference.  This declaration is based on my personal knowledge, and if

called upon to do so, I would be prepared to testify as to its truth and accuracy.

   3.  At Guardaley, I am the head of the department that carries out evidence collection and

provides litigation support services.   I work closely with our development team to create

credible techniques to scan for, detect, and download copies of copyrighted material on multiple

network protocols for use by copyright owners.

Exhibit O - 1

4.   Guardaley has developed a proprietary technology platform that provides an effective means to detect the unauthorized distribution of movies and other audiovisual content and files over online media distribution systems, or "peer-to-peer" ("P2P") networks.   Guardaley's technology enables it to detect and monitor the unlawful transfer and distribution of files amongst the P2P network by a "BitTorrent protocol" or "torrent" which is different than the standard P2P protocol used for such networks as Kazaa and Limewire.  The BitTorrent protocol makes even small computers with low bandwidth capable of participating in large data transfers across a P2P network.  The initial file-provider intentionally elects to share a file with a torrent network.  This initial file is called a "seed". Other users ("peers") on the network connect to the seed file to download. As yet additional peers request the same file, each additional user becomes a part of the network from where the file can be downloaded.  However, unlike a traditional P2P network, each new file downloader is receiving a different piece of the data from each user who has already downloaded the file that together comprise the whole (this piecemeal system with multiple pieces of data coming from peer members is called a "swarm").  So every downloader is also an uploader.  This means that every "node" or peer user who has a copy of the infringing copyrighted material on a torrent network must necessarily also be a source of download for that infringing file.

5.   This distributed nature of BitTorrent leads to a rapid viral spreading of a file throughout peer users. As more peers join the swarm, the likelihood of a successful download increases. Because of the nature of a BitTorrent protocol, any seed peer who has downloaded a file prior to the time a subsequent peer downloads the same file is automatically a source for the subsequent peer so long as that first seed peer is online at the time the subsequent peer downloads a file. Essentially, because of the nature of the swarm downloads as described above, every infringer is

*simultaneously* stealing copyrighted material from many ISPs in numerous jurisdictions around the country.

6.   The Plaintiff in this action is producer and distributor of motion pictures.  The Plaintiff engaged the United States Copyright Group to, among other tasks, document evidence of the unauthorized reproduction and distribution of the copyrighted motion picture to which Plaintiff holds the exclusive distribution and licensing rights, *"Far Cry"*, within the United States of America, including the District of Columbia.

7.   USCG, in turn, retained Guardaley to monitor and identify copyright infringement of Plaintiff's copyrighted motion picture on P2P networks.  On behalf of Plaintiff, we engaged in a specific process utilizing Guardaley's specially designed software technology to identify direct infringers of Plaintiff's copyright using BitTorrent protocol on P2P networks.

8.   All of the torrent infringers named as Doe Defendants were identified in one of two ways. We either: (1) searched for files corresponding to Plaintiff's motion picture title *"Far Cry"* and then identified the users who are offering the files for unlawful transfer or distribution; or (2) reviewed server logs obtained from P2P networks to determine the users who were offering the files of this copyrighted movie.  In the first identification method, we used the same core technical processes that are used by the P2P users on each respective network to identify users who are offering the *"Far Cry"* motion picture files on the network, or to directly locate the files of the film.  In the second identification method, we reviewed the same data that would be available to the operator of a server that is part of the P2P network.  Under the first method of identification, any user of a P2P network can obtain the information that is obtained by us from the P2P network.  Under the second method of identification, any operator of a server that is part of the P2P network can obtain the information that is obtained by us from the P2P network.

Exhibit O - 3

9.   Once Guardaley's searching software program identifies a file that is being offered for distribution using BitTorrent protocol that corresponds to the motion picture for which Plaintiff owns the exclusive licensing and distribution rights, *"Far Cry", or* once such a file is identified directly from our search or our review of server logs, we obtain the Internet Protocol ("IP") address of a user offering the file for download.  When available, we also obtain the user's pseudonym or network name and examine the user's publicly available directory on his or her computer for other files that lexically match Plaintiff's motion picture.  We then download the motion picture that the user is offering using BitTorrent Protocol. In addition to the torrent file of the motion picture itself, we download or otherwise collect publicly available information about the network user that is designed to help Plaintiff identify the infringer.  Among other things, we download or record for each file downloaded: (a) the time and date at which the file was distributed by the user; (b) the IP address assigned to each user at the time of infringement; and, in some cases, (c) the video file's metadata (digital data about the file), such as title and file size, that is not part of the actual video content, but that is attached to the digital file and helps identify the content of the file.  We then create evidence logs for each user that store all this information in a central database.

10. An IP address is a unique numerical identifier that is automatically assigned to a user by its Internet Service Provider ("ISP") each time a user logs on to the network.  Each time a subscriber logs on, he or she may be assigned a different IP address unless the user obtains from his/her ISP a static IP address.  ISPs are assigned certain blocks or ranges of IP addresses.  ISPs keep track of the IP addresses assigned to its subscribers at any given moment and retain such "user logs" for a very limited amount of time.  These user logs provide the most accurate means to connect an infringer's identity to its infringing activity.

11. Although users' IP addresses are not automatically displayed on the P2P networks, any user's IP address is readily identifiable from the packets of data being exchanged.  The exact manner in which we determine a user's IP address varies by P2P network.

12. An infringer's IP address is significant because it is a unique identifier that, along with the date and time of infringement, specifically identifies a particular computer using the Internet.  However, the IP address does not enable us to ascertain with certainty the exact physical location of the computer or to determine the infringer's identity.  It only enables us to trace the infringer's access to the Internet to a particular ISP and, in some instances, to a general geographic area.  Subscribing to and setting up an account with an ISP is the most common and legitimate way for someone to gain access to the Internet.  An ISP can be a telecommunications service provider such as Verizon, an Internet service provider such as America Online, a cable Internet service provider such as Comcast, or even an entity such as a university that is large enough to establish its own network and link directly to the Internet.

13. Here, the IP addresses Guardaley identified for Plaintiff enable us to determine which ISP was used by each infringer to gain access to the Internet.  Publicly available databases located on the Internet list the IP address ranges assigned to various ISPs.  However, some ISPs lease or otherwise allocate certain of their IP addresses to other unrelated, intermediary ISPs.  Since these ISPs consequently have no direct relationship -- customer, contractual, or otherwise -- with the end-user, they are unable to identify the Doe Defendants through reference to their user logs.  The intermediary ISPs' own user logs, however, should permit identification of the Doe Defendants.   We determined that the Doe Defendants here were using those ISPs listed in Exhibit A to the Complaint filed in this matter together with various other ISPs operating both

Exhibit O - 5

within and outside the District of Columbia, to gain access to the Internet and distribute and

make available for distribution and copying Plaintiff's copyrighted motion picture.

14. We downloaded the motion picture file and other identifying information described

above and created evidence logs for each Doe Defendant.  Once we identified the ISP used by

the Doe Defendants to gain access to the Internet from the IP address, USCG sent an e-mail to

the relevant contact at each ISP informing them of the Doe Defendant's IP address and the date

and time of the infringing activity.  That e-mail message requested that each ISP retain the

records necessary to identify its subscriber who was assigned that IP address at that date and

time.  Once provided with the IP address, plus the date and time of the infringing activity, the

Doe Defendant's ISPs quickly and easily can use their respective subscriber logs to identify the

name and address of the ISP subscriber who was assigned that IP address at that date and time.

### Confirmation of Downloaded Material

15. I am also responsible for identifying on-line piracy of motion pictures for Guardaley,

including gathering evidence of on-line piracy to support counsel's copyright protection

enforcement efforts.

16. As part of my responsibilities at Guardaley, I have been designated to confirm that the

digital audiovisual files downloaded by Guardaley are actual copies of the motion picture

entitled *"Far Cry"*.  It is possible for digital files to be mislabeled or corrupted; therefore,

Guardaley (and accordingly, Plaintiff) does not rely solely on the labels and metadata attached to

the files themselves to determine which motion picture is copied in the downloaded file, but also

to confirm through a visual comparison between the downloaded file and the motion picture

itself.

6

17. As to Plaintiff's copyrighted motion picture entitled *"Far Cry"*, as identified in the Complaint, I or one of my assistants have watched a DVD or VHS copy of the motion picture provided by Plaintiff.  After Guardaley identified the Doe Defendants and downloaded the motion pictures they were distributing, we accessed the downloaded files using Guardaley's proprietary software application, which stores the files downloaded.  We opened the downloaded files, watched them and confirmed that they contain a substantial portion of the motion picture identified in the Complaint.

18. Plaintiff's motion picture entitled *"Far Cry"* continues to be made available for unlawful transfer and distribution using BitTorrent protocol, in violation of Plaintiff's exclusive licensing and distribution rights, and rights in the copyright.  USCG and Guardaley continue to monitor, on an on-going and continuing basis, such unlawful distribution and transfer of Plaintiff's motion picture and to identify infringers by the unique Internet Protocol ("IP") address assigned to them by their respective ISPs on the date and at the time of the infringing activity.

Exhibit O - 7

I declare under penalty of perjury that the foregoing is true and correct.

Executed on 31.12.09 , ____, at Karlsruhe .

_____

Patrick Achache

# databot economic data - Patrick Achache

==Patrick Achache==
Of Germany in ==Karlsruhe, DE==

## Facts

| | |
|---|---|
| **Home** | Germany |
| **Location** | Karlsruhe, DE |
| **GL mandates** | 3 seats |
| **Investments** | CHF 20'000 .00 (1 company) |

Feedback / Error Report

## Location



| Overview | Investments 1 | 2 companies | **Publications 3** | Composition 3 |

### SOGC publications

Werbung



✓ **Ihr Partner**
für erfolgreiches
Forderungs-
management

✓ **Inkasso**
im In- und Ausland

✓ **Online**
Administration über
unsere Webplattform



#### SHAB No 42 of 1.3.2011 p. 35 Publ 6.055 million

==BP Equity GmbH==, in Walchwil, CH-170.4.009.565-1 , a limited liability company (SHAB No. 48 of 10.03.2010, p. 21, Publ 5,533,518 )
**new. Statutes Amendment 1.28.2011.: Company**
==IP Equity GmbH== . translations of the new company: (IP Equity Sarl) (IP Equity Sagl) (IP Equity Co Ltd liab.). New Releases: Releases made to the shareholders by mail, e-mail or fax. [Further modification not requiring publication facts]. [With amendments to the articles of 01.28.2011 was secondary aim of the company changed
**the.]. Registered persons new or mutating**
Bolliger, Stephan , of Zurich, Dietikon, managing director with single signature; Achache, Patrick , a German national, in Karlsruhe (DE), Chairman of the Board, with single signature and shareholders, with single signature, with 200 ordinary shares of CHF 100.00 [previously: in train, managing director with single signature and members with individual signature].

#### SHAB No 48, 03.10.2010 p. 21 Publ 5,533,518

==BP Equity GmbH== (BP Equity Sarl) (BP Equity Sagl) (BP Equity Ltd liab co.), In Walchwil, CH-170.4.009.565-1 , Wihelstrasse 9, 6318 Walchwil, limited liability company (new
**registration). statutes Date**
02:03 . .2010
**Purpose: To**
fund projects in software and entertainment, and provision of insurance services; whole purpose of description according to
**statutes. Share capital**
20,000 .00. CHF
**Publication organ:**
SHAB. Notices to the shareholders in writing or by e-mail. According to statement by the company on 18/01/2010 under the Company no regular audit and dispense with a limited
**audit. Registered persons**
Achache, Patrick , a German national, in train, managing director with single signature and shareholders, with single signature, with 200 ordinary shares of CHF 100.00.

#### SHAB No 196 from 09.10.2009 p. 24 Publ 5,285,866

==Intersda GmbH== (Intersda Sarl) (Intersda Sagl) (Intersda Co Ltd liab.), In Walchwil, CH-170.4.009.208-8 , Wihelstrasse 9, 6318 Walchwil, limited liability company (new
**registration). statutes Date**
9/29/2009
**purpose. :**
provision of services in information technology, including advice and support; whole purpose of description according to
**statutes. Share capital**
20,000 .00. CHF
**Publication organ:**
SHAB. Notices to the shareholders in writing or by e-mail. According to corporate statement dated 29.09.2009 under the Company no regular audit and dispense with a limited
**audit. Registered persons**
Achache, Patrick , a German national, in train, managing director with single signature and shareholders, with single signature, with 200 ordinary shares of CHF 100.00.

© 2010-2011 by factor AG

◄ ► + http://translate.google.com/translate?u=http%3A%2F%2Fswiss-registers.info%2Fcompany_detail.aspx%2FCH17040095651--BP-Equity-GmbH--W  Q▾ Google

⇆ 🕮 ▦ Social Justic...) at Discogs   Freeze! You ...– Mobiledia   Miami-Dade ...nformation   Haute-Law.com   The Copyrig... of the USA   Class Action...of Contents   A Tale of Tw...| DuetsBlog   »

**Google** translate    http://swiss-registers.info/company_detail.aspx/CH17040095651--    View: **Translation**  Original

From: Detect language ⇕    To: English ⇕    **Translate**

## swiss-register.ch

> Home

> News

> Business

> People

> Domain

> Contact

AdChoices ▷  ◄ ►

**Download Google Chrome**
Searching is fast and easy with Google's web browser.
www.google.com/chrome

**Download Games Online**
A New Game Download Every Day! Safe, Secure Online Game Downloads.
www.BigFishGames.com

**Bad Credit Auto Loans**
Zero Money Down, 100% Bank Financed New & Used Cars, Suv's & Trucks
We-Finance-Bad-Credit.com

**Get Private Investors**
2,000 Entrepreneurs Have Raised $1,000,000,000+ With My 'Formula'
Growthink.com/GetPrivateInve...

[Google™ Benutzerdefinierte Suche]   (Search)

Equity GmbH BP (BP SA Equity) (Equity Sagl BP) (BP Equity Ltd liab. Co) Walchwil

, 6318 Walchwil

### current people / interests

03/01/2011 <u>Patrick Achache</u> German national
03/01/2011 <u>Stephan Bolliger</u> Zurich
10/03/2010 <u>Patrick Achache</u> German national
**all people ...**

**WSJ Online: 4 Weeks Free** Unlimited Access Anytime, Anywhere Subscribe Today & Get 4 Weeks Free! www.WSJ.com

**Pay Car Loan Online** Car Loan Payment Made Easy. Pay W/ Credit Card. No Checks Required! www.ChargeSmart.com

**$1000 Loan Company** Pay Monthly – Limited Time Bad Credit OK – Apply Now! www.eLoanPersonal.com

AdChoices ▷   Web results for

Equity GmbH BP (BP SA Equity) (Equity Sagl BP) (BP Equity Ltd liab. Co)

### Web Search

Equity GmbH BP BP BP SA Equity Equity Equity Sagl BP Ltd. liab. Co in CH-170.4.009.565-1 Walchwil Wihelstrasse 9 6318 Walchwil limited liability company ...
Ups on 10/03/2010 - ZG http://www.moneyhouse.ch/shab/2010_048/neugruendungen_ZG.htm

BP Equity GmbH, CH-170.4.009.565-1 Walchwil ... New company IP Equity GmbH. Translations of the new company equity Sàrl IP IP IP Sagl Equity Equity Ltd liab. Co.
Commercial register of 01.03.2011 - I http://www.moneyhouse.ch/shab/2011_042/publikationen_i.htm

All-Tech Services SA in Lutry Walchwil CH-550.1.054.222-4 ... BAVERI Financial Services Ltd liab. Co wound up in ... BP Service GmbH Hodi Emmen North Branch ...

1598
### from the Swiss Commercial Register

last update 03/03/2011 register.im **swiss-HR-6055000.xml 20,110,301** - New Releases: Notices to the shareholders by mail, e-mail or fax. [Also not change the facts subject to publication]. [With the amendment of Articles of Incorporation was amended 28/1/2011 secondary aim of the society.]. Peoples registration new or modified: Bolliger, Stephan, of Zurich, Dietikon, managing director with single signature; Achache, Patrick, a German national, in Karlsruhe (DE), Chairman of the Board, with single signature and shareholders, with single signature, with 200 ordinary shares to of CHF 100.00 [previously: train, managing director with single signature and members with single signature]. **HR-20100310-5533518.xml** - CH-170.4.009.565-1, Wihelstrasse 9, 6318 Walchwil, limited liability company (new registration). Statutes Date: 02.03.2010. Purpose: To fund projects in the areas of software and entertainment and the provision of insurance services; whole purpose according to paraphrase statutes. Share capital: CHF 20 000.00. Official publication: SOGC. Notices to the shareholders in writing or by e-mail. According to statement by the company on 18/01/2010 under the company is no regular audit and waives a limited audit. Registration: Achache, Patrick, a German national, in train, directors, and shareholders with an electronic signature, with single signature, with 200 ordinary shares of CHF 100.00.

**Prev <<**    **Next >>**

▷
Google offers
beta

The city is what you make of it. Make it affordable.

Sign up now

AdChoices ▷

Active Clie
General Fi
Client Arch
Inquirie
Finance
Resourc
Managem
Persona

Exhibit O - 10



**Open a FREE Account** | **Log in** | **Help**

Enter search term... | Whois Search | Search

More Domains
Reverse Whois
History Details
Get Notified
Trademark Monitor
Screenshot History

## Whois Record For IntersDa.com

Ads by Google

**Top Mesothelioma Law Firm** Nationally Recognized Law Firm. Free Evaluation. Call 888-347-6135 YourMesotheliomaLawFirm.com

**GoDaddy #1 domain names** $7.99 .COM Domains - Save Today Free Hosting, Blogcast, Email, More GoDaddy.com

**Law Office of Alex Nesson** Experienced Representation. Free Initial Consultation! alexnesson.com

**Aframe & Barnhill, P.A.** Facing Bankruptcy? We Can Help. Relief Starts Today. 508-756-6940 www.aframebarnhill.com

**Criminal Defense Help** Know Your Rights, Connect For A Free Criminal Case Review By Lawyer www.TotalCriminalDefense.com

Ads by Google

**Car Accident Injury Help**
Free Online Injury Settlement Info & Fast, Free Evaluation!
www.Personal-Injury-Help.us

**Ask a Lawyer Online Now**
24 Lawyers Are Online. Current Wait Time: 14 Minutes.
Law.JustAnswer.com

**Lane's Domains**
Web Hosting, Domain Transfers E-mails, Quick Shopping Cart
securepaynet.net

**Find Lawyers - Free**
Free, Confidential Lawyer Locator. Save Time - Describe Your Case Now!
www.LegalMatch.com

**Streaming Hosting**
Get Help With Saving & Investing. Build A Strong Financial Future.
goalbuilder.com

**Multistate Edge Bar Prep**
Start Studying Now! 2800 Questions. Adaptive Software & Pass Guarantee.
www.MultistateEdge.om

**Best 10 Web Hosting Sites**
Compare the Top 10 Web Hosting. All offer

| Whois Record | Site Profile | Registration | Server Stats | My Whois |

Like · 2K

**You the smart one?** Let us show you the job you dream of

Reverse Whois: "InterSDA GmbH" owns about **3 other domains**
Email Search: achache@intersda.com is associated with about **4 domains**
info@webspace-verkauf.de is associated with about **7,562 domains**

Registrar History: **2 registrars**
NS History: **1 change** on **2** unique name servers over **5** years.
IP History: **4 changes** on **3** unique name servers over **5** years.
Whois History: **67 records** have been archived **since 2007-10-23**.
Reverse IP: **568 other sites** hosted on this server.

Log In or Create a FREE account to start monitoring this domain name

**DomainTools for Windows®**
Now you can access domain ownership records anytime, anywhere...
right from your own desktop! **Download Now>**



```
DOMAIN: INTERSDA.COM

RSP: heXoNet Support GmbH
URL: http://www.hexonet.net/

created-date: 2006-02-14 14:38:33
updated-date: 2010-03-15 10:01:21
registration-expiration-date: 2012-02-14 14:38:33

owner-organization: InterSDA GmbH
owner-name: Patrick Achache
owner-street: Wihelstrasse 9
owner-city: Walchwil
owner-state:
owner-zip: 6318
owner-country: CH
owner-phone: +41.417581082
owner-fax:
owner-email: achache@intersda.com

admin-organization: InterSDA GmbH
admin-name: Patrick Achache
admin-street: Wihelstrasse 9
admin-city: Walchwil
admin-state:
admin-zip: 6318
admin-country: CH
admin-phone: +41.417581082
admin-fax:
admin-email: achache@intersda.com

tech-organization: Webspace-Verkauf.de
tech-name: Markus Thumerer
```



**You Searched for patrick achache logistep**

**Saint Patrick Medal**
Large Variety. Hard to Find Medals. 10% Off Coupon Code: FATHER10
DiscountCatholicProducts.com/Medals

**Patrick Coupons**
Download And Print Patrick Coupons (100% Free)
CrispCouponsToday.com

**Patrick Coupons Free**
Get Coupons & Save Up To 90%.
LetsCouponNow.com

**Spongebob Quiz**
What Spongebob Character are you?

Free Setup & Domain
Name.
www.Top10HostingLis
.com

**Domain Name**
**Email Hosting**

From $24.99, Business
Plans include 3, 5, 10,
25 & 50 Mailbox
Bundles!
www.GetSyncd.com

**Free Govt**
**Support Phones**

Emergencies Happen!
Get a Free Phone &
250 Free Minutes.
SafeLinkWireless.com

Take the Quiz and find out!
www.boredquiz.com Sponsored Results

```
tech-street: Lichtenfelser Strasse 17 a
tech-city: Grub am Forst
tech-state: Bayern
tech-zip: 96271
tech-country: DE
tech-phone: +49.9560981690
tech-fax: +49.95609816929
tech-email:  info@webspace-verkauf.de


billing-organization: Webspace-Verkauf.de
billing-name: Markus Thumerer
billing-street: Lichtenfelser Strasse 17 a
billing-city: Grub am Forst
billing-state: Bayern
billing-zip: 96271
billing-country: DE
billing-phone: +49.9560981690
billing-fax: +49.95609816929
billing-email:  info@webspace-verkauf.de


nameserver: ns1.webspace-verkauf.de
nameserver: ns2.webspace-verkauf.de
nameserver: ns3.webspace-verkauf.de
```



mimedia   Backup, Access and Stream your Digital Life.
Now get 7GB for free. Get Started.

Memberships  |  Developer API  |  About Us  |  Blog  |  Desktop Tools  |  Terms of Service  |  Privacy  |  Support  |  Careers  |  Contact Us  |  Site Map

© 2011 DomainTools, LLC All rights reserved.

Exhibit O - 12





# IP Equity GmbH Profile

Wihelstrasse 9
6318 Walchwil 6318 Zg Switzerland
Phone : +41-417581082

Exhibit O - 13

# WELCOME

Hoover's is the business information resource that delivers a unique combination of up-to-date data, broad coverage, and comprehensive information about companies, decision makers, and industries - along with powerful tools to put this information to work for your business. Hoover's offers everything you need to successfully:

* Identify and evaluate potential sales leads, markets, and business partners
* Deepen relationships with current customers
* Assess competitive risks and eliminate threats
* Build presentation-ready reports and customized lists of companies, industries, and decision makers

Unlike other business information providers, only Hoover's has a full-time, in-house editorial and research team dedicated wholly to investigating, pinpointing, authenticating, and analyzing data to provide the most comprehensive, up-to-date information available on companies, industries, and executives.



# Table of Contents

**Company Overview** 2

Key Information 2

Key Financials 2

Key People 3

**People** 3

People 4

**Biographies** 4

Stephan Bolliger 5

Patrick Achache 5

# Company Overview

Wihelstrasse 9
6318 Walchwil 6318 Zg Switzerland
Phone : +41-417581082

Miscellaneous business credit institution

## Key Information

| | |
|---|---|
| DUNS Number | 485494194 |
| Location Type | Single Location |
| Subsidiary Status | No |
| Manufacturer | No |
| Total Employees | 1 |
| 1-Year Employee Growth | 0.00% |
| Year of Founding or Change in Control | 2010 |
| Primary Industry | 1317:Agricultural Lending |
| Primary SIC Code | 61590100:Agricultural credit institutions |
| Primary NAICS Code | 522293:International Trade Financing |

## Key Financials

| | |
|---|---|
| Fiscal Year-End | December |
| Sales ($ M) | $0.27M |

## Key People

| Name | Title |
|---|---|
| Stephan Bolliger | Managing Director |
| Patrick Achache | |



# People

## Employees

| Title | Name | Age | Salary | Bonus |
|---|---|---|---|---|
| Managing Director | Stephan Bolliger | | -- | -- |
| | Patrick Achache | | -- | -- |



# Biographies

## Stephan Bolliger

**Current Company Titles**
Unknown - Present : Managing Director

## Patrick Achache

**Current Company Titles**
Unknown - Present :



# databot economic data - Patrick Achache

## IP Equity GmbH, Walchwil
**CH-170.4.009.565-1**

| Overview | Authorised 2 | Persons 2 | Publications 4 |

### Facts

| | |
|---|---|
| **Status** | Active |
| **Establishing** | 4. March 2010 |
| **Seat** | Walchwil |
| **Legal form** | Limited Liability Company |
| **Capital** | CHF 20'000 |

| | |
|---|---|
| **SOGC News** | 2 |
| **Last Change** | 1. March 2011 |
| **Procuration** | 4 people |

Like       Register to be able to see what your friends like.

Feedback / Error Report

### Address

IP Equity GmbH
Wihelstrasse 9
CH - 6318 Walchwil



### IP Equity GmbH
#### Limited liability company in Walchwil

#### Purpose

Financing projects in the areas of software and entertainment, and provision of insurance services; whole purpose description According to the statutes

Werbung



**factor ag**
**INKASSO**

✓ **Ihr Partner**
für erfolgreiches Forderungs-management

✓ **Inkasso**
im In- und Ausland

✓ **Online**
Administration über unsere Webplattform

#### Translation of Company Name

BP Equity Ltd liab. Co
BP Equity Sagl
BP Equity Sàrl
IP equity Ltd liab. Co
IP equity Sagl
IP equity Sàrl

#### Former company name

BP Equity GmbH   in March 2011

#### Management

Patrick Achache from Germany in Karlsruhe, DE
Stephan Bolliger , Zurich Dietikon
Patrick Achache from Germany in Karlsruhe, DE

#### Latest Releases

| 01. March 2011 | **Reason for Deletion** Company: IP Equity Inc. |
|---|---|
| 10. March 2010 | **Note** According to statement by the company on 18/01/2010 under the Company no regular audit and dispense with a limited audit |

#### Last SOGC News

| 01. March 2011 | **SHAB No 42 of 1.3.2011 p. 35 Publ 6.055 million** BP Equity GmbH, in Walchwil, CH-170.4.009.565-1 , a limited liability company (SHAB No. 48 of 10.03.2010, p. 21, Publ 5,533,518 ) **new. Statutes Amendment 1.28.2011.: Company** IP Equity GmbH . translations of the new company: (IP Equity Sarl) (IP Equity Sagl) (IP Equity Co Ltd liab.). |
|---|---|

New Releases: Releases made to the shareholders by mail, e-mail or fax. [Further modification not requiring publication facts]. [With amendments to the articles of 01.28.2011 was secondary aim of the company changed **the.]. Registered persons new or mutating**

Bolliger, Stephan , of Zurich, Dietikon, managing director with single signature; Achache, Patrick , a German national, in Karlsruhe (DE), Chairman of ...

| | |
|---|---|
| 10. March 2010 | **SHAB No 48, 03.10.2010 p. 21 Publ 5,533,518**<br>BP Equity GmbH (BP Equity Sarl) (BP Equity Sagl) (BP Equity Ltd liab co.), In Walchwil, CH-170.4.009.565-1 , Wihelstrasse 9, 6318 Walchwil, limited liability company (new **registration). statutes Date**<br>02:03 . .2010<br>**Purpose: To**<br>fund projects in software and entertainment, and provision of insurance services; whole purpose of description according to<br>**statutes. Share capital**<br>20,000 .00. CHF<br>**Publication organ:**<br>SHAB. Notices to the shareholders in writing or by e-mail. According to statement by the company on 18/01/2010 under the Company no regular audit and dispense with a limited **audit. Registered persons**<br>Achache, Patrick , a German national, in train, managing director with single signature ... |

© 2010-2011 by factor AG

# databot economic data - Patrick Achache



**Patrick Achache**
Of Germany in Karlsruhe, DE

| Overview | Investments 1 | 2 companies | Publications 3 | Composition 3 |

### Facts

| | |
|---|---|
| Home | Germany |
| Location | Karlsruhe, DE |
| GL mandates | 3 seats |
| Investments | CHF 20'000 .00 (1 company) |

Feedback / Error Report

### Location

Map data ©2011 Google, Tele Atlas

## Investments

Werbung

factor ag
**INKASSO**

✓ **Ihr Partner**
für erfolgreiches
Forderungs-
management

✓ **Inkasso**
im In- und Ausland

✓ **Online**
Administration über
unsere Webplattform

| Company | CH Number | Number | Currency | Amount | From | Up |
|---|---|---|---|---|---|---|
| IP Equity GmbH in Walchwil | CH-170.4.009.565-1 | 200 | CHF | 100.00 | 10. March 2010 | 1. March 2011 |
| Intersda GmbH in Walchwil | CH-170.4.009.208-8 | 200 | CHF | 100.00 | 9. October 2009 | - |

© 2010-2011 by factor AG

Exhibit O - 21

# databot economic data - Patrick Achache



**Patrick Achache**
Of Germany in Karlsruhe, DE

Overview | Investments 1 | 2 companies | Publications 3 | Composition 3

## Facts

| Home | Germany |
| Location | Karlsruhe, DE |
| GL mandates | 3 seats |
| Investments | CHF 20'000 .00 (1 company) |

Feedback / Error Report

### Mandates

Managing Director
Shareholders
CEO
Only current mandates

Original German text:
Firmen 2

Contribute a better translation

### Location

Map data ©2011 Google, Tele Atlas

| Company | Function | Authorised | From | Up |
|---|---|---|---|---|
| IP Equity GmbH in Walchwil | CEO | Single signature | 1. March 2011 | - |
| IP Equity GmbH in Walchwil | Shareholders | Single signature | 10. March 2010 | - |
| IP Equity GmbH in Walchwil | Managing Director | Single signature | 10. March 2010 | - |
| Intersda GmbH in Walchwil | Shareholders | Single signature | 9. October 2009 | - |
| Intersda GmbH in Walchwil | Managing Director | Single signature | 9. October 2009 | - |

Werbung

factor ag
INKASSO

✓ **Ihr Partner**
für erfolgreiches
Forderungs-
management

✓ **Inkasso**
im In- und Ausland

✓ **Online**
Administration über
unsere Webplattform

© 2010-2011 by factor AG

# EXHIBIT P

1  Scott Hervey, State Bar No. 180188
   Scott M. Plamondon, State Bar No. 212294
2  **weintraub** genshlea chediak
   a law corporation
3  400 Capitol Mall, 11th Floor
   Sacramento, CA 95814
4  (916) 558-6000 – Main
   (916) 446-1611 – Facsimile
5
   Attorneys for Plaintiff
6  Camelot Distribution Group, Inc.

7

8

9              IN THE UNITED STATES DISTRICT COURT

10         IN AND FOR THE CENTRAL DISTRICT OF CALIFORNIA

11                        WESTERN DIVISION

12

13  CAMELOT DISTRIBUTION GROUP, INC.,    )  Case No.: CV11-01949 DDP (FMOx)

14          Plaintiff,                    )
                                          )  DECLARATION OF TOBIAS FIESER IN
15      vs.                               )  SUPPORT OF RESPONSE TO ORDER TO
                                          )  SHOW CAUSE
16  DOES 1 through 5,865, inclusive,      )

17          Defendants.                   )

18                                        )

19  _____)

20

21  I, Tobias Fieser,, declare as follows:

22          1.      I am the Technical Administrator of IPP International UG and have personal

23  knowledge of the facts set forth in this declaration except as to matters stated upon information

24  and belief, and as to those matters I believe them to be true and if called upon to do so, I

25  could and would competently so testify under oath.

26          2.      Each of the Doe Defendants have effectuated the illegal transfer of Plaintiff's

27  Movie through the use of the "BitTorrent protocol" (or "torrent") in connection with a peer-to-

28  peer ("P2P") network.  This architecture is significantly different in form from the older P2P

weintraub genshlea chediak
LAW CORPORATION

1    protocols which were employed on networks such as Napster, Kazaa, Limewire, and Gnutella.

2        3.    The BitTorrent protocol allow computers to exchange large amounts of data

3    across a network while consuming minimal bandwidth on the network.   With the BitTorrent

4    protocol an initial file-provider elects to share a "seed" file via a BitTorrent network. Thereafter,

5    other users ("peers") connect to the seed file and begin downloading data from the seed, while

6    simultaneously sharing the downloaded data with other peers.

7        4.    As additional peers request the same file, each additional user becomes a part

8    of the network (or "swarm") and begins sharing its data with other peers, which means that

9    each additional user's computer is connected not only to the seeder/uploader but also is

10   connected to myriad other peer/downloaders.

11       5.    The BitTorrent protocol used to download Plaintiff's Movie would have each new

12   file downloader receive a different piece of the data from each user who has already

13   downloaded that piece of data, all of which pieces together comprise the whole. This means

14   that every peer user who has a copy of the infringing copyrighted material on such a network—

15   or even a portion of a copy—can also be a source of download for that infringing file,

16   potentially both copying and distributing the infringing work simultaneously.

17       6.    The distributed nature of the BitTorrent protocol leads to a rapid spreading of a

18   file through a huge number of peer users all of whom are both uploading and downloading

19   portions of the file simultaneously.   The propagation of copying files employing the BitTorrent

20   protocol is similar to that of a computer virus. As more peers join the swarm, more parts of the

21   original file become readily available, and the likelihood of a successful download increases.

22       7.    Because of the nature of the swarm downloads as described above, every

23   infringer is simultaneously stealing copyrighted material through collaboration with multiple

24   other infringers, through a number of ISPs, in numerous jurisdictions around the country.   One

25   difference between this BitTorrent protocol and the older P2P network protocols Employed by

26   networks such as Napster, Grokster, Limewire, and Gnutella is how those networks locate and

27   trade bits of the files.

28       8.    Napster, Kazaa, Limewire, Gnutella, and similar first generation P2P networks

Declaration of Tobias Fieser in Support of Response to
Order to Show Cause
CV11-01949 DDP (FMOx)

Exhibit P - 2

are simple file sharing networks. Through use of a common interface, infringers are interconnected to a variety of people each of whom are sharing a variety of files. Users search the P2P network to locate other users who have files that are being sought by. Thereafter an individual chooses a specific user from whom to download a file, and begins the process of copying the entire file from the particular user who has offered the file for copying.

9.     BitTorrent is fundamentally different.  Instead of being user-focused, BitTorrent is file-focused. The person seeking to share a file creates a "tracker" and makes the tracker available. Rather than finding that tracker by sending out search requests along a file sharing network, infringers find it in various location on the internet, including without limitation, websites, via recommendations in chat rooms, and in links posted to mailing lists.    Once a tracker has been made available anyone interested in sharing that specific file can use the tracker to essentially create a network dedicated to sharing just that specific file.

10.    The most important characteristic of BitTorrent is the concept of the swarm, which is a group of peers who are using the BitTorrent protocol to transfer a single file amongst themselves. Peers engaged in downloading a file as part of a torrent cooperate to replicate the file among each other using swarming techniques. A user joins an existing torrent by downloading a ".torrent" file,  adding it to its client and connecting to the specified tracker. The ".torrent" file contains data regarding the file to be downloaded (e.g., the number of pieces, encryption and error checking data called "SHA-1 hash values") and the IP address of the "tracker" of the torrent.   The tracker is the only centralized component of the BitTorrent protocol, however it is not involved in the actual distribution of the file.   Rather, the tracker only keeps track of the peers who are currently members of the swarm and directs a downloader's computer to the other peers to facilitate the downloading of the pieces of the file.

11.    When joining a swarm, a new peer receives from the tracker a list of IP addresses of peers who are available to connect to and cooperate with. For a typical file, such as Plaintiff's Movie, 50 or more peers are chosen at random in the list of peers currently involved in the torrent.   This group of peers forms the peer set of the new user joining the swarm.   The group of peers will then distribute the file among each other.   Each peer knows

**weintraub** genshlea chediak
LAW CORPORATION

1  what pieces each other peer has, and each peer helps the other to successfully download the

2  entire file.

3       12.    There are a very few original copies of Plaintiff's Movie being tracked through

4  the use of BitTorrent trackers. Because of the nature of the BitTorrent protocol, it is a near

5  certainty that each of the infringers who have copied and distributed Plaintiff's movie have

6  been involved with the copying and distribution of the exact same infringing file from the time

7  of its initial seeding up to and including the present day. The coordinated actions of the Doe

8  Defendants have caused a single copy of the Movie to be distributed to thousands of

9  individuals without Plaintiff's consent, and without compensation to Plaintiff.

10       I declare under penalty of perjury under the laws of the State of California that the

11  foregoing is true and correct.

12       Executed this 12 day of May, 2011, at _Karlsruhe_ .

13

14       Dated: May 12 , 2011

15

16                     By: _Fieser_

17                          Tobias Fieser

18

19

20

21

22

23

24

25

26

27

28

weintraub genshlea chediak
LAW CORPORATION

# EXHIBIT Q

# EXHIBIT A

**TO:** **DECLARATION OF TOBIAS FIESER IN SUPPORT OF PLAINTIFF'S MOTION FOR LEAVE TO TAKE DISCOVERY PRIOR TO A RULE 26(f) CONFERENCE**

IPP international LTD.

# FUNCTIONAL DESCRIPTION

IPP international IPTRACKER v1.2.1

Page 2                                    March 8, 2011

## Table of contents

1     Introduction ................................................................................................... 3

2     The program IPP international IPTRACKER v1.2.1 ......................................... 4

  2.1     Description of Action............................................................................. 4

    2.1.1     Filesearch ................................................................................. 4

    2.1.2     Summarization of the procedure ................................................ 4

    2.1.3     Safety of IP and other connection data...................................... 4

    2.1.4     The date and time...................................................................... 4

  2.2     Visualisation of the process ................................................................. 5

  2.3     Description of the most important program functions .............................. 6

3     Logdata database................................................................................... 7

  3.1     Protection of data privacy and data security ......................................... 7

4     Addendum............................................................................................. 8

  Gnutella  .............................................................................................. 9

  Gnutella 2 ........................................................................................... 9

  eDonkey2000 (Ed2k)............................................................................ 10

  Bittorrent (BT)...................................................................................... 11

  Globally Unique Identifier (GUID)............................................................ 12

  The hash value .................................................................................... 12

Page 3                                         March 8, 2011

# 1  Introduction

The following disquisition introduces the software IPP international IPTRACKER. The software was developed to determine copyright violations in peer-to-peer networks (called P2P networks) and to preserve evidences during illegal distribution of copyright protected material.

P2P allows spreading data of every kind (software, music, video etc.) via the Internet fast. The data is saved on the computers of the participants and is distributed by common P2P software products which are available on the internet for free. The Data is usually copied from foreign computers (called download) while other data is sent at the same time (called upload). Every participant can release files on his computer and make it available to others, comparable to the file release function within a local network. The files are copied via direct connection between the computers. P2P networks have millions of users and offer an enormous variety of files.

The procedure itself is legal for data which is not under copyright.

A common description of the operation of most commonly used P2P peer-to-peer techniques used to exchange data on the Internet can be found in the addendum.

Page 4                                    March 8, 2011

# 2  The program IPP international IPTRACKER v1.2.1

## 2.1  Description of Action

### 2.1.1  Filesearch

Once a file is downloaded, verified and definitely allocated to a Rights holder, the hash value is used to determine possible sources on the internet. Different servers, trackers and clients provide lists of IPs where the specific file could or still can be downloaded.

### 2.1.2  Summarization of the procedure

These lists are downloaded from the providing system and computed sequentially. Each IP found in these lists is requested using the common P2P protocol functions. If the requested P2P client confirms the existence of the file on the local hard disc (in the shared folders), the download is started.
If the part downloaded is sufficient to be verified and compared to the original, the IP address and exact time and date is stored in a secure database.
The download process is continued.

After completion of the download process and before the stored information is used for further steps the downloaded data is compared with the original (complete already downloaded and verified file) bit by bit.

### 2.1.3  Safety of IP and other connection data

A direct and continuous connection between the IPTRACKER-server and the uploader of the file is established and exists at least 10 seconds before, during and at least 10 seconds after the capture sequence i.e. during the whole download process.

Optionally the screen can be capture automatically to backup another evidence.

### 2.1.4  The date and time

The (IPTRACKER-) server date and time is synchronised every minute via Network time protocol (NTP). This function is provided by an additional program (Dimension 4 v5.0 http://www.thinkman.com/dimension4).
The synchronization report is saved frequently and redundantly stored on a file server. The time is received from the Federal technological Institute in Brunswick (Physikalisch-Technische Bundesanstalt in Braunschweig) and has a maximum deviation of for 1/10 second (atomic clock).

Several other redundant institutes providing the exact time are stored in an internal database of the program: Dimension 4.

Page 5                                           March 8, 2011

### 2.2   Visualisation of the process



Page 6                                    March 8, 2011

## 2.3  Description of the most important program functions

The IPP international IPTRACKER is based on the hybrid Filesharing client Shareaza 2.4.0.0. All communication interfaces correspond to the specifications of the P2P protocols Bittorrent, Gnutella 1 and 2 as well as ED2k. These interfaces were left invariably in the filesharing client.

The function of the upload in addition was reduced to a minimum (handshaking).
The IPP international IPTRACKER merely stores the data of the hosts connected with, if the package verification succeeds.

- IP address
- port
- exact capture time
- name of the protocol
- filename
- file size
- hash values of the file (SHA1, ED2k, BiTH)
- GUID
- username
- clientname
- content downloaded

A screenshot of the host can be made by the IPTRACKER program. The host is marked automatically during the download phase to safeguard another evidence. Not relevant entries are masked. The name of the screenshot is also stored in the database.

To guarantee the immutability of the data, IP, date and time is signed with a private 4096 bit RSA key. The RSA key is included internally in the IPTRACKER program using a precompiled library and can be not read or used elsewhere.

RSA is a recognized asymmetrical encoding procedure which can be used both for the encoding and for the digital signature. It uses a key pair consisting of a private key which is used decode or sign data and a public key with which decoding or signature checks are made possible. Both keys are kept secret.

Page 7                                                  March 8, 2011

# 3  Logdata database

The data is stored in a MySQL database. The database server runs locally as a service on the respective server. The connection is established via ODBC driver: MyODBC-3.51.11. The query language is SQL. The IPTRACKER program accesses the database exclusively writing. The entries right-related cannot be changed.

The data is exclusively submitted as data sheets for the assertion of the injured rights.

## 3.1  Protection of data privacy and data security

The rack-servers are stored in a room which is locked and protected with most current security mechanisms.

The database is password protected and stored on an encoded hard disk. The hard disk is encoded with TrueCrypt 6.0 using AES encyption. The password is not saved on any computer, only known by two people and has more than 25 signs. It must be entered manually at every system startup. When the hard disk is removed from the computer or the power supply, it has to be mounted again using the password.

If the hard disk should be reached by unauthorized people, the data security is therefore ensured at any time.

To maximize data security, the IPTRACKER program offers an implemented program function which permits not only to sign but also to encode completely relevant data. So the data cannot be seen or changed even by persons with direct access to the server.

To create valid entries the secret key pair is necessary. It is not possibly to store data manually at any time.

Only the IPTRACKER program is able to create valid data.

The data can only be decoded and used by the responsible lawyer, only his software contains the deciphering method and this one in this case also secret (called "public") key.

Page 8                                    March 8, 2011

# 4  Addendum
### Basic Knowledge

P2P networks can be subdivided into several groups using their structure and operation.

**Centralized P2P systems**
These systems are using a central server to which all knots are connected. All search enquiries from the knots are processed by the server. The basis of P2P systems is the data transmission between the individual knots. A direct connection between the knots is established when the file is found on a specific knot.

The server is the bottle of the neck in this process.

Nowadays centralized P2P systems are of more minor importance.

**Pure P2P systems without a central instance**
There are networks without a central server which do not manage any central data stock (Gnutella1 and Gnutella2 network).

**P2P-Filesharing networks via server client protocol**
There are networks with one or several central servers which manage information about the users connected at present. This is provided by the Bittorrent and eDonkey network. With the installation of Emule the users receive a list of all users (file: server.met) attached to a server and all released files. Bittorrent and eDonkey cover currently 95% of the exchange activity.

Page 9                                        March 8, 2011

## Gnutella

Gnutella is a P2P network decentralized completely which can be observed by the IPP international IPTRACKER software. "Decentralized" means that every knot uses a similar software and there are no central servers which process search enquiries.

A search query is passed to the neighbouring systems at first. These systems refer the query to their neighbours until the requested file was found. After that a direct connection for the data transmission can be established between searching and offering knot

## Gnutella 2

Gnutella 2 works most largely like the original Gnutella network with a similar connection system but Unicode2 search function with extensive metadata, TigerTree Hashing, and generally faster link speed. A "Partial file Sharing" function was implemented which divides files into parts. It's possible to download these parts from different knots instead of downloading the whole file from one knot.

Some known Gnutella2 clients are:
Shareaza, Morpheus, Gnucleus, adagio, MLDonkey



Page 10                                    March 8, 2011

**eDonkey2000 (Ed2k)**

The eDonkey2000 peer to peer network needs server to connect the knots. The server only provides lists of files which are available on the individual knots.

Some Edonkey2000 clients are: eMule, eMulePlus, aMule, xMule, MLDonkey, Lphant



Page 11                                   March 8, 2011

**Bittorrent (BT)**

BitTorrent is used for the fast distribution of large amounts of data in which central servers are controlling the location of the files.

BitTorrent does not behave like a usual P2P network. There is no search function like it is available it at EDonkey or Gnutella clients.

To get all necessary information for a download, a .torrent file is downloaded (from another network or an internet page). It contains all information to start the download.

The Bittorrent participants connect with the so-called tracker of this file and with that with other users who also are interested in at this file. A private network is built.

Trackerless systems were developed in new versions. The tracker function is done by the client software. This avoids some of the previous problems (e.g. the missing failure safety of the trackers).

Some Bittorrent clients are: Shareaza, BitComet, Azureus



Page 12                                                              March 8, 2011

**Globally Unique Identifier (GUID)**

Every P2P user receives a unique identification which consists of a 32-digit hexadecimal number. The user receives the identification at the moment of the installation of the P2P program. The program generates the GUID from user-specific data. So it is possible that a user has several GUID identifications (e.g. he gets a new GUID at the installation of a network client), however, it is not possible that an allocated GUID is allocated to another user again.

**The hash value**

The hash value is necessary to identify a file.

A special advantage of Bittorrent, eDonkey and Gnutella networks is the fault-free data transmission between the users. Bigger files are subdivided into little packages. For every package a single identification value is generated using known algorithms. The hash value is frequently described as a fingerprint since it is unique similarly like a fingerprint.

i.e. each file exceeding the size of 2 megabytes owes more than one hash value - one for the whole file and one for each package.

Standard operation of common P2P-client programs during the filesharing process:

The client software must guarantee that the received content is always the queried one. Therefore only hash values are requested — filenames are unimportant during the transmission.

After a client received a data package the content has to be verified. Therefore the hash value of the package is generated by the client and compared to the hash value provided before. If the two keys are identical, the downloaded package is accepted. If there are deviations at the comparison, then the package is declined and requested again. The package can also be downloaded from another knot.

All mentioned programs are able to split bigger files into packages and to identify these using hash values independently which program is used for the data exchange. With this it is possible to assign small parts of a file to the original file. It is made sure that the part of the file always belongs to the requested file.

After the whole file is downloaded it will be verified on the whole before the download process is finished and the file is signed as "VERIFIED".

Every network uses different hash algorithms. Bittorrent the so-called "BiTH", eDonkey this one "ED2K", and Gnutella the "SHA1" algorithm.

The IPP international IPTRACKER is able to generate and compare each hash algorithm listed above.

# EXHIBIT R

1

Court File No. T-2058-12

## FEDERAL COURT

**BETWEEN:**

## VOLTAGE PICTURES LLC

Plaintiff

**and**

## JOHN DOE and JANE DOE

Defendants

## SUPPLEMENTARY AFFIDAVIT OF BARRY LOGAN
(Sworn on May 27, 2013)

I, **BARRY LOGAN**, of the City of Stratford, in the province of Ontario, **MAKE OATH AND SAY AS FOLLOWS:**

1.      On December 7, 2012, I swore an affidavit describing my involvement in the Internet

Protocol investigation conducted for the Plaintiff in the herein matter.

2.      In paragraph 8 of my original affidavit I stated the following:

> Between September 1 and October 31, 2012, forensic software called GuardaLey Observer v1.2 (the "Forensic Software") was used to scan BitTorrent networks for the presence of Voltage's copyrighted works.

3.      The software used in my investigation was GuardaLey Observer v.1.47, not v.1.2.

This was simply a typographical error in my original affidavit that I had neglected to correct.

2

SWORN BEFORE ME at the City of          )
Toronto, in the Province of Ontario,     )
this 27th day of May, 2013               )
                                         )
                                         )
_____  )   **BARRY LOGAN**

A Commissioner of Oaths, etc.

**Court File No. T-2058-12**

**VOLTAGE PICTURES LLC**
Plaintiff

and

**JOHN DOE and JANE DOE**
Defendants

---

## ONTARIO
## SUPERIOR COURT OF JUSTICE

Proceeding commenced at Toronto

---

## AFFIDAVIT OF BARRY LOGAN
(Sworn on May 27, 2013)

---

**BRAUTI THORNING ZIBARRAS LLP**
151 Yonge Street, Suite 1800
Toronto, ON M5C 2W7

**P. James Zibarras**
**LSUC No. 48856F**

**John Philpott**
**LSUC No. 60246U**

Tel:   416.362.4567
Fax:   416.362.8410

**Lawyers for the Plaintiff,**
**VOLTAGE PICTURES LLC**

Court File No. CV-

## FEDERAL COURT

**BETWEEN:**

### VOLTAGE PICTURES LLC

Plaintiff

**and**

### JOHN DOE and JANE DOE

Defendants

## AFFIDAVIT OF BARRY LOGAN
(Sworn on December 7, 2012)

I, **BARRY LOGAN**, of the City of Stratford, in the province of Ontario, **MAKE OATH AND SAY AS FOLLOWS:**

1.     I am the owner and principal forensic consultant of Canipre Inc. ("Canipre"), an Ontario based corporation that provides forensic investigation services to copyright owners. As part of my duties at Canipre, I routinely identify the Internet Protocol ("IP") addresses used by individuals who download and distribute copyrighted works over peer to peer ("P2P") networks using the BitTorrent Protocol.

2.     The Plaintiff, Voltage Pictures LLC ("Voltage"), is a movie production company based in Los Angeles, California.  Voltage retained Canipre to investigate whether its films were being copied and distributed by Canadian members of P2P online networks and to support the associated litigation.  I was directly involved in the investigation and as such

have knowledge of the matters to which I hereinafter depose. Where I do not have personal knowledge, I have stated the source of my information and believe it to be true.

### *Background – The BitTorrent Protocol*

3.      The BitTorrent Protocol is a P2P file sharing protocol that facilitates the distribution of large amounts of data over the internet through networks.

4.      When a file is initially uploaded to a BitTorrent network, that is referred to as "seeding". Other P2P networks users, called "peers", can then connect to the user seeding the file in order to copy it.

5.      The BitTorrent Protocol breaks a file into numerous small data packets, each of which is identifiable by a unique hash number created using a hash algorithm. Once a file has been broken into numerous packets, other network users or peers are able to download different sections of the same file from multiple users. Each new peer is directed to the most readily available packet of the file they wish to download. In other words, a peer does not copy a file from one user, but from any peer who previously downloaded the file and has it available on the BitTorrent network. The peer then becomes a seeder as it distributes the data packet to other peers connected to the BitTorrent network.

6.      Once a packet is downloaded by a peer, that peer automatically becomes a download source for other peers connected to the BitTorrent network who are requesting the file. This speeds up the time it takes to download a file and frees up the capacity of a computer or server to simultaneously download and upload files. Unless the settings on the user's BitTorrent program are changed, every user who is copying or who has copied a file is

simultaneously distributing it to every other user or peer connected to the BitTorrent network. This allows even small computers with low bandwidth to participate in large data transfers across a P2P network.

### *Canipre's Forensic Investigation*

7.      Voltage retained Canipre to identify the Internet Protocol ("IP") addresses used on the BitTorrent network to copy and distribute copyrighted works which Voltage has the rights to in Canada. A list of such works which Canipre monitored as part of this investigation is attached as **Exhibit "A"**.

8.      Between September 1 and October 31, 2012, forensic software called GuardaLey Observer v1.2 (the "Forensic Software") was used to scan BitTorrent networks for the presence of Voltage's copyrighted works.

9.      I was tasked with monitoring, analyzing, reviewing and attesting to the results of the investigation.

10.      The Forensic Software was run between September 1 and October 31, 2012. The Forensic Software searched BitTorrent networks for files corresponding to Voltage's copyrighted works and identified the IP address of each seeder or peer who was offering any of these files for transfer or distribution. This information is available to anyone that is connected to the P2P network.

11.      The Forensic Software then downloaded the copies of Voltage's copyrighted works available for distribution on the P2P networks, and for each file downloaded recorded the following identifying information:

a.     the IP address assigned to the peer by his or her internet service provider ("ISP") at the time it distributed the file;

b.     the date and time at which the file was distributed by the seeder or peer;

c.     the P2P network utilized by the peer; and

d.     the file's metadata, which includes the name of the file and the size of the file (collectively, the "File Data").

12.     The File Data is stored in a secure central database. I have personally reviewed the File Data. After reviewing the File Data, I identified the transactions associated with IP addresses geographically limited to Ontario and to customers of TekSavvy Solutions Inc. ("TekSavvy") that used the BitTorrent network to reproduce and distribute Voltage's copyrighted works during the period of September 1 to October 31, 2012. A copy of the File Data for these transactions is attached as **Exhibit "B"**.

*Identifying the IP Addresses*

13.     An internet service provider or ISP, such as TekSavvy, is an organization which provides access to the Internet to its customers. Peers, seeds, and users access the BitTorrent network through the internet access provided by their ISP.

14.     An IP address is a unique numerical identifier that is automatically assigned to an internet user by that user's ISP.

15.     ISPs are assigned blocks or ranges of IP addresses. The range assigned to any ISP can be found in publicly available databases on the internet.

16.    ISPs track the IP addresses assigned to their customers at any given time and retain "user logs" of that information.

17.    Through the Forensic Software, I am able to track a peer by its IP address to a particular ISP and to their geographic location. This is how I was able to limit the IP addresses and related File Data in Exhibit B to customers of TekSavvy in the province of Ontario.

18.    Once provided with the IP address and the corresponding File Data, ISPs can review their user logs to identify the name, address, email address, and phone number of their clients who acted as peers to copy and distribute unauthorized versions of Voltage's works.

19.    Only an ISP can correlate the IP address to the real identity of its subscriber. Without the involvement of the ISPs, Voltage will be unable to determine the identities of those persons who are distributing their copyrighted works.

*Confirmation of Data*

20.    I personally reviewed the File Data gathered from this investigation.

21.    After reviewing the File Data, I verified that the transactions contained in Exhibit B are associated with IP addresses geographically limited to Ontario and to customers of TekSavvy. I have also verified that the IP addresses and related File Data contained in Exhibit B hereto correctly reflect what is contained in the secure central databases.

22.     In addition, I have analyzed each of the BitTorrent packets distributed by the IP addresses listed in Exhibit B and verified that reassembling the pieces results in a fully playable digital motion picture that is one of Voltage's copyrighted works.

23.     I was provided with a control copy of each of Voltage's copyrighted works, which I have viewed side by side with the digital media files set forth in Exhibit B and confirmed that they were the same.

SWORN BEFORE ME at the City of          )
Toronto, in the Province of Ontario,    )
this ⌐ day of December, 2012            )
                                        )
_____        )
                                        )          BARRY LOGAN
A Commissioner of Oaths, etc.

Nanci Elizabeth McFadden-Fair,
a Commissioner, etc., Province of Ontario,
for Michael F. Fair, Barrister and Solicitor.
Expires November 26, 2015.

Court File No.

**VOLTAGE PICTURES LLC**
Plaintiff

and

**JOHN DOE and JANE DOE**
Defendants

---

## ONTARIO
## SUPERIOR COURT OF JUSTICE

Proceeding commenced at Toronto

---

## AFFIDAVIT OF BARRY LOGAN
(Sworn on December          2012)

---

**BRAUTI THORNING ZIBARRAS LLP**
151 Yonge Street, Suite 1800
Toronto, ON  M5C 2W7

**P. James Zibarras**
**LSUC No. 48856F**

**John Philpott**
**LSUC No. 60246U**

Tel:   416.362.4567
Fax:   416.362.8410

**Lawyers for the Plaintiff,**
**VOLTAGE PICTURES LLC**

15

This is **Exhibit "A"** referred to in the

affidavit of **BARRY LOGAN** sworn before me

this �len 1 day of December, 2012.

_A COMMISSIONER FOR TAKING AFFIDAVITS_

Nanci Elizabeth McFadden-Fair,
a Commissioner, etc., Province of Ontario,
for Michael F. Fair, Barrister and Solicitor.
Expires November 26, 2015.

## Voltage's Cinematographic Works as Monitored by Canipre

### 09.01.12 – 10.31.12

Generation Um ... (2012)

Tucker & Dale vs Evil (2010)

True Justice (The Complete First Season) (2010)

The Third Act aka The Magic of Belle Isle (2012)

The Good Doctor (2011)

Rosewood Lane (2011)

Another Happy Day aka The Reasonable Bunch (2011)

Killer Joe (2011)

Escapee (2011)

This is **Exhibit "B"** referred to in the

affidavit of **BARRY LOGAN** sworn before me

this      day of December, 2012.

_____

*A COMMISSIONER FOR TAKING AFFIDAVITS*

Nanci Elizabeth McFadden-Fair,
a Commissioner, etc., Province of Ontario,
for Michael F. Fair, Barrister and Solicitor.
Expires November 26, 2015.

# EXHIBIT S

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| MALIBU MEDIA, LLC, | * | |
| Plaintiff, | * | CASE NO. 8:13-cv-00360-RWT |
| v. | * | |
| JOHN DOE subscriber assigned IP address 68.50.250.243, | * | |
| | * | |
| Defendant. | * | |
| | * | |

**PLAINTIFF'S WRITTEN RESPONSE TO THE COURT'S**
**MEMORANDUM/ORDER [CM/ECF 9]**

## I.    INTRODUCTION

Malibu Media, LLC ("Malibu Media") appreciates the opportunity to discuss the issues raised in this Court's order dated March 1, 2013.  For the reasons set forth in Plaintiff's Memorandum Explaining Why It Has a Clear and Undeniable Right to Issue a Rule 45 Subpoena, Plaintiff has a clear, absolute, and undeniable right to subpoena the identities of the Doe Defendants in the subject cases.[1]  Indeed, since this case was filed, Plaintiff has received orders allowing it to subpoena Internet Service Providers ("ISP"s) in 80 individual John Doe suits throughout the country.  *See* Exhibit A.  No court has *ever* denied Plaintiff's motion to subpoena the identity of a John Doe Defendant who was sued individually in a BitTorrent copyright infringement lawsuit.  Here, it is Plaintiff's sincere hope that once leave is granted to issue the subpoenas, that this process will reduce the number of frivolous motions attempting to quash the subpoenas.   Plaintiff also appreciates that the scheduled hearing, wherein defense counsel and ISPs have been invited to discuss their concerns and to collaborate on an efficient

---

[1] If the Court denies Plaintiff the right to subpoena the ISP in order to obtain the Doe Defendant's identity, Plaintiff respectfully requests the Court certify the issue to the Fourth Circuit.

Exhibit S - 1

process for managing these cases, has the potential of reducing the amount of work for all concerned. And, Plaintiff looks forward to working cooperatively the Court, the ISPs and the defense counsel to establish efficient case management procedures.

## II. RESPONSE TO THE COURT'S QUESTIONS

### A. Malibu Media's affiliation with Patrick Collins, Inc., Third Degree Films, Inc., K-Beech, Inc., Hard Drive Productions, Inc., Raw Films, Ltd., and/or AF Holdings, LLC

Malibu Media, Patrick Collins, Inc., Third Degree Films, Inc., K-Beech, Inc. and Raw Films, Ltd. *have* used the same attorneys, investigator and litigation support personnel. These movie studios are not related in any other way. Going forward, undersigned only intends to file suits on behalf of Plaintiff. Accordingly, Plaintiff will soon have *no* connection with the other studios.

Plaintiff has no connection with Hard Drive Productions, Inc., AF Holdings, LLC, the Copyright Enforcement Group or any other group that has or is filing BitTorrent copyright infringement suits in the United States.

Plaintiff is keenly aware that other enforcement groups have tarnished the reputation of copyright owners who sue for BitTorrent copyright infringement. Indeed, AF Holdings, LLC is currently under investigation for fraudulently using its founder, John Steele's, gardener's name as AF Holdings, LLC's manger, with the gardener's knowledge. Evan Stone was sanctioned by a District Court in Texas for sending a subpoena to an ISP after the court denied his client the right to do so except as to Doe 1 in a joined suit. And, that sanction was upheld on appeal. Almost all of the other groups who have litigated BitTorrent copyright infringement cases began their enforcement efforts by relying on long-arm jurisdiction to sue 100s or 1000s of infringers in one federal court suit brought in a district where the majority of the Doe Defendants did not reside. Neither Plaintiff nor anyone with whom it has worked has relied on federal long arm

2

jurisdiction to sue Doe Defendants for copyright infringement in jurisdictions where those Defendants do not reside. Instead, Plaintiff has scrupulously adhered to the most stringent interpretations of the law as articulated by the majority of the District Courts across the country. And, informed Courts across the country have recognized and appreciated that Plaintiff has acted within the law and ethically during these cases.

One of the bedrock principals of the entire social structure of the United States and the Judeo-Christian ethics upon which that structure was founded is that we are to evaluate every person by his or her actions, without allowing our opinions of person A to be affected by the actions of person B.[2] That is particularly true when, as here, Person A and Person B have no affiliation with each other. With this in mind, Plaintiff respectfully requests that the Court not allow the alleged bad acts of some other lawyers, copyright owners or copyright enforcement groups to color its opinion of Plaintiff or the propriety of Plaintiff's copyright enforcement efforts.

Regarding the propriety of Plaintiff's enforcement efforts, during her tenure as the U.S. Register of Copyrights, Mary Beth Peters explained the rights of adult entertainment companies to proceed with these suits against the individual infringers by stating: "[t]he law is unambiguous. Using peer-to-peer networks to copy or distribute copyrighted works without permission is infringement and copyright owners have every right to invoke the power of the courts to combat such activity. Every court that has addressed the issue has agreed that this activity is infringement." See Pornography, Technology, and Process: Problems and Solutions on Peer-to-Peer Networks Statement of Marybeth Peters The Register of Copyrights before the Committee on the Judiciary 108th Cong. (2003), available at

---

[2] "You reward everyone according to what they have done." Psalm 62:12
"I the LORD search the heart and examine the mind, to reward each person according to their conduct, according to what their deeds deserve." Jeremiah 17:10

http://www.copyright.gov/docs/regstat090903.html (emphasis added).  Ms. Peters concluded that

copyright owners have no reason to apologize for enforcing their rights in this manner.  *Id*.

Plaintiff has consistently and without exception striven to make sound legal and factual

arguments and has no reason whatsoever to apologize for its enforcement activities.  To the

contrary, Plaintiff is extremely proud of the good and honorable work it is doing enforcing its

copyrights and deterring infringement.

### B.  Other Methods to Determine if a John Doe as a Subscriber is the Infringer

### 1.  A Rule 45 Subpoena is the Only Federal Procedure for Obtaining the John Doe Defendants' Identities

A Rule 45 subpoena is the only legal process available under federal law to ascertain the

identities of the John Doe defendants.  To explain, "[i]n June 2003, the RIAA (Recording

Industry Association of America) announced a nationwide effort to identify and sue individuals

committing copyright using P2P systems."  In re Charter Communications, Inc. Subpoena

Enforcement Matter, 393 F.3d 771, 774 (8th Cir. 2005).  Just as is the case here, the RIAA could

identify the IP Addresses of the alleged infringers but could not identify the infringers by name

without the assistance of the ISP that assigned the infringers their IP Addresses.  The RIAA

began its enforcement campaign by requesting federal Clerks of Courts to issue subpoenas

pursuant to Section 512(h) of the Digital Millennium Copyright Act ("DCMA" or the "Copyright

Act").  The RIAA would then serve a Section 512(h) subpoena on the ISP that assigned the Doe

Defendant his or her IP address.

Section 512(h) provides for a comparatively easy process for obtaining the names of

infringers vis-à-vis John Doe copyright infringement suits.  Indeed, under Section 512(h)(2)(A)-

(C), a copyright owner need only file three items with the Clerk of Courts along with its request

for a 512(h)(2) subpoena: "(A) a copy of a notification described in subsection (c)(3)(A) [of

4

Section 512]; (B) a proposed subpoena; and (C) a sworn declaration to the effect that the purpose for which the subpoena is sought is to discover the identity of an alleged infringer and that such information will only be used for the purpose of protecting rights under this title." If the Clerk finds that all three items are present then the Clerk must issue a Section 512(h) subpoena.

     a. <u>**Verizon and Charter Challenge the 512(h) Subpoena Process**</u>

Several of the ISPs to whom the RIAA served Section 512(h) subpoenas moved to quash the subpoenas. These ISPs, including Charter and Verizon, appealed their district court losses to the D.C. and 8th Circuits. The central issue of these two cases was the propriety of serving a Section 512(h) subpoena on an ISP that merely "transmits" as opposed to "stores" data. <u>See RIAA v. Verizon Internet Services, Inc., 351 F.3d 1229 (D.C. Cir. 2003)</u>; and <u>In re Charter Communications, Inc., Subpoena Enforcement Matter</u>, 393 F.3d 771 (8th Cir. 2005). "The stakes [were] large for the music, motion picture and software industries. . . ." the D.C. Circuit opined, because the Section 512(h) process was so much easier than a copyright infringement Doe suit. <u>RIAA v. Verizon</u> at 1238; <u>accord</u> <u>In re Charter</u> at FN3 (same.)

In the Verizon and Charter cases, the ISPs argued that a copyright owner cannot serve a Section 512(h) subpoena on an ISP that merely "transmits" data because the copyright owner cannot satisfy the condition precedent required by Section 512(h)(2)(A). Section 512(h)(2)(A) requires that the copyright owner deliver to the Clerk of Courts a copy of the notification described in Section 512(c)(3)(A). And, the ISPs argued, the notification to the ISP must contain "an identification of the material that is claimed to be infringing or to be the subject of infringing activity <u>and that is to be removed or access to which is to be disabled, and information reasonably sufficient to permit the service provider to locate the material.</u>" (Emphasis added.) The ISPs argued that the copyright owner cannot provide them with notice of where the infringing data is located because the infringing data is not located on the ISPs servers; instead,

5

the infringing data is located on the infringers' computers over which the ISPs have no control. Put another way, the ISPs argued that copyright owners cannot send an ISP that merely "transmits" data a DMCA take down notice, which they contended is a condition precedent of using the 512(h) subpoena process.

**b. The D.C. and Eighth Circuits Held Section 512(h) Subpoenas Cannot Be Served On ISPs that Merely Transmit Data**

Rightly or wrongly, both the D.C. Circuit and the 8th Circuit, over the dissent of several esteemed jurists, agreed with the ISPs. After both Circuits ruled in favor of the ISPs, Section 512(h) subpoenas have not been used.

**c. The ISPs in this Case Merely Transmit Data**

Almost all of the internet service providers currently in existence, including all of the ones which Plaintiff desires to serve with subpoenas in this case merely "transmit" data. Put another way, Time Warner, AT&T, Cox, Charter, Cable One, Qwest, Clearwire, Verizon, etc. do not keep a copy of the movie on their servers and stream it to the Doe Defendants. Instead, the subject internet service providers merely provide the Doe Defendants with internet access, the cabling and other services necessary for the Doe Defendants to surf and use the internet. For this reason, under the Verizon and Charter decisions, Plaintiff cannot use the easy subpoena process provided by Section 512(h) of the DMCA to obtain the identity of the Doe Defendants from these ISPs.

**2. Section 512(h) Does Not Preempt a Copyright Owner's Right to Ascertain the Identity of Infringers through a Subpoena Issued Pursuant to Fed.R.Civ.P. 45**

Section 512(h) of the Copyright Act affords copyright owners an easy process to obtain the identities of internet users from ISPs that "store" data. Section 512(h) does not preempt a copyright owner's ability to obtain the identity of infringers through a Rule 45 subpoena from those ISPs that merely "transmit" data.

6

**a. Appellate Courts Hold that the Use of Rule 45 Subpoenas in On-Line Infringement Cases to Identify Anonymous Doe Defendants is Permissible**

Both the Eighth and Second Circuits have approved the use of Rule 45 subpoenas in on-line infringement cases to identify anonymous Doe Defendants. The Eight Circuit, during the great debate over whether a Section 512(h) subpoena could be used, held "organizations such as the RIAA can file a John Doe suit, along with a motion for third-party discovery of the identity of the otherwise anonymous 'John Doe' defendant." *In re Charter Communications, Inc., Subpoena Enforcement Matter,* 393 F.3d 771, FN3 (8th Cir. 2005). The Eighth Circuit's confirmation that a John Doe suit is proper was the express consolation prize for copyright owners when denied the right to use the easy process afforded by Section 512(h). Similarly, in *Arista Records, LLC. v. Doe 3,* 604 F.3d 110 (2d Cir. 2010) the Second Circuit upheld the District Court's denial of a motion to quash after Arista obtained leave "to serve a subpoena on defendants' common ISP, the State University of New York at Albany." By so holding, the Second Circuit approved the process of issuing a Rule 45 subpoena to an ISP to identify anonymous Doe Defendants.

**b. Prior to Discovery, Plaintiff Cannot Know With 100% Certainty that the Subscriber is the Infringer**

At the onset of a lawsuit, Plaintiff knows that the John Doe defendant's Internet was used to infringe Plaintiff's copyrights. In each of its complaints, Plaintiff alleges that the subscriber is the infringer. For the reasons set forth below, this allegation is plausible. While the subscriber is the infringer in the majority of instances, it is possible that someone other than the subscriber is the infringer. Indeed, the subscriber could be renting his or her house to a person using the subscribers internet to commit an infringement. Alternatively, the subscriber may have relatives or friends living with him or her who use the subscriber's internet and are the infringers. The probability of these occurrences is greatly diminished in the subject suits, however, because the

7

quantum of infringement committed by each of the Doe Defendants expands over of long period of time, and the Doe Defendants likely received DMCA notices from their ISPs alerting them to the instances of infringement. Presumably, a subscriber who is not the infringer but who receives a DMCA notice would reach out to any other person using the subscriber's internet service and cause the infringement to stop. Nevertheless, since there is a possibility that the subscriber is not the infringer, Plaintiff routinely agrees to refrain from publically identifying the John Doe Defendant by name in court papers until after the discovery period has concluded.

C. **Plaintiff's Complaint States a Claim that is Plausible.**

Every court to rule on whether Plaintiff's claims are "plausible" has found in Plaintiff's favor. *See e.g. Malibu Media, LLC v. John Doe 1*, 2013 WL 30648 (E.D. Pa. Jan. 3, 2013) ("Accepting all factual allegations in the Amended Complaints as true, *Iqbal,* 556 at 678, the Court concludes Plaintiff has stated a claim upon which relief can be granted under the Copyright Act."); *Malibu Media, LLC v. Pelizzo*, 2012 WL 6680387 (S.D. Fla. Dec. 21, 2012) ("[T]aking the allegations in the light most favorable to Plaintiff, the Complaint adequately states a claim of copyright infringement"); *Patrick Collins, Inc. v. Does 1-22*, 2011 WL 5439005 (D. Md. 2011) ("[T]he Court finds that Plaintiff has adequately stated a claim for copyright infringement.") Plaintiffs' complaints have *never* been dismissed pursuant to Rule 12(b)(6).

Further, the Second Circuit found that a copyright holder's suit against an online infringer is "plausible" through a detailed and well thought out analysis under the *Twombly* and *Iqbal* standards. *See Arista Records, LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010). In *Arista*, the Court specifically analyzed the requirements asserted by Twombly for pleading an inference of illegal conduct noting "[a]sking for plausible grounds to infer an agreement does not impose a probability requirement at the pleading stage; it simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of illegal[ity]." *Id*. citing *Bell Atl.*

*Corp. v. Twombly*, 550 U.S. 544, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007).

> [Although *Twombly* and *Iqbal* require " 'factual amplification [where] needed to render a claim plausible,' " *Turkmen v. Ashcroft*, 589 F.3d 542, 546 (2d Cir.2009) (quoting *Ross v. Bank of America, N.A (USA)*, 524 F.3d 217, 225 (2d Cir.2008)), we reject Doe 3's contention that *Twombly* and *Iqbal* require the pleading of specific evidence or extra facts beyond what is needed to make the claim plausible.

*Id*. at 120-121. Likewise, here, Plaintiff's factual allegations in its Complaint are supported by factual assertions in its Exhibits. In support of its Motion for Leave, Plaintiff filed a sworn declaration from its investigator that the technology used to identify the Doe Defendant's IP address is accurate. *See* CM/ECF 4-2. On Exhibit A of Plaintiff's Complaint, Plaintiff demonstrates the dates and time the infringement occurred, the hash files, and the names of the movies infringed. On Exhibit B of Plaintiff's Complaint, Plaintiff demonstrates that its copyrights are properly registered. And on Exhibit C of Plaintiff's Complaint, Plaintiff provides evidence of all the other infringing activity that has taken place through Defendant's Internet. Plaintiff has provided enough factual support for it to be reasonable that the Defendant is the subscriber and the infringer. As stated above, based on the time period and abundance of infringement, causing high bandwidth usage, slow Internet speeds, DMCA notices, and other evidence of infringement taking place on the network, it is reasonable to believe the subscriber, who owns, pays for and is control of the Internet services, would not allow that activity to happen on his or her network unless he or she was committing the infringement.

It is without question that copyright infringement on the Internet is actionable. The Supreme Court in *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.* 545 U.S. 913, 125 S.Ct. 2764 (2005), found that Grokster was liable for contributory infringement because it materially aided and induced its users to commit direct infringement via its peer-to-peer file sharing service. Similarly, the First, Second, Seventh, Eighth, Ninth and D.C. Circuits have all held that peer-to-

peer infringement is actionable. *See Sony v. Tennenbaum,* 660 F.3d 487 (1st Cir. 2011) holding in a twenty-six (26) page opinion that Tennenbaum was liable for infringement committed through a peer-to-peer network, that peer-to-peer infringement is not "fair use" nor would any other defense shield Tennenbaum's tortious conduct, and that the statutory damages clause set forth in the Copyright Act is constitutional; *Arista Records, LLC. v. Doe 3*, 604 F.3d 110 (2d Cir. 2010) denying an individual John Doe Defendant's motion to quash a subpoena issued to an internet service provider in response to an allegation that the John Doe Defendant infringed Arista's copyrights through a peer-to-peer file sharing network; *In re Aimster Copyright Litigation*, 334 F.3d 643 (7th Cir. 2003) upholding a preliminary injunction because Aimster was contributorily liable for its users' direct infringements; *In re Charter Communications, Inc. Subpoena Enforcement Matter*, 393 F.3d 771, 774 (8th Cir. 2005) opining that copyright owners have a right to identify peer-to-peer file sharers through a Rule 45 subpoena because those file sharers *are* infringing the owners' copyrights; *A&M Records, Inc. v. Napster, Inc.,* 239 F.3d 1004, 1013 (9th Cir. 2001) "[w]e agree that the plaintiffs have shown that Napster users infringe at least two of the copyright holders' exclusive rights: the rights of reproduction, § 106(1); and distribution, § 106(3);" and *RIAA v. Verizon Internet Services, Inc.,* 351 F.3d 1229, 1238 (D.C. Cir. 2003) repetitively acknowledging that file sharing is infringement. Significantly, "District courts . . . agree . . . that downloading music from the internet, without paying for it or acquiring any rights to it, is a direct violation of the Copyright Act." *UMG Recording, Inc. v. Alburger*, 2009 WL 3152153, *3 (E.D. PA. 2009).

**D.** ***Patrick Collins, Inc. v. Doe 1*, No. 12-cv-1154 (ADS) (GRB), ___ F.R.D. ___ , 2012 WL 5879120, at *4-*5 (E.D.N.Y. Nov. 20, 2012) and Plaintiff's Citations**

Plaintiff respectfully suggests that the case cited by this Court, *Patrick Collins, Inc. v. Doe 1*, No. 12-cv-1154 (ADS) (GRB), __ F.R.D. __ , 2012 WL 5879120, at *4-*5 (E.D.N.Y.

Nov. 20, 2012) is not contrary authority, nor is it controlling authority to this Court. In *Patrick Collins, Inc.* the Eastern District of New York upheld a magistrate's ruling that **_allowed_** Patrick Collins to subpoena an ISP to receive the identifying information of one John Doe defendant. *See Patrick Collins, Inc. v. Doe 1*, 12-CV-1154 ADS GRB, 2012 WL 5879120 (E.D.N.Y. Nov. 20, 2012) ("**ORDERED** that Judge Brown's Report and Recommendation is adopted in its entirety.") Judge Brown's Report and Recommendation granted the plaintiff the ability to subpoena a doe defendant's ISP to receive the doe defendant's identity, because without doing so, a copyright plaintiff would be without a remedy. Indeed, Judge Brown specifically stated, "these plaintiffs are allegedly the owners of copyrighted works who should not be left without any remedy." *In re BitTorrent Adult Film Copyright Infringement Cases*, CIV.A. 11-3995 DRH, 2012 WL 1570765 (E.D.N.Y. May 1, 2012). Likewise, Plaintiff is asking the Court to not leave it without a remedy.

Further, in every single copyright BitTorrent case cited in *Patrick Collins, Inc. v. Doe 1*, a court granted a copyright plaintiff its motion to subpoena at least one John Doe defendant, when personal jurisdiction was proper, as in this case. *See Next Phase Distribution, Inc. v. John Does 1-27*, 284 F.R.D. 165, 172 (S.D.N.Y. 2012) ("**ORDERED** that Motion for Discovery (Docket No. 5) is **GRANTED** with respect to John Doe 1"; *DigiProtect USA Corp. v. Does*, 10 CIV. 8760 PAC, 2011 WL 4444666 (S.D.N.Y. Sept. 26, 2011) (dismissed on the basis of improper personal jurisdiction); *Media Products, Inc. v. John Does 1-26*, 12 CIV. 3719 HB, 2012 WL 3866492 (S.D.N.Y. Sept. 4, 2012) ("ORDERED that the ISPs shall not turn over any further personal information to Plaintiffs other than as to John Doe 1"); *Patrick Collins, Inc. v. John Does 1 through 37*, 2:12-CV-1259-JAM-EFB, 2012 WL 2872832 (E.D. Cal. July 11, 2012) ("Plaintiff may immediately serve a Rule 45 subpoena on Charter Communications (the ISP listed for the first John Doe in Exhibit A to plaintiff's complaint and in plaintiff's proposed order

11

on the application for expedited discovery) to obtain the following information about that John Doe (based on the IP address listed for him/her—24.182.55.21): name, address, telephone number, and email address); *Digital Sins, Inc. v. John Does 1-245*, 11 CIV. 8170 CM, 2012 WL 1744838 (S.D.N.Y. May 15, 2012) ("I hereby *sua sponte* quash any subpoena that may be outstanding to any internet service provider seeking information about the identity of any John Doe defendant other than John Doe 1"); *Patrick Collins, Inc. v. Does 1-6*, 12 CIV. 2964 JPO, 2012 WL 2001957 (S.D.N.Y. June 1, 2012) ("ORDERED that Plaintiff is allowed to conduct immediate discovery on the ISPs listed in Exhibit B to the Declaration of Tobias Fieser"); *SBO Pictures, Inc. v. Does 1-20*, 12 CIV. 3925 SAS, 2012 WL 2034631 (S.D.N.Y. June 5, 2012) ("As to discovery regarding both Doe 1 and any other Doe defendants against whom claims are re-filed, I adopt the procedures of Judge McMahon and Magistrate Judge Brown"); *Digital Sin, Inc. v. Does 1-176*, 279 F.R.D. 239, 244 (S.D.N.Y. 2012) ("**IT IS HEREBY ORDERED** that Digital Sin may immediately serve a Rule 45 subpoena on the ISPs listed in Exhibit A to the Complaint to obtain information to identify Does 1–176, specifically her or his name, address, MAC address, and email address"); *Media Products, Inc. v. John Does 1-26*, 12 CIV. 3719 HB, 2012 WL 3866492 (S.D.N.Y. Sept. 4, 2012) ("ORDERED that the ISPs shall not turn over any further personal information to Plaintiffs other than as to John Doe 1 in each named case and in accordance with my earlier orders."); *Arista Records LLC v. Does 1-16*, 1:08-CV-765 GTS/RF, 2009 WL 414060 (N.D.N.Y. Feb. 18, 2009) *aff'd sub nom. Arista Records, LLC v. Doe 3*, 604 F.3d 110 (2d Cir. 2010) ("The discovery information sought by the Plaintiffs is specific and reasonable. The Subpoena seeks the IP user's name, address, telephone number, email address, and MAC, and nothing else that would be considered intrusive. All of this information will reasonably facilitate Plaintiffs' efforts to serve process upon the alleged offenders in order to bring suit against them for their alleged conduct. Once again, this is another element that tips in

12

Plaintiffs' favor"); *AF Holdings, LLC v. Doe*, C 12-2049 PJH, 2012 WL 3835102 (N.D. Cal. Sept. 4, 2012) (granting a Motion to Dismiss on the basis of a negligence claim which has not been pled here by Plaintiff); *Patrick Collins, Inc. v. Does 1-4*, 12 CIV. 2962 HB, 2012 WL 2130557 (S.D.N.Y. June 12, 2012) ("ORDERED that Plaintiff is allowed to conduct immediate discovery on the ISPs listed in Exhibit B to the Declaration of Tobias Fieser").

Some of the courts listed above have used the joinder rule to limit a plaintiff's ability to identify Doe defendants on a large scale basis. That judicial strategy has worked insofar as plaintiff does not have to sue everyone in the same swarm the plaintiff can look at all the movies the defendants have downloaded and only sue the most egregious infringers. That is what Plaintiff has done here.

Plaintiff was not obligated to cite *Patrick Collins, Inc. v. Doe 1*, No. 12-cv-1154 (ADS) (GRB), __ F.R.D. __ , 2012 WL 5879120, at *4-*5 (E.D.N.Y. Nov. 20, 2012). The Maryland Rules of Professional Conduct state: "A lawyer shall not knowingly ... fail to disclose to the tribunal legal authority in the controlling jurisdiction known to the lawyer to be directly adverse to the position of the client and not disclosed by opposing counsel[.]" MD R CTS J AND ATTYS Rule 16-812, MRPC 3.3. This case was not controlling on this Court because it arose in the Eastern District of New York which is not a court within the Fourth Circuit. Further, it is not controlling because it was an opinion of a District Court and therefore not binding on this Court. Finally, as stated above, the holding in that case is consistent with the holding Plaintiff urged upon this Court. Namely, that Plaintiff should be allowed to subpoena the identity of one John Doe Defendant per lawsuit filed. A large amount of case law exists on the subject of copyright infringement suits on the Internet. Indeed, a search on Westlaw of "bittorrent", "copyright" and "subpoena" reveals over 300 cases. Undersigned, in both its original Motion for Leave and its

Memorandum Explaining Why it has a Clear and Undeniable Right to Issue a Rule 45 Subpoena made an effort to cite as much case law as possible.

**E. If Malibu Media is granted a subpoena to serve on an ISP and determines the name and address of the IP subscriber, what does Malibu Media intend to do with that information?**

Plaintiff is going to litigate its case. Attached as Exhibit B is a 26(f) report from *Malibu Media, LLC v. John Does 1, 6, 13, 14, and 16*, Case No. 2012-2078, in the Eastern District of Pennsylvania, which sets forth how Plaintiff litigates its cases.

In its Complaint, Plaintiff has provided every Defendant with an exculpatory evidence form and the opportunity to provide evidence of non-infringement to Plaintiff. With any Defendant that fails to provide a credible basis for non-infringement, Plaintiff will serve the Defendant and proceed to litigate. Should the Court desire Plaintiff to do so, Plaintiff will file any identifying information by the Defendants under seal or anonymously, in order to prevent any unnecessary leverage or pressure to settle. After that, Plaintiff will serve Defendant. Plaintiff will depose the ISPs to lay the foundation of its records into evidence, depose search engines to evaluate certain key words and whether the defendant was searching for Plaintiff's content, and depose the defendant. If a "someone else used my internet" defense is presented, Plaintiff will depose the other potential users. Plaintiff has an expert on retainer to look at the computers. This expert is also in the process of preparing a report that demonstrates that IPP's software is accurate and works exactly the way IPP testifies that it works. Plaintiff will file this report in its cases once it is completed. Copies of the experts' CVs will be attached.

Plaintiff will prove beyond a preponderance of the evidence that the infringement was committed through the internet service reflected by the Internet Protocol Address ("IPA") subscribed to by each John Doe Defendant. Although unlikely, Plaintiff may also substitute a person other than the ISP subscriber from whose internet service infringement took place. This

is the reason Plaintiff is saying in the first instance that the John Doe defendant can remain anonymous through the end of discovery.

Plaintiff's expectation is that probably about one third of its cases will not proceed past receiving the identity of the Defendant from the ISP. This is because in some cases the ISP does not have records of an IPA because of its limited data retention. Also, in some cases a Defendant will prove to be active duty military, or unable to pay a judgment. In these cases, Plaintiff does not pursue the Defendant. Should a Defendant want to settle early in the litigation process, Plaintiff will consider any offers and may in turn propose its own settlement offer.

**F.  Limitation of Subpoenas to Curb Unwarranted Pressure to Settle**

Plaintiff suggests that a protective order requiring that Court filings not contain the Doe Defendant's name prior to the end of the discovery period will enable fair litigation by both parties and remove any potential for exploitation. Plaintiff does not suggest that any other limitations be imposed on the scope of the subpoena or that any of the regular rules of procedure which govern all cases be modified.

**G.  The Effect of the "Six Strikes" Program on Issuing a Subpoena**

The "Six Strikes" program does not alleviate the need for copyright holders like Plaintiff to request subpoenas. First, "Six Strikes" is for MPAA and RIAA affiliate members only. Plaintiff has not been provided the benefit of participating in this program. Further, those involved in creating the "Six Strikes" program have made it clear that it is not intended to deter the most consistent and extreme infringers, whom Plaintiff is suing[3]. Indeed, Thomas Dailey, the senior VP of Verizon, stated, "this [] system is not going to stop hardcore infringers" and that it

---

[3] http://www.broadcastingcable.com/article/492241-Six_Strikes_Alerts_Get_Once_Over_on_Hill.php
"She said she expected that people after a couple of warnings will get the message, but conceded it won't stop the hard-cores"

is instead about changing behavior, "where it can be corrected."[4]  This process is not designed by Congress or enacted into law and therefore does not supersede the Copyright Act which grants a copyright holder the right to sue an individual for copyright infringement and does not replace Plaintiff's right to subpoena the identity of a John Doe defendant to prosecute a claim for infringement.

### H. IPP Ltd's Reliability

Adverse counsel raise issues regarding Plaintiff's technology and investigator, IPP Ltd. Respectfully, these critiques have absolutely no basis in fact.  IPP, Ltd.'s detection technology is 100% accurate and the process of detection is unimpeachable.  As stated above, Plaintiff is currently in the process of having independent expert witnesses with computer forensic backgrounds evaluate IPP's software in order to provide testimony that the software works. These experts have already thoroughly tested the software and orally reported to Plaintiff that the software does work as described.  Plaintiff anticipates this report will be completed in the next few weeks and will file the report in these proceedings at the appropriate time.

### 1. An Internet Protocol Address Cannot Be Spoofed

In the letter by John C. Lowe [CM/ECF 14-6] adverse counsel suggests that Plaintiff's identification of an Internet Protocol Address ("IPA") may be inaccurate because it is possible to spoof the IPA.  "In computer networking, the term IP address spoofing or IP spoofing refers to the creation of Internet Protocol (IP) packets with a forged source IP address, called spoofing, with the purpose of concealing the identity of the sender or impersonating another computing system."[5]   While this may be possible with some software, in each case before this Court, Plaintiff is certain that the IPA was not spoofed.  Indeed, IPP's software established a direct

---

[4] Id.
[5] http://en.wikipedia.org/wiki/IP_address_spoofing citing
http://66.14.166.45/sf_whitepapers/tcpip/IP%20Spoofing%20-%20An%20Introduction.pdf

Transmission Connection Protocol/Internet Protocol ("TCP/IP")[6] connection with the John Doe Defendants' IP address. *See* Complaint ¶17. When a direct TCP/IP connection is established, it is impossible for an individual to hide, mask, or spoof his or her IP address because that individuals computer directly connects with IPP's server. This fact was attested to by the MPAA, RIAA and the ISPs during the hearings for Six Strikes and there are several academic journals that reach the same conclusion.

### 2. IPP'S Relationship with Guardaley and the German High Court

In the letter by Jason Sweet [CM/ECF 14-3], adverse counsel suggests that IPP Limited (1) may not exist; (2) if it does exist is the same as the German investigators Guardaley; and (3) that the State Court of Berlin found flaws regarding Guardaley's technology. Adverse counsel sets forth these conspiracy theories with little evidence.

First, IPP's expert Tobias Fieser will be a fact witness. Second, IPP, Ltd. and Guardaley have no common ownership or clients. Occasionally, the two companies work with each other, mainly because they are in the same common field and location. Further, adverse counsel's

---

[6] "TCP/IP (Transmission Control Protocol/Internet Protocol) is the basic communication language or protocol of the Internet. It can also be used as a communications protocol in a private network (either an intranet or an extranet). When you are set up with direct access to the Internet, your computer is provided with a copy of the TCP/IP program just as every other computer that you may send messages to or get information from also has a copy of TCP/IP.

"TCP/IP is a two-layer program. The higher layer, Transmission Control Protocol, manages the assembling of a message or file into smaller packets that are transmitted over the Internet and received by a TCP layer that reassembles the packets into the original message. The lower layer, Internet Protocol, handles the address part of each packet so that it gets to the right destination. Each gateway computer on the network checks this address to see where to forward the message. Even though some packets from the same message are routed differently than others, they'll be reassembled at the destination." http://searchnetworking.techtarget.com/definition/TCP-IP

letter misidentifies Guardaley's owner as Patrick Achache, further demonstrating that it is based simply on conjecture.

The German investigative company Guardaley has not reinvented itself as IPP, Ltd. Indeed, Guardaley is still filing declarations in several cases. See e.g. *Studio West Productions, Inc. v. Does 1-14*, Case No. 2:13-cv-00370-AB (E.D. Pa., January 28, 2013); *Studio West Productions, Inc. v. Does 1-237, Case No. 4:12-cv-03690* (S.D. Tex., January 8, 2013); *Studio West Productions, Inc. v. Does 1-205*, Case No. 4:12-cv-03691 (S.D. Tex., January 8, 2013); *Nu Image, Inc. v. Does 1-91*, Case No. 4:12-cv-00331-RH-CAS (N.D. Fla., October 26, 2012). Finally, adverse counsel misstates the proceedings which took place in Berlin regarding Guardaley's technology. The findings adverse counsel suggests were *not* proven in court or by a third party expert but by merely alleged by a competitor. The judgment which adverse counsel refers to is not legally binding, and most importantly Guardaley's case has no bearing on IPP, Ltd. With each John Doe Defendant in this case, Plaintiff can provide Defendant with a packet sniffer demonstrating the piece of the BitTorrent file that the Defendant was distributing. As Plaintiff's experts will testify, the packet sniffer and direct TCP/IP connection simply cannot be manipulated or spoofed. Put simply, the detection technology employed by IPP, Ltd. is simply not a major concern of Plaintiff's. It is infallible and the process is not impeachable. If challenged, Plaintiff will prove these points.

1. **CONCLUSION**

For the foregoing reasons Plaintiff respectfully requests that the Court grant Plaintiff's motion for leave to subpoena the John Doe Defendants identities.

Dated: March 23, 2013

18

Respectfully submitted,
MALIBU MEDIA, LLC.
PLAINTIFF

By:  /s/*Jon A. Hoppe*
Jon A. Hoppe, Esquire #6479
Counsel
Maddox, Hoppe, Hoofnagle &
        Hafey, L.L.C.
1401 Mercantile Lane #105
Largo, Maryland 20774
(301) 341-2580

## CERTIFICATE OF SERVICE

I hereby certify that on March 23, 2013, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF and that service was perfected on all counsel of record and interested parties through this system and to both adverse  and amici counsel through the following electronic mail addresses:

lholzman@theholzmanlawfirm.com;

jsweet@boothsweet.com;

johnseiver@dwt.com;

bhuffman@lockelord.com;

johmlowe@johmlowepc.com

irasiegel@earthlink.net.

By:  /s/*Jon A. Hoppe*

Exhibit S - 19

# EXHIBIT T

## Vacancies24.de
### Alle Stellenangebote auf einen Blick!

Suchen

**Meistgesuchte Jobs**

g+1  0

KAYAK

COMPARE
HUNDREDS
OF TRAVEL
SITES
AT ONCE.

Search

**Linux Administrator/ Programmierer in Vollzeit Arbeitsort: Karlsruhe, Baden**
IPP Int. / Systemplaner und systemanalytiker / Baden-Württemberg
**Bitte beachten Sie, dass die Bewerbungsfrist abgelaufen ist.**

Alle Jobs für systemplaner und systemanalytiker in Baden-Württemberg
Alle Jobs bei IPP Int. in Baden-Württemberg

IPP Int. ist abgestimmt auf die Bedürfnisse von Unternehmen aus den Bereichen der Software- und Unterhaltungsindustrie. Die Basis unseres Portfolios sind Software Eigenentwicklungen sowie unsere globale Internet-Infrastruktur. Wir sind der perfekte Partner für ganzheitlichen Schutz digitaler Inhalte jeglicher Art. Durch die Kombination verschiedener Methoden und Techniken erreichen wir eine nie dagewesene Abdeckung und ganzheitlichen Schutz von Software, Filmen, Musik, Bildern und Texten. Von Downloads bis hin zu illegalen Verkäufen - unsere Ermittlungen decken jeden Bereich ab. Die Effektivität, mit der wir unsere Produkte betreiben und kombinieren, ermöglicht unsere Dienstleistungen besonders kosteneffizient anzubieten. Unser Angebot: Einen zukunftssicheren Arbeitsplatz in einem hochmotivierten Team und ein interessantes Aufgabenfeld. Ihre Aufgabe: Serveradministration und Skriptprogrammierung Mysql Datenbank und VMware ESX Server Ihr Profil Sie verfügen über umfangreiche Kenntnisse folgenden Bereich: ¿ Umgang mit Linux-Betriebssystemen ¿ Administration von MySQL Datenbanken ¿ SQL ¿ PC- und Netzwerktechnik ¿ Skriptprogrammierung (wenn möglich Pearl) Optionale Kenntnisse: ¿ Webprogrammierung (PHP, HTML. ) ¿ Windows Programmiersprachen (C++, VB) - Geforderte Anlagen: Lebenslauf, Zeugnisse; Kenntnisse und Fertigkeiten: Betriebssystem LINUX; Datenbank MySQL; Datenbank SQL; PC-Technik

**Veröffentlicht am**
2011-10-12

**E-Mail**
jobs@quardaley.com

**Telefon**
+49 721 66800093

**Adresse**
Am Hubengut 8, D-76149 Karlsruhe, Baden, Deutschland

**Weitere Informationen**
Jennifer Cindori

**Wie bewirbt man sich**
per Email

**Bitte beachten Sie, dass die Bewerbungsfrist abgelaufen ist.**

| Meistgesuchte Jobs |
|---|
| Verkäufer/in im BASE Shop ... |
| Tischler/in Arbeitsort: S ... |
| Fachlagerist/in Arbeitsor ... |
| Filialleiter/in im BASE S ... |
| Teamassistenz/ Büroassist ... |
| Amtsvormund/Amtspfleger / ... |
| Stop! Weiterlesen ! Hier ... |
| Elektroniker/in Arbeitsor ... |
| Examinierte Pflegefachkra ... |
| Automaten-Techniker für W ... |
| Sportlehrer/in Arbeitsort ... |
| Podologin gesucht Arbeits ... |
| Architekt/in Arbeitsort: ... |
| TOP>> Mehrere Service-Tec ... |
| Ergotherapeut/in im mobil ... |

Datenschutzinfo in

▶ **Job Stellenangebote**
▶ **Stellenausschreibung**
▶ **Offene Stellenangebote**

**Beliebte Tags**

| |
|---|
| Klebetechnik |
| Hydraulikmonteure |
| Mehlingen |
| Interaktiv |
| Primonda |

Datenschutzinfo in

▶ **Stellenangebote Karlsruh**
▶ **Jobbörse Stellenangebo**
▶ **Stellenangebote Arbeit**

**Neue Arbeitgeber**

| |
|---|
| Xchange Language Services ... |
| Skare fleisch |
| Dr. Bilir, Martinovic, St ... |
| BVU GmbH |
| Klaus Hinz Taxiunternehmen |
| Gasthaus Almbachklamm Ber ... |
| Schornsteinfeger |
| Werksarztzentrum Deutschl ... |
| Opticost GmbH |
| PolygonVATRO GmbH |

Datenschutzinfo in

▶ **Unix System Administrat**
▶ **Jobsuche Stellenangebo**
▶ **Stellenangebote Pflege**

**Links**

Kontaktieren Sie uns
Stellennummer: 6753360

© 2013 Vacancies24.de — Impressum — Kontaktieren Sie uns

# EXHIBIT U

**Hauptmenü**

Home

Imprint

Services

**Imprint**



**IPP International Unternehmensgesellschaft (haftungsbeschränkt)**

Überseering 25
22297 Hamburg
Deutschland

Fon: + 49 (0) 40 600 385 3230
Fax: +49 (0) 40 600 385 3237
E-Mail: info@ippint.de
Internet: www.ippint.de

CEO: Uwe Hennrich

Registergericht: Amtsgericht Hamburg
Registernummer: HRB 115546

**Disclaimer:**

1. Online-contents
The author reserves the right not to be responsible for the topicality, correctness, completeness or quality of the information provided. Liability claims regarding damage caused by the use of any information provided, including any kind of information which is incomplete or incorrect, will therefore be rejected. All offers are not-binding and without obligation. Parts of the pages or the complete publication including all offers and information might be extended, changed or partly or completely deleted by the author without separate announcement.

2. Referrals and links
The Author is not responsible for any contents linked or referred to from his pages - unless he has full knowledge of illegal contents and would be able to prevent the visitors of his site from viewing those pages. If any damage occurs by the use of information presented there, only the author of the respective pages might be liable, not the one who has linked to these pages. Furthermore the author is not liable for any postings or messages published by users of discussion boards, guestbooks or mailinglists provided on his page.

3. Copyright
The author intended not to use any copyrighted material for the publication or, if not possible, to indicate the copyright of the respective object. The copyright for any material created by the author is reserved. Any duplication or use of such diagrams, sounds or texts in other electronic or printed publications is not permitted without the author's agreement.

4. Legal force of this disclaimer
This disclaimer is to be regarded as part of the internet publication which you were referred from. If sections or individual formulations of this text are not legal or correct, the content or validity of the other parts remain uninfluenced by this fact.

**Hauptmenü**

Home

Imprint

Services

**Imprint**

**IPP International Unternehmensgesellschaft (haftungsbeschränkt)**

Hermannstraße 9
20095 Hamburg
Deutschland

Fon: + 49 (0) 40 600 385 3230
Fax: +49 (0) 40 600 385 3237
E-Mail: info@ippint.de
Internet: www.ippint.de

CEO: Uwe Hennrich

Registergericht: Amtsgericht Hamburg
Registernummer: HRB 115546

UST-ID Nr.: DE 279686524

**Disclaimer:**

1. Online-contents
The author reserves the right not to be responsible for the topicality, correctness, completeness or quality of the information provided. Liability claims regarding damage caused by the use of any information provided, including any kind of information which is incomplete or incorrect, will therefore be rejected. All offers are not-binding and without obligation. Parts of the pages or the complete publication including all offers and information might be extended, changed or partly or completely deleted by the author without separate announcement.

2. Referrals and links
The Author is not responsible for any contents linked or referred to from his pages - unless he has full knowledge of illegal contents and would be able to prevent the visitors of his site from viewing those pages. If any damage occurs by the use of information presented there, only the author of the respective pages might be liable, not the one who has linked to these pages. Furthermore the author is not liable for any postings or messages published by users of discussion boards, guestbooks or mailinglists provided on his page.

3. Copyright
The author intended not to use any copyrighted material for the publication or, if not possible, to indicate the copyright of the respective object. The copyright for any material created by the author is reserved. Any duplication or use of such diagrams, sounds or texts in other electronic or printed publications is not permitted without the author's agreement.

4. Legal force of this disclaimer
This disclaimer is to be regarded as part of the internet publication which you were referred from. If sections or individual formulations of this text are not legal or correct, the content or validity of the other parts remain uninfluenced by this fact.

Exhibit U - 2

3/4/14 4:27 PM

# EXHIBIT V

EXHIBIT V

Telephone counseling    for FREE    **0800 8 885 885**





Telephone-secretariat    Industry Solutions    Business

## Imprint

BSAG Bueroservice24 AG

Überseering 25

22297 Hamburg

Free advice: 0800-8885885

E-mail: info (at) bueroservice24.de

URL: www.bueroservice24.de

Chairman Marcus Polke

Board of Directors: Christian Weber, Kim Barthel

Commercial Register: Amtsgericht Hamburg HRB 112 851

VAT Reg. DE270104172

Tel: 040-600385-0

Fax: 040-600385-130

| Telephone-secretariat | Services | Social Media | Business | Support | TUV tested |
|---|---|---|---|---|---|
| Benefits | Business address | The SME blog | Home | Terms and Conditions | |
| Immediately test | Credit Report | Facebook | Contact | FAQ | |
| Offer Calculator | Industry Solutions | Google + | Cooperation | Privacy Policy | |
| And Price List | | Twitter | Affiliate | Imprint | |
| Entry-level package | | Xing | Press | Lexicon | |
| Standard Package | | | Jobs | Sitemap | |
| Professional Package | | | | | |
| Weekend Package | | | | | |

View  History  Bookmarks  Window  Help
Case 1:14-cv-00223-MJG  Document 9-1  Filed 03/28/14  Page 224 of 270
Google Translate
Tue Mar 4  8:55 PM  mepietz



## Bueroservice24.de

### Persönliches Telefon-Sekretariat

Gleich anrufen und informieren: 040/600385 - 4990



Jetzt 2 Wochen
**kostenlos testen!**

### Eine Geschäftsadresse in Hamburg inklusive eigener Telefonnummer?

Sie sind auf der Suche nach einem Anbieter, der Ihnen einen deutschen Postadresse inklusive deutscher Telefon- und Faxnummer generiert und betreut? Wir helfen Ihnen!

Wir verlegen Ihre Geschäftsadresse an Hamburgs exklusivste Adresse - in die Hermannstraße 9! Das heißt, wir generieren eine Postadresse für Ihr Unternehmen (mit eigenem Namensschild am Eingang) an die Kunden und Geschäftspartner Ihre Post und Pakete senden können. Wir nehmen diese entgegen und senden Sie an Sie weiter. Die Hamburger Adresse schafft Seriosität und Vertrauen bei Ihren Kunden. Gerne bieten wir Ihnen zusätzlich eine Hamburger Telefon- und Faxnummer an, unter der wir Ihre Anrufe unter Ihrem Unternehmensnamen annehmen, sobald Sie bei Ihrem Telefon die Rufumleitung aktivieren.

Ihre neue Geschäftsadresse in der Hamburger Hermannstraße 9, in 20095 können Sie für 84,90 Euro nutzen. Auch hier besteht die Möglichkeit, diese in Verbindung mit einem Telefonservice-Paket zu buchen. So sparen Sie sich eine teure Büromiete und Möblierung und haben eine professionelle Bürovertretung für Ihr Unternehmen! Die Geschäftsadresse Hamburg einfach und zuverlässig nutzen zu können, schätzen unsere Partner: Viele Unternehmen berichten uns stetig die positiven Rückmeldungen Ihrer Kunden auf unseren Telefonservice. Das Gute daran ist, dass diese nicht gemerkt haben, dass sie mit einem externen Telefonsekretariat verbunden wurden.

Wenn sich weitere Fragen ergeben haben oder Sie sich über zusätzliche Leistungen wie den Büroservice oder Bonitätsauskünfte informieren sollen, so melden Sie Bedarf an unter unserer Firmennummer:

040/ 600385 - 4990



○ Herr ○ Frau

Ihr Name:*

Telefonnummer:*

E-Mail:*

* Pflichtfelder

**Jetzt Rückruf anfordern!**

**Folgende Seiten könnten Sie auch interessieren**

Büroservice Aachen
Büroservice Berlin
Büroservice Düsseldorf
Büroservice Frankfurt (Main)
Büroservice Hamburg
Büroservice Heidelberg
Büroservice Karlsruhe
Büroservice Kiel
Büroservice Köln

---

### Bueroservice24.de

### Persönliches Telefon-Sekretariat

Call immediately and inform: 040 / 600385-4990

Now two weeks
**Free Trial Now!**

### A business address in Hamburg, including its own phone number?

You are looking for a provider that you generated a German postal address including German telephone and fax number and cared for? We can help!

We publish your business address on Hamburg's most exclusive address - in the Hermann Street 9! That is, we generate a mailing address for your business (with its own name sign at the entrance) to the customers and business partners can send your mail and packages. We accept this and send it on to you. The address in Hamburg creates integrity and trust with your customers. We are happy to offer you a hamburger telephone and fax number in addition, under which we accept your calls to your company name as soon as you activate the diversion on your telephone.

**Your new business address in Hamburg Hermann Strasse 9, 20095 in,** you can use for 84,90 Euro. Again, there is the possibility this in conjunction with a telephone service to book package. To save yourself an expensive office rent and furniture and have a professional office representation for your business! To use the **business address Hamburg simple and reliable,** value our partners: Many companies tell us constantly the positive feedback of your customers to our Phone Service. The good thing is that they have not realized that they were connected to an external telephone Secretariat.



○ Mr. ○ Woman

Your Name: *

Telephone number: *

E-Mail: *

* Mandatory fields

**Request a Call Now!**

**The following pages, you might also consider**

Secretarial services Aachen

Exhibit V - 2



Nationwide telephone service and secretarial services | TÜV seal "very well" | Bueroservice24 AG

8/10/12 11:54 AM



Telephone counseling     for FREE     **0800 8 885 885**

Now two weeks



*free test!*



**FRAU FREIHE**
Fachgebiet: Therapeuten, Online-Shops
Interessen: Kunst, Literatur

**FRAU VOLLMANN**
Fachgebiet: Immobilienmakler, Versicherungsmakler
Interessen: Hunde

  

## Immediately test

Convince yourself personally and quickly in just two minutes from the quality of our services and the professionalism of our technical secretaries and secretaries! The immediate test is completely free and without obligation.

Now start the test immediately

## Personal quote

In the future, always be reached by phone at attractive rates: Get our no-obligation quote for your personal phone Bueroservice24.de Secretariat.

Get a Quote Now

## Industry Solutions

Real estate agents, online shops - Exposé shipping, order taking, appointment - every industry has its specific requirements of our professional Telephone-secretariat. Learn more here!



## The advantages of a professional secretariat by telephone Bueroservice24.de for you:

**100%** **100 percent accessibility:** Optimize your business performance and grow your business through a permanent telephone availability. No call you will get lost!

 **Real-time conversation Note:** Whether you are in a meeting or on vacation. Immediately after the phone call you receive an e-mail, SMS or a fax and can act and react accordingly.

 **Corporate Benefits:** Through our professional answering service will show potential customers and other key audiences professionalism and integrity - and thereby have more time for your business success.

 **Professional answering:** Our professional staff understands your needs and industry characteristics, and knows how to communicate with your callers professionally and success-oriented - in your company name.

 **Flexible rates,** we know that entrepreneurs different demands on a phone have a medium as a company secretary. Therefore we offer to businesses of any size and any industry the right tariff.

 **High German and English guarantees:** As a Hamburg company, we offer you and your callers a perfect High German and English - guaranteed.

Nationwide telephone service and secretarial services | TÜV seal "very well" | Bueroservice24 AG.

8/10/12 11:54 AM

Case 1:14-cv-00223-MJG   Document 9-1   Filed 03/28/14   Page 227 of 270

| Telephone-secretariat | Services | Social Media |
|---|---|---|
| Benefits | Business address | The SME blog |
| Immediately test | Credit Report | Facebook |
| Offer Calculator | Industry Solutions | Google + |
| And Price List | | Twitter |
| Entry-level package | | Xing |
| Standard Package | | |
| Professional Package | | |
| Weekend Package | | |
| | **Business** | **Support** |
| | Home | Terms and Conditions |
| | Contact | FAQ |
| | Cooperation | Privacy Policy |
| | Affiliate | Imprint |
| | Press | Lexicon |
| | Jobs | Sitemap |

**TUV tested**



Germany's largest office survey showed that poor telephone accessibility has a negative effect on customer relationships.

We are here for you - if you are not there - and beyond!

Our professional and nationwide phone service is the core competence of our company. In addition, we offer additional services, secretarial services - even in multiple languages - for business customers. We guarantee our customers a reliable business and personal secretarial services. With modern communication technology and trained professionals, we enable your company secretaries constantly available to your customers and business partners for your support as well as vacation and sick leave. With an inexpensive and attractive pricing model, we help you reduce your fixed costs. In addition to an affordable fee, you pay only for services actually provided and verifiable.

Bueroservice24.de also offers you an exclusive business address in Hamburg. Find out about our Hamburg business addresses .

Take advantage of our service Services for your business or yourself and contact us today so that we are there for your customers if it can not be themselves.

If you have further questions about the telephone office, the credit information or other products? Perhaps you can find in our FAQs that answer.

We thank the many customers who are already our telephone service or office service.

# EXHIBIT W



**Morgan Pietz <morganpietz@gmail.com>**

---

## Defendant Deposition Availability, 8:13-cv-3024, MD109

---

**Jon Hoppe** <JHoppe@mhhhlawfirm.com>                              Sat, Mar 1, 2014 at 5:23 PM
To: "Morgan E. Pietz" <mpietz@pietzlawfirm.com>
Cc: "John C. Lowe" <johnlowe@johnlowepc.com>

Dear Messrs. Pietz and Lowe:

I am interested in taking the deposition of your client in this case as soon as possible. Would you please contact me as soon as possible to set up an appropriate date for doing so?  If I do not hear from you shortly, I may have no other recourse than to act unilaterally on this issue. Thank you for your prompt attention to this matter.

Very truly yours,

Jon A. Hoppe, Esquire
Maddox, Hoppe, Hoofnagle & Hafey, L.L.C.
1401 Mercantile Lane #105
Largo, Maryland 20774
(301) 341-2580 (ph.)
(301) 341-5727 (fax)

---

The information contained in this electronic message is attorney privileged and confidential information intended only for the use of the individual or entity named above. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution or copy of this communication is strictly prohibited. If you have received this communication in error, please immediately notify the sender by telephone at the number printed above and return the original to the sender at the address printed above via electronic mail. Thank you.

---

3/25/14 10:31 PM

Exhibit W - 1

# <u>EXHIBIT X</u>

<u>EXHIBIT X</u>



**Morgan Pietz <morganpietz@gmail.com>**

## Malibu Media - D. Md. - 13-3024 - Deposition and Discovery re IPP "Oral Contingency Agreement"

3 messages

**Morgan E. Pietz** <mpietz@pietzlawfirm.com>                    Mon, Mar 3, 2014 at 2:02 PM
To: "Jon A. Hoppe" <jhoppe@mhhhlawfirm.com>
Cc: "John C. Lowe" <johnlowe@johnlowepc.com>

Jon,

Per our conversation  -- to confirm:

(1) I will get back to you regarding tentative date availability for a deposition of my client in this case, on Monday 3/31 or Tuesday 4/1.  If necessary, I will stipulate to extend the discovery deadline.

(2) Attached, please find a recent motion to exclude the testimony of IPP, on the ground that it comes from an expert (or fact) witness being impermissibly compensated on a contingent fee basis, filed in a Malibu case in Colorado, which will serve as a jumping off point for my further inquiry on this issue.  The verified discovery responses I mentioned from MM are attached as exhibits thereto.

As I explained, I would like a firm answer, under penalty of perjury, as to whether IPP was being compensated pursuant to an "oral contingency agreement" at the time it conducted the observations at issue in this case, and at the time it made its declaration which you used in support of your motion for early discovery.  I'd like to know what were the terms of the so-called "oral contingency agreement", when it stopped, and what are the current terms of the deal with IPP.

You made it very clear that you thought any attempt to investigate this issue would be bad faith on my part, and you would make a Rule 11 motion if I file any motion of any kind since your view is my client lacks standing to do anything other than have his deposition taken.  You further noted that you would not spend even one "split second" considering anything I sent you on this issue, and you threatened to make any cases we have together from here on out as unpleasant and as expensive as possible.

Respectfully, I disagree that this is bad faith or personally motivated on my part, and feel it is my duty to my client to investigate this issue, as the entire case against my client is apparently built upon compromised expert witness testimony that may very well be excluded.  You can review the attached motion for the law on that issue, at least as applicable in Colorado.

Since you are correct that my client is not yet a party to this suit, what I propose is making a motion to intervene and to propound early written discovery inquiring into the compensation structure for IPP.  I had offered that you could investigate and get back to me with something under oath saying this is all a big mistake, explaining why.  You refused, and said you would vigorously contest any attempt to make any inquiry into how IPP is compensated, as you think it is irrelevant, even though I noted that inquiries and impeachment as to how experts are compensated is essentially routine, par for the course trial practice.

If you change your mind, and want to try and explain, with something under oath, why the verified discovery responses previously served by your client about the "oral contingency agreement" are incorrect, there is indeed still a chance we can resolve this short of motion practice.  Note though, a declaration which says

Exhibit X - 1

'well, we don't do it anymore' which is how I read what your client tried to say before, is not going to be sufficient in my view.

Thus, absent a satisfactory explanation, I contemplate making a motion to be heard on this issue on an expedited time frame.  It occurs to me that if IPP's potential testimony is excluded, and its contribution to the complaint is stricken, then you have no basis to take my client's deposition.  As I mentioned, I am nevertheless willing to proceed with the deposition as scheduled, but in exchange I want some answers on this "oral contingency" issue to be similarly prioritized here for the first phase of pre-service discovery.  If your position is that you will refuse to engage on the IPP compensation issue, I may make a motion to stay my client's deposition pending resolution of the IPP issue.  Or, we can both get a round of limited discovery; you, the one hour deposition of my client; me, some answers to some limited written discovery on IPP's compensation structure.  Your choice; but discovery should not be a one-way street.

I hope that after you have had a chance to calm down, and the shock of this apparent revelation subsides, that we can manage to continue to work together in a professional manner.  Until today, I never had any cause to complain on that account as to our prior dealings.  And despite your insistence that 'everything is personal,' I hope you can see that, at least as far as I am concerned, this really is not.

Best regards,
Morgan


--

Morgan E. Pietz
THE PIETZ LAW FIRM
3770 Highland Ave., Ste. 206
Manhattan Beach, CA 90266
mpietz@pietzlawfirm.com
Ph: (310) 424-5557
Fx: (310) 546-5301
www.pietzlawfirm.com

---

**8 attachments**

 **Exhibit A.pdf**
379K

**Exhibit B.pdf**
366K

 **Exhibit C.pdf**
144K

**Exhibit D.pdf**
161K

 **Exhibit E.pdf**
114K

 **Exhibit F.pdf**
39K


**Kerr's Motion (Non-Comformed).pdf**
1296K


**Motion to Exclude FINAL.pdf**
92K

---

**Jon Hoppe** <JHoppe@mhhhlawfirm.com>                                   Mon, Mar 3, 2014 at 5:13 PM
To: "Morgan E. Pietz" <mpietz@pietzlawfirm.com>

Morgan:

Thank you for agreeing to set up a depostion of your client and get back to me about the date and tome of the same.

As to the entirely separate "issue" of the compensation of IPP, I will have a comprehensive response for you shortly. I am heatened somewhat by your suggestions that this "issue" might be resolved short of the waste of both our time and our clients' money on frivolous motions practice. I am initally disinclined to open the door to two-way preliminary discovery (particularly on the record in any case at bar) for reasons which I can briefly explain.

The preliminary discovery which my client has been granted in these matters is designed to resolve one issue only: whether the internet subscriber is the most likely actual infringer of my client's copyrighted material (and, if not, whom else might be the same). The preliminary discovery process is not designed to pre-litigate the sufficiency of the Complaint or the strength of any potential trial presentation of the same. Such "issues' are entirely premature until a John Doe defendant may be revealed, named and served. Your assertion that such discovery  is "kind of unfair" could not be further from the truth. To the contrary, the preliminary discovery process set out by the Maryland Court is designed entirely to protect the identity and reputation of the internet subscriber involved and to guard against any untoward or  coercive negotiation of the dispute.

Your criticism of my point of view on the nature and purpose of your raising this "issue" at this juncture of these matters is also entirely unfounded. Up until now, we have engaged in a number of matters in fruitful and professional discussion and negotiation of the real issues of whether the subscriber at issue is the actual infringer and if so, what is a fair compensation under which to settle. Your attempt now to suddenly use the preliminary discovery process already designed to protect your client to pre-litigate the case in chief clearly poison's the well of goodwill between us. Clearly, theft of copyrighted material is going on against my client's legally compensable interest on a grand scale. Your attempt to prevent that rightful compensation through clever argument and procedural manipulation is both professionally and morally reprehensible.

As to the response you expect to receive on the "issue" you have clearly prematurely raised, and as to your view of the sufficiency thereof, I think you are once again professionally off the mark. To the contrary, I should think that even in the absence of any statement under oath, you should be professionally willing to consider reference to clear statement of legal precedent that your attack on the sufficiency or admissibility of our evidence is either entirely premature or procedurally wronghealed. Assuming my presentation of such precedent to you, the same would be the basis of any Rule 11 Motion I might contemplate.

On the other hand, my client and/or his investigator may have or be willing to prepare an affidavit as to the nature of compensation between them and an explanation of how the same is either consistent or not with the discovery responses to which you refer. You provide no evidence of any response stating "well, we don't do that any more", so I wont respond directly to such a suggestion, except to note its disrespectfully perjorative tone. But in the event that such a document can and will be produced to you, the same would have to be presented with the strict understanding that we do not in any way concede your procedural right to the same

or any other information at this juncture of this or any other suit by my client regarding these matters. Our position remains - and must continue to be in all of these matters - that the role and function of internet subscribers and their counsel prior to the amendment of a Complaint and service of the same along with a Summons is to present themselves for deposition to determine whether such amendment and service will involve them. ==Under no circumstances will we consider the idea of making preliminary discovery in these cases a two-way street. It was not designed that way by the Court and for good reason.==

Finally, your unsolicited and off-hand remarks regarding my state of mind are entirely out of line and unprofessional. You flatter yourself, sir, if you think you can inflict shock upon me or in any way disturb my calmness or peace of mind. And you falsely and disingenuously flatter me by asserting that I can change the objective nature of human relations by not "taking" something personally. Your final sentence raises your self-flattery to superhuman levels, asserting that your "concern" can somehow change an objective fact of human relations. Perhaps if you can somehow obtain the mystical power to change one or the other of us into something not defined as a "person" you can render interactions between us not "personal".

In conclusion, I can concur with the sentiment expressed in the next to last sentence of your e-mail. Until now, I had no cause to complain about our ability to work together in a professional manner. That was, of course, before you elected to poison the well of goodwill between us with frivolous, too-clever-by-half, procedural manipulations and attempts to prematurely begin the general litigation of this matter. I hope that such tactics on your part will cease and we will be able to return to the professional and procedurally proper resolution of these matters.


Very truly yours,


Jon A. Hoppe, Esquire
Maddox, Hoppe, Hoofnagle & Hafey, L.L.C.
1401 Mercantile Lane #105
Largo, Maryland 20774
(301) 341-2580 (ph.)
(301) 341-5727 (fax)

---

The information contained in this electronic message is attorney privileged and confidential information intended only for the use of the individual or entity named above. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution or copy of this communication is strictly prohibited. If you have received this communication in error, please immediately notify the sender by telephone at the number printed above and return the original to the sender at the address printed above via electronic mail. Thank you.

---

**From:** morganpietz@gmail.com on behalf of Morgan E. Pietz
**Sent:** Mon 3/3/2014 5:02 PM
**To:** Jon Hoppe
**Cc:** John C. Lowe
**Subject:** Malibu Media - D. Md. - 13-3024 - Deposition and Discovery re IPP "Oral Contingency Agreement"

[Quoted text hidden]

---

**Morgan E. Pietz** <mpietz@pietzlawfirm.com>                    Mon, Mar 3, 2014 at 6:16 PM
To: Jon Hoppe <JHoppe@mhhhlawfirm.com>
Cc: "John C. Lowe" <johnlowe@johnlowepc.com>

Thanks, Jon.

Please send me something under oath, which details the full history of IPP and Fieser's compensation
arrangements, and explains the "oral contingency agreement" discovery response, and I will consider holding
off on a motion.  In terms of the kind of substantive answer which I consider insufficient, see Mr. Kotzker's
email attached as Exhibit C to the motion I sent you.

Best regards,
Morgan
[Quoted text hidden]

Exhibit X - 5

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:13-cv-02394-WYD-MEH

MALIBU MEDIA, LLC,

Plaintiff,

v.

JEREMIAH BENSON,

Defendant.

_____

**DEFENDANT'S MOTION TO EXCLUDE TESTIMONY AND EVIDENCE FROM IPP**
**INTERNATIONAL UG AND TOBIAS FEISER**
_____

Defendant, Jeremiah Benson, through undersigned counsel, hereby moves for an order

excluding all testimony and evidence from IPP International UG and Tobias Feiser (collectively

"IPP"). Plaintiff also respectfully requests that, Plaintiff Malibu Media disclose all past and present

fee agreements between Plaintiff, its counsel and IPP. In support of the requests, Defendant states

as follows:

**BRIEF IN SUPPORT**

Plaintiff, Malibu Media ("Malibu") is a prolific copyright litigant. In the last three years

alone, Malibu has filed approximately 1773 copyright lawsuits nationwide, with 308 of those suits

being filed in this Court alone. In every instance, these lawsuits are supported by evidence provided

by the German firm IPP. (*See e.g.* Amended Complaint ¶¶ 16-17, 19-20; Exhibits A-B; Docket.

No. 16; *see also* Affidavit of Tobias Feiser in support of Motion for Leave to Take Early

Discovery; Dck. No. 7 Exhibit D.)  However, what has not disclosed to this, or any other Court is

that IPP is a financially interested party. Specifically, in each of the above referenced cases IPP

supplied evidence to Malibu pursuant to an "oral contingency agreement" with its national counsel

1

Exhibit X - 6

Keith Lipscomb, of the Miami based law firm Lipscomb, Eisenberg & Baker, P.L.  IPP's actions as a contingent-fee witness are contrary to common law principles, public policy, the ABA Model and Colorado Rules of Professional Conduct as well as the Federal Anti-Gratuity Statute.  For these reasons, IPP should not be allowed to offer evidence or testimony in this case. In addition, Malibu should be ordered to disclose to the Defendant, this Court, and any other court in which it has filed a lawsuit using evidence provided by IPP, all past and present fee agreements between Plaintiffs, its counsel and IPP for review and other appropriate judicial action.

## FACTUAL BACKGROUND

IPP is a German based company that provides services that involve the "track[ing] and monitor[ing of] illegal propagators within [BitTorrent] networks."[1] Malibu's lawsuits are supported by evidence provided by IPP, and in particular IPP employee Tobias Feiser. (*See e.g.* Amended Complaint ¶¶ 16-17, 19-20; Exhibits A-B; *see also* Affidavit of Tobias Feiser in support of Motion for Leave to Take Early Discovery; Dck. No. 7 Exhibit D.) In an identical copyright infringement case in a separate jurisdiction Malibu, certified under penalty of perjury that IPP is paid only based on a contingent of settlement proceeds. Specifically, Malibu admitted the following:

> **Interrogatory No. 1**: Please identify all . . . business entities that have an interest, financially, or otherwise, in this litigation, including, . . . forensic consultants, and/or witnesses, . .. and specifically and in detail describe the nature of the interest.

> **Response to Interrogatory No. 1**: . . . IPP International UG, is a fact witness who will testify that its technology detected that a person using Defendant's IP address was downloading and distributing Plaintiff's copyrighted works. **Pursuant to an oral contingency fee agreement, IPP International UG is entitled to a small portion of the proceeds from the resolution of this case in consideration for the services it provides.**

---

[1] *See* www.ippint.de/index.php?option=com_content&view=article&id=3&Itemid=3 (accessed Jan. 29, 2014).

Exhibit X - 7

(*See* Exhibit A – Verified Response No. 1).  In response to an Interrogatory in another identical federal lawsuit, Malibu admitted that "[it] and IPP International UG have an oral agreement that was formed approximately 2.5 years ago "negotiated the terms of [Malibu]'s agreement with IPP." (Exhibit B – Verified Response No's. 4-5).  Again, Malibu admitted that that its national counsel M. Keith Lipscomb, of the Miami based law firm Lipscomb, Eisenberg & Baker, P.L "negotiated the terms of Plaintiff's agreement with IPP International UG" and that IPP is "entitled to a small portion of the proceeds from the resolution of this case in consideration for the services it provided." *Id*. Finally, Malibu has repeatedly identified in court filings that IPP is "a fact witness who will testify that its technology detected that a person using Defendant's IP address was downloading and distributing Plaintiff's copyrighted works."[2] (*See* Exhibit A – Verified Response No. 1).

In response to this information, Defendant's counsel sought clarification from Malibu's local counsel as to the Malibu's fee agreement with IPP. (Exhibit C) Malibu's response however was completely contrary to the above referenced statements provided under penalty of perjury by Malibu's representative Colette Field, and submitted by its counsel pursuant to F.R.C.P. 11. *Id*. Defendant's counsel sought additional assurances, such as a simple declaration from Mrs. Field for example, or even Mr. Lipscomb. *Id*. Malibu never responded to this request. More telling perhaps is the fact that despite being ordered by the Honorable Geraldine S. Brown of the U.S. District Court for the Northern District of Illinois to disclose the nature and terms of this "oral

---

[2] The reference to IPP's "technology" would indicate that it is not as much a fact witness as an expert witness. However, it is likely that such designation was applied to IPP so as to avoid the need for drafting an expert report under Fed. R. Civ. P. 26.

Exhibit X - 8

contingency agreement," Malibu has steadfastly refused and now stands under the threat of a motion for show cause why it should not be held in contempt. (See Exhibit D).

## LEGAL ARGUMENT

## I.  ALL EVIDENCE FROM IPP SHOULD BE EXCLUDED

### a.  CONTINGENCY BASED COMPENSATION OF WITNESSES IS CONTRARY TO COMMON LAW PRINCIPLES, PUBLIC POLICY AND SUBJECT TO EXCLUSION

Relying on the common law and the court's authority to forestall violations of ethical principles, many jurisdictions have held that testimony of witnesses whose compensation is contingent upon the outcome of the case must be excluded. See, e.g., *United States v. Singleton*, 144 F.3d 1343, 1347 (10th Cir. 1998) (contracts to pay fact witnesses are void as violative of public policy), vacated on other grounds, 165 F.3d 1297 (10th Cir.), cert. denied, 119 S. Ct. 2371 (1999); *see also, Hamilton v. General Motors Corp.*, 490 F.2d 223, 228-229 (7th Cir. 1973) (holding that paying fact witnesses for testimony is against public policy and refusing to allow payment for testimony); *Followwill v. Merit Energy Co.*, 2005 WL 5988695, at *1 (D. Wyo. Apr. 11, 2005) (granting defendants' motion to exclude plaintiffs' expert witness and strike his expert report because the witness was paid on a contingency basis).[3]

---

[3] *See also Straughter v. Raymond*, 2011 U.S. Dist. LEXIS 53195, at *9-10 (C.D. Cal. May 9, 2011) (excluding expert witness compensated pursuant to a contingency fee); *see also e.g. Caldwell v. Cablevision Sys. Corp.*, 984 N.E.2d 909, 912, 960 N.Y.S.2d 711 (N.Y. 2013) ("What is not permitted and, in fact, is against public policy, is any agreement to pay a fact witness in exchange for favorable testimony, where such payment is contingent upon the success of a party to the litigation."); *Westin Tucson Hotel Co. v. State*, 936 P.2d 183, 190 (Ariz. App. 1997)("…a contract providing for compensation of a witness contingent on the success of the litigation is subversive of public justice for the reason that his evidence may be improperly influenced. Public policy considerations brand such a contract illegal."), *In re Schapiro*, 128 N.Y.S. 852, 858 (N.Y. App. Div. 1911) ("A witness who . . . receives compensation or a promise of compensation for giving his testimony is necessarily a discredited witness."); *Reffett v. C. I. R.*, 39 T.C. 869, 878 (1963) ("[I]t seems to be a rather generally accepted rule that all agreements to pay witnesses extra compensation contingent on the success of the lawsuit are against public policy whether the agreement is with an ordinary witness, an expert witness, or a witness who cannot be compelled to testify, because such agreements constitute a direct temptation to commit perjury."). *Ouimet v. USAA Casualty Ins. Co.*, 2004 U.S. Dist. LEXIS 31199, 2004 WL 5865274, at *2 (C.D. Cal. Jul. 14, 2004) (excluding expert's testimony, in part, because it "would run directly afoul of [Rule 5-310 of the California Rules of Professional Conduct], as her compensation under the contingency fee agreement depends upon the outcome of the case."); *Farmer v. Ramsay*, 159 F. Supp. 2d 873, 883 (D. Md. 2001) (granting motion to strike reports of expert retained under contingency fee arrangement), aff'd on other grounds, 43 Fed. App'x 547 (4th Cir. 2002); *Cosgrove v. Sears Roebuck & Co.*, 1987 U.S. Dist. LEXIS 11696, 1987 WL 33595,

4

Exhibit X - 9

On the face of its discovery responses, Malibu admits under penalty of perjury that IPP is being paid on a contingent basis. (*See* Ex's A and B). IPP will make money only if this case is resolved positively for Malibu. Further, the amount of money IPP will make is contingent on the proceeds received in settlement or collected in judgment. Such an arrangement is contrary to public policy and common law principles that hold such agreements void on their face and an affront to the integrity of the judicial system by turning third parties into both a witness and a "de facto" financially interested Plaintiff. *See e.g. Commonwealth v. Miranda*, 458 Mass. 100, 934 N.E.2d 222, 229 n.15 (Mass. 2010) ("[c]ompensation to fact witnesses  is said to violate the integrity of the judicial system, to undermine the proper administration of justice, and to be contrary to a witness's solemn and fundamental duty to tell the truth."). While the common law torts of maintenance no longer exist in Colorado, *Fastenau v. Engel*, 125 Colo. 119, 122 (Colo. 1952), such quasi barratrous and/or champertous financial arrangement should not be endorsed by this Court and evidence from IPP should be stricken from the record and excluded going forward.

    b.   Contingency Based Compensation Of Witnesses Violates the Rules Of Professional Conduct

While an issue of apparent first impression in this District, some trial courts have precluded improperly paid witnesses because their payment violates ethical rules. See, e.g., *Golden Door Jewelry Creations, Inc. v. Lloyds Underwriters Non-Marine Ass'n*, 865 F. Supp. 1516, 1526 (S.D. Fla. 1994) (excluding fact witness as a sanction where lawyer "violated the very heart of the integrity of the justice system"). Moreover, model and state based ethical rules have long

---

at *1-2 (S.D.N.Y. Dec. 21, 1987) (precluding testimony of expert witness paid on contingency fee basis, but allowing party sixty days to designate new expert witness); *In re SMTC Mfg.*, 421 B.R. 251, 264 n.2 (W.D. Tex. Bankr. 2009) (noting prior dismissal of expert witness retained under contingency fee arrangement); *cf. Accrued Fin. Servs., Inc. v. Prime Retail, Inc.*, 298 F.3d 291, 300 (4th Cir. 2002) (holding that to the extent  that employees of financial auditing company planned to testify as experts, company was improperly offering expert testimony for contingent fee in violation of public policy).

Exhibit X - 10

# EXHIBIT Y



**Morgan Pietz <morganpietz@gmail.com>**

## Malibu Media v. Doe 8:13-cv-3024; MD109

**Jon Hoppe** <JHoppe@mhhhlawfirm.com>                    Thu, Mar 6, 2014 at 8:28 PM
To: morganpietz@gmail.com

Morgan,

Our investigation on this case has revealed that your client may be living with roommates who could be responsible for the infringement. This is why we intended to schedule the deposition. The same might very well have led to the need to move for leave to depose one or more of your client's roommates. Unfortunately, looking at the calendar for this case, our client is up against its second Rule 4(m) deadline to serve the Summons and Complaint. From my experience, Maryland judges have not always been amenable to multiple extensions of the Rule 4(m) deadline. And in this case, I can't see us agreeing on a protective order for my client (who will not hand over confidential information about its contracts without one), providing you declarations, contracts, and other information, and getting through the depositions in any sort of timely fashion that would allow us to proceed and serve reasonably quickly.


For that reason, instead of continuing on and accruing more attorney's fees on this case only for it to be dismissed for failure to serve in time, my client has dismissed the case. Please be aware that in the future, my client plans on resolving these issues with you and your clients in a timely fashion and will proceed. Unfortunately in this case the timing was against us.

Very truly yours,


Jon A. Hoppe, Esquire
Maddox, Hoppe, Hoofnagle & Hafey, L.L.C.
1401 Mercantile Lane #105
Largo, Maryland 20774
(301) 341-2580 (ph.)
(301) 341-5727 (fax)

The information contained in this electronic message is attorney privileged and confidential information intended only for the use of the individual or entity named above. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution or copy of this communication is strictly prohibited. If you have received this communication in error, please immediately notify the sender by telephone at the number printed above and return the original to the sender at the address printed above via electronic mail. Thank you.

Exhibit Y - 1

# EXHIBIT Z

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:13-cv-02394-WYD-MEH

MALIBU MEDIA, LLC,

      Plaintiff,

v.

JEREMIAH BENSON,

      Defendant.

_____/

**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION
TO EXCLUDE TESTIMONY AND EVIDENCE FROM IPP INTERNATIONAL UG
AND TOBIAS FEISER [CM/ECF23]**

Exhibit Z - 1

## I.   INTRODUCTION

Defendant's Motion to Exclude Testimony and Evidence from IPP international UG and Tobias Fieser (CM/ECF 27) ("the Motion") correctly asserts that Malibu Media, LLC ("Malibu") paid IPP International UG ("IPP"), for its data collection services.   From these facts, Defendant erroneously argues that the physical evidence obtained by IPP is inadmissible and that IPP's employee should be precluded from testifying.   While not titled as such, it is a Motion *in Limine* seeking to exclude relevant evidence and testimony.   Paying a service provider to record a computer is not a basis under the Federal Rules of Evidence to exclude relevant evidence and testimony.

## II.   FACTUAL BACKGROUND

   A.   The Data Evidencing The Infringement Is *Not* Capable of Being Manipulated By Humans

Defendant's entire argument is premised on the possibility of witness bias based upon Malibu's payment for IPP's services.   As explained below, the evidence that Malibu uses for purposes of proving infringement occurred is *recorded* in such way that it is *not* capable of being manipulated or altered.   Humans play no part in the creation or storage of the evidence. Significantly, the evidence can be independently verified by anyone – including Defendant. Indeed, in preparation of this response, Plaintiff independently verified that the evidence is correct.   Consequently, there is no possibility of biased testimony.   The fact section explains why this paragraph is true.

   1.   A Very Short Explanation of How BitTorrent Works

To understand the evidence upon which Plaintiff relies, there are two important things to address about the way BitTorrent works: (a) peers in a BitTorrent swarm connect to each other's computers in order to transmit "pieces" of a computer file (here, the computer files transmitted

1

contain copies of Plaintiff's works); and (b) every "piece" of the computer file – and the entire computer file – being transmitted via BitTorrent has its own *unique* hash value.   Hash values are digital fingerprints for pieces of data.[1]   Hash values are more reliable than DNA evidence.   *See* FN1.   A hash value is calculated.   Regardless of who calculates the hash value of any certain piece of data, the hash value for that certain piece of data will always be the same.[2]

### 2.   A 10,000 Foot Overview of the Data Collection System Used By IPP

The data collection system used by IPP has numerous components.   It contains, *inter alia*: (1) a proprietary BitTorrent Client[3]; (2) servers running a MySQL database which log verified infringing transactions; (3) packet analyzers, also known as packet sniffers, which create and analyze PCAPs; (4) servers that run the proprietary BitTorrent Client and record PCAPs; (5) WORM ("Write Once Read Many") tape drives for storing the PCAPs and MySQL server data; (6) a program to synchronize the servers' clocks with both a GPS clock and an atom clock[4]; (7) a proprietary program for checking the MySQL log files against the contents of the PCAPs; and (8) a proprietary program which checks the information contained in an Excel Spreadsheet

---

[1] See Exhibit A, citing numerous district and appellate court decisions describing hash values and finding that they are reliable unique identifiers for data akin to digital fingerprints.

[2] *See* Composite Exhibit B, which is an article explaining that hash values can be calculated and websites advertising commercially available free hash calculators.

[3] In other words, a software program that enables the BitTorrent protocol to work.   The BitTorrent Client used by Excipio is not commercially available and its code is a trade secret.   Patzer, at ¶ 6.   It was written to overcome the unique challenges of entering into a massive number of BitTorrent transactions with a massive number of people without distributing data.   *Id.*, at ¶ 7.

[4] If the servers are not synchronized with both the GPS clock and atom clock to within one hundredth of a second the infringing transaction is not logged but instead disregarded.  Patzer, at ¶ 8.

[2] *See* Composite Exhibit B, which is an article explaining that hash values can be calculated and websites advertising commercially available free hash calculators.

[3] *See* Exhibit B, Wikipedia Article on a Packet Analyzer code is a trade secret.   Patzer, at ¶ 6.   It was written to overcome the unique challenges of entering into a massive number of BitTorrent transactions with a massive number of people without distributing data.   *Id.*, at ¶ 7.

[4] If the servers are not synchronized with both the GPS clock and atom clock to within one hundredth of a second the infringing transaction is not logged but instead disregarded.  Patzer, at ¶ 8.

against what is in the PCAPs and server's log files.  *See* Patzer Declaration, at ¶ 5, Exhibit K;

and Exhibit C, Mr. Fieser's testimony during the Bellwether Trial transcript at p. 100.

### 3. The Evidence Produced By the Data Collection System Is Independently Verifiable

The *evidence* that the data collection system produces is comprised of PCAP computer

files and MySQL server log files.  Each entry on the MySQL log file correlates to a specific

PCAP file.  Patzer, at ¶ 9.

### a. PCAP Computer Files Are Independently Variable

Data sent through the internet is delivered in the form of "packets" of information.[5]

PCAP stands for "Packet Capture."  A PCAP is a computer file containing captured or recorded

data being transmitted between two computers.[6]  A "Packet Analyzer" records packets of data

being transmitted between two computers over a network, such as the internet, and saves it in a

computer file called a PCAP.[7]  Packet analyzers also enable users to read and analyze PCAPs.

IPP's data collection system uses a proprietary packet analyzer *and* TCPDump to record the

*entire* infringing transaction.  TCPDump is an open source free packet analyzer.[8]

### (i) Anyone Who Downloads TCPDump – For Free – Can Review and Verify the Infringing Transaction

*Anyone* who downloads TCPDump – for free – can review and verify the entire

transmission of a piece of Malibu's copyrighted work from Defendant's IP address.  The proof

of infringement is a PCAP *recording* of Defendant's IP Address *sending* a piece of the

copyrighted work to the MySQL server.  The PCAP recording speaks for itself.  Testimony

---

[5] *See* Exhibit D, Wikipedia Article on "Internet Protocol," at paragraph 2.
[6] *See* Exhibit E, Wikipedia Article on "PCAP."
[7] *See* Exhibit F, Wikipedia Article on "Packet Analyzer."
[8] http://www.tcpdump.org/#

about what is contained in the PCAP can be elicited at trial by either IPP's employee, Mr. Fieser, Malibu's computer forensic expert Mr. Patrick Paige, Excipio's independent contractor, Mr. Michael Patzer, or via a demonstration during trial by any other witness. The demonstration would merely require the witness to install TCPDump so that he or she could read and analyze the PCAP. Here, in preparation of its response to this motion, Plaintiff's attorneys asked Michael Patzer, an individual who does not work for IPP, to examine the evidence, without compensation. Mr. Patzer independently reviewed the PCAPs in this case and confirmed that the PCAPS recorded Defendant's IP address infringing Plaintiff's copyrighted works at the exact Hit Dates and UTC times listed on Exhibit A to Plaintiff's Complaint. Patzer, at ¶ 13.

b. Every Entry Onto the MySQL Server Log File Correlates To a PCAP

Defendant sent the investigative server numerous "pieces" of each one of the computer files that contain a copy of Malibu's works. Accordingly, TCPDump recorded numerous BitTorrent transactions for each infringing computer file. *See* Exhibit G. Each one of these transactions was logged in a MySQL log file *and* fully recorded as a PCAP. Significantly, every entry on the MySQL server log file correlates to a specific PCAP. Patzer, at ¶ 9. Both the MySQL log file and the PCAP are computer records.

4. The PCAP and Log Files Are Saved on an Uneditable WORM ("Write Once Read Many") Tape Drive

"Write once read many (WORM) describes a data storage device in which information, once written, cannot be modified. This write protection affords the assurance that the data cannot be tampered with once it is written to the device."[9] Both the PCAPs and log files are saved onto WORM tape drives. Patzer, at ¶ 10. There is no possibility that the information on these WORM drives can be edited. *Id.,* at ¶ 11. Further, each of the WORM tape drives is

_____

[9] *See* Exhibit H, Wikipedia article entitled "Write once read many."

4

electronically stamped with a German government issued time stamp at least every twenty four hours. *Id.,* at ¶ 12.

**PCAP CREATION AND STORAGE FLOW-CHART**



Exhibit Z - 6

B.    A Short Summary of Mr. Fieser's Possible Testimony

Mr. Fieser is the only employee of IPP who *may* testify.  His testimony is unnecessary. Therefore, Malibu will *not* likely call Mr. Fieser.  What follows is a short summary of what Mr. Fieser would say if Malibu calls him.

Tobias Fieser is a salaried employee of IPP.  Fieser Declaration, at ¶ 4, Exhibit L.  He does not have an ownership interest in IPP nor any other entity involved in or affiliated with IPP's data collection system.  *Id.*, at ¶ 6.  Mr. Fieser is not being paid for his testimony and does not have the right to receive any portion of a settlement or judgment in Plaintiff's favor.[10]  *Id., at* ¶ 7.

Mr. Fieser has three primary functions at IPP: (1) verify that the BitTorrent computer files as evidenced by their unique hash values are copies of the original works; (2) extract the MySQL server data and make it available to IPP's clients, here Malibu's counsel; and (3) upload a declaration prepared by IPP's clients' counsel (in this case Malibu's attorney) into a computer program and sign a declaration if a green light appears.[11]  *See* Exhibit C, Mr. Fieser's testimony during the Bellwether Trial transcript at pp. 92, 100.  The computer program verifies the attested to infringement data is contained in the servers' MySQL log files.  This ensures it has not been altered by counsel during the suit formation process.  *Id.*

1.    Mr. Fieser Does Not Need to Testify That the Computer Files Transmitted Via BitTorrent Are Copies Because Anyone Can Do That

---

[10] Malibu would reimburse IPP for Mr. Fieser's travel and lodging costs and pay IPP a reasonable flat daily rate fee for Mr. Fieser's time away from work.

[11] Each month approximately 80,000 U.S. citizens infringe Malibu's copyrighted works.  Malibu's counsel culls through this infringement data received by IPP and sues 100-150 of the worst-of-the-worst infringers.  To identify potential defendants, Malibu's counsel analyzes various things such as length of infringement, number of infringed works, and evidence of third party infringements the content of which can be used to identify a specific person.  After using IPP's infringement data counsel sends it back as formatted declarations.

6

Mr. Fieser does not need to testify that the computer files transmitted via BitTorrent are copies of Malibu's movies.  To explain, the computer files have *unique* cryptographic hash values and are playable movie files.  Accordingly, anyone can watch the BitTorrent computer file copy and compare it to the original for purposes of ascertaining whether it is a copy.  For this reason, in all other recent matters around the country which have approached trial, opposing counsel has stipulated that the computer files contain copies.  If opposing counsel will not so stipulate then Malibu will ask this Court to take judicial notice.  Judicial notice is appropriate under rule Fed. R. Evid. 201(b) because it is "a fact that is not subject to reasonable dispute [and] . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."  A stipulation or judicial notice is particularly appropriate because the movies contain adult content.  Consequently, it may be uncomfortable or distracting for jurors to watch them.  Nevertheless, in the absence of a stipulation or judicial notice, Malibu could have Patrick Paige, its expert witness, Plaintiff's principle, or Mr. Patzer calculate the hash values of the subject computer files at or before trial and play the copy and original in a split screen. This proves A is a copy of B.

> 2. <u>Mr. Fieser is Not the Witness Malibu Will Call to Authenticate the Infringement Data at Trial or to Lay the Foundation For its Introduction</u>

At trial, Malibu will call Mr. Patzer to testify that the PCAPs and MySQL log files contain evidence that proves that an infringement was committed by a person using Defendant's IP Address.  Malibu will not use Mr. Fieser for this purpose because he will not be able to establish the chain of custody to the PCAP.  To explain, Mr. Patzer, not Mr. Fieser, restores the PCAPs saved onto the WORM tape drives and makes forensically sound copies of them for use at trial.  Thus, only Mr. Patzer can testify to the chain of custody.

C.      A Very Short Explanation of Michael Patzer's Anticipated Testimony

Michael Patzer works as an independent contractor predominantly for Excipio GmbH, a German company.  Patzer, at ¶ 2.  Excipio contracts with IPP to provide IPP with the data collection system that IPP uses to detect infringement of Malibu's works.[12]  *Id.*, at ¶ 4.  Mr. Patzer designed, implemented, maintains and monitors the data collection system that Excipio both owns and uses to identify the IP addresses used by people to commit copyright infringement via the BitTorrent protocol.  *Id.*, at ¶ 3.  *See also* Exhibit I, Mr. Patzer's testimony during the Bellwether Trial transcript at p. 54.  No one at Excipio has an ownership in IPP or vice versa. *Id.*, at ¶ 14.  Mr. Patzer does not have an ownership interest in Excipio.  *Id.,* at ¶ 15.  He is not paid for his testimony and is not entitled to any portion of any money received from a settlement or judgment in Malibu's favor.[13]  *Id.,* at ¶ 16.  Malibu has never paid Excipio or Mr. Patzer anything.  *Id.,* at ¶ 16.

Mr. Patzer will answer all of the questions necessary to lay the foundation for the introduction into evidence of the PCAP and MySQL log files as business records within the meaning of Fed. R. Evid. 803(6).  Further, he will answer all of the questions necessary to authenticate the PCAP and MySQL log files pursuant to Fed. R. Evid. 901(a).  Finally, Mr. Patzer will testify that the PCAPs are recordings of computer transactions during which a person using IP Address 76.25.62.43 sent pieces of the infringing computer files to the servers that he personally maintains and monitors.

---

[12] IPP used to maintain and operate and use its own system.  At some time unknown to Malibu, but well in advance of any of the infringement that was logged in this case, IPP entered into a license agreement with Excipio to use its system.  The two companies now both compete with each other and are licensor-licensee. Under this arrangement, IPP licenses the use of Excipio's system and servers.  Patzer, at ¶ 3. IPP adds value and distinguishes itself by, *inter alia*, customer specific analysis tools and its client service.

[13] Malibu does intend to reimburse Excipio for Mr. Patzer's travel and lodging cost and pay a reasonable flat daily rate fee for Mr. Patzer's time away from work.

Exhibit Z - 9

D.    Patrick Paige Tested the Data Collection System

Malibu's computer forensic expert, Patrick Paige, tested the data collection system.  His report is attached as Exhibit J.  His test involved seeding public domain movies, i.e. movies that are not protected by copyright.  *See* Exhibit J.  He gave IPP the titles of the works.  *Id.*  IPP, using Excipio's system, found the works and entered into BitTorrent transactions with Mr. Paige's test servers.  *Id.*  Mr. Paige used a packet analyzer on his test servers to record all of the transactions in PCAPs.  *Id.*  He compared the PCAPs he recorded during the transactions with the PCAPs that were recorded by IPP using Excipio's system.  *Id.*  They matched perfectly.  *Id.* This could not happen unless Excipio's system accurately created PCAPs of transactions.  *Id.*

E.    Judge Baylson Found the Data Collection System Was Valid

Judge Baylson presided over the Bellwether trial wherein Malibu was the first ever Plaintiff to try a BitTorrent copyright infringement case.  At the trial, Judge Baylson had an independent court appointed computer expert in attendance.  After the trial, Judge Baylson found that IPP's data collection system "is valid."  *See Malibu Media, LLC v. John Does 1, 6, 13, 14*, 950 F. Supp. 2d 779, 782 (E.D. Pa. 2013) ("Malibu [] expended considerable effort and expense to determine the IP addresses of the infringing parties, and the technology employed by its consultants . . . was valid.")

F.    Defendant Can Retain An Expert to Test the Data Collection System

Defendant has the right to hire an expert to test the data collection system.  Defendant has chosen instead to attack the data collection system based upon unfounded speculation about the potential for biased testimony.  Defendant's attack does not specify how the system may be flawed or how testimony that merely reads computer records can be biased.  This is no surprise because there is no possibility for biased testimony.

G.    Malibu and IPP Have a Written Fixed Fee Agreement

Malibu and IPP have a written fixed fee agreement pursuant to which Malibu pays IPP for providing the service of collecting data about infringements. Field, at ¶ 8. IPP has not been paid anything for this case. Fieser, at ¶ 10. Malibu's prior oral agreement with IPP to pay IPP a small portion of the amount received from a settlement or judgment from Malibu's litigation does not apply to this case. Field, at ¶ 7. Malibu has never paid *any* fact witness to testify in this case or any other case. *Id.*, at ¶ 9.[14]

## III.    ARGUMENT

A.    Malibu is Permitted to Pay For Data Collection Services

Malibu has not paid nor offered to pay any individual for testimony. The fee Malibu pays IPP is for data collection services. Paying IPP for data collection services is neither unethical nor prohibited by law. "[P]arties are free to pay individuals, including fact witnesses, for providing information and assisting with litigation, so long as the payment is not for their testimony." *Armenian Assembly of Am., Inc. v. Cafesjian*, 924 F. Supp. 2d 183, 194 (D.D.C. 2013). "[T]his Court is unaware of any authority that interprets Rule 4-3.4(b) as barring counsel from compensating someone for their efforts in collecting evidence." *Platypus Wear, Inc. v. Horizonte Fabricacao Distribuicao Importacao Exportacao Ltda*, 2010 WL 625356 (S.D. Fla. 2010). "[T]he court concludes that [defendant] and its counsel paid [the witness] only for time spent in connection with the litigation process." *Centennial Mgmt. Servs., Inc. v. Axa Re Vie*, 193 F.R.D. 671, 679 (D. Kan. 2000). "Anyone has a right, when threatened with litigation, or desiring himself to sue, to employ assistance with a view of ascertaining facts as they exist, and to hunt up and procure the presence of witnesses who know of facts and will testify to them." *Hare v. McGue*, 178 Cal. 740, 742, 174 P. 663, 664 (1918). At significant expense, IPP provides

---

[14] Malibu pays Mr. Paige, an expert, an hourly rate to prepare for and appear at legal proceedings.

Malibu with labor and a data collection service.  Malibu Media is permitted to pay IPP for its service.

B.      No Witness Has Ever Been Paid For Testimony Much Less on a Contingent Basis

Defendant erroneously conflates Malibu's proper payment to IPP for its data collection services with the false allegation that Malibu paid Tobias Fieser for testimony.  Mr. Fieser is a salaried non-equity owning employee of IPP.  Fieser, at ¶¶ 4, 7.  Malibu has never paid nor offered to pay Mr. Fieser anything.  *Id.*, at ¶ 11.  When, as here, "[i]t is clear that the [individual] himself, as a witness, is not eligible to receive compensation for his testimony . . . [the] case does not even involve the payment of a fee to a witness."  *People v. McNeill*, 316 Ill. App. 3d 304, 306, 736 N.E.2d 703, 705 (Ill. App. Ct. 2000).  In *McNeil,* the witness's employer's compensation was contingent on the outcome of the case.  Like here, however, the witness was not paid for his testimony.  The *McNeil* Court refused to exclude the witness and opined that the defendant could always attempt to impeach the witness's credibility on the basis that his employer had a contingent interest in the case.

C.      Even if Malibu Had Paid a Witness on a Contingency That Witness's Testimony Should Not be Excluded

"The *per se* exclusion of whole categories of evidence is disfavored by the Federal Rules of Evidence.  It is a fundamental tenet of those rules that, with few exceptions, 'all relevant evidence is admissible,' Fed. R. Evid. 402, and 'every person is competent to be a witness,' Fed. R. Evid. 601."  *U.S. v. Cervantes-Pacheco*, 826 F.2d 310, 315 (5th Cir. 1987) (refusing to prevent the federal government's confidential informant from testifying even though the federal government had offered the confidential informant *contingent* compensation for his testimony.) Notably absent from Fed. R. Evid. 402 and 601 is that a witness be disinterested or uncompensated in order to be permitted to testify.

11

Consistent with the foregoing, "the 'assumption that interested witnesses necessarily lie or that disqualification is the best way to deal with the threat of perjury' has been rejected." *Just In Case Bus. Lighthouse, LLC v. Murray*, 2013 COA 112, (Colo. App. 2013) citing 27 Charles A. Wright & Victor J. Gold, *Federal Practice & Procedure* § 6005, at 69 (2007).  The court in *Just in Case Bus. Lighthouse* also noted that "under CRE 601, per se exclusion of testimony is disfavored", "the potentially corrupting effect of contingent compensation implicates credibility, but does not involve competency" and "questions relating to the credibility of a witness and the weight to be accorded the testimony of a witness are matters to be resolved solely by the jury". *Id.* at *4-*5.

Here, there has been no bad faith by Plaintiff or Plaintiff's counsel.  Defendant's motion relies on incidents that happened outside this case.  Further, Plaintiff's counsel has informed undersigned that all of the discovery regarding this issue was provided to opposing counsel in the case in the Northern District of Illinois before the Honorable Judge Brown.  *See* CM/EF 23 at *3. Finally, even if Plaintiff's agreement with IPP was improper, *which it is not*, it does not violate Colorado Rule of Professional Conduct 3.4(b) because undersigned did not negotiate the agreement and IPP has not been paid anything for this case.

> D.   Malibu Did Not Violate the Federal Anti-Gratuity Statute But Even if it Had That Would Not Be a Basis For Excluding Evidence or Testimony

Defendant's assertion that Malibu violated 18 U.S.C. § 201(c)(2) – which prohibits knowingly paying a person to testify – is  baseless.  First, Plaintiff has an agreement to pay IPP for its data collection efforts.  It does not pay Mr. Fieser nor does it pay IPP for Mr. Fieser's testimony. *Centennial Mgmt. Servs., Inc. v. Axa Re Vie*, 193 F.R.D. 671, 681 (D. Kan. 2000) ("the court has concluded, based on the evidence before it, that neither [defendant] nor its counsel paid money to [witness] 'for' or 'because of' his testimony. Accordingly, the court must

Exhibit Z - 13

conclude that no violation of section 201(c)(2) occurred."  Second, Mr. Fieser's testimony is truthful.  Therefore, 18 U.S.C. § 201(c)(2) does not apply.  *Golden Door Jewelry Creations, Inc. v. Lloyds Underwriters Non-Marine Ass'n*, 865 F. Supp. 1516, 1524 (S.D. Fla. 1994) ("Because there is no evidence in the record that the testimony elicited through [Defendant's] monetary inducements was false testimony, the Court concludes that the evidence does not support a violation of § 201(c)(2).")

Third, and most significantly here, 18 U.S.C. § 201 is a criminal statute *not* an evidentiary rule of exclusion.  Indeed, even if testimony is proffered which violates 18 U.S.C. § 201(c)(2) the testimony should not be excluded under Fed. R. Evid. 403 or any other rule because "exclusion confers windfalls on the guilty," and "a jury should be competent to discount appropriately testimony given under a powerful inducement to lie." *United States v. Dawson*, 425 F.3d 389, 394 (7th Cir. 2005).

E.  Malibu's Motion for Leave Did Not Violate Colorado Rule of Professional Conduct 3.3(d)

Defendant erroneously argues that undersigned violated the Colorado Rules of Professional Conduct because "Malibu plainly knew that its fee arrangement with IPP could subject the evidence to exclusion, or at a minimum increased scrutiny into its credibility." CM/ECF 23, at p. 11.  Defendant further states that "Malibu failed to disclose that IPP was and is being illegally and/or unethically compensated.  Even if such testimony were not excluded out of hand, this Court should have at least had the opportunity to judge the credibility and weight of the evidence prior to its grant of early discovery."  *Id.*

"The object of an ex parte proceeding is [] to yield a substantially just result."  Colo RPC 3.3 (2012), at Comment 14.  This is accomplished by an attorney's duty to "make disclosures of material facts known to the lawyer and that the lawyer reasonably believes are necessary to an

13

informed decision." *Id.*  Here, the Court's only decision with regard to Plaintiff's ex parte motion, was limited to whether or not Plaintiff had demonstrated that "good cause" existed for it to serve early discovery on Defendant's ISP to uncover Defendant's identity.   The good cause standard examines: (1) whether the plaintiff made a prima facie showing of a claim of copyright infringement, (2) whether the plaintiff submitted a specific discovery request, (3) whether there is an absence of alternative means to obtain the subpoenaed information, (4) whether there is a central need for the subpoenaed information, and (5) the defendant's expectation of privacy.  *See* CM/ECF 7-1, at p. 4.   Significantly, this Court found that Plaintiff satisfied the above factors. *See* CM/ECF 10, at p. 2 ("After review of the motion, the Court finds that Plaintiff establishes good cause for limited expedited discovery.")  The weight and credibility of the evidence that Plaintiff may use to prove its case is not relevant to the good cause standard.   To the contrary, this Court and numerous others have previously examined many similar motions by this Plaintiff and none has ever found it necessary or appropriate to examine the evidence or its credibility prior to allowing early discovery.[15]  Regardless, as explained herein, Plaintiff's evidence is sound and immune to bias because of the numerous steps and safeguards involved.

No unjust result came about from Plaintiff's ex parte motion.  Defendant has not argued to the contrary.   The only result was that Plaintiff was allowed to serve its subpoena on Defendant's ISP.   Defendant's interests were adequately protected by his ability to move to

---

[15] In a similar BitTorrent copyright infringement case brought by this Plaintiff in the Western District of Michigan a defendant attempted to assert a similar argument under Michigan Rule of Professional Conduct 3.3(d), which is identical to the Colorado Rule.  There the defendant included three pages of "disclosures" which he believed Plaintiff should have disclosed to the court in its ex parte motion for early discovery.  Similar to here, many of the "disclosures" related to Plaintiff's evidence and ability to prove its case.  Rejecting the defendant's argument, the court held that it was "unconvinced that omission of those statements violated Rule 3.3(d).  The Court has previously scrutinized Plaintiff's subpoena request and determined that Plaintiff has established 'good cause' . . . with 'good cause' shown, such a process is necessary for a copyright holder to protect its copyright when BitTorrent protocol is the alleged method of infringement."  *Malibu Media, LLC v. Doe*, 1:13-cv-00893-RJJ, CM/ECF 15, at p. 2 (W.D. Mich. October 28, 2013).

Exhibit Z - 15

quash the subpoena, which he did not do in this case.  There was no need for the Court to weigh

the credibility of the evidence prior to granting Plaintiff's Motion.

## IV.    CONCLUSION

For the foregoing reasons, Defendant's Motion should be denied in its entirety.

Dated:  March 20, 2014

Respectfully submitted,

By: /s/Jason Kotzker
Jason Kotzker
jason@klgip.com
KOTZKER LAW GROUP
9609 S. University Blvd. #634132
Highlands Ranch, CO 80163
Phone: 720.330.8329
*Attorney for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that on March 20, 2014, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF and that service was perfected on all counsel of record and interested parties through this system.

By: /s/Jason Kotzker

15

## DECLARATION OF PATRICK PAIGE

**I, PATRICK PAIGE, DO HEREBY DECLARE:**

1.      I am over the age of eighteen (18) and otherwise competent to make this declaration.  The facts stated in this declaration are based upon my personal knowledge.

2.      I was a police officer from 1989 until 2011 for the Palm Beach County Sherriff's Department.  And, from 2000-2011, I was a detective in the computer crimes unit.

3.      As a detective in the computer crimes unit, I investigated internet child pornography and computer crime cases.

4.      I have conducted forensic computer examinations for:

(a)      Broward County Sheriff's Office (BSO);

(b)      Federal Bureau of Investigation (FBI);

(c)      U.S. Customs and Border Protection (CBP);

(d)      Florida Department of Law Enforcement (FDLE);

(e)      U.S. Secret Service;

(f)      Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF); and

(g)      Various municipalities in the jurisdiction of Palm Beach County.

5.      I was also previously assigned to a police unit working in conjunction with TLO Corp., which is a private company.

6.      When I worked with TLO Corp., I supervised the other detectives assigned to the unit, which was consisted of six online investigators and two computer forensic examiners.

7.      I am familiar with software programs used to investigate computers, including EnCase and Access Data.

8.     I have taken over 400 hours of courses designed to teach people how to investigate computers.

9.     Also, while working from 2003-2011 for Guidance Software, the makers of EnCase, I have taught over 375 hours of courses in computer forensics ranging from beginner to advanced levels.

10.     I have had students in my courses from various government branches, including: (a) sheriff's offices; (b) FBI agents; (c) ATF agents; (d) agents from the Central Intelligence Agency, and (e) individuals from other branches of government and the private sector.

11.     After leaving the Palm Beach County Sherriff's office, I founded Computer Forensics, LLC, where I am currently employed.

12.     I have received the following awards and commendations:

(a)     1991 – Deputy of the Year, awarded by the 100 Men's Club of Boca Raton & Rotary Club.

(b)     1997 – Deputy of the Month for June.

(c)     2001 – Detective of the Month for October.

(d)     2002 – Outstanding Law Enforcement Officer of the Year, awarded by the United States Justice Department for work in the *U.S. vs. Jerrold Levy* case.

(e)     2003 – U.S. Customs Service Unit Commendation Citation Award for computer forensic work in Operation Hamlet.  Operation Hamlet was one of the largest rings in the history of U.S. Customs of individuals who were molesting their own children, and transmitting the images and video via the Internet.

(f)     2005 – Detective of the Month for December.

(g)     2007 – Outstanding Law Enforcement Officer of the Year, awarded by the United States Justice Department for work in the *U.S. vs. Jimmy Oliver* case.

(h)     2008 – Letter of Commendation issued by the FBI for outstanding computer forensic work in the *U.S. vs. Frank Grasso* case.

2

13.     I have been called to testify as a fact and expert witness on numerous occasions in the field of computer forensics in both trial-level and appellate proceedings before state, federal, and military courts in Florida, California, New Jersey, and New York.

14.     No court has ever refused to accept my testimony on the basis that I was not an expert in computer forensics.  My skill set and my reputation are my most important assets in my current position with Computer Forensics, LLC.

15.     With regard to my experience investigating child pornography cases, I supervised police officers whose responsibility it was to establish a successful TCP/IP connection with persons who were sending pornographic images of children or other illegal content over the Internet.

16.     The offenders' IP addresses, as well as the dates and times of the illegal transmission were recorded.

17.     An officer would then request that the assistant state attorney subpoena the corresponding ISPs for the purpose of identifying the subscribers that were transmitting the illegal content.

18.     In these cases, the subscribers were not notified by the ISPs that their identity was being subpoenaed because they could have deleted the images and destroyed the data.

19.     After receiving the subscribers' identities, we would prepare a search warrant that would authorize us to enter the subscribers' dwelling and seize all of their computer devices.

20.     I was directly involved in approximately 200 search warrants either by way of managing the process or performing it personally.

21.     I can recall only one instance in all the times that we executed a search warrant and seized computers where we did not find the illegal content at the dwelling identified in the search warrant.

22.     In that one instance, the Wi-Fi connection was not password protected, and the offender was a neighbor behind the residence.

23.     I never came across a Wi-Fi hacker situation.

24.     In my opinion, a child pornographer has a greater incentive to hack someone's Wi-Fi connection than a BitTorrent user because transmission of child pornography is a very serious crime with heavy criminal penalties, and many offenders can face life sentences if convicted.

25.     I tested IPP International U.G.'s ("IPP") IP detection process.

26.     To do so, I downloaded four public domain movies from the national archive.

27.     I then encoded text into the videos, so that I would know whether someone that downloaded that particular movie downloaded the version of the movie that I created.

28.     I then rented four virtual servers, each of which was connected to the Internet and used a unique IP addresses.

29.     I then configured the servers so that all of them were running Windows 2008 server edition, and I put a different BitTorrent client onto each server.

30.     A BitTorrent "client" is software that enables the BitTorrent protocol to work.

31.     After installing the BitTorrent clients, I also installed Wireshark onto each server. "Wireshark" is a program that captures network traffic and creates PCAPs, just as TCP Dump, which IPP uses, does.   A PCAP is like a video recording of all the incoming and outgoing transactions of a computer.

4

32.     After installing Wireshark onto each of the servers, I transferred the movies from my local computer to the servers.

33.     I then used the BitTorrent clients on each of the servers to make .torrent files.  I uploaded these .torrent files onto various torrent websites.

34.     I then informed IPP of the movie names.  Thereafter, IPP sent me screen captures of the movies I had seeded.

35.     The screen captures sent by IPP had my codes on them; thus, I knew that IPP had caught the movies I had seeded.

36.     IPP also sent me additional data identifying the IP Address used by each of the four servers, and sent me PCAPs.

37.     I reviewed IPP's PCAPs vis-à-vis the PCAP log files created by each of my test servers, and determined that IPP's PCAPs match my PCAPs.  This could not have happened unless IPP's server was connected to the test server because the transactions would not match.

38.     From this test, I concluded that IPP's software worked, and had a subpoena been issued for my IP addresses, it would have revealed my identity.

**FURTHER DECLARANT SAYETH NAUGHT.**

## DECLARATION

**PURSUANT TO 28 U.S.C. § 1746**, I hereby declare under penalty of perjury that the foregoing is true and correct.

Executed on this 11th day of November, 2013.

By:_____
                     **PATRICK PAIGE**

Exhibit Z - 21

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 1:13-cv-02394-WYD-MEH

MALIBU MEDIA, LLC,

      Plaintiff,

v.

JEREMIAH BENSON,

      Defendant.

_____/

### DECLARATION OF MICHAEL PATZER

### I, MICHAEL PATZER, DO HEREBY DECLARE:

1.      I am over the age of eighteen (18) and otherwise competent to make this declaration. The facts stated in this declaration are based upon my personal knowledge.

2.      I work as an independent contractor predominantly for Excipio GmbH, a German company. I have extensive personal knowledge of Excipio's business.

3.      I personally designed, implemented, monitor and maintain the data collection system that Excipio both owns and uses to identify the IP Addresses used by people to commit copyright infringement via the BitTorrent Protocol.

4.      Excipio contracts with IPP to provide IPP with this data collection system which is the system that IPP uses to detect infringement of Malibu's works. Specifically, IPP licenses the use of Excipio's system and servers.

5.      The data collection system used by IPP has numerous components. It contains, *inter alia*: (1) a proprietary BitTorrent Client; (2) servers running a MySQL database which log

1



verified infringing transactions; (3) packet analyzers, also known as packet sniffers, which create and analyze PCAPs; (4) servers that run the proprietary BitTorrent Client and record PCAPs; (5) WORM ("Write Once Read Many") tape drives for storing the PCAPs and MySQL server data; (6) a program to synchronize the servers' clocks with both a GPS clock and an atom clock; (7) a proprietary program for checking the MySQL log files against the contents of the PCAPs.

6.      The BitTorrent Client used by Excipio is not commercially available and its code is a trade secret.

7.      It was written to overcome the unique challenges of entering into a massive number of BitTorrent transactions with a massive number of people without distributing data.

8.      If the servers are not synchronized with both the GPS Clock and atom clock to within one hundredth of a second the infringing transaction is not logged but instead disregarded.

9.      Every entry on the MySQL server log file correlates to a specific PCAP.

10.     Both the PCAPs and log files are saved onto WORM tape drives.

11.     There is no possibility that the information on these WORM drives can be edited.

12.     Further, each of the WORM tape drives is electronically stamped with a German government issued time stamp at least every twenty four hours.

13.     I independently reviewed the PCAPs for the IP address 76.25.62.43 and confirmed that the PCAPs recorded the IP address infringing Plaintiff's copyrighted works at the exact Hit Dates and UTC times listened on Exhibit A to Plaintiff's Complaint.

14.     No one, including myself, at Excipio has an ownership in IPP or vice versa.

15.     I do not have an ownership interest in Excipio.

16.     I am not paid for my testimony and am not entitled to any portion of any money received from a settlement or judgment in Malibu's favor.

2

MP

17.   Malibu has never paid Excipio or me anything.

**FURTHER DECLARANT SAYETH NAUGHT.**

## DECLARATION

**PURSUANT TO 28 U.S.C. § 1746**, I hereby declare under penalty of perjury under the

laws of the United States of America that the foregoing is true and correct.

Executed on this _13_ day of _March_ , 2014.

By: _____

**MICHAEL PATZER**

3

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 1:13-cv-02394-WYD-MEH

MALIBU MEDIA, LLC,

      Plaintiff,

v.

JEREMIAH BENSON,

      Defendant.

_____/

## DECLARATION OF TOBIAS FIESER

**I, TOBIAS FIESER, HEREBY DECLARE:**

1.      My name is Tobias Fieser.

2.      I am over the age of 18 and am otherwise competent to make this declaration.

3.      This declaration is based on my personal knowledge and, if called upon to do so, I will testify that the facts stated herein are true and accurate.

4.      I am a salaried employee of IPP International UG ("IPP").

5.      IPP is a company organized and existing under the laws of Germany.

6.      I do not have an ownership interest in IPP nor any other entity involved in or affiliated with IPP's data collection system.

7.      I am not being paid for my testimony and do not have the right to receive any portion of a settlement or judgment in Plaintiff's favor.

8.      Malibu and IPP have a written fixed fee agreement pursuant to which Malibu pays IPP for providing the service of collecting data about infringements.

9.      IPP has not been paid anything for this case.

10.      Malibu has never paid nor offered to pay me anything.

1

**FURTHER DECLARANT SAYETH NAUGHT.**

## <u>DECLARATION</u>

**PURSUANT TO 28 U.S.C. § 1746**, I hereby declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on this ⟨19th⟩ day of ⟨March⟩ , 2014.

By: _____
**TOBIAS FIESER**

2