# UNITED STATES DISTRICT COURT

# DISTRICT OF MARYLAND

| | |
|---|---|
| MALIBU MEDIA, LLC,<br>　　　　　　Plaintiff,<br>　　v.<br>JOHN DOE subscriber assigned IP address<br>173.64.119.92,<br>　　　　　　Defendant. | Case No. 1:14-cv-0223-MJG<br><br>Assigned to:  Honorable Marvin J. Garbis<br>　　　　　　United States District Judge |
| MALIBU MEDIA, LLC,<br>　　　　　　Plaintiff,<br>　　v.<br>JOHN DOE subscriber assigned IP address<br>71.200.143.209,<br>　　　　　　Defendant. | Case No. 1:14-cv-0257-CCB<br><br>Assigned to:  Honorable Catherine C. Blake<br>　　　　　　United States District Judge |
| MALIBU MEDIA, LLC,<br>　　　　　　Plaintiff,<br>　　v.<br>JOHN DOE subscriber assigned IP address<br>74.103.54.222,<br>　　　　　　Defendant. | Case No. 1:14-cv-0260-CCB<br><br>Assigned to:  Honorable Catherine C. Blake<br>　　　　　　United States District Judge |
| MALIBU MEDIA, LLC,<br>　　　　　　Plaintiff,<br>　　v.<br>JOHN DOE subscriber assigned IP address<br>76.100.228.15<br>　　　　　　Defendant. | Case No. 1:14-cv-0263-RDB<br><br>Assigned to:  Honorable Richard D. Bennett<br>　　　　　　United States District Judge |

MALIBU MEDIA, LLC,
                    Plaintiff,

        v.

JOHN DOE subscriber assigned IP address
98.204.121.246,
                    Defendant.

Case No. 1:14-cv-0660-GLR[1]


Assigned to:  Honorable George Levi Russell, III
                    United States District Judge


**ISP SUBSCRIBER'S REPLY IN SUPPORT OF MOTION FOR AN ORDER TO SHOW CAUSE
AS TO WHY ALL EVIDENCE AND DATA FROM TOBIAS FIESER
AND HIS COMPANY IPP SHOULD NOT BE PRECLUDED
AND THESE CASES DISMISSED**

---

[1] An identical version of this document is being filed concurrently in all cases identified on the caption.

# TABLE OF CONTENTS

(a)  What Champerty Looks Like In The 21st Century ................................................................ 4

(b)  Malibu Response On The Professional Conduct Rule 3.3(d) Issue: If My Boss In Miami Did It, It Was Not Unethical, *QED* ........................................................................................... 6

(c)  International Men Of Mystery: Tobias Fieser, Michael Patzer, Daniel Macek, Patrick Achache, Guardaley & The Shell Companies, And The Software With A Name Nobody Seems To Know ..................................................................................................................... 8

  (1)  Proceedings In The *Elf-Man* Case In The Eastern District Of Washington Substantially Corroborate Movant's Theory That Guardaley, IPP and Excipio Are All Run By The Same Group Of People Engaged In A Global Shell Game ............. 10

  (2)  There Is Also Other, New Evidence From A *Malibu* Case In Indiana Further Linking IPP To Guardaley ...................................................................................................... 13

  (3)  The Bellwether Trial Testimony Malibu Submitted In Support Of Its Opposition Further Supports Movant's Argument That There Is No Actual Difference Between Any Of The German Computer Entities Malibu Pretends Are All Different ............ 13

  (4)  Fieser's Sworn Statement About What Software He Supposedly Used To Log The Infringement In This Case Is Contradicted By Malibu's Own Court Filings, And Is Belied By Various Exhibits, Which Malibu Fails to Address Or Even Acknowledge 14

  (5)  Both Fieser And Patzer Should Be Precluded From Trying To Lay A Foundation For The Tainted Data ....................................................................................................... 17

(d)  For The Purposes Of This Motion, Which Seeks Exclusion Of Evidence *Per se*, It Does Not Matter If Guardaley / IPP / Excipio's Software Is Accurate Or Not .................................... 18

(e)  The Case From A District Court On The Seventh Circuit That *Malibu* Relies Upon Heavily Applies A Minority View On Witness Contingency Agreements ......................................... 20

(f)  Malibu Fails To Distinguish *Accrued Financial II*, Which Clearly Controls ....................... 21

(g)  Malibu Fails To Offer A Credible Reason Explaining Why Dismissal Of The 3024 Action Was Not Pure Forum Shopping ......................................................................................... 23

(h)  An Order To Show Cause Is The Best Way To Proceed ...................................................... 24

(i)  If Malibu's Response To The Order To Show Cause Confirms What Appears To Be True, Then Dismissal Is The Appropriate Remedy ...................................................................... 25

(j)  Conclusion ....................................................................................................................... 26

<u>**REPLY ON THE MERITS**</u>

In January, Malibu's local counsel in Illinois, perhaps inadvertently, let slip that Malibu compensated its key witness, IPP, pursuant to an "oral contingency agreement." <u>Exhibit B</u>.[2]  For the nearly six months since then, plaintiff Malibu Media, LLC ("**Malibu**") has steadfastly refused to provide any further detail as to what that means, when such an agreement was in effect, or how large was IPP/ Guardaley/ Excipio's contingent interest in the outcome of the litigation.  Malibu admits that there was a witness contingency agreement in place, but concludes that since it was abruptly terminated shortly after it was revealed, the resulting prejudice to the defendants and to the judicial system should be completely ignored.

**(a)**     **What Champerty Looks Like In The 21st Century**

Malibu's position is that "[p]aying a service provider to record a computer transaction" is not grounds to exclude evidence or dismiss a case.  But that is not a fair description of what appears to be going on in these cases.  Rather, here, the "service provider," is in the business of recording computer transactions, and, together with plaintiff's lawyers, they solicit clients to stir up litigation, in exchange for a piece of the settlement action, in contravention of Maryland's strong public policy against champerty.  According to testimony put on by Malibu at its much-ballyhooed "bellwether trial" in Pennsylvania, IPP[3] has 150 servers (P's Exh. I to Opp. at 20:17[4]) which it uses to continuously monitor

---

[2] Unless otherwise noted, all references to <u>Exhibits</u> are to the Pietz Decl., filed initially in the lead cases on March 28, 2014, in support of this motion.   <u>Exhibits AA to EE</u> are attached to the declaration of Morgan E. Pietz submitted in support of this reply ("Reply Decl.").

[3] Although Michael Patzer testified at trial that the servers were IPP's, prior documents he filed in other cases identify the servers as belonging to Guardaley (<u>Exhibit Q</u>) and the new story, since Malibu's oral contingency agreement with IPP came to light in January of this year, is that the servers belong to Excipio.  <u>Exhibit Z</u> and Opp. at 12 & fn. 12.

[4] This refers to the exhibits to Malibu's opposition to the instant Motion For An OSC.  Page references to Malibu's exhibits refer to the ECF pagination in the top right.

10,000,000 different files being shared using BitTorrent (Ps' Exh. I to Opp. at 29:6).  The computer network traffic Guardaley/IPP/Excipio is in the business of monitoring, on a massive scale, is **only** inherently valuable to the extent that it could serve as the basis for copyright infringement lawsuits for statutory damages.  Malibu again admits that the lawyers, not the "client," choose who to sue in these cases.  Opp. at fn. 11.  The decision about who to settle with and for how much is also delegated out, to notorious "settlement negotiators," who may well come as part of a package deal provided by Guardaley/IPP/Excipio and/or the plaintiff's lawyers.  Exhibit AA to Reply Decl., ¶¶ 7–12.  In short, these circumstances suggest that when it comes to this "systematically opportunistic" new business model of using the federal court's subpoena power, the threat of high statutory damages, and the stigma associated with pornography to leverage infringement settlements, the tail is wagging the dog.

As Judge Motz recognized, claim investigation and aggregation services are not necessarily inappropriate, and can even provide "an effective (and wholesome) deterrent" against violating legal obligations that are too-often ignored.  *See* _Accrued Fin. Servs., Inc. v. Prime Retail, Inc._, 2000 WL 976800 at *3 fn. 3, (D. Md. No. 1:99-cv-2573, ECF No. 20, 6/19/00) ("_Accrued Financial I_").  While nothing about Malibu's "teen" pornography and the maze of German shell companies it relies upon to perform unlicensed wiretapping electronic snooping on thousands of people's online activities seems "wholesome," exactly, it is true that online piracy is a big problem, and Malibu has a right to sue for infringement.  It also has a right to hire an expert to assist in proving its cases.  Movant does not dispute any of that.

However, if "Maryland's strong public policy against the stirring up litigation or promoting litigation for the benefit of the promoter rather than for the benefit of the litigant or the public" is to have any meaning, then the arrangement here cannot be tolerated.  *See* _Accrued Fin. Servs., Inc. v. Prime_

_Retail, Inc._, 298 F.3d 291, 300 (4th Cir. 2002) ("_Accrued Financial II_").  Malibu has admitted that

Guardaley/IPP/Excipio, the key witness on whose data the whole enterprise is founded, obtained a

contingent financial interest in the outcome of Malibu's litigation,[5]  which is prohibited by a variety of

different legal rules.  Motion For An OSC at pp. 23–34.  Further, the facts suggest that

Guardaley/IPP/Excipio is the true "promoter" of this whole scheme, and that together with the plaintiff's

lawyers and the notorious "settlement negotiators," they directly control who to sue, whether and when

to settle, and for how much.  While courts and attorney regulatory bodies have been willing to tolerate

champerty insofar as contingent fee representation by lawyers and third-party lawsuit financing is

concerned, in order to increase access to justice, condoning the arrangements here would effectively

amount to a complete judicial abrogation of the doctrine of champerty.  If this case and the kind of

"systematic opportunism"[6] it reflects is not modern champerty, then what is?

**(b)   Malibu Response On The Professional Conduct Rule 3.3(d) Issue: If My Boss In Miami Did It, It Was Not Unethical, _QED_**

Beyond champerty, plaintiff here had an affirmative duty to disclose material adverse facts when

it moved, on a pure _ex parte_ basis, to obtain early John Doe discovery, without an opponent there to

object.  _See_ ABA Model and Maryland Rules of Professional Conduct, Rule, 3.3(d).  If lawsuit

promoters are going to take near total financial interest in the outcome of the claim (via an assignment of

the whole copyright, as the lawyers did in Prenda) or a partial financial interest in the outcome of the

claim (via an "oral contingency agreement" of the sort Guardaley/IPP obtained here) then these

enterprises need to be forthright about what they are doing when they seek _ex parte_ relief.  Certainly, to

---

[5] Exactly what cases were undergoing what Malibu calls the "suit formation process" (Opp. at 10) during the term of this improper "oral contingency agreement" Malibu has not yet disclosed.

[6] Matthew Sag, "Copyright Trolling, An Empirical Study," (March 21, 2014). Iowa Law Review, Forthcoming. Link: http://ssrn.com/abstract=2404950

the extent such contingent financial arrangements are considered to be a material adverse fact, and plaintiffs are routinely going into courts on a pure *ex parte* basis to seek John Doe discovery, the plaintiff's lawyers have a duty to disclose all this.  Malibu concedes that it did not so here, and counsel on the pleadings here in Maryland concludes that there could not possibly be any kind of breach of this duty because lead national counsel in Miami, not counsel here, negotiated the improper witness contingency agreement.  Regardless of what local counsel here did or did not know, lead counsel in Miami, whose firm presumably authored the early discovery papers in the first instance, and who participated in the consolidated proceedings in this district before Judges Titus and Grimm, had a duty to make sure this fact was disclosed to the Courts here and across the country.

        In deciding whether knowing that the witness on whose testimony all of these cases are based was being paid on a contingent fee basis was the kind of material fact this Court should have been appraised of during the *ex parte* proceedings, the Court should consider how this issue has been handled since it first arose in January.  If the payment arrangements Malibu's counsel made with IPP were all above board, why has Malibu spent the last six months fighting tooth and nail all attempts by defendants to inquire into these arrangements?  If there was and still is nothing to hide, why not fully explain how the German computer guys are compensated, and who they really work for, in the opposition to this motion?  Such questions are routine for any expert who actually plans to testify.  The fact that it was an "oral" contingency agreement suggests counsel knew the arrangement was suspect, and that the decision to omit mention of the contingent fee compensation paid to the declarants in the *ex parte* papers filed across the country seeking leave to issue subpoenas was knowing and intentional.  Further, the decision to dismiss the 3024 Action before Judge Motz rather than risk getting into all this in his courtroom or

providing discovery on these issues further suggests that Malibu and its counsel were withholding an adverse fact that they knew was material.

**(c)    International Men Of Mystery: Tobias Fieser, Michael Patzer, Daniel Macek, Patrick Achache, Guardaley & The Shell Companies, And The Software With A Name Nobody Seems To Know**

Beyond the affirmative duty to disclose material adverse facts, Malibu's lawyers also had a duty of candor that prohibits them from making intentionally misleading statements to the Court.  The statements made on the record here in the letter to Judges Titus and Grimm downplaying the links between Guardaley and IPP (Exhibit S), and more recent statements by Malibu attempting to cast Excipio as a different company (Opp.), free from the taint of Guardaley's unreliability and IPP's contingent interest in these cases, also appear to come perilously close to affirmative misrepresentations.

Confronted with suggestions that the key witness, being paid on contingency, is merely a front for the discredited German company Guardaley, Malibu argues that since Guardaley also continued to exist as a separate entity, it would be wrong to consider IPP to be merely a front for Guardaley.  Of course, there is absolutely no reason that Guardaley cannot continue to exist on paper, and even in practice, while at the same time clandestinely orchestrating everything done by its subsidiary or affiliate IPP.  Notably, Malibu does not actually go so far as to deny any of the facts linking IPP to Guardaley.

Instead, Malibu raises technical objections and offers a variety of carefully worded and practically meaningless statements like "[Fieser] does not have an ownership interest in IPP" (Opp. at 10) and "No one at Excipio has an ownership in [sic] IPP or vice versa.  Mr. Patzer does not have an ownership interest in Excipio."  (Opp. at 12).  Guardaley and/or the people behind it could own both IPP and Excipio, and the foregoing sworn assertions would be perfectly correct.  What would be far more forthcoming than offering a variety of sworn statements about who does ***not*** own what would be to

simply explain who really does own Guardaley, IPP, and Excipio, and detail the terms on which all of these entities are compensated for their "suit formation" and unlicensed private investigation services. Similarly, Malibu should explain the connection between the German computer guys generating these lawsuits, and the Miami-based, non-lawyer "settlement negotiators" who are delegated authority by the ostensible client to settle them.

Recently, at oral argument, Judge Sykes of the Seventh Circuit Court of Appeals remarked of Prenda Law, that it seemed like there was "a lot of shell game activity" going on with respect to the entities behind those cases.[7]  That same concern was one of the reasons Judge Wright sanctioned Prenda so roundly in the infamous *Star Trek* order.  *Ingenuity 13, LLC v. John Doe*, 2013 U.S. Dist. LEXIS 64564 (C.D. Cal., May 6, 2013).

Here, the hacked emails from Guardaley's Patrick Achache quoted in the Wired.com story (Exhibit N) suggest that the shell game approach is actually a concerted strategy by Guardaley: for each new client, and/or whenever they encounter a problem, this same group of computer guys, mainly based in Karlsruh, Germany, just forms a new entity with a new mail drop forwarding address, so as to throw both courts and defendants off the scent.

Since the publicly available facts detailing Guardaley's links to IPP were rounded up in the Pietz Decl., submitted with the instant moving papers, others have found further examples of phony shell companies, more fake addresses, more evidence that Guardaley, IPP and Excipio is all the same thing, run by all the same people.

---

[7] https://madisonrecord.com/issues/332-class-action/263809-seventh-circuit-hears-arguments-in-prenda-attorneys%E2%80%99-appeal-over-261k-sanction-order-judge-says-lightspeed-record-is-troublesome

(1)     Proceedings In The *Elf-Man* Case In The Eastern District Of Washington Substantially
        Corroborate Movant's Theory That Guardaley, IPP and Excipio Are All Run By The
        Same Group Of People Engaged In A Global Shell Game

Recent proceedings in *Elf-Man, LLC v. Lamberson*, E.D. Wa. No. 2:13-cv-395-TOR, ECF No.

50, 5/20/14, at 7:26 (attached to the Pietz Reply Decl. as Exhibit AA) corroborate Movant's arguments

that Guardaley, IPP and Excipio is run by the same group of people playing a global shell game.  In *Elf-*

*Man*, Michael Patzer and Daniel Macek—the very same computer witnesses Malibu talks about in the

instant opposition—were caught red handed trying to hide behind yet another series of phony shell

companies.  In addition, the proceedings also show how Patzer and Macek are trying to use the Hague

Convention so as to avoid being hailed into American courts to be deposed about their supposed

evidence of infringement.

Elf-Man, LLC is not a pornographer, but rather a maker of a flop B-movie,[8] that presumably lost

money for its investors via traditional means of monetization, so they decided instead to try and recoup

their losses through BitTorrent litigation.  Somehow, Elf-Man, LLC got connected to the Guardaley

guys, or *vice versa*, and they began filing infringement lawsuit based on evidence provided by Michael

Patzer and Daniel Macek.  According to the plaintiffs Rule 26 initial disclosures in *Elf-Man*, "Daniel

Macek is plaintiff's primary investigator who oversaw the direct peer-to-peer connection with

Defendant's IP address and confirmed the distribution of plaintiff's motion picture through defendant's

IP address and is knowledgeable about associated records and activity observed."  Exhibit BB to Reply

Decl.  Michael Patzer "is an author of software used by plaintiff's investigator and is knowledgeable

about peer-to-peer file exchanges and the veracity of plaintiff's investigations."  *Id.* Having reviewed

Malibu's opposition here, this should all be pretty familiar to this Court, only here, Tobias Fieser

---

[8] http://www.rottentomatoes.com/m/elf_man_2012/ (score of 14%).

performs Daniel Macek's function.   In fact, according to one of the transcripts Malibu attached to the instant opposition, Fieser's direct testimony at the bellwether trial, in Pennsylvania, the same Daniel Macek supposedly double-checks all of Fieser's work in the Malibu cases.  Exh. C to Opp, ECF No. 20-3 at 9:11.  Thus, according to Fieser's testimony at the bellwether trial, he and Macek basically perform the same job function using the same proprietary software tools at the same company (whatever that company may be called at any given time).  *See id.*

However, according to Elf-Man, Patzer and Macek "work[] for" Crystal Bay Corporation" which was supposedly "retained by" Anti-Piracy Management Company.  <u>Exhibit CC</u> to Reply Decl.  In Elf-Man's Rule 26 disclosures, the same address in Stuttgart, Germany is given for both Patzer and Macek. The defendant in that case began pressing to depose Patzer and Macek in Washington, and making inquires to plaintiff's counsel about where these two could be located and how they could be served. Defense counsel began investigating and pointed out to Elf-Man that most of the information provided about Patzer and Macek about their supposed role in the litigation appeared to be pretty suspicious.  The plaintiff's lawyer "derid[ed] the inquiry [about Patzer and Macek] as 'more like a conspiracy novel than a legitimate request for additional discovery'" and refused to respond.  <u>Id</u>. at p. 7.

That response should sound pretty familiar.  As the Court will recall from the moving papers, as well as <u>Exhibit S</u> thereto, when defense attorney Jason Sweet first pointed out to Judges Titus and Grimm in early 2013 that it appeared that IPP did not really exist, but was merely Guardaley reinvented with a new name, Malibu's counsel here dismissed this suggestion in a signed pleading filed on the record as "conspiracy theories" set forth "with little evidence."  <u>Exhibit S</u>, p. 17.  Apparently then "conspiracy theory" must be Guardaley et al.'s standard line they tell their allied plaintiff's lawyers to respond with whenever anyone starts inquiring about their various shell companies.

- 11 -

As the defendant's own investigation revealed in *Elf-Man*, Crystal Bay Corporation, the company Macek (and Patzer?) supposedly "worked for" (<u>Exhibit CC</u> to Reply Decl., at p. 8) was a defunct South Dakota corporation, apparently incorporated in 2012 by a disbarred lawyer who, according to his website, "now specializes in creating 'anonymous' 'shelf' corporations." <u>Exhibit DD</u> to Reply Decl., at ¶ 5.  The official address Crystal Bay Corporation registered with the South Dakota Secretary of State?  It belongs to a mail forwarding company, and it is the same address given for the disbarred lawyer's "Agent Services" company.  *Id.* at ¶ 6.  Same thing with the Stuttgart, Germany address given for Patzer and Macek: it corresponds to an office building in Stuttgart "that offers mail drop services and short term office rents, even by the hour." *Id.* at ¶ 7. The Elf-Man defendant also investigated the phone numbers given for Patzer and Macek.  The regional code for Macek's number corresponded to Karlsruhe, Germany.[9]  The regional code for Patzer was for a suburb of Karlsruhe. <u>Exhibit EE</u> to Reply Decl., at ¶ 7.

The coup de grace from *Elf-Man*: when defense counsel there recently called the (Karlsruhe) phone number given for Macek in the initial disclosures in that case, the person on the other end of the line answered it "Guardaley." <u>Exhibit EE</u> to Reply Decl., at ¶ 8.

Guardaley / IPP / Excipio / Crystal Bay / Anti-Piracy Management Company / Whatever They Want To Call It's effort to hide behind the Hague convention in *Elf-Man* is also illuminating.  That is a tactic, further to the general strategy of steadfastly refusing any discovery about the computer guys or how their software works, that Malibu has absolutely employed in its litigation.  If Guardaley wants to provide ligation support services for thousands of U.S. lawsuits, in exchange for which they presumably make millions of dollars (through some as-yet undisclosed mechanism) would it be too much to ask that

---

[9] Karlsruhe, Germany appears to be Guardaley/IPP/Excipio's main nerve center. *See* Pietz Decl. ¶ 32.

they setup a real, formal office in the United States under their own name so that they will be clearly subject to the jurisdiction of our federal courts?  A declarant who simultaneously files numerous declarations in U.S. federal courts but who also refuses to actually come to the districts where the cases are pending to be deposed when defendants seek to examine the hearsay statements is not acting in good faith and the court does not have to allow it.

      (2)      <u>There Is Also Other, New Evidence From A *Malibu* Case In Indiana Further Linking IPP To Guardaley</u>

As explained in the supporting Declaration of Gabriel Quearry, which will be filed here, out of an abundance of caution, under seal, at least until Malibu provides a compelling reason as to why it should not become public, there is other evidence linking what is supposed to be IPP data to Guardaley. This is being addresses separately, and under seal, at least temporarily.

      (3)      <u>The Bellwether Trial Testimony Malibu Submitted In Support Of Its Opposition Further Supports Movant's Argument That There Is No Actual Difference Between Any Of The German Computer Entities Malibu Pretends Are All Different</u>

Malibu accuses defense counsel Pietz of himself attempting to mislead this Court by not attaching certain portions of the transcript from the bellwether trial to the Colorado opposition filed as <u>Exhibit Z</u>.  Opp at 19.  Malibu reasons that Patzer's testimony from the bellwether trial shows that he has been working with Malibu for a long time.  Thus, according to Malibu, the assertion in the motion that Malibu has tried to downplay Fieser and IPP's role, and instead pretend like Patzer and his new company called Excipio are some different entity, is supposedly incorrect, and not including the trial transcripts is evidence of an intent to deceive.  In reality, Pietz did not attach the trial transcript exhibits to <u>Exhibit Z</u> simply to cut down on space space.

More importantly, the testimony Malibu complains Pietz omitted only further supports the argument that Guardaley = IPP = Excipio, and that Patzer, Fieser, and Macek are all part of the same organization.  For starters, at the beginning of Patzer's testimony, he first says "yes" when asked if he works at IPP Limited.  ECF No. 20-9 at 4:11–18.  Malibu's counsel then asks him a leading question, reminding him that "you don't actually work for IPP, Limited.  You said you work for a firm that provides these services to IPP, Limted, correct?" and Patzer confirms that.  *Id.*  However, throughout Patzer's testimony, he constantly refers to "we" when it is clear he is referring to IPP.  None of that suggests that Excipio is really a totally different company that should be credited as possibly more trustworthy than Guardaley; it suggests Patzer thinks of himself as working with Fieser at IPP.

(4)     Fieser's Sworn Statement About What Software He Supposedly Used To Log The Infringement In This Case Is Contradicted By Malibu's Own Court Filings, And Is Belied By Various Exhibits, Which Malibu Fails to Address Or Even Acknowledge

Here is a simple and important question that Guardaley et al., computer guys seem to have a hard time answering: exactly what is the name of the computer software used to log the data this lawsuit is based upon?  In each and every Fieser Decl. filed in the Malibu cases in Maryland,[10] Fieser avers, under penalty of perjury, that he "used forensic software named INTERNATIONAL IPTRACKER v 1.5 and related technology" to scan the BitTorrent network.  Fieser Decl. ¶ 9.

Movant argued in the instant motion, that foregoing sworn assertion is contradicted by the following confounding footnote, which has been Malibu's party line since January, when the potential contingency fee issue came to light and tainted the brand value of IPP:

---

[10] Undersigned counsel confirmed around the time of the original instant motion papers being in 14-cv-223, that Malibu had continued to file the exact same Fieser Decl. even in its newest cases, well into 2014.   Undersigned has not reviewed the most recent cases, filed since the instant motion, to see if the form Fieser Decl. has been changed to reflect whatever the newest name that they are now calling the software.

> "IPP used to maintain and operate and use its own system. At some time unknown to Malibu, but well in advance of any of the infringement that was logged in this case, IPP entered into a license agreement with Excipio to use its system. The two companies now both compete with each other and are licensor-licensee. Under this arrangement, IPP licenses the use of Excipio's system and servers. Patzer, at ¶ 3. IPP adds value and distinguishes itself by, inter alia, customer specific analysis tools and its client service." Motion For An OSC at 53.[11]

In reality, as Exhibit Q suggests "INTERNATIONAL IPTRACKER" was probably really nothing more than a new brand name slapped on software that started out being called GUARDALEY or GL OBSERVER.  Exhibit Q, p. 4.  The graphic on page 4, in what is supposed to be IPP's white paper, identifies the server logging the infringement as "GL Observer."  *Id.* This suggests that the IPP white paper was a cut and paste job originally derived from a Guardaley white paper.  That proposition is further confirmed by the *Wired* article, which quotes Guardaley's de facto sales agent in England, somebody named Terence who was friendly as Patrick Achache, as explaining the way Guardaley's services work to a potential customer as follows:

> "An independent expert's report is in place for Guardaley, but your monitoring will be done through a different legal entity," wrote Terence. "This will mean that we will need to get a new one created. There will be no problems, as the technology used will be exactly the same as Guardaley's."  Exhibit N, p. 9.

As further confirmed in Exhibit R, sometimes even the guys supposedly using this software have a hard time keeping straight what they are supposed to be calling it at any given time.

In the instant opposition, Malibu argues that Fieser's declaration is not perjurious because "the Declaration of Tobias Fieser [] never states that the [INTERNATIONAL IPTRACKER] software belongs to IPP."  However, Fieser **has** sworn before that "INTERNATIONAL IPTRACKER" **is IPP's software suite.**  Exhibit Q (white paper, attached to Fieser's sworn declaration, explaining that the

---

[11] Although Movant pointed out all the reasons this passage, which was originally from Colorado papers filed months ago, is fairly confounding, Malibu's opposition here just repeats the same footnote, and makes no attempt to explain any further.

software is "***IPP*** international IPTRACKER v1.2.1") (emphasis added).  The Fieser Decl. submitted *in this case* does not go so far as to say that this software suite belongs to IPP.  However, Fieser did effectively acknowledge that INTERNATIONAL IPTRACKER is IPP's software suite when he attached Exhibit Q to his sworn declaration in a prior case.  This is no secret; Fieser has acknowledge this fact many times.

The foregoing proof of what Malibu and/or Guardaley / IPP has been doing is a bit subtle and complicated.  However, the bottom line is this: as soon as Jonathan Phillips filed a motion on the witness contingency issue this last January that seemingly tainted IPP, Malibu changed it story and started saying it was using Excipio software, not IPP software.  According to the new story since January, Malibu has been using ***new*** software licensed from Excipio software for some time now (exactly how long Malibu does not know, yet Malibu is somehow sure it was before the infringement in this case), and any possible problems with IPP do not matter, because IPP provided the ***old*** software.  The Fieser Decl. filed in this case says he was using IPP's old software.  Malibu's opposition says it used Excipio's new software. Thus, only one of two things is possible: (1) either Fieser's declaration here was false when he swore he used IPP's old software, or (2) Malibu or someone was trying to mislead the Court in the more recent filings wherein Malibu suggests that no, it was not using IPP software, but rather, it switched over to use some kind of new, Excipio software for this case.

Of course, Malibu's opposition completely ignores this logic, and refuses to pin itself down as to what version of reality or what software trade name it wants to go with for now.  The best and most effective way to sort out this mess would be to simply dismiss any case Malibu filed which relied upon the old version of the Fieser declaration, on the theory that either Malibu or Fieser was not being candid

about what software was used, and either way that is a problem, and because IPP is fatally tainted by the

contingent fee agreement.

    (5)    <u>Both Fieser And Patzer Should Be Precluded From Trying To Lay A Foundation For The Tainted Data</u>

Malibu argues that the data collected by their Internet observation system—whatever its called

and whomever designed it—is "physical evidence" that speaks for itself.  Not really.  Rather, the

evidence is a bunch of ones and zeroes on a 'built from scratch' custom computer system.  As noted,

four of the eight steps in describing IPP (or whomever's) system are described as "proprietary."  Given

the "tit for tat" nature of the BitTorrent network, it is unclear how IPP could obtain more than a

vanishingly small amount of any copyrighted work from a single peer in using BitTorrent. Regardless of

whether the court credits the Fieser Decl., where he avers to "personally" "extracting" the data from the

system, or the opposition, where Patzer is the only one who can testify to the chain of custody because

he "restores" the data, it does not matter, both are part of the same group.  The whole group should be

precluded from testifying or laying a foundation in these cases in any case where Fieser averred that the

data was logged using the (supposedly) older IPP INTERNATIONAL IP TRACKER system.   If Malibu

wants to move forward in the future with new experts, or with these experts in cases that were not

tainted by the contingency fee agreement, it can try again provided it supports its efforts with more

forthright declarations about who has an interest in the case and what software they used and when.

* * *

Malibu could have saved defense counsel, and the Court, a lot of time going through all the

somewhat tedious evidence linking Guardaley to IPP to Excipio by simply admitting, last year before

- 17 -

Judges Titus and Grimm, or even in the instant opposition, that Guardaley, IPP and Excipio are all

closely related subsidiaries or affiliates run by the same group of people.  That fact, in and of itself, is

questionable, but not necessarily inappropriate.  Aside from the risk of alter ego liability if the entities

are under-capitalized, there is not necessarily anything wrong with using multiple corporate entities.   As

in the Prenda case, the more troubling conduct is all of the obvious (albeit unsuccessful) efforts at

concealment, and, especially, the misleading statements made to the Court here (Exhibit S) designed to

hide who is really behind these lawsuit.  The whole "Crystal Bay" front company used in the Elf-Man

case is really nothing more than another example of Guardaley running its standard shell company

playbook, as described by Patrick Achache in the *Wired* story.  Exhibit N.

     Does such a group of "experts," who all have dubious qualifications to begin with, that is

engaged in a purposefully misleading and unfair business strategy, really have any business serving as

the sole factual foundation for literally ***thousands*** of lawsuits filed in the U.S. Federal Courts?

**(d)     For The Purposes Of This Motion, Which Seeks Exclusion Of Evidence *Per se*, It Does Not Matter If Guardaley / IPP / Excipio's Software Is Accurate Or Not**

     In the letter Malibu submitted to Judge Titus and Judge Grim last year, they argued that IPP's

proprietary software was literally "infallible." Exhibit S at 18.  In the opposition to the instant motion,

Malibu submits a declaration from Michael Patzer where he avers that "the PCAPs recorded the IP

address 76.100.228 [sic] infringing Plaintiff's copyrights."  That is incorrect.  Mr. Patzer left out three

digits in that IP address.  This simply goes to show that no matter how "infallible" Malibu and Patzer

think the software and corresponding proprietary system they designed may be, there is always room for

human error, at either the input stage, or the output stage.

     In the opposition, Malibu suggests that Movant concedes the reliability of Patzer's software

(whatever its called).  Not so.  Since Malibu refuses to provide meaningful discovery on these issues in

all of its cases nationwide, there are few if any defendants who are really in a position to know whether the software works or not.

Maybe this group of German computer guys has indeed improved their software substantially since they sent out unjustified cease and desist letters, and the German court found credible the claim that Guardaley's software was unreliable.  Maybe the Guardaley Observer / IPP International IP Tracker / Whatever They Are Trying to Call The Software Now software suite really is super accurate and reliable.  Who knows.

However, for the purpose of the present motion, how well the software works is not all that important.  Relying on the court's inherent supervisory power, in *Communist Party v. Subversive Activities Control Board*, 351 U.S. 115, 124 (1956), a civil case, the Supreme Court reversed an administrative board's judgment because it was "taint[ed]" by the testimony of three perjurious witnesses, despite the fact that there was sufficient untainted evidence to uphold the board's judgment.  If the German computer guys are all indeed part of the same organization, and that organization had a contingent interest in this litigation, then any data collected during the term of that contingent fee agreement should be excluded *per se*, and cases based on such data should be dismissed.

The reason contingent fee witness testimony is excluded *per se* is not because such testimony is *necessarily* going to be unreliable, incorrect or biased.  It is excluded *per se* because the *potential* for bias inherent in such a situation erodes the public's confidence in the judicial system, and risks seriously prejudicing the other side.  If the court opts for *per se* exclusion, then Patzer's proprietary software is out regardless of whether it is more reliable than DNA evidence, which seems unlikely.

Thus, the rationale behind *per se* exclusion of contingent fee witnesses is similar to the rationale for enforcing a 'Caesar's wife' type standard, where the mere appearance of bias is enough, when it comes to judicial recusal.  As stated with approval by the U.S. Supreme Court,

> "The goal of section 455(a) [the judicial recusal statute] is to avoid even the appearance of partiality. If it would appear to a reasonable person that a judge has knowledge of facts that would give him an interest in the litigation then an appearance of partiality is created even though no actual partiality exists because the judge does not recall the facts, because the judge actually has no interest in the case or because the judge is pure in heart and incorruptible." *Liljeberg v. Health Services Acquisition Corp.*, 486 US 847, 860 (1988).

Like perceived judicial bias, perceived witness bias in the form of "[f]inancial arrangements that provide incentives for the falsification and exaggeration of testimony threaten the very integrity of the judicial process" itself (*Accrued Fin. Servs., Inc. v. Prime Retail, Inc.*, 2000 WL 976800 at *3 n. 3, (D. Md. No. 1:99-cv-2573, ECF No. 20, 6/19/00) (Motz, J.) *aff'd by* 298 F.3d 291, 300 (4th Cir. 2002)).

**(e)     The Case From A District Court On The Seventh Circuit That *Malibu* Relies Upon Heavily Applies A Minority View On Witness Contingency Agreements**

Malibu relies heavily upon *Malibu Media, LLC v. Doe*, N.D. Ill. No. 13-cv-8484, 2014 WL 1228383 (N.D. Ill. Mar. 24, 2014), where a court denied a motion to quash that raised some of the same issues brought before this court, albeit in cursory fashion.  What Malibu ignores, of course, is the extensive discussion in Movant's Motion For An OSC where Movant explains that there is a split between the circuits as to what to do about contingent fee witnesses, and that the Seventh Circuit takes a minority view, holding that such scenarios can be used for impeachment and sorted out by the jury, while the Fourth Circuit, per *Accrued Financial II*, takes the majority view that contingent fee witnesses should be excluded *per se*.  Motion For An OSC at pp. 28–30.  *Accrued Financial II* is binding, while the Seventh Circuit precedent relied upon by Judge Ellis in that Malibu case, which takes an opposite view, is not.  Moreover, for all of the reasons very persuasively explained by Judge Sninder of the

Central District of California, who had her choice as to which approach to take, the Fourth Circuit's approach is the better one anyway.  Since Malibu did not bother to seriously engage on this fairly debatable issue in its brief, Movant will not belabor the point.

Moreover, Malibu's counsel in the case in Illinois presumably did not make an affirmative representation to the court there that IPP was ***not*** really just Guardaley in disguise, and counsel there presumably did not dismiss a case rather than risk having a contingent fee witness issue decided by a Judge it wanted to avoid.

**(f)      Malibu Fails To Distinguish _Accrued Financial II_, Which Clearly Controls**

The first point Malibu makes in an attempt to distinguish _Accrued Financial II_ is that "Malibu Media hired IPP for its specific purpose, to accurately record the IP addresses which infringe its property."  Opp at 27.  Movant asked Malibu to clarify who approached whom.  Malibu states in the opposition "Malibu Media sought IPP's aid in identifying the infringing IP addresses, not the other way around."  Opp. at 28.  That particular assertion is not supported by a declaration. _Id._ However, Collete Field, one of Malibu's owners, does aver that "Malibu Media engaged IPP".  Field Decl. at ¶ 6.  Malibu admitted in its interrogatory responses from Illinois that the contact with IPP was made through lead national counsel in Miami.  Exhibit C.  Presumably then Malibu means to argue  that it directed it's counsel to hire IPP.  In any event, regardless of who approached whom, the scenario presented here is no different than the lease auditors performing claim investigation and aggregation services for commercial tenants in _Accrued Financial I and II_.  IPP plays a highly analogous role to lease auditors: it uses special skill and knowledge to investigate and aggregate claims for lawsuits that might otherwise go un-sued upon.  Malibu may have a legitimate reason to seek suit, but so did the commercial tenants being nickel and dimed for maintenance fees by their landlords in _Accrued Financial_.

The second way Malibu tries to distinguish *Accrued Financial II* is by arguing that "the factors at issue in Accrued were not present in this case." Opp. at 28. Malibu does not specifically point to any factor from *Accrued Financial* that it believes is not present here. Instead, it supports this assertion with a non-sequitur explaining why Malibu feels a need to sue thousands of people for online infringement.

However, as noted by Malibu, one of the key factors both Judge Motz and the Fourth Circuit focused upon in *Accrued Financial* was the fact that the ostensible client there "lost the right to control its destiny in the litigation." Opp. at 27 *citing Accrued Financial II*, 298 F.3d at 298. However, as noted, not only did Malibu confirm again in its instant opposition that the lawyers choose who to sue, but as explained a while back in a declaration from an older case, there is this group of settlement negotiators that decide who to settle these cases with and for how much. *See* Reply Decl., Exhibit AA, ¶¶ 7–12. Malibu should be ordered to explain what role Elizabeth Jones, who admitted she is not an attorney or employee of Malibu so there is no question of privilege, plays in overseeing Malibu's settlements.

One point other courts have focused on in the past is the use by Malibu and other, similar plaintiffs, of these so-called "settlement negotiators" to handle settlement negotiations with John Does. In particular, in an early case sounding the alarm as to this kind of litigation, Magistrate Judge Gary Brown of the Eastern District of New York had harsh words for "settlement negotiators" who worked for a plaintiff called K-Beech, for their improper, boiler-room-style pressure tactics. *In re: BitTorrent Adult Film Copyright Infringement Cases,* 2012 U.S. Dist. LEXIS 61447 (E.D.N.Y. May 1, 2012) (No. CV-11-3995). As it turned out, Malibu, K-Beech, and five other pornographers used the same "settlement negotiators," who were based out of Miami, where Malibu's lead national plaintiff's counsel is also located. The facts as to all this are explained in an old declaration undersigned filed in California, which is attached to the Reply Decl. as Exhibit AA. While most of the issues from that

- 22 -

declaration are no longer relevant these days, ¶¶ 7–12 thereto is relevant to showing that Malibu is not actually in control of settling its litigation.

Malibu's attempt to distinguish _Farmer v. Ramsay_, 159 F. Supp. 873, 883 (D. Md. 2001) is similarly far wide of the mark.  In _Farmer_, the court followed the Fourth Circuit's binding precedent from _Accrued Financial II_ and applied the rule of _per se_ exclusion to a contingent fee witness.  Malibu focuses on an independent reason the district court also gave for excluding the expert, namely that the report was also just raw statistics that was not particularly probative.  However, as noted, if the rule of _per se_ exclusion is applied, it does not matter if the evidence is good, bad, or in between.  According to Malibu, Patzer has "independently" verified IPP's evidence.  That certainly sounds good, but what does it really mean?  Simply identifying the name of the software he supposedly used to do this "independent" verification, and explaining how it differed from IPP's old software, or the Guardaley software discredited in the German courts (which Patzer may also have designed), and why the "proprietary" aspects of it are not subject to error, would be a good start towards making such an assertion more credible.

**(g)     Malibu Fails To Offer A Credible Reason Explaining Why Dismissal Of The 3024 Action Was Not Pure Forum Shopping**

Although Malibu disputes what the motivation was for dismissing the 3024 Action before Judge Motz, it is notable that its lawyer does not actually say that he did not read the brief he was sent citing to _Accrued Financial_, or that this knowledge did not factor into his decision to dismiss the case.  Further, Malibu's new assertion in the opposition that "the Rule 4(m) deadline had already expired" (Opp. at 30) is plainly incorrect.  The joint request to extend to the Rule 4(m) deadline to March 10, 2014, was extended by paperless order of the Court on February 22, 2014.  _Malibu Media, LLC v. John Doe_, D. Md. No. 13-cv-3024, ECF Nos. 14, 15.  The complaint was dismissed on March 6, 2014, thus, there

were four days left.  Moreover, defense counsel Pietz had already stipulated in writing and orally for a second extension of the deadline.

**(h)      An Order To Show Cause Is The Best Way To Proceed**

It seems clear that various rules and duties have been violated in this case: the rule against contingent fee witnesses (which itself springs from multiple wellsprings of authority), the rule mandating disclosure of material adverse facts in an ex parte, and the duty of candor to the court, among others.  The more difficult question is how important are the rules that have been violated, how willful were the violations, and most importantly of all, what should the Court do about it?

As noted in greater detail Movant's opposition to Malibu's Motion to Strike the Pietz Decl., filed initially on May 15, 2014 in the lead cases, there are several reasons why an order to show cause as to dismissal is the best way forward at this point.  Given the unique procedural posture of this case, ordering Malibu to submit substantively responsive counter-declarations, and deeming as admitted anything from the extensive Pietz Declarations that Malibu fails to credibly refute, makes a lot of sense. *See Hoffman on behalf of NLRB v. Beer Drivers & Salesmen's Local Union , et al.,*536 F.2d 1268, 1277 (9th Cir. 1976) (district court was within its discretion to order the submission of  counter-affidavits, to narrow the issues in a contempt proceeding, and to consider as undisputed anything not refuted in the counter-affidavits).  This would be a prudent way to move the factual record forward on these issue, which are common to all Malibu cases, in a coordinated way for all cases in this district.

If Malibu's responses to an Order to Show Cause do not satisfy the concerns of the Court and Movant, then the Court might also consider setting an evidentiary hearing, and vesting Movant with the power to take limited discovery in advance of it.

**(i)     If Malibu's Response To The Order To Show Cause Confirms What Appears To Be True, Then Dismissal Is The Appropriate Remedy**

If what appears to be true so far is confirmed on the factual record here in Maryland, namely that what Malibu calls the "suit formation" process for Movant's case occurred during the term of the oral contingency agreement Malibu had in place with IPP, then IPP, Fieser, Patzer, and everyone else connected to IPP should be *per se* excluded, and the case should be dismissed with prejudice because there is no foundation for any of it.

The Motion For An OSC argues in fairly comprehensive fashion why dismissal is the appropriate remedy in this case, and makes the key point that the context of this kind of "systematically opportunistic" litigation, should factor heavily into the Court's decision to opt for dismissal rather than a lesser sanction.  Motion For An OSC at pp. 37– 51.

Malibu does not devote much effort to arguing the various *Shaffer* factors.  Opp. at 32–34.

On the first and second factors, culpability of the wrongdoer and client, Malibu concludes that "no wrong has occurred" because "no witness has been paid on a contingency basis as alleged by Movant" and the oral contingency agreement has "since been replaced".  According to Malibu, it and its counsel are utterly blameless.  However, as noted by Movant, Judge Snider who collected cases on both sides of the issue, and opted for *per se* exclusion, concluded hat the fact "[t]hat plaintiff and [the expert] Dr. Keyes recently cancelled their contingency fee arrangement does not change the analysis." *Straughter v. Raymond*, 2011 U.S. Dist. LEXIS 53195, at *12 (C.D. Cal. May 9, 2011).

On the third and fourth factor, prejudice to the judicial process and the victim, Malibu concludes that there has been no prejudice because Movant "'has not yet attempted to seek appropriate discovery' in this case."  Aside from it being unclear how this point goes to prejudice, given a reality where Malibu dismissed the 3024 Action, rather than provide any discovery on these issues, as well as Malibu's

history of stonewalling all meaningful discovery across the country, this argument is not just illogical, it is also misguided.

On the fifth factor, availability of other sanctions, Malibu points out that dismissal is an extreme sanction. True. However Malibu really offers no compelling reasons why dismissing dozens of lawsuits filed by a champertous lawsuit mining outfit that will undoubtedly try and file hundreds more cases again sometime soon should be viewed in a much different light that punishing a real client for counsel's mistake. This Court should absolutely be afforded broader discretion by the Fourth Circuit to remedy the harms caused by the current situation given the significant aggregate impact that these cases have on this Court's docket. *See Malibu Media, LLC v. John Does 1-28,* M.D. Fl. No. 8:12-cv-1667, ECF No. 22, 12/6/12 (citing cases and noting the significant impact that Malibu cases have on the court's docket and that District courts have "unquestionable" authority to control their own dockets.)

On the sixth factor, public interest, Malibu argues that dismissing its cases would abrogate the Copyright Act. Obviously, that is not true. Malibu can continue filing copyright infringement lawsuits, "[h]owever they can do so without entering into contingency fee agreements," as Judge Motz put it. <u>*Accrued Financial I*</u>, *supra*, at *3 fn.3.

**(j)      Conclusion**

For all of the reasons detailed both in this reply, as well as in the initial Motion For An OSC, Movant respectfully request that Malibu Media be ordered to show cause as to why all evidence from IPP, Tobias Fieser, and their related persons and entities, should not be excluded and these cases dismissed.

Respectfully submitted,

DATED:      May 31, 2014


**THE PIETZ LAW FIRM**

*/s/ Morgan E. Pietz*


Morgan E. Pietz (Cal. Bar No. 260629)*
3770 Highland Avenue, Suite 206
Manhattan Beach, CA 90266
mpietz@pietzlawfirm.com
Telephone:    (310) 424-5557
Facsimile:    (310) 546-5301
*Pro Hac Vice*

**JOHN C. LOWE PC**


John C. Lowe (Md. Bar No. 12409)
5920 Searl Terrace
Bethesda, MD 20816
johnlowe@johnlowepc.com
Telephone:    (202) 251-0437
Facsimile:    (888) 595-6007
*Local Counsel*

Attorneys For Putative John Does Identified On The Caption

## CERTIFICATE OF SERVICE

I hereby certify that on this date, I electronically filed the foregoing paper with the Clerk of the Court using ECF, which will send notification of such filing to all attorneys of record.

*/s/ Morgan E. Pietz*
Morgan E. Pietz

DATED:      May 31, 2014